## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KATHERINE MUSLOW AND** | § | |
| **MEREDITH CUNNINGHAM** | § | **Civil Action No. _____** |
| | § | |
| **Plaintiffs,** | § | **Jury Trial Demanded** |
| **v.** | § | |
| | § | |
| **BOARD OF SUPERVISORS OF LOUISIANA** | § | |
| **STATE UNIVERSITY AND AGRICULTURAL** | § | |
| **AND MECHANICAL COLLEGE, THOMAS** | § | |
| **SKINNER, LARRY HOLLIER, AND JON** | § | |
| **HARMAN** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Katherine Muslow and Meredith Cunningham ("Plaintiffs") bring this action against Defendants, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, Jon Harman, Larry Hollier, and Thomas Skinner (sometimes collectively referred to as "Defendants"). Plaintiffs assert claims for gender discrimination, unequal pay, wrongful termination, and retaliation, all of which violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 201, *et seq.* ("EPA"); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"); the Louisiana Employment Discrimination Law, La. R.S. § 23:332, *et seq.* ("LEDL"); and 42 U.S.C. § 1983. Muslow also asserts a claim for gender discrimination under the Louisiana Equal Pay for Women Act, La. R.S. § 23:661, *et seq.*

## NATURE OF THE ACTION

1. Plaintiffs bring this action to remedy (and, hopefully, to end) Defendants' longstanding gender-based discrimination, including systemic and inequitable compensation paid women in their employ. Plaintiffs also seek redress for Defendants' purposeful and blatant

retaliation against Plaintiffs for expressing legitimate concerns about Defendants' discriminatory and illegal conduct.

2.      Defendants claim to have committed themselves to "providing equity in [their] present employment practices … [and] to the removal of past barriers that hinder equal employment opportunities."[1]  But Defendants' ostensible pledge to equality is just lip service and has not ensured the fair and equitable treatment of women they employ. To the contrary, Defendants have engaged in conduct directly at odds with their self-professed commitment to eliminating gender-based employment discrimination.

## THE PARTIES

3.      Plaintiff, Katherine Muslow ("Muslow"), is a person of the full age of majority domiciled in New Orleans, Louisiana.

4.      Plaintiff, Meredith Cunningham ("Cunningham"), is a person of the full age of majority domiciled in New Orleans, Louisiana.

5.      Defendant the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU") is a constitutionally-created body charged with overseeing and managing the "LSU" institutions across the state, with the legal capacity to sue and to be sued. Among the campuses LSU manages are its campus in Baton Rouge ("LSU (Baton Rouge)") as well as the LSU Health Sciences Center in New Orleans ("LSU (New Orleans)"), where LSU's schools of medicine, dentistry, nursing, public health, graduate studies, and allied health professions are located.  Internally, LSU (New Orleans) is often referred to as LSUHSC-NO, LSUHSC, or the HSC, as shown in the exhibits attached to this Complaint.

---

[1]      Available at: https://www.lsuhsc.edu/administration/hrm/relations-eeo.aspx  (last visited July 19, 2019).

6.      LSU is an employer with over 500 employees engaged in commerce within the meaning of Title VII, the Equal Pay Act, and Louisiana law.  LSU's campuses are "educational institutions" as Title IX defines and uses that term.  Along with Louisiana's Constitution and Revised Statutes, LSU's By-Laws govern its relationship with and oversight of the various LSU campuses and their students, faculty, and staff.  Pursuant to its By-Laws, LSU delegates its authority to certain administrators on the various campuses including to Defendants Skinner, Hollier, and Harman, which authority was exercised to engage in the improper and illegal conduct described below.

7.      Defendant Thomas Skinner is a person of the full age of majority who is, upon information and belief, domiciled in East Baton Rouge Parish, Louisiana.  Defendant Skinner is Vice President of Legal Affairs and General Counsel at LSU (Baton Rouge).  His job responsibilities include providing proactive professional advice on critical strategic, legal, and public policy issues.  He is part of the senior management team and interacts closely with LSU's senior officers and other officials, including with Defendants Hollier and Harman.  Skinner is also charged with providing advice and support to LSU, its President, the administrative staff and the faculty on business, legal, and public policy issues.  Skinner bears ultimate responsibility for the identification and management of legal risks across LSU.

8.      Defendant Larry Hollier is a person of the full age of majority domiciled in Orleans Parish, Louisiana.  He is Chancellor of LSU (New Orleans).  At all times relevant hereto, Hollier's job duties and responsibilities included directly supervising Muslow and setting salaries for employees within the Office of the Chancellor at LSU (New Orleans), where Plaintiffs were employed.

9.      Defendant Jon Harman is a person of the full age of majority domiciled in St. Tammany Parish, Louisiana.  Defendant Harman is Vice Chancellor, Administration and Finance at LSU (New Orleans).  As Vice Chancellor, Administration and Finance, Harman was and is responsible for Human Resource Management in New Orleans and was directly involved in the discriminatory decisions described herein.

### JURISDICTION AND VENUE

10.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

11.      Venue is proper because, among other things, one or more of the alleged unlawful employment practices occurred in this District.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.      Plaintiffs filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and have received Right to Sue Notices.  All conditions precedent to the institution of this lawsuit have been fulfilled.

### FACTUAL ALLEGATIONS

13.      Plaintiffs are attorneys licensed in the State of Louisiana.  Muslow was admitted to the Louisiana Bar in 1987.  Cunningham was admitted to the Louisiana Bar in 1999.

14.      Until recently, Muslow was "General Counsel" to LSU (New Orleans) and was one of fourteen people at LSU (New Orleans) who reported directly to Hollier.  Before Muslow's employment at LSU (New Orleans), she served as its counsel in private practice.

15.      Until recently, Cunningham was employed as Staff Attorney at LSU (New Orleans) and reported to Muslow.

16.     Among other things, Plaintiffs represented LSU in court and administrative proceedings and provided sound legal advice and counsel to faculty and administrators at LSU (New Orleans).

17.     Plaintiffs are and were qualified for their positions at LSU (New Orleans) and performed their duties competently, diligently, and satisfactorily. Neither Muslow nor Cunningham received a negative performance review throughout their entire employment.

A.     **Longstanding Practice of Discriminating Against Women at LSU (New Orleans)**

18.     LSU (New Orleans), in particular its Office of the Chancellor, has engaged in a years-long pattern and practice of discriminating against women employees, which includes compensating women at rates lower than men working in positions that require the same or substantially similar equal skill, effort, and responsibility.

19.     Without lawful justification, and solely on the basis of Plaintiffs' gender, LSU (New Orleans) paid Plaintiffs less than their male counterparts working in positions that required equal skill, effort, and responsibility, and, as described herein, has discriminated against them in other ways.

20.     In 2017, LSU (New Orleans) conducted a market study, among other things, to assess the equity of its salary structure (the "Study").  The stated rationale for undertaking the Study was: "Human Resource Management (HRM) will maintain a comprehensive compensation program directed toward attracting, retaining, and rewarding a qualified and diverse workforce. Within the boundaries of financial responsibility, employee compensation will be externally competitive and internally equitable[.]"  (Exhibit A, 2017 Unclassified Employee Market Study Methodology for LSU (New Orleans)).

21.     According to the Study, "A critical component of the foundation of a salary administration program is a job worth hierarchy that identifies and assigns a relative position within the [LSU (New Orleans)] paygrade structure."  (*Id.*)

22.     To that end, LSU (New Orleans) established thirty "paygrades," with each grade representing "a step within a pay grid and defines the amount of pay an employee will receive." The paygrades ranged from lowest (N20) to highest (N50).  (*Id.*)

23.     "Each step within the paygrade system [was] assigned a salary range," which consisted of three parts:  (1) the "minimum" of the range represented salaries for entry-level positions (for those with less than five years' experience); (2) the "midpoint" of the range represented the "middle of the market" (for those with 10-15 years' experience); and, (3) the "maximum" of the range represented salaries to "recognize high performing, highly experienced, highly specialized, or hard to recruit or retain talent" (for those with over 15 years' experience). (*Id.*)

24.     According to the Study, it was the goal of LSU (New Orleans) "to meet the market with respect to the salary range mid-point."  (*Id.*)

25.     LSU (New Orleans) also identified guiding principles of its purported unclassified salary-administration program, which included the principle that "[e]mployee pay and salary increases are based on market worth, work performance and economic conditions (budget)."  (*Id.*)

26.     Neither Plaintiff was given the opportunity to review the Study in full at the time it was conducted; nor was either Plaintiff given the opportunity to comment on the "job family" or pay-grade level assigned her position.

27.     Indeed, LSU (New Orleans) deemed Cunningham ineligible for any salary assessment under the Study due to her part-time status, although salaries were assessed under the Study for other part-time employees in the Chancellor's Office.

28.     Upon information and belief, this decision to exclude some (though not all) part-time employees from assessment under the Study disparately and adversely impacted women working at LSU (New Orleans).

29.     Unlike Cunningham, Muslow was a full-time employee of LSU (New Orleans) and her salary was assessed pursuant to the Study.   Muslow was provided information about the paygrade assigned her position (N43) and the salary ranges assigned to that grade: (1) the lowest, entry-level salary for the N43 range was $227,520; (2) the midpoint was $315,116; and, (3) the maximum was $402,711.

30.     In 2017, Muslow's salary was $182,475.   As such, her salary lagged below the midpoint range for her N43 paygrade by more than $132,000.

31.     Even further, Muslow's salary was $45,045 below the "minimum" for the N43 paygrade, notwithstanding her decades-long years of service to LSU (New Orleans).

32.     Sometime after this information was provided in 2017, Muslow learned that Hollier, with Harman's concurrence, intended to increase her salary as a result of the Study's findings.   But, Hollier did not intend to raise her salary enough to ensure she was paid at or even near the mid-point for the N43 paygrade as the Study had indicated was its intention.   Rather, Hollier and other male administrators, including Harman, intended to raise Muslow's salary to a level that fell below the minimum for the N43 paygrade.   Their intent was to free up additional funds so they could give raises to other male employees who the Study showed were not at all

underpaid or who were not underpaid to the degree the Study revealed Muslow was and, likely, had been for years.

33.     To make matters worse, Muslow learned that Hollier and Harman had the same plans with respect to the only other female direct-report to the Chancellor, whose salary Muslow later learned also lagged far below the minimum level for her paygrade

34.     After learning this information, Muslow confronted Hollier in a face-to-face meeting.  During that meeting, Muslow explicitly advised Hollier that gender pay disparities existed at LSU (New Orleans), specifically in the Chancellor's Office; that Hollier was not ameliorating those disparities despite his knowledge of them; and, that those persistent disparities posed a risk to the institution.

35.     Hollier ultimately, and begrudgingly, agreed to increase Muslow's salary to the minimum amount for her N43 paygrade, but no more—even though Muslow had served as institutional counsel for two decades and, by that time, had been employed directly by LSU (New Orleans) for sixteen years.

36.     Upon information and belief, others at LSU (New Orleans) conveyed similar admonitions to Hollier and/or his delegates, including Harman.  All of these admonitions, however, were ignored.

37.     Hollier's and Harman's gender-based compensation decisions, made despite the Study, knowingly exacerbated already-existing gender wage disparities at LSU (New Orleans).

**B.**     **The Full Study Is Produced and Shows Dramatic, Gendered Wage Disparities**

38.     Plaintiffs did not have the opportunity to view the Study in its entirety at the time Hollier and Harman used it to analyze salaries at LSU (New Orleans) in 2017.  Rather, in October

2018, Plaintiffs received and responded to a public-records request for the Study and, at that time, had the opportunity to review it in full.

39.     The Study revealed that Muslow and Cunningham, among other women in the Chancellor's Office, were paid dramatically less than their male counterparts within their same paygrades.  These disparities were apparent on the face of the Study.  At least eight men with paygrades below Muslow's earned the same or substantially more than she.

40.     The annualized salary of one male direct-report in the Chancellor's Office, whose position was graded two levels *below* Muslow's, exceeded Muslow's salary by $61,275.  At the time, this particular direct-report had only recently been hired and worked part time.

41.     The Study also showed another male direct-report, whose position was graded just one level above Muslow's, was being paid over $86,000 more a year than she.   Not only that, but Hollier directly or indirectly manipulated this employee's paygrade upwards to obscure the gender pay disparities his salary would have otherwise revealed had his paygrade been accurate.  For the same reason, Hollier also directly or indirectly gave him two full-time job titles.  Despite holding two full-time jobs at LSU (New Orleans), and upon information and belief, the employee did not work 80 hours a week or otherwise fulfill the responsibilities required of two full-time positions in senior administration.

42.     The Study also showed that Cunningham and four other employees were placed at a paygrade of N37.  Three of those five employees were women; two were men.

43.     According to the Study, the three women within the N37 paygrade were paid well below the $162,242 midpoint salary for that paygrade.  The three women's salaries were $115,839, $120,000, and $127,500, the latter of which was Cunningham's salary on an annualized basis.

44.     The salaries of the two men within the N37 paygrade were markedly higher than the women's salaries.  Not only were the men's salaries higher than the women's, but both men's salaries exceeded the $162,242 midpoint for the N37 paygrade—$167,757.96 and $180,743.04.

45.     Making matters worse, the Study itself understated by material amounts—by tens of thousands, if not hundreds of thousands, of dollars—the compensation paid in 2017 to men in the Chancellor's Office.  Among other things, the Study excluded men's "supplemental" pay, payments for car allowances of between $1,000-$1,250/month, and other compensation from research accounts and affiliated organizations such as the LSU Healthcare Network and the LSU Health Sciences Center-New Orleans Foundation.

46.     Upon information and belief, LSU (New Orleans), Hollier, and Harman knew the Study grossly understated the salaries paid to certain men within the Chancellor's Office.

47.     After accounting for the compensation items excluded by the Study, the Study shows that men in the Chancellor's Office in 2017 were paid, on average, over $90,000 more than women employed in the Chancellor's Office.

48.     Even when considering only those employees in the Chancellor's Office with more responsibilities (at paygrades of N37 and above), there remains a glaring differential in men's and women's compensation in the Chancellor's Office.  In this regard, men at the N37 level and above on average made over $100,000 more a year than similarly-situated women after accounting for the compensation items excluded from the Study.

49.     Likewise, the median salary for men working in the Chancellor's Office at the N37 level and above exceeded that for women by almost $70,000.

50.     LSU, Hollier, and Harman took no action to correct these gender-based disparities, despite being placed on notice of them by, among other things: (a) the Study itself; (b) Muslow's

and others' admonitions; (c) multiple EEOC charges filed by other women employees; and, (d) internal complaints to the HRM department at LSU (New Orleans), for which Harman bears direct responsibility.

51.     The Study established several criteria to be considered when setting salaries, namely "market worth, work performance and economic conditions (budget)."  Upon information and belief, Defendants did not use or consider any of the criteria to set Plaintiffs' salaries.  Rather, upon information and belief, salaries within the Chancellor's Office were and continue to be set at Hollier's discretion, with equally subjective and discriminatory input from Harman.

52.     Because discretion was and is the sole guidepost for setting salaries in the Chancellor's Office, other objectionable and illegal employment practices have resulted, such as nepotism and "good ole boys" clubs, to the detriment of women employees including Plaintiffs. Hollier and Harman condone, endorse, and embrace these objectionable and illegal employment practices within the Office of the Chancellor at LSU (New Orleans).

53.     Rather than rectify these illegal pay structures, LSU (New Orleans), Hollier, and Harman aggravated them by awarding additional pay raises of between 2-10% to Plaintiffs' male counterparts in October 2018.

54.     Under the 2018 raises, the salary for the male direct-report whose position was two paygrades below Muslow's, *see* paragraph 40, was increased to almost $260,000, so that his salary exceeded hers by $32,480.

55.     At the same time, the salary for the male direct-report one paygrade above Muslow, *see* paragraph 41, was increased to $410,476, leaving an almost $200,000 differential in his and Muslow's pay.

56.     Other male direct-reports received increases as well, including the Medical School Dean (to $762,814), the Vice Chancellor, Clinical Affairs (to $688,814.52), and Harman himself (to $328,900).   Notably, these salary amounts do *not* include additional compensation, car allowances identified above, and other payments kept out of the public's eye.

57.     Plaintiffs did not receive a pay increase in 2018.  Upon information and belief, LSU, Hollier, and Harman did not consider Plaintiffs for pay increases (or even whether their salaries should be evaluated) when the 2018 raises were implemented.

## C.     Plaintiffs' Office Is Consolidated with the Office of General Counsel at LSU (Baton Rouge)

58.     Two months after the 2018 salary increases (that Plaintiffs did *not* receive), Plaintiffs were notified that all existing legal positions at each of the various LSU campuses, including theirs at LSU (New Orleans), would be consolidated under a single Office of General Counsel ("OGC") centralized at LSU (Baton Rouge).

59.     Before that notification, Plaintiffs had rarely worked, or even communicated, with the attorneys employed by LSU (Baton Rouge).

60.     Years before, a position of "General Counsel" had been created at LSU (Baton Rouge) and Defendant Thomas Skinner was hired to fill it in 2015.  Notably, Skinner's hire prompted local media to speculate how an Illinois lawyer without a Louisiana license could competently serve as general counsel to LSU.

61.     Despite being hired in 2015, Skinner did not introduce himself to or meet with Plaintiffs; nor did he engage Plaintiffs about legal issues pending at LSU (New Orleans), save a cursory exchange on a matter ultimately referred to the Legislative Auditor.

62.     Another position created at LSU (Baton Rouge) was "Managing Attorney." Responsibilities for this position ostensibly included oversight of legal operations at the other LSU

campuses, including LSU (New Orleans).  In October 2017, a male lawyer, Carlton "Trey" Jones, was hired to fill this position.  His salary was $225,000.

63.     Neither Jones nor Skinner had legal experience within an academic health-sciences setting at the time they were hired by LSU (Baton Rouge).

64.     When notifying Plaintiffs of the consolidation in December 2018, Skinner wrote to Muslow and expressly advised that, although all legal resources were being consolidated under the OGC at LSU (Baton Rouge), "the change really should not affect your day to day work.  We will transition you to OGC administratively sometime after January 1, with a new title of Chief Counsel of HSC-NO, at the same compensation level."

65.     Around the same time this correspondence was sent, a new position was created out of whole cloth for Jones entitled "Deputy General Counsel."  The new position paid an additional $30,000 in salary, purportedly as compensation for "supervising" Muslow and Cunningham, as well as attorneys at the other LSU campuses.

66.     Neither Muslow nor Cunningham was given the opportunity to apply for the newly-created position of "Deputy General Counsel" even though they were qualified for the position; nor were other members of the LSU community or the general public given the opportunity to do so.

67.     Skinner and Jones scheduled a meeting with Plaintiffs in January 2019 during which they again represented that Plaintiffs' positions would remain unchanged and that LSU (New Orleans) would continue to bear responsibility for their salaries.  In effect, Plaintiffs would be employed by LSU (Baton Rouge) and "leased" to LSU (New Orleans).

13

68.     One notable change identified at the time was a different organizational structure whereby Muslow's position was rendered subordinate to Jones's at LSU (Baton Rouge), even though Muslow's legal experience exceeded that of Jones by almost twenty years.

69.     The new organizational structure also subordinated Cunningham's position to all OGC lawyers and staff employed by LSU (Baton Rouge).

70.     During the meeting, and despite what was represented to have been "years" of work to consolidate the legal functions among the LSU campuses, it became apparent that neither Jones nor Skinner had specific plans to consolidate OGC's operations with LSU (New Orleans).  By way of example, no workflow or other processes were established; no libraries, software, or work product were shared; no periodic meetings or other methods of keeping LSU attorneys abreast of developments on the various campuses were scheduled (or, even, contemplated to be scheduled); Plaintiffs weren't provided letterhead with their new designations; Plaintiffs never met in person the other hires in the office and only occasionally received haphazard and, at times, confusing emails from them about certain cases or subpoenas.

71.     Despite the "consolidation," LSU (New Orleans) remained Muslow and Cunningham's "establishment" at all relevant times as that term is used in federal anti-discrimination laws.

72.     In January 2019, Muslow and Cunningham received emails from the OGC's Business Manager welcoming them to the OGC team and providing steps to set them up in "Work Day," the HR system at LSU (Baton Rouge).  These steps consisted of completing online applications, providing updated resumes, and submitting law-school and undergraduate transcripts.

73.     While Plaintiffs privately questioned the need for some of this information given their qualifications and already-existing employment relationship with Defendants, they complied with OGC's requests and provided all information requested of them.

74.     Before Muslow and Cunningham completed this process, they received Employment Contracts for their respective positions, which had been executed by Skinner. Plaintiffs' salaries in the Employment Contracts were the same, discriminatory salaries they'd been paid to date.

**D.   Plaintiffs' Positions Are "Eliminated" after Asking for Salary Reviews and Raises Given the Gender-Based Compensation Disparities Revealed by the Study.**

75.     On February 15, 2019, Plaintiffs wrote Skinner.  There, they asked that, before signing the Employment Contracts, their salaries be reviewed and raises given to bring their compensation in line with those of their male counterparts at LSU (New Orleans).  The correspondence specifically stated that Muslow and Cunningham had been discriminated against at LSU (New Orleans) on the basis of their gender through disparate pay practices. (Exhibit B, February 15, 2019 Email Correspondence.)

76.     Just three days later, Skinner abruptly rescinded Plaintiffs' Employment Contracts "pending further review" on the pretext that Plaintiffs had not signed them, notwithstanding that neither Plaintiff had been given a deadline within which to execute the contracts.

77.     In truth, Skinner's abrupt decision to rescind the Employment Contracts was in retaliation for Plaintiffs' February 15, 2019 complaint of gender discrimination and requests for equal pay.

78.     Plaintiffs heard nothing back from Skinner or anyone from OGC, but they did attend a meeting with Hollier.  During the meeting, Hollier stated that Plaintiffs' jobs were "moving to Baton Rouge" because Plaintiffs "had not responded" to OGC's offers of employment.

79.     Plaintiffs explained they had, in fact, responded to the "offers" and had done everything asked of them for purposes of the Work Day software at LSU (Baton Rouge).  Hollier left the meeting flustered, stating he'd call Skinner for guidance.

80.     Plaintiffs heard nothing after that, so Plaintiffs emailed Hollier and Skinner asking for clarification about their positions.

81.     On March 1, 2019, Hollier and Skinner notified Plaintiffs in separate writings that their positions with LSU (New Orleans) would be "retired" effective June 30, 2019 and equivalent positions advertised to the public.  (Exhibit C, March 1, 2019 Email Correspondence).

82.     Skinner included not only Hollier on his March 1 email (Exhibit C), but four other males in LSU's administration:  Trey Jones (newly-entitled "Deputy General Counsel"), Jason Droddy (who, among other things, was the President's "Chief of Staff" at LSU (Baton Rouge) until very recently), Daniel Layzell (Vice President for Finance and Administration/CFO at LSU (Baton Rouge)), and Defendant Harman.

83.     In this same series of correspondence, Skinner represented to Plaintiffs that the HR department at LSU (Baton Rouge) had conducted its own market study to establish salaries for Plaintiffs' positions and that the salaries Plaintiffs had requested be brought in line with the Study were "far in excess of the amounts authorized for the positions by LSU HRM."  (Exhibit C, March 1, 2019 Email Correspondence.)

84.     Plaintiffs responded and asked that the LSU (Baton Rouge) market study be provided. They also asked whether Plaintiffs would be considered as candidates for their

equivalent positions, which Skinner indicated would be advertised to the public.  No market study was ever provided to Plaintiffs.  Rather, and for the second time, Skinner and Hollier's communications with Plaintiffs abruptly ceased.

85.     Plaintiffs asked more than once to see the market study to which Skinner referred, but none was ever produced.  Upon information and belief, Skinner's statements about the supposed market study were intentional misrepresentations made in response to Plaintiffs' protected acts of complaining about gender pay disparities at LSU (New Orleans).

86.     As a result of Defendants' discrimination and blatant retaliation, Plaintiffs filed Charges of Discrimination with the EEOC on March 26, 2019.  On March 28, Plaintiffs gave notice of the EEOC charges to the same men who'd been copied on the prior correspondence rescinding the Employment Contracts.

87.     The very next day after Plaintiffs gave notice of the EEOC charges, on March 29, Hollier sent certified letters to Plaintiffs' homes.  Notably, the letters were *backdated* to March 25 and stated that Plaintiffs' positions would be eliminated, and their employment terminated, effective close of business June 30, 2019.  (Exhibit D, Correspondence dated March 25, 2019 and Envelopes postmarked March 29, 2019).

88.     In contrast to what had been represented to Plaintiffs in December 2018 and January 2019, the letters stated Plaintiffs' positions, now located with the OGC but on "permanent assignment" to LSU (New Orleans), would be advertised and filled by LSU (Baton Rouge).  The letter "invited" Plaintiffs to apply for what were their respective jobs.  Since that representation, upon information and belief, senior administrators and HRM at LSU (New Orleans) have been interviewing and will be selecting Plaintiffs' replacements.

89.     Plaintiffs were—and remain—the most qualified and experienced individuals for their now-former positions, whether at LSU (New Orleans) or at LSU (Baton Rouge) as employees "on permanent assignment" to LSU (New Orleans).  But, Plaintiffs' work should have been paid equitably as required by equal protection and federal and state anti-discrimination laws—and pursuant to the Study LSU (New Orleans) itself created.  Plaintiffs, at all times, have provided good-faith, competent, and satisfactory advice and legal counsel to administration at LSU (New Orleans).  However, on numerous occasions, Plaintiffs' advice was not well received by administration (including by Hollier and Harman) and, to the detriment of LSU (New Orleans), that advice was not followed.

90.     Upon information and belief, Defendants have now begun efforts to avoid liability for the wrongdoing described in this Complaint.  Notably, they "dumbed down" the requirements and responsibilities for the positions that were formerly held by Plaintiffs to justify for litigation purposes the low (and discriminatory) salaries previously paid to Plaintiffs.

91.     Not only that, but just days before June 30 arrived, Defendants "extended" Muslow's employment to July 15 for pretextual reasons.  The real reason for the move was that the original termination date of June 30 was just eight days before Muslow would become eligible to retire under the terms of the Teacher's Retirement System of Louisiana  ("TRSL") plan in which she had been enrolled during her employment at LSU (New Orleans).  Defendants, of course, knew all along they were terminating Muslow just eight days before her TRSL eligibility date and, hence, denying her of significant, lifelong benefits upon which she had long relied as an employee at LSU (New Orleans).

92.     It was not until Defendants became aware that Muslow had retained legal counsel to prosecute her discrimination and retaliation claims—and presumably acting upon the advice of

their outside counsel—that they extended Muslow's employment.  Again, this was a transparent attempt to conceal for litigation purposes Defendants' discriminatory and retaliatory conduct.

93.     At all times, Defendants acted with malice or with reckless indifference to Plaintiffs' legal rights.

## FIRST CAUSE OF ACTION
### (Gender Discrimination –Title VII Claims against LSU)

94.     Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

95.     As shown by the allegations above, LSU has intentionally discriminated against Plaintiffs on the basis of their gender in violation of Title VII by, among other things, (a) compensating them at rates lower than similarly situated male co-workers; and, (b) terminating their employment.

96.     As a direct and proximate cause thereof, Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of LSU complained of herein violate Title VII, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, costs, and all other and further relief as to this Court appears necessary and proper.

## SECOND CAUSE OF ACTION
### (Gender Discrimination – LEDL Claims against LSU)

97.     Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

98.     As shown by the allegations above, LSU has intentionally discriminated against Plaintiffs on the basis of their gender in violation of the LEDL by, among other things, (a) compensating them at rates lower than similarly situated male co-workers; and, (b) terminating their employment.

99.     As a direct and proximate cause thereof, Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of LSU complained of herein violate the LEDL, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

### THIRD CAUSE OF ACTION
### (Retaliation –Title VII Claims against LSU)

100.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

101.    Plaintiffs have been retaliated against in response to their participation in proceedings under Title VII as well as to their opposition of Defendants' practices, which violate Title VII or which Plaintiffs reasonably believed violated Title VII.

102.    LSU engaged in conduct materially adverse to Plaintiffs and took action adverse action against them as heretofore alleged.

103.    As a direct and proximate cause thereof, Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of LSU complained of herein violate Title VII, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful

discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, costs, and all other and further relief as to this Court appears necessary and proper.

### FOURTH CAUSE OF ACTION
**(Retaliation – LEDL Claims against LSU)**

104.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein

105.    Plaintiffs have been retaliated against in response to their participation in proceedings under the LEDL as well as to their opposition of Defendants' practices, which violate the LEDL or which Plaintiffs reasonably believed violated the LEDL.

106.    LSU engaged in conduct materially adverse to a reasonable employee as heretofore alleged.

107.    As a direct and proximate cause thereof, Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of LSU complained of herein violate the LEDL, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

### FIFTH CAUSE OF ACTION
**(Gender Discrimination –Title IX Claims against LSU)**

108.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

109.     Each academic and non-academic department and unit for which LSU uses federal funds to pay employee salaries and wages is an "education program and activity receiving federal financial assistance" for purposes of Title IX, 20 U.S.C. §§ 1681, *et seq*.

110.     LSU has discriminated against Plaintiffs on the basis of their gender as heretofore alleged.

111.     As a direct and proximate cause thereof, Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of LSU complained of herein violate Title IX, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## SIXTH CAUSE OF ACTION
### (Retaliation –Title IX Claims against LSU)

112.     Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

113.     As heretofore alleged, Plaintiffs complained about the gender-based discriminatory treatment they were receiving and opposed Defendants' gender-based discriminatory policies and practices, which violate Title IX or which Plaintiffs reasonably believed violated Title IX.

114.     Defendants have retaliated against Plaintiffs because of their opposition to Defendants' practices, which violated Title IX or which Plaintiffs reasonably believed violated Title IX.

115.     LSU engaged in conduct materially adverse to a reasonable employee and took adverse actions against Plaintiffs as heretofore alleged.

116.    As a direct and proximate cause thereof, Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of LSU complained of herein violate Title IX, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## SEVENTH CAUSE OF ACTION
### (Gender Discrimination – EPA Claims as to all Defendants)

117.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

118.    Defendants have discriminated against Plaintiffs in violation of the EPA.

119.    Defendants paid Plaintiffs, or directed that Plaintiffs be paid, less than similarly-situated male employees performing equal work on jobs the performance of which require equal skill, effort and responsibility and which are performed under similar working conditions.

120.    The differential in pay between Plaintiffs and similarly-situated male employees was and is not due to any bona fide seniority, merit or incentive system or any other factor other than gender.

121.    Defendants did not act in good faith and created and perpetuated gender-based wage discrimination in violation of the EPA.

122.    The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).

123.    As a result of LSU's gender-based discriminatory policies and practices described above, and as adopted and embraced by Defendants, Plaintiffs have suffered damages, including but not limited to, lost past and future income, compensation and benefits.

124.    By reason of Defendants' discrimination, Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, lost wages, (including interest and benefits), liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, costs, and all other and further relief as to this Court appears necessary and proper.

**EIGHTH CAUSE OF ACTION**
**(Retaliation – EPA Claims as to Defendants LSU, Hollier, and Skinner)**

125.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

126.    Plaintiffs have been retaliated against in response to their participation in proceedings under the EPA as well as to their opposition of Defendants' practices, which violate the EPA.

127.    By reason of Defendants' retaliation, Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA including lost wages (including interest and benefits), liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, costs, and all other and further relief as to this Court appears necessary and proper.

**NINTH CAUSE OF ACTION**
**(Gender Discrimination – § 1983 Claims as to Defendants Harman, Hollier, and Skinner)**

128.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

129.    At all times herein, Defendants Harman, Hollier, and Skinner were acting under color of state law, and their actions and omissions caused Plaintiffs to be deprived of their rights

and privileges in violation of, among other things, Title VII, Title IX, the EPA, and the First and Fourteenth Amendments to the U.S. Constitution.

130.    Defendants Hollier and Harman directed and used the Study in 2017 in setting salaries to Plaintiffs' detriment.  The Study placed Hollier and Harman on notice of gender pay disparities at LSU (New Orleans), including, but not limited to, disparities in Plaintiffs' pay, as did Muslow and others through admonitions and external and internal complaints.  Despite that, Defendants Hollier and Harman took actions that exacerbated, rather than remedied, those disparities.

131.    The actions of Defendants Hollier and Harman were entirely discretionary and were not taken in reliance upon any policy or procedure established by LSU or LSU (New Orleans). Because discretion was and is the sole guidepost for setting salaries in the Chancellor's Office, other objectionable and illegal employment practices have resulted such as nepotism and "good ole boys" clubs to the detriment of women employees, including Plaintiffs.  Hollier and Harman condone, endorse, and embrace these objectionable and illegal employment practices within the Office of the Chancellor at LSU (New Orleans) and beyond.

132.    Upon information and belief, none of the criteria for setting salaries identified in the Study — "market worth, work performance and economic conditions (budget)"— was used to set Plaintiffs' salaries at LSU (New Orleans).  And none justified the disparate salaries paid Plaintiffs.

133.    Rather than rectify these illegal pay structures, Defendants Hollier and Harman aggravated them in October 2018 by awarding additional pay raises of between 2-10% to Plaintiffs' male counterparts.

134.     Defendant Skinner ratified Defendants Hollier and Harman's conduct by making intentional misrepresentations to Plaintiffs in response to their protected acts of complaining about gendered pay disparities at LSU (New Orleans) including, but not limited to, misrepresentations that the HR department at LSU (Baton Rouge) had performed a market study for Plaintiffs' positions.

135.     As a result of Defendants' actions, Plaintiffs have been deprived of their rights and privileges in violation of, among other things, Title VII, Title IX, the EPA, and the First and Fourteenth Amendments to the U.S. Constitution.

136.     Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of the individual Defendants as set forth herein violate the laws of the United States of America, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## TENTH CAUSE OF ACTION
### (Retaliation – § 1983 Claims as to Defendants Hollier and Skinner)

137.     Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

138.     Defendant Skinner illegally retaliated against Plaintiffs when they complained to him about Hollier's and Harman's conduct, made intentional misrepresentations to Plaintiffs in response to their protected acts of complaining about gendered pay disparities at LSU (New Orleans) including, but not limited to, misrepresentations that the HR department at LSU (Baton Rouge) had performed a market study for Plaintiffs' positions.  Skinner, further, retaliated against

Plaintiffs by "dumbing down" their positions at LSU (Baton Rouge) in a pretextual effort to justify the unlawful disparities in pay that Plaintiffs endured at LSU and to manufacture an after-the-fact justification for Plaintiffs' termination.

139.    Defendant Hollier likewise illegally retaliated against Plaintiffs by directing that their job positions be "retired."

140.    As a proximate result of Skinner's and Hollier's conduct, Plaintiffs have suffered damages and therefore request that they be awarded all available relief including, but not limited to, a declaratory judgment that the acts and practices of Skinner and Hollier as set forth herein violate the laws of the United States of America, injunctive relief, an award of lost wages, including lost fringe benefits, which resulted from the unlawful discrimination complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

### ELEVENTH CAUSE OF ACTION
**(Gender Discrimination – Plaintiff Muslow's LEPWA Claims as to LSU)**

141.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

142.    The LEPWA provides that the public policy of Louisiana "is that a woman who performs public service for the state is entitled to be paid the same compensation for her service as is paid to a man who performs the same kind, grade and quality of service, and a distinction in compensation may not be made because of sex."  La. R.S. § 23:662.

143.    The LEPWA, however, only protects female workers who are "employed to work forty or more hours a week."  La. R.S. § 23:663.  Accordingly, this claim is brought solely by Plaintiff Muslow.

144. As heretofore alleged, LSU discriminated against Muslow and its conduct violated the LEPWA.

145. LSU paid Muslow less than similarly-situated male employees performing equal work on jobs the performance of which require equal skill, effort, and responsibility and that are performed under similar working conditions.

146. The differential in pay between Muslow and similarly-situated male employees was and is not due to any bona fide seniority, merit or incentive system or any other factor other than gender.

147. LSU did not act in good faith and created and perpetuated gender-based wage discrimination in violation of the LEPWA.

148. As a result of LSU's gender-based discriminatory policies and practices described above, Muslow has suffered damages and therefore requests, among other things, an award of unpaid wages, reasonable attorney's fees, costs, and all other and further relief as to this Court appears necessary and proper.

## **DEMAND FOR JURY**

149. Plaintiffs hereby demand a trial by jury for all issues to which they are entitled under law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, having set forth their Complaint, Plaintiffs request that they be awarded all available relief under Title VII, Title IX, the EPA, 42 U.S.C. § 1983, the LEDL, and the LEPWA, including but not limited to the following:

(a) A declaratory judgment that the acts and practices complained of herein are in violation of the laws of the United States and the state of Louisiana;

(b) A permanent injunction against Defendants from engaging in any further unlawful conduct or practices as set forth herein;

(c) Reinstatement for Plaintiffs to their former positions or front pay in lieu thereof;

(d) Lost wages, including back pay, front pay, and lost fringe benefits, which resulted from the unlawful discrimination and retaliation complained of herein;

(e) Liquidated damages under the EPA;

(f) Compensatory damages in an amount to be proved at trial;

(g) Punitive damages commensurate with Defendants' ability to pay and to deter future conduct;

(h) Attorney's fees, expenses, and costs, all as provided by law;

(i) Pre-judgment and post-judgment interest; and,

(j) Any other legal and equitable relief that this Court deems just and proper.

**(Signature lines on next page)**

Dated:  July 22, 2019             Respectfully submitted:

By: <u>S/ Kyle Schonekas</u>
Kyle Schonekas (T.A.)
La. Bar Roll No. 11817
SCHONEKAS, EVANS, McGOEY &
   McEACHIN, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone:  (504) 680-6050
Facsimile:  (504) 680-6051
kyle@semmlaw.com

By: <u>S/ Peter S. Koeppel</u>
Peter S. Koeppel
La. Bar Roll. No. 01465
KOEPPEL CLARK, L.L.C.
2030 Saint Charles Avenue
New Orleans, Louisiana 70130
Telephone:  (504) 598-1000
Facsimile: (504) 524-1024
psk@koeppelllc.com

By:  <u>S/ Christopher L. Williams</u>
Christopher L. Williams
La. Bar Roll No. 32269
WILLIAMS LITIGATION, L.L.C.
639 Loyola Ave., Suite 1850
New Orleans, LA 70113
Telephone: 504.308.1438
Fax: 504.308.1446
chris@williamslitigation.com

***Attorneys for Plaintiffs***