UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KATHERINE MUSLOW AND                          CIVIL ACTION
MEREDITH CUNNINGHAM

VERSUS                                        NO. 19-11793

BOARD OF SUPERVISORS OF LOUISIANA
STATE UNIVERSITY AND AGRICULTURAL             SECTION M (2)
AND MECHANICAL COLLEGE, THOMAS
SKINNER, LARRY HOLLIER, AND JON
HARMAN

## ORDER & REASONS

Before the Court is a partial motion to dismiss plaintiffs' second supplemental and

amended complaint filed by defendants Board of Supervisors of Louisiana State University and

Agricultural and Mechanical College (the "LSU Board"), Thomas Skinner, Larry Hollier, and Jon

Harman (collectively, "Defendants").[1]  Plaintiffs Katherine Muslow and Meredith Cunningham

(collectively, "Plaintiffs") oppose the motion.[2]  Defendants reply in support of their motion.[3]

Having considered the parties' memoranda, the record, and the applicable law, this Court issues

this Order & Reasons.

## I.    BACKGROUND

### A.  Factual Background

This case arises out of an employment dispute.  Plaintiffs were formerly employed by the

the LSU Board as attorneys.  The LSU Board oversees and manages LSU institutions across

Louisiana, including its campuses in Baton Rouge ("LSU (Baton Rouge)") and the LSU Health

Sciences Center in New Orleans ("LSU (New Orleans)").[4]  Until January 2020, defendant Thomas

---

[1] R. Doc. 56.
[2] R. Doc. 61.
[3] R. Doc. 67.
[4] R. Doc. 50 (second amended complaint) at 2-3.

Skinner was Vice President of Legal Affairs and General Counsel at LSU (Baton Rouge).[5] Defendant Winston DeCuir is Skinner's successor.[6]  Jones is Deputy General Counsel at LSU (Baton Rouge).[7]   Defendant Larry Hollier is Chancellor, and defendant Jon Harman Vice Chancellor, Administration and Finance at LSU (New Orleans).[8]   Until mid-2019, Muslow was "General Counsel" to LSU (New Orleans) and reported directly to Hollier.[9]   Before her employment at LSU (New Orleans), she served as its outside counsel.  Likewise, until summer 2019, Cunningham was employed as a staff attorney at LSU (New Orleans) and reported to Muslow.[10]

According to Plaintiffs, in 2017, LSU (New Orleans) conducted a market study to assess the equity of its salary structure (the "Study").[11]   Due to her part-time status, Cunningham was deemed ineligible for a salary assessment under the Study,[12] although the Study – unbeknownst to her at the time – did rank her position within a paygrade and established a salary range for it, but Muslow, who was a full-time employee, did have her salary assessed.[13]   Plaintiffs allege that the Study showed that Muslow's salary was well below the "minimum" for the paygrade assigned to her position, despite having worked for LSU (New Orleans) for decades.[14]   Sometime after this information was provided, Muslow learned that Hollier, with Harman's concurrence, intended to increase her salary as a result of the Study, but only to a level that still fell below the minimum for

---

[5] *Id.* at 3.
[6] *Id.* at 4.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 5, 31.
[10] *Id.* at 5, 29.
[11] *Id.* at 6-8; *see also* R. Doc. 50-1.
[12] R. Doc. 50 at 8.  Plaintiffs allege that other part-time employees did have their salaries assessed, and that this selective assessment of part-time employees' salaries "disparately and adversely impacted women working at LSU (New Orleans)."  *Id.*
[13] *Id.*
[14] *Id.* at 8-9.

the relevant paygrade.[15]  Plaintiffs allege that Hollier and Harman intended to treat similarly the only other female direct-report to Hollier.[16]  Muslow allegedly then confronted Hollier in a face-to-face meeting during which Muslow "explicitly advised Hollier that gender pay disparities existed at LSU (New Orleans)," that despite knowledge of these disparities, Hollier was not acting to ameliorate them, and that "those persistent disparities posed a risk to the institution."[17]  Hollier subsequently agreed to raise to the minimum level for their respective paygrades the salaries for Muslow and the two other Chancellor's Office women employees (including the other female direct-report to Hollier) for whom Muslow also advocated.[18]

Plaintiffs allege that in October 2018, Muslow – the employee responsible for responding to public-records requests – was assigned such a request for the Study (which Plaintiffs had not yet viewed in whole); and Muslow provided the requester electronic copies of the Study.[19] Plaintiffs allege that the complete version of the Study reveals that they and other women working in the Chancellor's Office were paid "dramatically less than their male counterparts," and that these wage disparities were apparent on the face of the Study, enumerating various examples.[20] According to Plaintiffs, Hollier manipulated the paygrade of one of Muslow's counterparts to obscure even more dramatic disparities.[21]  Furthermore, they say, the disparities apparent from the face of the Study are vastly understated due to exclusion of categories of "extra" compensation paid only to men working in the Chancellor's Office.[22]  Plaintiffs allege that the LSU Board, Hollier, and Harman took no action to correct these disparities, but rather perpetuated them by

---

[15] *Id.* at 9.
[16] *Id.* at 9-10.
[17] *Id.* at 10.
[18] *Id.*
[19] *Id.* at 11-12.
[20] *Id.* at 12-14.
[21] *Id.* at 13.
[22] *Id.* at 14; *see also id.* at 16-19 (alleging that men, but not women, in the Chancellor's Office also benefitted from a nepotistic patronage system).

increasing the salaries of Plaintiffs' male counterparts in October 2018 based on purely subjective and arbitrary factors, while not raising – or even considering raising – Plaintiffs' pay.[23]   Plaintiffs also say that men at LSU (New Orleans) are treated preferentially in that they are given "substantial latitude about performing their job responsibilities in ways that women are not," of which Plaintiffs complained.[24]   They allege that Hollier was particularly dismissive of complaints of gender discrimination, disparate pay, and retaliation brought by women employees.[25]   Plaintiffs allege that they complained about gender pay disparities to human-resources officials, and Muslow spoke with other women employees at LSU (New Orleans) regarding the full Study's revelations, but many women expressed fear that the apparent disparities would not be remedied and that complaints would be met with retaliation.[26]

Plaintiffs say that in December 2018 they were notified that all existing legal positions at LSU, including theirs, would be consolidated under a single Office of General Counsel (the "OGC") at LSU (Baton Rouge), despite that until that point they had rarely worked or communicated with the attorneys at LSU (Baton Rouge), including Skinner, who was hired in 2015 to fill the recently-created position of "General Counsel."[27]   Around this time (December 2018), a new position entitled "Deputy General Counsel" was created for Jones, who had originally been hired in 2017 for the position of "Managing Attorney" at LSU (Baton Rouge).[28]   For this new position, Jones's salary would be raised, "purportedly as compensation for 'supervising' Muslow and Cunningham, as well as attorneys at the other LSU campuses."[29]   Plaintiffs allege that despite their own qualifications for this position, they were not given the opportunity to apply for it, nor

---

[23] *Id.* at 15-16.
[24] *Id.* at 19-20.
[25] *Id.* at 20.
[26] *Id.* at 21.
[27] *Id.* at 21-22.
[28] *Id.* at 22.
[29] *Id.*

were other members of the LSU community or the general public.  In January 2019, Plaintiffs met with Skinner and Jones, who reiterated their prior representations to Plaintiffs that Plaintiffs' positions at LSU (New Orleans) would remain unchanged other than their consolidation under the OGC, whereby Plaintiffs would be employed by LSU (Baton Rouge) and "leased" to LSU (New Orleans).[30]  Under the new organizational structure presented to them, Muslow's position would be rendered subordinate to Jones, "even though [her] legal experience exceeded [his] by almost twenty years," and Cunningham's position would be rendered subordinate to all OGC lawyers and staff employed by LSU (Baton Rouge).[31]  Plaintiffs allege that the "consolidation" was "in name only," noting that it became apparent that neither Jones nor Skinner had specific plans to consolidate OGC's operations with LSU (New Orleans) and that no information or support was given to Plaintiffs "that would have accompanied a genuine consolidation."[32]

In January 2019, Plaintiffs received emails from the OGC's business manager, welcoming them and providing them with steps to set them up within the LSU (Baton Rouge) human-resources system, for which Plaintiffs provided the requested information.[33]  Plaintiffs allege that before they completed this process, they received employment contracts executed by Skinner for their respective positions with the same salaries they had been paid to that date.[34]

On February 15, 2019, Plaintiffs wrote to Skinner asking that, before signing the contracts, "their salaries be reviewed and raises given to bring their compensation in line with those of their male counterparts at LSU (New Orleans)," and stating that they had been discriminated against on the basis of their gender through disparate pay practices at the institution.[35]  They believe that this

---

[30] *Id.* at 22-23.
[31] *Id.* at 23.
[32] *Id.* at 23-24.
[33] *Id.* at 24.
[34] *Id.*
[35] *Id.* at 24-25; *see* R. Doc. 50-2.

was the first time concerns regarding gender pay disparities arising from the Study were presented to a person outside the LSU (New Orleans) chain of command.[36]  Plaintiffs thought that Skinner, who was an attorney and directly responsible for Title IX compliance at all LSU campuses, would take their complaints seriously, but instead, rather than responding or ever acknowledging receipt of the email, Plaintiffs say, Skinner went straight to Hollier and asked him what he wanted to do; and the next business day, Skinner rescinded Plaintiffs' contracts "'pending further review' on the pretext that Plaintiffs had not signed them," even though "neither Plaintiff had been given a deadline within which to execute the contracts."[37]  Plaintiffs allege that following the rescission, their work environment at LSU (New Orleans) changed: work was diverted away from them and employees were discouraged from communicating with them.[38]  Plaintiffs say they met with Hollier, who "feigned confusion about [their] positions" and told them that their "jobs were 'moving to Baton Rouge' because Plaintiffs 'had not responded' to [the] OGC's offers of employment," to which Plaintiffs replied that they had indeed "responded to the 'offers'" and had completed the steps required by LSU (Baton Rouge) human resources to move to the OGC.[39]  After Plaintiffs emailed Hollier and Skinner asking for clarification about their positions, these two defendants notified Plaintiffs on March 1, 2019, in separate emails, that not only had their "so-called Employment Contracts been rescinded" but also that their positions at LSU (New Orleans) would be "retired" effective June 30, 2019, and equivalent positions would be advertised to the public, even though, to Plaintiffs' knowledge, they had already been moved to the OGC following that office's "welcome" notifications.[40]  Harman and Jones were copied on these emails, along with two other LSU administrators who Plaintiffs allege there was no reason to copy "other than

---

[36] R. Doc. 50 at 25.
[37] *Id.* at 25-26.
[38] *Id.* at 27.
[39] *Id.*
[40] *Id.* at 27-28.

to intimidate Plaintiffs."[41]   Skinner allegedly represented that Plaintiffs' requested salaries exceeded those established by research conducted by the human-resources department at LSU (Baton Rouge); although Plaintiffs requested more than once that this research be provided to them, Skinner did not respond to or acknowledge this request.[42]

On March 26, 2019, Plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission (the "EEOC"), and on March 28, 2019, they gave notice of the charges to Skinner, Hollier, Harman, Jones, and the other LSU administrators who had been copied on the March 1, 2019 emails.[43]   On March 29, 2019, Hollier mailed certified letters, dated March 25, 2019, to Plaintiffs' home addresses, stating that Plaintiffs' positions would be eliminated and their employment terminated, effective June 30, 2019.[44]   A few days before June 30, 2019, Defendants allegedly "'extended' Muslow's employment to July 15 for pretextual reasons."[45]   Plaintiffs allege that the "real reason" was that June 30, 2019, was eight days before Muslow would become eligible to retire under the Teacher's Retirement System of Louisiana ("TRSL") plan in which she was enrolled during her LSU (New Orleans) employment, and so Defendants were avoiding denying her these benefits "for litigation purposes."[46]

Plaintiffs allege that in summer 2019, Defendants selected a man to replace Muslow.[47] According to Plaintiffs, after a committee of LSU (New Orleans) administrators selected finalists from a pool of applicants, Hollier "was given final decision-making authority on the selection subject to input by [Jones]."[48]   They allege that the most recent organizational chart for LSU (New

---

[41] *Id.* at 28.
[42] *Id.*
[43] *Id.* at 29.
[44] *Id.*; *see* R. Doc. 50-3.  Plaintiffs allege that these letters were "backdated."  R. Doc. 50 at 29.
[45] R. Doc. 50 at 30.
[46] *Id.* at 30-31.
[47] *Id.* at 31.
[48] *Id.* at 31-32.

Orleans) shows Muslow's replacement as "General Counsel" and as a direct report to Hollier – just as Muslow was before the supposed consolidation – rather than "Chief Legal Officer" for LSU (New Orleans) within the OGC reporting structure at LSU (Baton Rouge).[49]  Plaintiffs add that other than their own positions, no other attorneys at other LSU campuses were "consolidated" into the OGC.[50]

Plaintiffs allege that on September 4, 2019, an email complaining of waste and corruption at LSU (New Orleans) was sent to various faculty members at this campus, including many members of the Faculty Senate.[51]  That September and October, seven complaints, including complaints of gender discrimination, were made to the university's ethics hotline.[52]  In response, Hollier decided to make a presentation to the Faculty Senate; while the presentation was being prepared, "it was surmised that Muslow was responsible" for the September 4, 2019 email (Plaintiffs allege she was not), angering Hollier, who stated that she "wasn't worth the money she was paid."[53]  Plaintiffs allege that Hollier's presentation was made on October 8, 2019, during which he acknowledged various concerns, but did not address the fear of retaliation raised by several of the complaints; instead, he and Harman "took steps to intimidate employees who they suspected might have information helpful to Plaintiffs' case."[54]  At a February 11, 2020 Faculty Senate meeting, Hollier responded to a request that all salaries be publicized online as they had been in the past to ensure female employees are paid equivalently to male employees with the

---

[49] *Id.* at 32.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.* at 33.
[54] *Id.* at 33-34.  Specifically, Plaintiffs allege that in September 2019, Harman met with the Assistant Director (Employee Relations & Talent Management), with whom Plaintiffs had raised their concerns over pay disparities, and questioned her in a way that left her with the impression that the meeting was meant to intimidate her; she was fired a month later, despite having worked at LSU (New Orleans) for many years.  Plaintiffs add that three other long-time employees, one of whom was aware of the matters raised in Plaintiffs' complaint, were terminated around the same time.

same rank/experience, by stating that this would require approval by the systems office.  Plaintiffs allege that Hollier is wrong about this and that he is only promoting the sort of pay secrecy that has inhibited equal pay for decades.[55]  Plaintiffs also allege that Hollier twice, at unspecified times, made dismissive remarks in response to complaints of gender discrimination, disparate pay, and retaliation by other women employees.[56]

## B. Procedural Background

When commencing their suit on July 22, 2019, Plaintiffs named as defendants the LSU Board, Skinner, Hollier, and Harman.[57]  In response to a motion to dismiss filed by Defendants,[58] Plaintiffs amended their complaint.[59]  On April 14, 2020, acting on Defendants' partial motion to dismiss the amended complaint,[60] the Court (1) dismissed with prejudice Plaintiffs' claims for declaratory judgment, permanent injunction, front pay in lieu of reinstatement under § 1983, Title IX discrimination and retaliation, § 1983 First Amendment discrimination, § 1983 equal-protection retaliation, and punitive damages under Title IX; and (2) granted Plaintiffs leave to further amend their complaint in order to cure pleading deficiencies in their claims for

---

[55] *Id.* at 35-36.

[56] *Id.* at 20.

[57] R. Doc. 1.

[58] R. Doc. 13.

[59] R. Doc. 31.  Accordingly, the Court dismissed Defendants' first motion to dismiss as moot.  R. Doc. 32.

In the amended complaint, which is no longer the operative complaint, Plaintiffs claimed: (1) gender discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), against the LSU Board; (2) retaliation, in violation of Title VII, against the LSU Board; (3) gender discrimination, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX"), against the LSU Board; (4) retaliation, in violation of Title IX, against the LSU Board; (5) gender discrimination, in violation of the Equal Pay Act, 29 U.S.C. §§ 201, *et seq.* ("EPA"), against all Defendants; (6) retaliation, in violation of the EPA, against the LSU Board, Hollier, and Skinner; (7) gender discrimination, in violation of the First and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983, against Harman, Hollier, and Skinner; and (8) retaliation, in violation of the First and Fourteenth Amendments, pursuant to § 1983, against Hollier and Skinner.  As relief, Plaintiffs sought (1) a declaratory judgment that the acts and practices complained of are in violation of federal law; (2) a permanent injunction preventing Defendants from engaging in any further unlawful conduct or practices; (3) prospective injunctive relief in the form of, *inter alia*, reinstatement to their former positions; (4) reinstatement to their former positions or front pay in lieu thereof; (5) lost wages, including back pay, front pay, and lost fringe benefits; (6) liquidated damages under the EPA; (7) compensatory damages; (8) punitive damages against Harman, Hollier, and Skinner in their individual capacities; (9) attorney's fees, expenses, and costs; (10) prejudgment and postjudgment interest; and (11) any other legal and equitable relief as the Court deems just and proper.  R. Doc. 31 at 22-30.

[60] R. Doc. 35.

reinstatement against Hollier and Harman under § 1983, § 1983 First Amendment retaliation, § 1983 equal-protection discrimination, and punitive damages under § 1983.[61]  On April 29, 2020, Plaintiffs filed a second supplemental and amended complaint, adding Jones and DeCuir as defendants.[62]

In the second amended complaint, which is now the operative complaint, Plaintiffs claim: (1) gender discrimination, in violation of Title VII, against the LSU Board; (2) retaliation, in violation of Title VII, against the LSU Board; (3) gender discrimination, in violation of the EPA, against the LSU Board, Hollier, Harman, and Skinner; (4) retaliation, in violation of the EPA, against the LSU Board, Hollier, Skinner, and Jones; (5) gender discrimination, in violation of the Fourteenth Amendment to the U.S. Constitution, pursuant to § 1983, against Harman, Hollier, and Skinner; and (6) retaliation, in violation of the First Amendment to the U.S. Constitution, pursuant to § 1983, against Hollier and Skinner.[63]  As relief, Plaintiffs seek (1) a declaratory judgment that the acts and practices complained of are in violation of federal law; (2) a permanent injunction preventing defendants from engaging in any further unlawful conduct or practices; (3) prospective injunctive relief in the form of reinstatement to their former positions; (4) reinstatement to their former positions or front pay in lieu thereof; (5) lost wages, including back pay, front pay, and lost fringe benefits; (6) liquidated damages under the EPA; (7) compensatory damages; (8) punitive damages against Harman, Hollier, Skinner, and Jones in their individual capacities; (9) attorney's fees, expenses, and costs; (10) prejudgment and postjudgment interest; and (11) any other legal and equitable relief as the Court deems just and proper.[64]

---

[61] *See* R. Doc. 45 at 52-53.
[62] *See* R. Doc. 50.
[63] *Id.* at 36-42.
[64] *Id.* at 42-43.

## II.    PENDING MOTION

Defendants first argue that Plaintiffs improperly re-urge their § 1983 claims seeking front pay in lieu of reinstatement, despite the Court's having dismissed with prejudice the availability of this remedy.[65]   Defendants then argue that there are no cognizable § 1983 official-capacity claims against Skinner, Hollier, or Harman because none of these officials has authority to reinstate Plaintiffs, and front pay in lieu of reinstatement is precluded (and has already been dismissed with prejudice).   Thus, since these defendants cannot redress Plaintiffs' alleged injuries, Defendants contend that the *Ex parte Young* exception to the Eleventh Amendment does not apply and Plaintiffs do not have standing to assert these claims against state officials.[66]   Defendants maintain that Skinner, Hollier, and Harman are entitled to qualified immunity from Plaintiffs' § 1983 individual-capacity claims: (1) as to Plaintiffs' equal-protection discrimination claims, Defendants argue that Plaintiffs do not sufficiently plead that male employees who were allegedly treated better than them by Defendants were similarly situated to them in all relevant aspects, nor do Plaintiffs allege discriminatory intent on the part of these three individual defendants; and (2) as to Plaintiffs' First Amendment retaliation claims against Hollier and Skinner, Defendants argue that none of Plaintiffs' alleged speech is protected by the First Amendment, in that Plaintiffs were speaking as employees, not citizens, when they made it, and to the extent they were not, the speech is not on a matter of public concern.[67]   Defendants further argue that because punitive damages in

---

[65] R. Doc. 56-1 at 6.  Defendants also argue that Plaintiffs improperly re-urge their requests for a declaratory judgment and permanent injunction for the same reason.  *Id.* at 5-6; *see also* R. Doc. 67 at 1-2.  Plaintiffs addressed the availability of these remedies in their opposition, *see* R. Doc. 61 at 5-14, and subsequently filed a motion for reconsideration of the April 14, 2020 Order & Reasons on this issue.  R. Doc. 62.  As explained in the Court's concurrently-issued Order & Reasons addressing Plaintiffs' motion for reconsideration: because Plaintiffs seek reinstatement, injunctive and declaratory relief remain available to Plaintiffs as prospective relief accompanying reinstatement; hence, the Court declines to dismiss with prejudice or strike Plaintiffs' claims for this relief insofar as they are prospective only.  To the extent that Plaintiffs did re-urge their claims for a declaratory judgment and permanent injunction as retrospective relief, the Court dismisses with prejudice and strikes such claims, as they were properly dismissed with prejudice in the April 14, 2020 Order & Reasons.  *See* R. Doc. 45 at 25-26.

[66] R. Doc. 56-1 at 6-9.

[67] *Id.* at 10-24.

this matter are limited to the § 1983 individual-capacity claims against Skinner, Hollier, and Harman, and these claims are subject to dismissal, the Court should also foreclose the availability of this remedy.[68]

In opposition, Plaintiffs argue that they sufficiently allege that both Hollier and Skinner have authority to reinstate them at LSU, and thus they have standing to bring § 1983 official-capacity claims against Hollier and Skinner.[69]  Turning to Plaintiffs' § 1983 individual-capacity claims, they assert that (1) as to their equal-protection discrimination claims, the Court already found that they had sufficiently alleged similarly-situated comparators, and because they have alleged a *prima facie* case of discrimination, there is no need for them to have specifically alleged direct evidence of discriminatory intent, but that regardless, their allegations demonstrate such intent on the part of Hollier, Harman, and Skinner; and (2) as to Plaintiffs' First Amendment retaliation claims, they were speaking as citizens, not employees, both when they complained about gender pay disparities and when they reported the misuse of public funds to benefit male employees, and that these instances of speech involve matters of public concern, and as such, they are protected by the First Amendment.[70]  Because in their view they have stated actionable claims for violations of their constitutional rights under § 1983, Plaintiffs posit that they may recover punitive damages from the individual defendants.[71]

In reply, Defendants maintain that Plaintiffs have not alleged that either Hollier or Skinner has authority to reinstate them (noting that Plaintiffs do not challenge Defendants' argument that their pleadings against Harman are deficient in this regard).[72]  As to Plaintiffs' equal-protection discrimination claims, Defendants argue that Plaintiffs improperly rely on Title VII evidentiary

---

[68] *Id.* at 24-25.
[69] R. Doc. 61 at 14-18.
[70] *Id.* at 19-33.
[71] *Id.* at 33.
[72] R. Doc. 67 at 2-5.

standards, especially because § 1983 has additional pleading requirements in comparison to Title VII, and Plaintiffs have not alleged either sufficiently similar male comparators or gender-based discriminatory animus on the part of Hollier, Harman, or Skinner.[73]  They maintain that Plaintiffs' speech is private, not public, and so it cannot give rise to First Amendment violations.[74]

## III.   LAW & ANALYSIS

### A.  Legal Standards

#### 1.  Rule 12(b)(1) standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to challenge a court's subject-matter jurisdiction.   "[A] claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory authority or constitutional power to adjudicate' the claim."  *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018) (quoting *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012)).   The party asserting jurisdiction bears the burden of proving that subject-matter jurisdiction exists.  *Id.*  "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  "A motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief."  *Sureshot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 235 (5th Cir. 2018) (citing *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007)).

---

[73] *Id.* at 5-8.
[74] *Id.* at 8-10.

Article III of the Constitution of the United States specifies that a federal court's "power extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. __, 136 S. Ct. 1540, 1547 (2016). "A justiciable Article III controversy requires the party instituting the action to have standing and the issue presented to the court to be ripe." *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337 (Fed. Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," which developed in the jurisprudence "to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo*, 136 S. Ct. at 1547 (citation omitted). The standing "doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* (citations omitted). A plaintiff must establish standing as to each claim asserted. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. __, 137 S. Ct. 1645, 1650 (2017). Constitutional standing is an element of subject-matter jurisdiction that may be challenged under Rule 12(b)(1). *Moore v. Bryant*, 853 F.3d 245, 248 n.2 (5th Cir. 2017).

The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan*, 504 U.S. at 560). The plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 at 560–61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000)). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Webb v. City of Dall.*, 314 F.3d 787, 791 (5th Cir. 2002).

## 2.   Rule 12(b)(6) standard

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The statement of the claim must "'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A pleading does not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555-57).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).  Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Thus, if the facts pleaded in the complaint "do not permit the court to infer more than a mere possibility of

misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*. The court "can choose to begin by identifying pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "[The] task, then, is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012) (internal quotation marks and citation omitted)). Motions to dismiss are disfavored and rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). A court may also take judicial notice of certain matters, including public records and government websites. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2007); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005). Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public

16

record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

## B. Analysis

### 1. Front pay in lieu of reinstatement

Defendants argue that in the second amended complaint, Plaintiffs improperly re-urge their request for front pay in lieu of reinstatement as relief for their § 1983 official-capacity claims, as the Court previously found that the *Ex parte Young* exception does not apply to § 1983 official-capacity claims seeking front pay in lieu of reinstatement, and dismissed with prejudice Plaintiffs' claims for this remedy.[75]   Defendants ask that the Court strike this reasserted claim.[76]   As Defendants observe,[77] Plaintiffs offer no counterargument on this point.

Among the forms of relief Plaintiffs seek for their § 1983 claims (their fifth and sixth causes of action), Plaintiffs list "reinstatement *or front pay in lieu thereof*."[78]   Because Defendants are correct that the Court already found – and continues to find – that a § 1983 official-capacity claim against a state official seeking front pay does not fall within the *Ex parte Young* exception to the Eleventh Amendment, and therefore previously dismissed claims for this relief with prejudice, the Court now strikes the phrase "or front pay in lieu thereof" from the requested remedies for Plaintiffs' fifth and sixth causes of action.[79]

### 2. Section 1983 official-capacity claims seeking reinstatement

In its April 14, 2020 Order & Reasons,[80] the Court examined Defendants' argument that

---

[75] R. Doc. 56-1 at 6 (citing R. Doc. 45 at 26).
[76] *Id.*
[77] R. Doc. 67 at 2.
[78] R. Doc. 50 at ¶¶ 205, 211 (emphasis added).
[79] *See id.*  The Court does not strike this same language from Plaintiffs' prayer for relief, as front pay remains an available remedy for Plaintiffs' Title VII claims (their first and second causes of action).  *See id.* at 36-37, 42.
[80] *See* R. Doc. 45 at 26-30.

because the relief sought for Plaintiffs' § 1983 official-capacity claims against individual defendants Skinner, Hollier, or Harman is barred by the Eleventh Amendment (*viz.*, prospective injunctive relief in the form of reinstatement, or front pay in lieu thereof), so too are these official-capacity claims.[81]  The Court agreed – and continues to agree – that claims seeking front pay in lieu of reinstatement from a state official under § 1983 are barred by the Eleventh Amendment.[82]  As to reinstatement, according to Defendants, because the *Ex parte Young* exception to the Eleventh Amendment does not apply when an individual defendant does not have the power to redress the injury complained of – here, the power to reinstate Plaintiffs at LSU – and none of the individual defendants has such authority, these claims are jurisdictionally barred.[83]  The Court agreed with Defendants that in the first amended complaint, Plaintiffs did not allege that either Hollier or Harman has authority to reinstate them in positions now under the aegis of LSU (Baton Rouge), thus dismissing the § 1983 claims for reinstatement against these two defendants, but disagreed with Defendants regarding Skinner, thus declining to dismiss the claim for reinstatement against him for lack of subject-matter jurisdiction.[84]  The Court provided Plaintiffs with an opportunity to cure the pleading deficiencies concerning Hollier and Harman's authority to reinstate them,[85] and Plaintiffs have attempted to do so in their second amended complaint.  In response, Defendants reiterate their argument that neither Harman, Hollier, nor Skinner is alleged to have authority to reinstate Plaintiffs, and so because these defendants cannot redress Plaintiffs' alleged injuries, Plaintiffs have asserted no cognizable § 1983 official-capacity claims.[86]

---

[81] *See* R. Doc. 35-1 at 5-9.
[82] *See* R. Doc. 45 at 29-30.
[83] R. Doc. 35-1 at 5-7.
[84] R. Doc. 45 at 28-29.
[85] *Id.* at 52-53.
[86] *See* R. Doc. 56-1 at 6-7.  As previously stated, relief in the form of front pay in lieu of reinstatement has already been foreclosed.

As explained in the Court's April 14, 2020 Order & Reasons,[87] the Eleventh Amendment codified state sovereign immunity, barring suits in federal court against states, including state agencies and instrumentalities. *Liu v. Texas State Univ.*, 2019 WL 3804491, at *4 (W.D. Tex. Aug. 12, 2019) (citations omitted). When the "state is the real, substantial party in interest," the Eleventh Amendment bars suits against state officials in their official capacity. *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)). "The state is a real, substantial party in interest when the judgment sought would expend itself on the state treasury or domain or would restrain the state from acting or compel it to act." *Warnock v. Pecos Cty.*, 88 F.3d 341, 343 (5th Cir. 1996). However, under *Ex parte Young*, the Eleventh Amendment does not protect state officials from claims for prospective, non-monetary relief when it is alleged that the state officials acted in violation of federal law. 209 U.S. 123, 155-56 (1908). Reinstatement is a form of prospective injunctive relief that falls under the *Ex parte Young* exception. *See Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 276 (5th Cir. 2020) (citing *Warnock*, 88 F.3d at 343); *Liu*, 2019 WL 3804491, at *5 (collecting cases).

To seek relief under the *Ex parte Young* exception, a plaintiff must establish standing by showing: (1) injury in fact; (2) causation; and (3) redressability. *Gregory v. Texas Youth Comm'n*, 111 F. App'x 719, 721 (5th Cir. 2004) (citing *Lujan*, 504 U.S. at 560-61). If a state official does not possess the power to reinstate an employee, *i.e.*, to redress the plaintiff's complaint, then the exception is inapplicable. *Thomas v. Univ. of Miss.*, 2018 WL 6613807, at *4 (N.D. Miss. Dec. 17, 2018); *cf. Lewis v. Hanemann*, 2015 WL 5883547, at *3 (W.D. La. Aug. 4, 2015) (individual defendant was not proper state official with authority to secure requested relief).

---

[87] *See* R. Doc. 45 at 27-28.

### a. Harman

Defendants argue that because Plaintiffs state in the second amended complaint that they sue Harman "in his individual capacity" without mention of any additional official-capacity designation – unlike Hollier and Skinner, against whom Plaintiffs specifically plead official-capacity claims "for purposes of injunctive relief only" – and because prospective relief is not available against Harman in his individual capacity, Plaintiffs have not asserted any cognizable § 1983 official-capacity claim against Harman.[88]  Defendants then reiterate their previously-espoused argument that Harman, Vice Chancellor at LSU (New Orleans), is not alleged to have authority to reinstate Plaintiffs to employment positions in the OGC at LSU (Baton Rouge).[89] Plaintiffs offer no counterargument.[90]

It appears that rather than attempting to cure the pleading deficiencies concerning Harman, Plaintiffs dropped their § 1983 official-capacity claim against him.  Accordingly, the Court dismisses any § 1983 official-capacity claim against Harman.

### b. Hollier

Defendants argue that Hollier, Chancellor of LSU (New Orleans), is not alleged to have authority to reinstate Plaintiffs to their positions, now consolidated into the OGC at LSU (Baton Rouge) and "leased" to LSU (New Orleans).[91]  This was the Court's basis for dismissing Plaintiffs' official-capacity claim for reinstatement against Hollier in its April 14, 2020 Order & Reasons.[92] Addressing Plaintiffs' amended allegations, Defendants assert that although Hollier "may allegedly have decision-making input on final candidates to be placed into the 'leased' position[s], the allegations admit that this alleged authority is subject to an initial selection process conducted

---

[88] R. Doc. 56-1 at 6-7 (quoting R. Doc. 50 at ¶¶ 7, 9, 11).
[89] *Id.* at 7-8.
[90] *See* R. Doc. 61 at 14-18.
[91] R. Doc. 56-1 at 7-8.
[92] R. Doc. 45 at 28.

by a committee and Hollier's alleged selection of a committee-approved finalist is 'subject to input by Trey Jones with OGC.'"[93]  Thus, Defendants maintain, Plaintiffs do not allege that Hollier has "unilateral authority" to reinstate them, and thus the *Ex parte Young* exception does not apply.[94]

Plaintiffs respond that an individual defendant does not need to have "unilateral authority" or "be the final decision-maker" to possess the requisite authority to authorize reinstatement as redress for a § 1983 employment-discrimination claim.[95]  They emphasize Hollier's direct involvement in the decision-making process for Plaintiffs' employment-related issues, his authority to select Muslow's replacement, and that this replacement reports directly to Hollier at LSU (New Orleans).[96]  They argue that regardless of the positions' "formal assignment" to the OGC, Hollier has the requisite authority to reinstate them, pointing to their allegations that the "so-called 'consolidation' of [Plaintiffs'] positions with OGC was pretextual and 'in name only.'"[97]

Defendants reply that the cases cited by Plaintiffs as support for the proposition that unilateral or final decision-making authority is not required are not on point, because those cases addressed whether defendants could be held individually liable and/or whether qualified immunity applied, not the defendants' reinstatement authority.[98]  Defendants add that "past decision-making 'involvement' on employment is not the same as reinstatement authority at the time of suit."[99]

Defendants are correct that the cases cited by Plaintiffs are unhelpful, because they address individual liability, not reinstatement authority.  *See Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018) (addressing whether only final decisionmakers can be held individually liable for First Amendment claims, explaining that the question "turns on traditional tort principles of

---

[93] R. Doc. 56-1 at 9 (quoting R. Doc. 50 at ¶ 153) (emphasis omitted).
[94] *Id.*
[95] R. Doc. 61 at 15.
[96] *See id.* at 15-17.
[97] *Id.* at 17 & n.12 (quoting R. Doc. 50 at ¶¶ 110-13, 152, 156).
[98] R. Doc. 67 at 3.
[99] *Id.*

'but for' causation"); *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 758 (5th Cir. 1986) (holding that an official's recommendation which forms the basis of a final employment decision is sufficient to subject that official to liability).   The Court is unpersuaded, though, that simply because, according to the allegations, a committee of administrators first "winnowed the field" of applicants from which Hollier could make a selection for Muslow's replacement, he does not hold the requisite authority to reinstate Plaintiffs.[100]   Plaintiffs allege that "Hollier … was given final decision-making authority on the selection subject to input by Trey Jones with OGC."[101]   That the authority to hire a person to replace Muslow is "subject to input" by defendant Jones makes this a close call.   Had Hollier's selection allegedly required the ***approval*** of Jones or someone else, Hollier likely would not have the requisite authority to reinstate Plaintiffs.   *See, e.g., Mire v. Bd. of Supervisors of La. St. Univ.*, 2017 WL 785439, at *4-5 (E.D. La. Mar. 1, 2017) (plaintiff, who failed to provide summary-judgment evidence refuting that defendant did not have authority to reinstate her, had alleged that defendant's termination of her employment/residency was not effective ***until it was approved***, without explanation as to why such approval would not also be required for reinstatement).   At this stage, without the benefit of evidence, it is not clear that Hollier – who is alleged to have "final decision-making authority," albeit subject to input from Jones, to select Muslow's replacement – does not have authority to reinstate Plaintiffs.   Accordingly, the Court finds that Plaintiffs have sufficiently cured the pleading deficiencies in this regard and may maintain their claims for reinstatement against Hollier in his official capacity.

### c.  *Skinner*

Defendants argue that since Plaintiffs have updated their factual allegations to state that Skinner was Vice President of Legal Affairs and General Counsel at LSU (Baton Rouge) "until

---

[100] *See id.* at 4 (quoting R. Doc. 50 at ¶ 153) (alterations omitted).
[101] R. Doc. 50 at 31-32.

this past January," he is not alleged to have authority to reinstate Plaintiffs.[102]  Plaintiffs counter

that "the existence of federal jurisdiction ordinarily depends on the facts as they exist when the

complaint is filed," pointing to *Kagarice v. Smatresk*, in which, as Plaintiffs describe it, the district

court "declined to dismiss an individual defendant and rejected his argument that 'he no longer

was the Dean of the College of Music at the University of North Texas and therefore had no current

ability to redress the harm alleged by Plaintiff.'"[103]  Defendants respond that Plaintiffs' reliance

on *Kagarice* is misplaced because that matter was decided under Rule 12(b)(6) for failure to state

an official-capacity claim under the American with Disabilities Act (the "ADA"), and as such,

"injunctive relief was not sought under § 1983, reinstatement was not at issue, and the *Ex parte

Young* exception was not considered."[104]

Neither Plaintiffs nor Defendants accurately represent the law on this issue.  In *Kagarice*,

lack of standing due to a defendant's leaving his post as a state official, thereby losing any ability

to reinstate the plaintiff to her former position (or place her in a higher one), was indeed at issue.

*See* 2018 WL 3422780, at *2, 5.  It is irrelevant that the plaintiff's claim was based on the ADA,

rather than § 1983; the defendants argued that the plaintiff could not maintain an official-capacity

claim against the former official because he lacked the ability to redress her alleged injury.  *Id.* at

*5.  At that juncture in that matter, however, as here when the Court issued its April 14, 2020

Order & Reasons, there was no evidence before the court regarding the official's leaving office.

Thus, the *Kagarice* court cited the Supreme Court's holding that "the existence of federal

jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."  *Id.* (quoting

*Lujan*, 504 U.S. at 569 n.4) (alterations omitted).  The *Kagarice* court continued: "In any event,

---

[102] R. Doc. 56-1 at 8 (quoting R. Doc. 50 at ¶¶ 7, 173).
[103] R. Doc. 61 at 18 (paraphrasing *Kagarice v. Smatresk*, 2018 WL 3422780, at *5 (E.D. Tex. June 25, 2018), *adopted*, 2018 WL 3417876 (E.D. Tex. July 13, 2018)) (alterations omitted).
[104] R. Doc. 67 at 4 (emphasis omitted).

the Federal Rules of Civil Procedure permit substitution of the proper party in the case of a 'misnomer' in a suit against a public official sued in [his or her] official capacity." *Id.* (quoting Fed. R. Civ. P. 25(d)).  Indeed, this language of Rule 25(d) was enacted precisely to head off issues of this sort when public officials who sue or are sued in their official capacities leave office "because a claim against an official in his or her official capacity is, by definition, a claim against the official's office." *Durham v. Martin*, 388 F. Supp. 3d 919, 930 (M.D. Tenn. 2019); *see Am. Civ. Liberties Union of Miss., Inc. v. Finch*, 638 F.2d 1336, 1342 (5th Cir. 1981) ("[T]he main purpose of [Rule 25(d) is] to prevent the abatement of actions against public officers upon a change of administration … ."); *see also* Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1960 (3d ed. 2007).  Rule 25(d) provides in pertinent part:

> An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party. … The court may order substitution at any time, but the absence of such an order does not affect the substitution.

Fed. R. Civ. P. 25(d); *see also Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985) ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office.") (citing Fed. R. Civ. P. 25(d)).

Thus, once Skinner left office at LSU in January, his successor, DeCuir, was automatically substituted, by operation of law, as a defendant to Plaintiffs' official-capacity claims.  The Court now orders, pursuant to Rule 25(d), that DeCuir be substituted as an official-capacity defendant in this matter in place of Skinner.[105]  Dismissal of Plaintiffs' request for reinstatement against DeCuir, in his official capacity, is therefore unwarranted.

---

[105] Because Skinner is also sued by Plaintiffs in his individual capacity, he remains a defendant in this matter as to the EPA claims.  *See, e.g., Babin v. Breaux*, 2013 WL 12122409, at *1 nn.1-2 (M.D. La. Mar. 19, 2013) (former officials substituted as defendants in their official-capacities but remained defendants in suit in their individual capacities).

### 3.   Qualified immunity from § 1983 individual-capacity claims

Defendants reassert their argument that the individual defendants are entitled to qualified immunity from Plaintiffs' § 1983 individual-capacity claims.[106]

"Section 1983 provides a cause of action to an individual harmed by a state official's violation of federal law.  A state official sued under § 1983 is entitled to qualified immunity from damages, which protects the official from liability for any act that was not objectively unreasonable at the time of the act."  *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019) (citing *Lincoln v. Turner*, 874 F.3d 833, 847 (5th Cir. 2017)).  "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Once a defendant invokes qualified immunity at the pleadings stage, the court must determine whether the plaintiff alleges specific facts which, if true, would overcome the defense of qualified immunity.  *Waller*, 922 F.3d at 599 (citations omitted); *Traweek v. Gusman*, 414 F. Supp. 3d 847, 860 (E.D. La. 2019) (quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)).   The qualified-immunity analysis involves determining: (1) whether the plaintiff has alleged a violation of a federal statutory or constitutional right, and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct.  *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1130 (5th Cir. 2014) (quoting *Pearson*, 555 U.S. at 232).  A court may consider either prong first "in light of the circumstances in the particular case at hand," and it does not need to address both.  *Pearson*, 555 U.S. at 236.  Yet, the Supreme Court has explained that it is often "beneficial" to begin with the first prong.  *Id.*

In its April 14, 2020 Order & Reasons, the Court determined that Plaintiffs had failed to

---

[106] R. Doc. 56-1 at 10.

properly allege violations of federal constitutional rights against Skinner, Hollier, or Harman –
which would entitle them all to qualified immunity – but granted Plaintiffs leave to cure pleading
deficiencies as to their equal-protection discrimination and First Amendment claims.[107]

### a. Equal-protection discrimination

Defendants argue that Plaintiffs have failed to plead equal-protection discrimination claims
against Skinner, Hollier, or Harman because they have not properly alleged, as to each defendant:
(1) that they were treated differently from other similarly-situated male employees, and (2) that
such unequal treatment stemmed from discriminatory intent, as is required for a viable equal-
protection discrimination claim.[108]   As for the first prong, Defendants argue that in the second
amended complaint, Plaintiffs discuss paygrades set out in the Study and use these paygrades as a
reference point to allege they were treated unfairly and compare their own salaries to the men's,
but they ignore that the Study also establishes "job families," *i.e.*, groupings of related jobs, and
do not allege that they were paid less than men within the same job family, so as to compare their
treatment to that of men similarly situated in all relevant and material respects.[109]   Concerning
discriminatory intent, Defendants maintain that Plaintiffs' allegations of disparate pay and men's
receiving "extra" compensation for subjective reasons do not show a gender-based discriminatory
animus.[110]   As to Harman, Defendants state that Plaintiffs allege no derogatory statements on his
part and "assert only that he 'concurred' or had 'input' on salary decisions by Chancellor Hollier
(his Supervisor)."[111]   Regarding Skinner, Defendants explain that Plaintiffs do not allege that he
made any discriminatory comments, but rather allege only that he made "intentional

---

[107] *See* R. Doc. 45 at 37-51.  Plaintiffs' First Amendment discrimination and equal-protection retaliation
claims, however, were dismissed with prejudice.
[108] R. Doc. 56-1 at 10-15.
[109] *Id.* at 10-13.
[110] *Id.* at 13-14.
[111] *Id.* at 14 (quoting R. Doc. 50 at ¶¶ 39, 88).

misrepresentations" to them, and such allegations do not demonstrate that his actions were animated by Plaintiffs' gender.[112]  Turning to Hollier, Defendants argue that the three comments Hollier allegedly made to unidentified persons (*viz.*, that Muslow "wasn't worth the money she was paid"; that "he didn't care about employee complaints of gender discrimination, disparate pay, and retaliation"; and that he blamed an employee's complaint of gender discrimination on her sexual orientation, specifically, that she was irritable because she "wasn't getting any love at home"), are "stray remarks" which do not establish that acts regarding Plaintiffs were motivated by a gender-based animus.[113]

Plaintiffs respond by arguing that because they have pleaded a *prima facie* case of employment discrimination – and under "binding" Fifth Circuit precedent prior to the appellate court's March 27, 2020 decision in *Jones v. Hosemann*, the elements of a *prima facie* case of employment discrimination under Title VII mirror those for a § 1983 claim – they have necessarily satisfied any pleading standard for an equal-protection discrimination claim, including the discriminatory intent element.[114]  According to Plaintiffs, they meet the elements of a *prima facie* case of discrimination because they allege that: (1) they are members of a protected class, *i.e.*, women; (2) they are qualified for the positions at issue; (3) they were the subjects of adverse employment actions, *e.g.*, being paid less than their male counterparts throughout their employment; and (4) because they are women, they were treated less favorably than similarly-situated male employees.[115]  As Plaintiffs see it, Defendants challenge only the fourth element.[116]

---

[112] *Id.* (quoting R. Doc. 50 at ¶¶ 123, 136).

[113] *Id.* at 15 (quoting R. Doc. 50 at ¶¶ 93-94, 159); R. Doc. 50 at 20.

[114] R. Doc. 61 at 19-21 (citing *Jones v. Hosemann*, 807 F. App'x 307, 2020 WL 1510408 (5th Cir. Mar. 27, 2020)).  Upon rehearing, the March 27, 2020 *Jones* opinion was withdrawn and substituted, to permit the plaintiff to replead his § 1983 claims.  *See* 2020 WL 3250038, at *1, 4 (5th Cir. June 15, 2020).  The Fifth Circuit's *per curiam* majority opinion, however, did not substantively change upon rehearing.  *See id.* at *1-4.

[115] R. Doc. 61 at 22.

[116] *Id.*

Plaintiffs emphasize that the Court, in its April 14, 2020 Order & Reasons, already found that they had sufficiently alleged "that they were treated differently than their male counterparts," and Plaintiffs have since added allegations in this regard to their complaint.[117]   Plaintiffs insist that they do not need to allege or show direct evidence of discriminatory motive, but rather, consistent with the *McDonnell Douglas* framework, they may use circumstantial evidence to prove discriminatory intent;[118] nonetheless, they point to various allegations concerning Harman, Hollier, and Skinner that, in Plaintiffs' view, show that these defendants acted with discriminatory intent.[119]

Defendants counter that Plaintiffs' reliance on Title VII evidentiary standards is misplaced; that the majority in the March 27, 2020 opinion in *Jones* clearly held that "Title VII and § 1983 are different" in that § 1983 applies to individuals; and that Plaintiffs must adequately plead the ultimate elements of an equal-protection discrimination claim (specifically, (1) that they were treated differently than other similarly-situated individuals, and (2) that such unequal treatment stemmed from discriminatory intent), which, Defendants say, Plaintiffs have not.[120]

Plaintiffs allege disparate-treatment (or disparate-pay) gender discrimination, in violation of the Fourteenth Amendment, on the part of Hollier, Harman, and Skinner.[121]   "To state a claim of [gender] discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that [s]he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"   *Priester v. Lowndes Cty.*, 354 F.3d 414, 424 (5th Cir. 2004) (racial discrimination) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir.2001)).   In *Jones*, the Fifth Circuit reiterated that § 1983

---

[117] *Id.* at 23 (quoting R. Doc. 45 at 49-50).
[118] *Id.* at 24-25 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).
[119] *See id.* at 25-28.
[120] R. Doc. 67 at 5-7 (quoting *Jones*, 807 F. App'x at 310, 2020 WL 1510408, at *2).
[121] *See* R. Doc. 50 at 38-40.

discrimination claims made by public employees (such as Plaintiffs) are analogous to claims under Title VII, and thus, "invidious discriminatory intent can be shown in the same way under § 1983 as under Title VII – by either direct or circumstantial evidence." 2020 WL 3250038, at *2 (citations omitted). The *Jones* court did not hold, as Defendants would have it, that Title VII and § 1983 are so different that satisfying the Title VII circumstantial-evidence-claim framework does not allow a plaintiff to survive a motion to dismiss a § 1983 discrimination claim, but rather, it held that "while the prima facie elements of a Title VII claim may establish an *employer*'s liability for intentional discrimination, a § 1983 plaintiff ***must additionally plead*** and prove which actions of the *individual defendant* caused the harm." *Id.* at *3 (italicized emphasis in original; bolded and italicized emphasis added). The *Jones* plaintiff failed to state an equal-protection discrimination claim, not because he had failed to adequately plead discriminatory intent, but because he "d[id] not make any allegations about the particular actions of the individual employees." *Id.* In other words, "[i]t is not enough for a [§ 1983] plaintiff to simply allege that something unconstitutional happened to him," so "[t]he plaintiff must plead that each defendant individually engaged in actions that caused the unconstitutional harm." *Id.* at *2.

So, while Defendants are correct that "a plaintiff need not make out a prima facie case to survive a Rule 12(b)(6) motion but a 'plaintiff must plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make her case plausible,'"[122] where there is no direct evidence of intentional discrimination, a § 1983 plaintiff – like a Title VII plaintiff – may prove such discrimination using circumstantial evidence, which is examined under the *McDonnell Douglas* burden-shifting framework (with the additional requirement under *Jones* that a § 1983 plaintiff plead and prove which actions of each individual defendant caused the harm). *See*

---

[122] R. Doc. 67 at 5 (quoting R. Doc. 45 at 50 (citing *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019), and *Monumental Task Comm'n, Inc. v. Foxx*, 2016 WL 5780194, at *3 (E.D. La. Oct. 3, 2016)).

*Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018) (applying framework to wage-discrimination claim brought under § 1983); *Giles v. City of Dallas*, 539 F. App'x 537, 543 (5th Cir. 2013) (applying framework to race-discrimination claim brought under § 1983); *McCorvey v. Univ. of Tex. Health Sci. Ctr.*, 2016 WL 8904949, at *14 (W.D. Tex. Dec. 21, 2016) (applying framework to race-discrimination claim brought under Title VII); *see also Cicalese*, 924 F.3d at 767 ("If a [Title VII] plaintiff's disparate treatment claim depends on circumstantial evidence, he will ultimately have to show that he can satisfy the *McDonnell Douglas* framework.") (internal quotation marks and citation omitted).  It is when a plaintiff "d[oes] not allege any facts, direct **or** circumstantial, that would suggest [the defendant's] actions were based on [the plaintiff's protected status] **or** that [the defendant] treated similarly situated employees of [a status] other [than that of plaintiff] more favorably" that his claim should be dismissed.  *Raj v. La. St. Univ.*, 714 F.3d 322, 331 (5th Cir. 2013) (emphasis added) (explaining that the plaintiff had failed to allege the second element of a Title VII disparate-treatment claim, *i.e.*, that such an action was taken "*because* of [his] protected status," although he had satisfied the first element, *i.e.*, that he had suffered an adverse employment action) (citation omitted; emphasis in original).

Thus, while the Court reaffirms its prior statement that "a showing of discriminatory intent or purpose is required to establish a valid equal protection claim,"[123] upon further review, particularly in light of *Jones*, it is apparent that such a showing – in the public-employment context, for a disparate-treatment claim – can be made using circumstantial evidence under the *McDonnell*

---

[123] R. Doc. 45 at 50 (quoting *Doe v. Silsbee Indep. Sch. Dist.*, 402 F. App'x 852, 855 (5th Cir. 2010) (quoting *United States v. Crew*, 916 F.2d 980, 984 (5th Cir. 1990))).  As Plaintiffs note, R. Doc. 61 at 25 n.24, *Doe* was not an employment case, and so it did not discuss the *McDonnell Douglas* framework.  In response to Plaintiffs' note, Defendants, in conclusory fashion, state that "*Doe* is legally on point," and also cite *Kelley v. City of Wake Village* for the proposition that "an equal protection claim must show 'discrimination against women was a motivating factor.'"  R. Doc. 67 at 6-7 (quoting *Kelley v. City of Wake Vill.*, 264 F. App'x 437, 443 (5th Cir. 2008).  As previously explained, proving discriminatory motive is indeed a requisite of an equal-protection claim, but in the employment context, discrimination can be proven using circumstantial evidence under the *McDonnell Douglas* framework (plus individual action).

*Douglas* framework (plus allegations of particular actions by individual defendants) to allow an inference of discriminatory intent, and so the pleadings should be analyzed accordingly. *See Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047-48 (5th Cir. 1996) ("To succeed on a claim of intentional discrimination under Title VII [or] Section 1983, … a plaintiff must first prove a *prima facie* case of discrimination. Generally, a plaintiff proves a *prima facie* case through a four-element test that allows an inference of discrimination. But a *prima facie* case can also be proven by direct evidence of discriminatory motive.") (citations omitted); *see also Lee v. Conecuh Cty. Bd. of Ed.*, 634 F.2d 959, 962 (5th Cir. 1981) ("A *McDonnell Douglas* prima facie showing is … simply proof of actions taken by the employer *from which we infer discriminatory animus* because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.") (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978)) (emphasis added).

A *prima facie* case of employment discrimination requires that a plaintiff show: "(1) membership in a protected class, (2) that she was subject to an adverse employment action, (3) that she was qualified for her position, and (4) that she was replaced by someone outside of the protected class, or in the case of disparate treatment, that others similarly situated were treated more favorably."[124] *McCorvey*, 2016 WL 8904949, at *14 (citing *Okoye v. Univ. of Tex. Hous.*

---

[124] As the Court reads the second amended complaint, Plaintiffs base their equal-protection claim on allegations of disparate treatment in pay and benefits. *See* R. Doc. 50 at 39. Plaintiffs do also allege that they "were fired for seeking a salary review and equal treatment for themselves and other women at LSU (New Orleans), while … no male employee has been fired for asking for a raise," R. Doc. 50 at 29, but it is unclear whether this alleged unequal treatment forms a second basis for Plaintiffs' equal-protection discrimination claim, especially because neither side treats it as such in their memoranda.

The Fifth Circuit has articulated a variation of the elements necessary to state a *prima facie* case of disparate treatment for claims of discrimination in compensation (also called "disparate pay" or "wage discrimination" claims): a plaintiff "must show that he was a member of a protected class and that he was paid less than a non-member for work requiring substantially the same responsibility." *Mitchell*, 895 F.3d at 370 (quoting *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008)) (applying framework to § 1983 claim); *see also Goring v. Bd. of Supervisors of La. St. Univ.*, 414 F. App'x 630, 633 (5th Cir. 2011) (applying framework to Title VII claim). This requires showing that "his circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class." *Mitchell*, 895 F.3d at 370 (quoting *Taylor*, 554 F.3d at 523). At this point, the variation is of no consequence. For purposes of Plaintiffs' meeting the four elements required for a *prima facie* disparate-treatment

*Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001) (alterations, internal quotation marks, and citation omitted).  Defendants maintain that Plaintiffs have not sufficiently alleged that male employees who were allegedly treated more favorably were "similarly situated" in all material respects.[125]  As Plaintiffs emphasize, the Court already found that Plaintiffs have sufficiently alleged this element,[126] and the Court declines Defendants' invitation to revisit its conclusion at this juncture.  Defendants' arguments concerning "job families" and other specifics of the alleged similarities between Plaintiffs and male employees at LSU (New Orleans) are better suited for a later stage of the proceedings.  *See Benoit*, 2019 WL 4879326, at *4 ("The Court must not convert the plausibility requirement of pleading into an analysis of whether [the] [p]laintiff is likely to succeed on the merits. … Further discovery may establish that the [p]laintiff and these other employees were not in 'nearly identical' circumstances … .") (citations omitted).

To determine that Plaintiffs have sufficiently alleged a § 1983 *prima facie* case of discrimination based on circumstantial evidence, the Court must examine whether Plaintiffs have alleged actions on the part of each individual defendant causing them unconstitutional harm, in accordance with *Jones*.[127]  As to Hollier and Harman, Plaintiffs allege that the defendants "directed

---

claim, at issue is only whether they allege that they were treated differently than similarly-situated employees, *i.e.*, those with substantially the same job responsibilities. *See Benoit v. Norris Int'l Servs. LLC*, 2019 WL 4879326, at *3 (W.D. La. Aug. 23, 2019) ("The Fifth Circuit defines 'similarly situated' narrowly. … Similarly situated individuals must be 'nearly identical' and must fall outside the plaintiff's protected class.") (quoting *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005)), *adopted*, 2019 WL 4879130 (W.D. La. Oct. 2, 2019).

[125] R. Docs. 56-1 at 10-13; 67 at 6.

[126] R. Doc. 61 at 23 (citing R. Doc. 45 at 49-50).  Plaintiffs note that Muslow also satisfies this element "because 'she was replaced by someone outside of the protected group,' *i.e.*, a male attorney." *Id.* at 23 n.20 (quoting R. Doc. 50 at ¶¶ 151-56, and citing *Shields v. Boys Town La., Inc.*, 194 F. Supp. 3d 512, 517 (E.D. La. July 12, 2016)). The Court does not, however, understand Plaintiffs to be asserting a § 1983 wrongful-termination claim under the Equal Protection Clause (although they do include their termination among the bases of their Title VII gender-discrimination claim, and their termination forms the primary basis of all their retaliation claims), to which being replaced by someone outside of the protected group would be relevant. *See* R. Doc. 50 at 36-42.  Plaintiffs assert a disparate-treatment (or more specifically, disparate-pay) gender-based discrimination claim, for which the question is whether they were treated differently than similarly-situated male employees, not whether they were replaced by someone outside of the protected group.

[127] While Defendants do not explicitly challenge the sufficiency of the pleadings in this regard, analysis of this issue is warranted given their contesting whether Plaintiffs properly allege discriminatory intent on the part of each defendant, since Plaintiffs can only avoid having to allege direct evidence of discrimination if they properly

and used the Study in 2017 in setting salaries to Plaintiffs' detriment and, in doing so, intentionally understated salaries paid to men at LSU (New Orleans)."[128]  Plaintiffs also allege that despite their placing Hollier and Harman on notice of gender pay disparities at LSU (New Orleans), "Hollier and Harman took actions that exacerbated, rather than remedied, those disparities," and that rather than rectify allegedly illegal pay structures identified in the Study, "Hollier and Harman aggravated them in October 2018 by awarding additional pay raises of between 2-10% to Plaintiffs' male counterparts."[129]  These are not allegations, such as those made by the plaintiff in *Jones*, in the passive voice, but rather allegations that Hollier and Harman's actions caused the allegedly discriminatory harm (disparate treatment in compensation).  *See* 2020 WL 3250038, at *3 ("[Jones] does not allege that the three individual [defendants] were the ones who interviewed him, rejected him, or selected someone else for the job.  Instead, Jones uses the passive voice and says that a 'white male' with fewer qualifications and less experience 'was ultimately hired.'").

Defendants point out that with regard to Harman, Plaintiffs "assert only that he 'concurred' or had 'input' on salary decisions [made] by Chancellor Hollier (his Supervisor)."[130]  But in *Jones*, the Fifth Circuit cited a statement from its previous First Amendment retaliation decision in *Sims* that "individual liability turns on traditional tort principles of whether the particular act was a **causal link** in the termination" in holding that § 1983 plaintiffs claiming discrimination must plead which actions of each individual defendant caused harm.  *Id.* (quoting *Sims*, 894 F.3d at 641) (emphasis added; internal quotation marks and citation omitted).  In *Sims*, the court explained that "[i]f an individual defendant's animus against a coworker's exercise of First Amendment rights is

---

assert a *prima facie* case of discrimination based on circumstantial evidence in accordance with *Jones*.  Given the Court's disposition of the question whether Plaintiffs' sufficiently pleaded a *prima facie* case of discrimination based on circumstantial evidence, the Court does not now reach Plaintiffs' arguments based on direct evidence of discrimination.

[128] R. Doc. 50 at 39.

[129] *Id.* at 39-40.

[130] R. Doc. 56-1 at 14.

a link in the causal chain that leads to a plaintiff's firing, the individual may be liable even if she is not the final decisionmaker."  894 F.3d at 639 (citations omitted).  Plaintiffs have sufficiently alleged that Harman's actions were a link in the causal chain that led to the alleged disparate pay to establish a *prima facie* case of discrimination against him.

As for Skinner, Plaintiffs allege that "Skinner ratified Defendants Hollier and Harman's conduct by making intentional misrepresentations to Plaintiffs in response to their protected acts of complaining about gendered pay disparities at LSU (New Orleans) including, but not limited to, misrepresentations that the HR department at LSU (Baton Rouge) had performed a market study for Plaintiffs' positions."[131]  Allegedly "ratifying" or otherwise covering up discriminatory conduct is not the same as allegedly ***causing*** discriminatory harm.  Under no interpretation of the tort principle of causation could such alleged behavior be understood to have "caused" the alleged harm; Skinner's after-the-fact "intentional misrepresentations" could not have been a chain in the causal link leading to the alleged discriminatory compensation.  That Skinner's conduct is not alleged to have caused the harm is reinforced by Plaintiffs' allegations that until February 2019 (when, "[g]iven how dismissive Hollier in particular was to issues of pay disparity," they wrote Skinner believing that he "would be more likely to take complaints of gender discrimination and pay equity seriously"), they "had had no professional dealings with Skinner and did not know if he was aware of the simmering discontent Hollier and Harman's conduct had engendered among women at LSU (New Orleans)."[132]  Essentially, Plaintiffs allege that they came to Skinner to complain about the harm, not that Skinner himself caused it.[133]  Thus, Plaintiffs have failed to state

---

[131] R. Doc. 50 at 40.

[132] *Id.* at 25-26.

[133] In the allegations relating to their § 1983 First Amendment retaliation claim, Plaintiffs also assert that Skinner "treated Plaintiffs differently than other LSU employees when he refused to acknowledge, much less investigate and respond to, Plaintiffs' complaint," and they allege the same against Hollier.  R. Doc. 50 at 41.  While these allegations suggest a sort of discrimination, it is not an allegation of *gender-based* discrimination: Plaintiffs allege that Skinner (and Hollier) treated them differently than "other" LSU employees, not *male* LSU employees.  Nor

a claim of disparate-treatment discrimination, in violation of the Equal Protection Clause, against Skinner in his individual capacity, and so he is entitled to qualified immunity from this claim.

In sum, Plaintiffs have properly alleged § 1983 equal-protection claims against Hollier and Harman in their individual capacities, but not against Skinner.  Defendants make no argument that if Plaintiffs sufficiently state equal-protection claims for disparate treatment in compensation, such a right (to be free of gender-based wage discrimination) was not clearly established at the time of the alleged harm to trigger the second prong of the qualified-immunity analysis.  That is not to say that Hollier and Harman may not raise the issue later.  Plaintiffs have stated violations of their equal-protection rights on the part of Hollier and Harman, and so, for now, these two defendants are not entitled to qualified immunity.  *See Jones*, 2020 WL 3250038, at *2 ("[T]he sufficiency of plaintiff's pleadings is both inextricably intertwined with and directly implicated by the qualified-immunity defense.") (quoting *Iqbal*, 556 U.S. at 673) (alterations omitted).

### b. *First Amendment retaliation*

Defendants maintain that Plaintiffs have failed to sufficiently allege violations of their First Amendment rights committed by Hollier and Skinner because Plaintiffs' alleged speech is, in Defendants' view, not protected by the First Amendment.[134]  They observe that Plaintiffs allege retaliation by Skinner in making intentional misrepresentations to them when they complained to him in the February 15, 2019 email, retaliation by Hollier when he directed that their job positions be eliminated or retired, and retaliation in their being fired for seeking a salary review and equal treatment for themselves and other women, all of which, Defendants say, is not protected speech.[135]  According to Defendants, in all instances of speech allegedly made by Plaintiffs,

---

could such treatment constitute action *causing* the alleged discriminatory pay.  The same goes for Plaintiffs' allegation that Skinner "acted with deliberate indifference" in response to the February 15, 2019 email and their request for the LSU (Baton Rouge) market study.  *See id.* at 26, 28.

[134] R. Doc. 56-1 at 15-24.

[135] *Id.* at 15 (citing R. Doc. 50 at ¶¶ 140, 209, 208).

Plaintiffs were speaking as employees, not private citizens, because they learned of the matter of which they allegedly spoke in the course of their employment with LSU and all the alleged communications were made internally, either up the chain of command, to human-resources officials, or to LSU coworkers.[136]  Defendants argue that the February 15, 2019 email is not speech involving matters of public concern in that neither its content, context, nor form indicates the speech is public: the email contains no specific statement complaining of gender discrimination, it was sent internally to supervisors only, and there are no allegations of widespread public debate over LSU's pay practices at the time the email was sent.[137]  Turning to Plaintiffs' alleged meetings and communications with others at LSU,[138] Defendants note that Plaintiffs assert that "such communications were 'textbook matters of public concern protected by the First Amendment,'" despite admitting to the "'presence of policies such as Permanent Memorandum-76'" directing LSU employees to report financial irregularities;[139] as such, Defendants argue, "Plaintiffs' alleged speech on 'misuse of public funds and breach of the public trust' was made as part of their duty as LSU employees," and was therefore employee speech.[140]  They argue that these communications are similar to the February 15, 2019 email in that their content, form, and context are private.[141]

Plaintiffs counter that they were indeed speaking as citizens, not employees, both when they complained about gender-based pay disparities and when they reported the misuse of public funds to benefit male employees.[142]  Regarding their complaints about LSU's misuse of public

---

[136] *Id.* at 16-18.

[137] *Id.* at 19-23.

[138] Defendants identify Plaintiffs' alleged meetings and communications with others at LSU as: (1) a face-to-face meeting between Muslow and Hollier; (2) Plaintiffs' later meeting with Hollier; (3) a face-to-face meeting between Muslow and the Director of Human Resources Management; (4) Plaintiffs' conversations with the Assistant Director (Employee Relations & Talent Management); and (5) Muslow's alerting the other woman direct-report and other women employees at LSU (New Orleans) about the Study. *Id.* at 23 (citing R. Doc. 50 at ¶¶ 44, 96-98, 128).

[139] *Id.* (quoting R. Doc. 50 at ¶ 92).

[140] *Id.* (citation omitted)

[141] *Id.* at 23-24.

[142] R. Doc. 61 at 28.

funds, Plaintiffs argue that the statement in Permanent Memorandum-76 directing employees to report financial irregularities is a "general job-imposed obligation" which, under the Supreme Court's holding in *Lane v. Franks*, does not qualify as an employee's official duty rendering communications made pursuant to the duty employee speech.[143]   Plaintiffs also point to their allegation that such complaints were not "ordinarily within the scope of their jobs as attorneys because these complaints 'were not sought or intended as legal advice.'"[144]   Plaintiffs argue that their speech involves matters of public concern because (1) the content of their complaints of gender-based pay disparity were already found to touch on a matter of public concern (gender discrimination), and their complaints of misuse of state funds benefitting male employees also relate to a matter of public concern, *viz.*, malfeasance, corruption, or breach of the public trust; (2) while their complaints were submitted internally, this form of communication is not dispositive, but rather "of marginal relevance"; and (3) the context of their speech was public because their complaints concerned gender discrimination affecting not only themselves but also other women in the Chancellor's Office and at LSU (New Orleans) generally, and the pay inequities revealed by the Study were "a common topic of discussion among women employees"; they also point to the governor of Louisiana's stances on gender pay disparities in the state, and events occurring after their termination, including the filing of other gender discrimination complaints in fall 2019, and the Faculty Senate's subsequently expressing concerns to Hollier over salary transparency and gender pay disparities.[145]

The First Amendment protects public employees, under certain circumstances, when they speak as private citizens on a matter of public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 417

---

[143] *Id.* at 29 (quoting *Anderson v. Valdez (Anderson II)*, 913 F.3d 472, 477 (5th Cir. 2019) (citing *Lane v. Franks*, 573 U.S. 228 (2014))).

[144] *Id.* at 29-30 (quoting R. Doc. 50 at 19-20).

[145] *Id.* at 30-33.

(2006).  While public employees "do not surrender all their First Amendment rights by reason of

their employment," their right to speak as citizens on matters of public concern is not absolute

because "when a citizen enters government service, the citizen by necessity must accept certain

limitations on his or her freedom."  *Anderson II*, 913 F.3d at 476-77 (quoting *Garcetti*, 547 U.S.

at 417-18) (alterations omitted).  Therefore, to establish a § 1983 claim for employment retaliation

related to speech, a plaintiff-employee must prove that: (1) she suffered an adverse employment

decision; (2) she spoke as a citizen on a matter of public concern; (3) her interest in the speech

outweighed the government's interest in efficient provision of public services; and (4) her

protected speech motivated the adverse decision.  *Id.* (citing *Anderson v. Valdez (Anderson I)*, 845

F.3d 580, 590 (5th Cir. 2016)); *Malin v. Orleans Par. Comms. Dist.*, 718 F. App'x 264, 267 (5th

Cir. 2018) (citing *Gibson v. Kilpatrick (Gibson III)*, 838 F.3d 476, 481 (5th Cir. 2016)).[146]

Defendants challenge only the second prong.

    A public employee does not speak as a citizen for purposes of the First Amendment if she

made statements pursuant to her official duties.  *Garcetti*, 547 U.S. at 421; *Cutrer v. McMillan*,

308 F. App'x 819, 821 (5th Cir. 2009).  Making this determination requires a fact-intensive

analysis, for which the critical question is "whether the speech at issue is itself ordinarily within

the scope of an employee's duties, not whether it merely concerns those duties."  *Rodriguez v. City

of Corpus Christi*, 687 F. App'x 386, 389 (5th Cir. 2017) (quoting *Lane v. Franks*, 573 U.S. at

---

[146] In *Gibson*, following the district court's holding that the mayor-defendant was not entitled to qualified immunity from the plaintiff's First Amendment retaliation claim, the Fifth Circuit reversed, holding that the plaintiff's speech concerning the mayor's misappropriation of city funds to state and local authorities was not protected by the First Amendment because he spoke in his capacity as an employee (specifically, as chief of police).  *Gibson v. Kilpatrick (Gibson I)*, 734 F.3d 395, 406 (5th Cir. 2013).  The Supreme Court then vacated *Gibson I* and remanded it for reconsideration in light of *Lane v. Franks*.  *Gibson v. Kilpatrick*, 573 U.S. 942 (2014).  The Fifth Circuit then determined that *Lane* did not significantly change the employee/citizen speech (*Garcetti*) analysis and primarily was "an application of prior Supreme Court precedent," and accordingly again reversed the denial of qualified immunity, finding no violation of clearly established rights.  *Gibson v. Kilpatrick (Gibson II)*, 773 F.3d 661, 667, 673 (5th Cir. 2014).  Left remaining was the plaintiff's First Amendment retaliation claim against the city over whether he was fired for suing the mayor; as to this speech, the Fifth Circuit held in *Gibson III* that he spoke as a citizen, but then determined that the speech did not involve matters of public concern.  838 F.3d at 481-82, 487.

240).  The focus of this analysis is on "the role of the speaker, rather than the content of the speech." *Rodriguez*, 687 F. App'x at 389 (citations omitted).  Even if a claimant has demonstrated she spoke as a citizen, a court must then determine whether the speech is on a matter of public concern by analyzing "the content, form, and context of a given statement, as revealed by the whole record." *Gibson III*, 838 F.3d at 482 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

In its April 14, 2020 Order & Reasons, the Court identified two categories of Plaintiffs' speech for which they alleged retaliation in the first amended complaint: (1) the February 15, 2019 email, and, to the extent they alleged retaliation for such speech, other instances of their complaining about gender pay disparities, such as the face-to-face meeting between Muslow and Hollier in 2017; and (2) reporting instances of male employees being paid for work they were not performing.[147]  Addressing the February 15, 2019 email, the Court declined to consider the fact-intensive question whether Plaintiffs had spoken in this instance as employees or citizens, an issue which neither side had addressed, and found that the speech as a whole did not involve matters of public concern because while its content marginally weighed in favor of finding it addressed a public concern (the email could, though barely, be read to raise gender discrimination by stating that Plaintiffs' salaries should be raised "to ameliorate the environment at LSU (New Orleans) that has not seemed historically to view equity as potentially a gendered issue"),[148] its form was private in that it was an internal email addressed to supervisors only, without any indication of an intent to "go public," and sought relief only for Plaintiffs, and its context was also private in that there was no allegation of widespread public debate over gender pay disparities or discrimination at LSU (New Orleans) or LSU as a whole.[149]  Turning to Plaintiffs' reporting instances of male employees being paid for work they were not performing, the Court found that Plaintiffs had

---

[147] R. Doc. 45 at 40 & n.128.
[148] *Id.* at 43 (quoting R. Doc. 31-2 at 1) (brackets omitted).
[149] *Id.* at 43-46

spoken as employees, not citizens, because they specifically alleged that they reported these instances "in fulfillment of the requirements of Permanent Memorandum-76,"[150] which provides that all LSU employees are to report "known or suspected incidents of financial irregularities."[151]

In articulating their First Amendment retaliation claim in the second amended complaint, Plaintiffs allege that "Skinner illegally retaliated against Plaintiffs when they complained to him in their February 15 email, made intentional misrepresentations to Plaintiffs in response to their protected acts of complaining about gendered pay disparities at LSU (New Orleans)," and that Hollier "likewise illegally retaliated against Plaintiffs by directing that their job positions be 'eliminated' or 'retired' not once, but twice, the latest occurring in a backdated letter sent after notice of Plaintiffs' EEOC charges."[152]  Plaintiffs also allege that they "were fired for seeking a salary review and equal treatment for themselves and other women at LSU (New Orleans)"[153] and that the "decision to 'rescind' Plaintiffs' Employment Contracts was done in retaliation for Plaintiffs' February 15, 2019 complaint of gender discrimination against themselves and other women at LSU (New Orleans) as shown by the Study attached to Plaintiffs' email, as well as their requests for equal pay."[154]  Thus, Plaintiffs allege that Hollier and Skinner retaliated against them for sending the February 15, 2019 email, filing EEOC charges, and otherwise speaking about their salaries and gender pay disparities.  As in its April 14, 2020 Order & Reasons, the Court groups these communications together for purposes of analysis, except that now it separately analyzes the filing of the EEOC charges, as well as Plaintiffs' new allegations that they spoke to non-supervisor

---

[150] *Id.* at 46 (quoting R. Doc. 31 at 20) (emphasis omitted).

[151] *Id.* (quoting R. Doc. 35-1 at 16 (Defendants' memorandum)); *see also Permanent Memorandum 76: Detection, Reporting and Investigation of Incidents of Financial Irregularity*, LA. ST. UNIV. (Aug. 1, 2014), https://www.lsu.edu/administration/policies/pmfiles/pm-76.pdf.

[152] R. Doc. 50 at 41.

[153] *Id.* at 29.  In the first amended complaint, they similarly alleged that they "were fired for merely asking for equal pay for themselves and the other women at LSU (New Orleans), while male employees were knowingly paid salaries for work they did not perform in violation of the Equal Protection Clause."  R. Doc. 31 at 20.

[154] R. Doc. 50 at 26.

LSU (New Orleans) women employees about the gender pay disparities purportedly revealed in the Study.[155]  Plaintiffs also allege that their reporting instances of LSU (New Orleans) paying men salaries and benefits for jobs they did not perform are matters of public concern protected by the First Amendment, indicating – although it is less than clear – that they base their First Amendment retaliation claim on this speech as well.[156]  The Court once again distinguishes this alleged speech from that over gender pay disparities.

- **Communications to supervisors and directors over salaries and pay disparities[157]**

In addition to Plaintiffs' February 15, 2019 email addressed to Skinner, Plaintiffs allege that (1) in 2017, following release of the Study and learning that neither she nor the other woman direct-report, nor a third woman in the Chancellor's Office, would be raised to the minimum salaries for their paygrades, "Muslow confronted Hollier in a face-to-face meeting" in which she "explicitly advised Hollier that gender pay disparities existed at LSU (New Orleans), specifically in the Chancellor's Office; that Hollier was not ameliorating those disparities despite his knowledge of them; and, that those persistent disparities posed a risk to the institution," and that she "advocated at the same time for the second female direct report, as well as the other woman within the Chancellor's Office who was not a direct report but who was subject to the same treatment, to be granted equity raises to at least the minimum salaries for their respective paygrades," to which Hollier "begrudgingly agreed";[158] (2) following Plaintiffs' viewing of the full Study in October 2018, and the awarding of pay raises to Plaintiffs' "male counterparts" – but

---

[155] *See id.* at 21.

[156] *See id.* at 19-20 (redacted allegations); *see also* R. Doc. 50-4 at 19-20 (sealed unredacted allegations).

[157] In its April 14, 2020 Order & Reasons, the Court focused its analysis on the February 15, 2019 email, explaining that this analysis applied to Plaintiffs' other communications over pay disparities in the same way.  R. Doc. 45 at 40 n.128.  While still generally analyzing the speech together, the Court now distinguishes between the instances of speech when material.

[158] R. Doc. 50 at 10.

not Plaintiffs – that same month,[159] "[i]n a face-to-face meeting, Muslow complained to the Director of [Human Resources Management] about the 2018 pay increases and specifically raised the issue of gender pay disparity at LSU (New Orleans) that the 2017 Study revealed," in response to which the director allegedly did not disagree but took no action;[160] (3) "Plaintiffs also had frequent conversations with the Assistant Director (Employee Relations & Talent Management) about the same topic";[161] and (4) after Skinner notified Plaintiffs that their employment contracts had been rescinded "pending further review," Plaintiffs met with Hollier to discuss the rescission and their positions.[162]

Defendants argue that Plaintiffs spoke as employees, not citizens, in these instances because they learned of the matters on which they spoke in the course of their employment with LSU, and because Muslow viewed the full Study in October 2018 "as part of her job duty to respond to a public records request."[163]  Furthermore, they say, the February 15, 2019 email is "signed by Muslow as Chief Counsel, LSUHSC-NO, sent only to Skinner …, and states in bold the e-mail may contain confidential or privileged information 'intended only for the use of' recipient."[164]  Defendants add that the meetings and conversations with Hollier, the Director of Human Resources Management ("HRM"), and the Assistant Director (Employee Relations & Talent Management) occurred in Plaintiffs' roles as employees going up the chain of command and to human-resources officials.[165]  Plaintiffs do not specifically address whether they spoke as citizens or employees when making these communications.[166]

---

[159] *Id.* at 11, 16.
[160] *Id.* at 21.
[161] *Id.*
[162] *Id.* at 26-27.
[163] R. Doc. 56-1 at 17.
[164] *Id.* (quoting R. Doc. 50-2) (emphasis omitted).
[165] *Id.* at 17-18.
[166] *See* R. Doc. 61 at 29-30.

In *Lane*, the Supreme Court "focused on 'the scope of ordinary job responsibilities' as the critical factor for whether speech was made as an employee or a citizen, holding that a public employee who was subpoenaed to testify at the criminal trial of an employee he had fired spoke as a citizen rather than an employee," even though "the testimony 'related to his public employment or concerned information learned during that employment,' because it was 'undisputed' that his 'ordinary job responsibilities did not include testifying in court proceedings." *Gibson III*, 838 F.3d at 482 (quoting *Lane*, 573 U.S. at 237-40) (brackets omitted).  The Fifth Circuit has explained that "a public employee's speech is made pursuant to his or her official duties when it is 'made in the course of performing his employment.'"  *Corn*, 954 F.3d at 277 (quoting *Anderson I*, 845 F.3d at 595 (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007))).  To aid in the evaluation of this question, the Fifth Circuit has consulted state agency law, specifically asking "whether the employee was subject to the employer's control and whether the employee's course of conduct was intended to serve any purpose of the employer." *Rodriguez*, 687 F. App'x at 389 (quoting *Anderson I*, 845 F.3d at 594-99) (alterations omitted).  It has "also determined that a public employee acts as an employee, rather than a citizen, when he decides to raise complaints about his job duties up the 'chain of command.'" *Id.* (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)).  The Fifth Circuit also considers factors, none of which is dispositive, such as "job descriptions, whether the employee communicated with coworkers or with supervisors, whether the speech resulted from special knowledge gained as an employee, and whether the speech was directed internally or externally." *Johnson v. Halstead*, 916 F.3d 410, 422 (5th Cir. 2019) (citing *Rogers v. City of Yoakum*, 660 F. App'x 279, 283 (5th Cir. 2016) (citing *Davis*, 518 F.3d at 313)).

In communicating with supervisors[167] and human-resources directors[168] about their salaries *and* the gender pay disparities allegedly reflected in the Study, Plaintiffs were likely speaking as employees because "complaints made up the chain of command about conditions in a workplace are often held [to be] unprotected," *Johnson*, 916 F.3d at 423, and all of these communications were made internally to supervisors or human-resources officials, and resulted at least in part from special knowledge gained as employees.   That Plaintiffs allegedly were speaking on gender discrimination at LSU (New Orleans) more broadly, not only on their own employment or to vindicate their own rights, clouds the picture of this fact-intensive question.[169]   *Cf. id.* (holding that the defendant was entitled to qualified immunity because it was "not clearly established that an internal complaint of discrimination made only to supervisors, primarily to vindicate one's own

---

[167] Plaintiffs argue that, in writing the February 15, 2019 email to Skinner, they were "essentially 'speaking out of school' to try to get relief."  R. Doc. 61 at 30 (quoting R. Doc. 50 at ¶ 119) (brackets omitted).  Defendants counter that "[t]his assertion … overlooks the fact that the Complaint admits Skinner was General Counsel for the OGC (Baton Rouge) at the time, and the OGC is where Plaintiffs['] former legal positions had been consolidated," and so "the e-mail was not 'out of school' and was a complaint up the chain of command."  R. Doc. 67 at 9 (citations omitted; emphasis in original).  It is unclear from the second amended complaint whether Plaintiffs' positions were consolidated at the time they were still employed at LSU; Plaintiffs allege that they believed they had transitioned to the OGC upon completion of the human-resources process when Skinner rescinded their employment contracts with the OGC (also described as the OGC's offers of employment).  *See* R. Doc. 50 at 26-27.  But because Plaintiffs were addressing their salaries with the OGC, *see* R. Doc. 50-2, Skinner was the most appropriate person to receive the complaint, especially since Plaintiffs allege that Hollier and Harman were at least partially responsible for the alleged discriminatory pay.  *See, e.g., Gibson II*, 773 F.3d at 671 (explaining that where "the employee is reporting the misconduct of his supervisor, an outside agency may be the most appropriate entity to which to report the misconduct").

[168] The human-resources officials with whom Plaintiffs spoke were not their supervisors, but in *Rodriguez*, the Fifth Circuit held that the plaintiff's "raising of concerns about an incident that she witnessed at work within her employer's human resources department, rather than to the public, represents a chain-of-command complaint that is ordinarily within the scope of every public employee's duty."  *Rodriguez*, 687 F. App'x at 390 (citations omitted).  That being said, in *Rodriguez*, the plaintiff was asked to send a statement to human resources by her superior.  *Id.* ("[The plaintiff] thus did not act solely on her own initiative but did so pursuant to a supervisor's directive.").  Plaintiffs do not allege that they were directed to address their complaints to these officials.

[169] However, Plaintiffs do not allege that they spoke on gender pay disparities or gender discrimination at LSU (New Orleans), or were in any way speaking to vindicate the rights of others, when they met with Hollier following the February 15, 2019 email; rather, they allege that they discussed only the rescission of their offers of employment with the OGC, and that Hollier acted with deliberate indifference to their complaint, "consistent with his *previous* disregard for pay inequities and gender discrimination."  R. Doc. 50 at 27 (emphasis added).  In speaking with their supervisor about their own employment only, Plaintiffs were undoubtedly speaking as employees not citizens, and they were not speaking on matters of public concern.  *See Harmon v. Dallas Cty.*, 927 F.3d 884, 894 (5th Cir. 2019) ("By its very nature, … an employee's grievance from termination will not ordinarily constitute a matter of public concern.") (citations omitted).

rights, qualifies as speech made as a 'citizen' rather than as an 'employee'") (citation omitted). Thus, as it did in its previous Order & Reasons, the Court turns to the second question of the analysis whether speech is protected by the First Amendment: did Plaintiffs' communications address matters of public concern?

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Gibson III*, 838 F.3d at 482 (citations and quotation marks omitted).  In considering the content, form, and context of a statement to determine whether it involves matters of public concern, "no factor is dispositive." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011).  Yet, it has been said that "context and form are weighed more heavily than content." *Davis v. Matagorda Cty.*, 2019 WL 1015341, at *9 (S.D. Tex. Mar. 4, 2019) (citing *Teague v. City of Flower Mound*, 179 F.3d 377, 382 (5th Cir. 1999)), *adopted*, 2019 WL 1367560 (S.D. Tex. Mar. 26, 2019).

*Content*

"The content of speech concerns a matter of public concern 'if releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance.'" *Dumas*, 2017 WL 1969641, at *6 (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001)) (alterations omitted).  In mixed-speech cases, "the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government." *Kennedy v. Tangipahoa Par. Library Bd. of Control*, 224 F.3d 359, 372 (5th Cir. 2000) (discerning principles from review of Fifth Circuit mixed-speech precedent) (citations omitted).

As Plaintiffs remind Defendants, the Court already found that the content of Plaintiffs' speech touches on a matter of public concern, *viz.*, gender discrimination.[170]  Yet, Defendants insist that the "single tangential reference to a 'potentially gendered issue' is not a specific statement of alleged gender discrimination."[171]  As to the February 15, 2019 email, the Court agrees with Defendants that it is a stretch to read Plaintiffs' language as raising gender discrimination at LSU, but declines to reconsider the question at this juncture.  Furthermore, Plaintiffs allege that, while primarily addressing their own salaries, they specifically brought up pay disparities and gender discrimination at LSU (New Orleans) in the 2017 meeting with Hollier and in their communications with human-resources officials.  Based on the pleadings, the content of Plaintiffs' speech marginally weighs in favor of finding it involves a matter of public concern.

*Form*

"[A]nalysis of the form of the employee's speech focuses primarily on two factors: (1) the simple form or format of the speech," *i.e.*, "the medium used by the speaker and the intended audience"; and "(2) the speaker's motivation."  *Bates v. Univ. of Tex. Med. Branch*, 425 F. Supp. 2d 826, 845 (S.D. Tex. 2003).  The latter "comes down to a simple question in most cases: Does the employee seek only personal benefits, or does he or she seek a broader remedy that will serve the public interest?"  *Id.*[172]  Speech made privately instead of publicly weighs against concluding that it is on a matter of public concern.  *See Gibson III*, 838 F.3d at 486 (concluding that the form of the speech, a personal-capacity lawsuit, rather than a report to state authorities or a speech made at a public meeting, significantly supported concluding it was not a matter of public concern); *see*

---

[170] R. Doc. 61 at 30 (citing R. Doc. 45 at 46).

[171] R. Doc. 56-1 at 20 (quotation marks and citations omitted).

[172] The Fifth Circuit has also analyzed a speaker's motivation as a separate factor, supplementary to the content-form-context test.  *See Markos v. City of Atlanta*, 364 F.3d 567, 572 (5th Cir. 2004) (explaining that while a speaker-employee's motivation does not supplant the three factors delineated in *Connick v. Myers*, it is relevant to the inquiry).

*also Kennedy*, 224 F.3d at 374 ("'The fact that plaintiffs chose not to publicize their complaints is not dispositive.' ... 'Rather, the publicization of the speech at issue, appropriately viewed, is simply another factor to be weighed in analyzing whether the speech addressed matters of public concern.'") (quoting *Benningfield v. City of Hous.*, 157 F.3d 369, 374 (5th Cir. 1998), and *Thompson v. City of Starkville*, 901 F.2d 456, 466 (5th Cir. 1990)) (internal brackets and ellipses omitted).

In its April 14, 2020 Order & Reasons, the Court found – and still finds – that the medium of the February 15, 2019 email is private in that it is unquestionably an internal email sent by Plaintiffs to a supervisor (Skinner) only.[173]  The same goes for Plaintiffs' private meetings with Hollier and human-resources officials.  As for Plaintiffs' motivation, there is still no indication that Plaintiffs sought pay raises for others in the February 15, 2019 email.  However, Plaintiffs now allege that in the 2017 meeting with Hollier, "Muslow advocated at the same time [as for herself] for the second female direct report, as well as the other woman within the Chancellor's Office who was not a direct report but who was subject to the same treatment, to be granted equity raises to at least the minimum salaries for their respective paygrades."[174]  Plaintiffs also now allege that when "Hollier begrudgingly agreed to increase Muslow's salary to the minimum amount for her N43 paygrade," he "did the exact same thing with respect to the two women for whom Muslow advocated – agreed to raise them to the minimum amount for their respective paygrades, but no more."[175]  Therefore, in this instance, it appears that Muslow allegedly sought relief for others, not just herself.  That being said, that Muslow advocated only for two women in the Chancellor's Office, not all women at LSU (New Orleans), is telling: one would think that a person advocating to end alleged gender pay disparities at LSU (New Orleans) would advocate for all women

---

[173] R. Doc. 45 at 43.
[174] R. Doc. 50 at 10; *cf.* R. Doc. 31 at 8.
[175] R. Doc. 50 at 10; *cf.* R. Doc. 31 at 8.

allegedly affected.  Still, at that point, before Plaintiffs had viewed the full Study, it is possible that Muslow would have been concerned mostly about the women in the Chancellor's Office: Plaintiffs now allege that in 2017, "Muslow pressed staff within HRM for more information about the Study," requests which were not fully answered, and that "the Director of HRM specifically flagged Muslow's salary as concerning, as well as the salaries of other women in the Chancellor's Office."[176]  Plaintiffs' vague allegations regarding their conversations with human-resources officials in 2018 do not allow the Court to determine whether they sought relief solely for themselves or also for others.[177]  In sum, only Muslow's speech in her 2017 meeting with Hollier – albeit private in medium – indicates that she was not solely seeking personal relief.  At most, this factor is neutral as it pertains to that speech only.  Overall, the form of Plaintiffs' speech is private.

*Context*

"The context inquiry analyzes the underlying philosophical, political, and social circumstances surrounding an employee's speech."  *Davis v. Allen Par. Serv. Dist.*, 210 F. App'x 404, 410 (5th Cir. 2006) (citation omitted).  Speech is made in the context of a matter of public concern when it occurs "against a backdrop of widespread debate in the community" rather than when it is "made solely in furtherance of a personal employer-employee dispute."  *Gibson III*, 838 F.3d at 486-87 (citations and quotation marks omitted).  Even "[s]peech that is purely private in form may qualify as public-concern speech if the context shows a relation to a matter of active and articulated public concern."  *Bates*, 425 F. Supp. 2d at 847.  The *Bates* court explains that "[f]or example, in *Givhan* [*v. Western Line Consolidated School District*, 439 U.S. 410 (1979)], the form

---

[176] R. Doc. 50 at 9.

[177] *See* R. Doc. 50 at 21 ("Muslow complained to the Director of HRM about the 2018 pay increases and specifically raised the issue of gender pay disparity at LSU (New Orleans) that the 2017 Study revealed. … Plaintiffs also had frequent conversations with the Assistant Director (Employee Relations & Talent Management) about the same topic … .").

of speech was private, but the teacher spoke against a background of active public debate on school desegregation and employment policies in her district.   In fact, at the time that Givhan was terminated, her school district was the subject of a desegregation order … ."   *Bates*, 425 F. Supp. 2d at 847 (citing *Givhan*, 439 U.S. at 411).   In contrast to *Givhan*, in *Bates*, "nothing about the context of [the plaintiffs'] speech," which consisted of grievances and EEOC charges in furtherance of their personal employment disputes, "indicate[d] that the public had an active interest in any matter connected with or related to the conditions of [their] employment."   *Id.* at 848 (finding that the context of the speech was "wholly private").

In its previous Order & Reasons, the Court explained that Plaintiffs did not allege "any 'active and articulated public interest' in gender discrimination at LSU (New Orleans), or even LSU as a whole," or "any 'widespread debate in the community' over LSU's treatment and pay of its female employees."[178]   Plaintiffs point to new allegations indicating, in their view, that the "pay inequities revealed by the [Study] were a common topic of discussion among women employees, who had 'significant resignation and fear that even systemic gender discrimination laid bare by the Study would not be remedied and any complaints would be met with harsh retaliation, including termination," and that events following Plaintiffs' discharge show that other individuals in the community were concerned about gender discrimination and public corruption at LSU (New Orleans), as reflected by the seven anonymous complaints, including complaints about gender discrimination, made to LSU's ethics hotline in September and October 2019, Hollier's acknowledging a concern about the absence of women in senior leadership positions in a presentation to the Faculty Senate in October 2019, and the Faculty Senate's expressing concerns over "transparency in terms of salaries" and asking for "more accountability in our programs to

---

[178] R. Doc. 45 at 46 (quoting *Bates*, 425 F. Supp. 2d at 847-48, and *Gibson III*, 838 F.3d at 486-87).

make sure female employees are paid equivalently as our male employees with the same rank/experience."[179]  Defendants respond that Plaintiffs' speech was all made in the workplace, and their "reliance on events that allegedly occurred several months after Plaintiffs' discharge also fails to show that their alleged speech several months earlier was made in any context other than as an employee with a private dispute."[180]

That the second amended complaint includes allegations of some debate and discussion in the LSU (New Orleans) Faculty Senate over gender discrimination and, specifically, pay disparities at LSU (New Orleans) *after* Plaintiffs' alleged speech was made and their employment terminated cannot show that Plaintiffs' speech was made "in the context of a ***continuing*** commentary that had ***originated*** in a public forum, " *Markos*, 364 F.3d at 572 (citations and alteration omitted; emphasis added), "against the backdrop of ***ongoing*** commentary and debate in the press," *Kennedy*, 224 F.3d at 373 (citation omitted; emphasis added), or "against a background of ***active*** public debate."  *Bates*, 425 F. Supp. 2d at 847 (citations omitted; emphasis added). Plaintiffs do not point the Court to any case in which community debate occurring after the speech was made meant that the speech's context was public.

Nor are Plaintiffs' allegations over the governor of Louisiana's positions on equal pay and efforts to combat pay secrecy any help to Plaintiffs.[181]  Public debate over gender pay disparities in Louisiana ***generally*** does not indicate that there existed "widespread public debate" over pay disparities at LSU (New Orleans), or LSU as a whole.  Plaintiffs do not provide any case in which a court has looked to a general topic of controversy in the nation or the state to indicate there was "widespread public debate" on the subject in the relevant context of the speech at issue.  On the contrary, courts finding that the context of speech is public have consistently pointed to public

---

[179] R. Doc. 61 at 32-33 (quoting R .Doc. 50 at ¶¶ 96-98, 157-61, & 175).
[180] R. Doc. 67 at 9 (emphasis omitted).
[181] R. Doc. 61 at 32 n.29 (quoting R. Doc. 50 at ¶¶ 93, 177).

debate on the specific subject matter in question.  In *Givham*, for example, the speech's context was public not because there was an "active and articulated public concern" regarding racial discrimination and school desegregation generally; rather, there existed ongoing public debate over these issues as they pertained specifically to the plaintiff's school district, "the very subject of her speech."  *Bates*, 425 F. Supp. 2d at 848 (citing *Givham*, 439 U.S. at 411-13).  In *Markos*, the plaintiff, a police sergeant, had been approached by a journalist who desired information regarding a coworker's alleged use of excessive force and the incident's subsequent handling by his superiors; by the time his statements were published, "there had already been a previous article published ***on this controversy***." 364 F.3d at 569, 572 (emphasis added).  In other words, not only had the plaintiff been approached by a journalist, there already existed press on the relevant incident by the time he made the speech in question; the Fifth Circuit did not rely or even discuss public debate on policing practices generally.  In *Kennedy*, the plaintiff, a librarian, wrote a letter – initially private but eventually obtained by members of the community and discussed in a newspaper article – concerning a brutal crime which occurred at the library where she was employed, in which she proposed updates to parish library safety policy; news of the incident had "left the community in an uproar" and "sparked intense media scrutiny and gossip."  224 F.3d at 361, 374.  The context was public not because there existed debate over public safety at libraries generally; rather, at the time the plaintiff wrote the letter, the local community was already in the midst of debating crime prevention in that very parish's library system as a result of the incident.

Finally, that Plaintiffs allege they had approached other women employees at LSU (New Orleans) to discuss the pay disparities allegedly revealed by the Study does not indicate that there existed widespread public debate or concern in the community.[182]  That Plaintiffs allege that

---

[182] *See* R. Doc. 50 at 21.

Muslow discussed the issue with "many" women employees in LSU (New Orleans), not only women working in the Chancellor's Office,[183] indicates there may have been some concern on the issue among the broader LSU (New Orleans) community, but this is far from sufficient to show that the university or local community had been debating it at the time.  As the cases above illustrate, the context of speech is typically only found to be public when the specific topic has already garnered the attention of local media and the broader, non-employee community.  That is not the context in which Plaintiffs' speech allegedly occurred.  The context of this speech is private.

When viewed and balanced together, the content, form, and context of Plaintiffs' speech weigh against finding that any of their communications to supervisors over salaries and gender pay disparities involves matters of public concern.  This speech is not protected by the First Amendment.

- **Filing EEOC charges**

Defendants argue that Plaintiffs spoke as employees in filing EEOC charges, noting that Plaintiffs do not allege that they filed EEOC charges seeking class-wide relief; rather, Defendants assert, at all times Plaintiffs have sought individual relief for themselves for personal workplace issues.[184]  Plaintiffs do not specifically address whether they spoke as citizens on matters of public concern in filing EEOC charges.[185]

"When a public employee takes job concerns to external agencies, such communications are ordinarily made as a citizen rather than an employee."  *Cutrer*, 308 F. App'x at 821 (citing *Davis*, 518 F.3d at 313).  Filing EEOC charges on their own behalf could not have been within the scope of Plaintiffs' employment as in-house counsel at LSU (New Orleans).  Even if Plaintiffs spoke as citizens in filing EEOC charges, however, this speech does not involve matters of public

---

[183] *Id.*

[184] R. Doc. 56-1 at 17-18 & n.7.

[185] *See* R. Doc. 61 at 28-33.

concern.  "Lodging a complaint with the EEOC, without further airing of grievances, implicates only the private employment interests speech of the plaintiff and is not conduct that constitutes speech on a matter of public concern." *Id.* (citing *Short v. City of West Point*, 125 F.3d 853, at *1 (5th Cir. 1997)).  "It does not create a generalized petition for a remedy to a public problem." *Short*, 125 F.3d 853, at *1 (citing *Ayoub v. Texas A&M Univ.*, 927 F.2d 834, 837-38 (5th Cir. 1986)).  Plaintiffs do not allege that the charges – which are not before the Court to examine – address alleged discrimination by Defendants against non-plaintiff employees.  *See Cutrer*, 308 F. App'x at 822 (rejecting plaintiffs' argument that their filing an EEOC charge as a class distinguishes their case from *Ayoub* or *Short* because the EEOC charge "does not … address alleged discrimination actions against non-plaintiff employees").  Plaintiffs did not publicize or otherwise attempt to call the public's attention to their complaint.  *See id.* (explaining that in *Ayoub*, the "plaintiff 'never attempted to air' the complaints at the heart of his EEOC charge 'in a manner that would call the public's attention to the alleged wrong'") (quoting *Ayoub*, 927 F.2d at 837).  As with their communications with supervisors over pay disparities, while the content of a gender-discrimination complaint may be a matter of public concern, the form and the context surrounding Plaintiffs' filing EEOC charges indicate it was a private, employment matter.  *See id.* ("Although discrimination in awarding promotions based on age can certainly be a matter of public concern, 'in the context in which it was presented in this case' by [the plaintiffs], 'it was a purely personal and private matter.'") (quoting *Ayoub*, 927 F.2d at 838).  The First Amendment does not protect this speech.

- **Speech to other women employees**

As mentioned earlier, Plaintiffs now allege that Muslow spoke to the other woman direct-report to Hollier and other women employees at LSU (New Orleans) about the pay disparities allegedly revealed by the Study and that were allegedly worsened by the October 2018 raises given

to men.[186]   Plaintiffs allege that "many women were not surprised by the inequities," but feared retaliation in response to complaints.[187]   Defendants argue that Plaintiffs were speaking as employees when speaking to LSU coworkers, emphasizing that none of Plaintiffs' speech was directed outside the LSU workplace.[188]   Plaintiffs do not specifically address whether they were speaking as citizens on matters of public concern in making this speech.[189]

"[A] public employee does not speak pursuant to his official duties merely because he speaks while *at* work" or "he speaks *about* work."  *Anderson I*, 845 F.3d at 594 (emphasis in original).   Moreover, "'[m]any citizens do much of their talking inside their respective workplaces,' and employees undoubtedly communicate as citizens," for example, "in workplace emails."  *Malin*, 718 F. App'x at 269 (explaining that the plaintiff did not speak as an employee merely because the speech at issue was made in an email sent to coworkers) (quoting *Garcetti*, 547 U.S. at 420).   In *Malin*, because the nature of the communication – a workplace email sent to coworkers – did not answer whether the plaintiff spoke as an employee or citizen, the Fifth Circuit turned to the content of the plaintiff's speech, comparing it with her ordinary job responsibilities to determine whether the offending email was sent in the course of performing her job.  *See id.* The plaintiff, a deputy director at a parish communications district, had inadvertently copied all her coworkers on her reply to an announcement about a board member leaving the post to lead a charitable foundation, in which she spoke harshly about his handling of public funds, predicted similar behavior in his new role, and stated she would no longer donate through that charitable foundation.  *Id.* at 265.   The court explained that the plaintiff's normal job functions did not include criticizing or commenting on board members' performance or departures, or expressing her views

---

[186] R. Doc. 50 at 21.
[187] *Id.*
[188] R. Docs. 56-1 at 17-18; 67 at 8.
[189] *See* R. Doc. 61 at 28-33.

on charitable giving, but commenting on the district's funding policies may have been, since they were "broadly related to her employment" and "likely based on information she acquired at the job." *Id.* at 270. Based on the former, the court determined that she spoke, at least in part, as a citizen. *Id.*

Muslow's conversations with non-supervisor women employees were not complaints up the chain of command typical of employee speech. That they were voiced internally to other LSU employees does not answer the question, as both employee and citizen speech occurs in this manner. Furthermore, alerting other employees to what she viewed as discriminatory treatment of women at LSU (New Orleans) would not likely have been within the scope of Muslow's employment as in-house counsel. Such behavior is not within the employer's control nor does it appear to have been intended to benefit the employer, the LSU Board. *See Rodriguez*, 687 F. App'x at 389. Nor do the allegations indicate that Muslow was asked or in any way required to engage in this speech. *See id.* (explaining that the Fifth Circuit notes whether the employee spoke on his own initiative). At the same time, evaluating LSU (New Orleans)'s employment practices may have been related to her work duties, and as Defendants note,[190] Muslow learned the details of the full Study (which is presumably what she would have been "alerting" others to, rather than the unclassified version of the Study released earlier) as part of her job responding to a public-records request. At this juncture, it is unclear whether Muslow was speaking as a citizen or an employee, although this speech appears to more closely resemble that of a citizen's.

Turning to whether this speech involves matters of public concern, the content and context of this speech are essentially the same as that of Plaintiffs' communications to supervisors and human-resources officials about gender pay disparities. The content weighs in favor of its being

---

[190] R. Doc. 56-1 at 17.

a matter of public concern: like the meetings with supervisors, this alleged speech more clearly raised the issue of gender discrimination than the February 15, 2019 email, and that it addressed the overall pay disparities allegedly revealed by the Study, rather than focusing on Muslow's own salary, makes the content of this speech more public than Plaintiffs' complaints to supervisors. The context of this speech mirrors exactly that of the communications to supervisors: there are no allegations of widespread public debate at the time the speech was made, and so the context was private. The medium of the speech is also private, as although it was directed to coworkers and not supervisors, it remained non-public. It does not appear, however, that Muslow's personal interest primarily motivated this speech; rather, as alleged, this speech appears to have been motivated by a desire to "alert" others to what Muslow perceived as LSU (New Orleans)'s unfair treatment of them.

Whether this speech involves a matter of public concern is a closer call than Plaintiffs' other alleged speech concerning gender pay disparities. Even if the content and motivation behind this speech indicates it was not private speech, the lack of any allegations that it was publicized outside of the workplace or that the public was even aware of the matter pushes the scale the other way. Because Skinner and Hollier invoked qualified immunity, it was up to Plaintiffs to demonstrate that they had properly alleged constitutionally impermissible retaliation in response to this speech. *Walker v. Smith*, 2019 WL 1781422, at *4 (S.D. Miss. Apr. 23, 2019) ("Once [the defendant] invoked qualified immunity, [the plaintiff] had the burden 'to show that the defense is not available.'") (quoting *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010)). But Plaintiffs do not even explicitly address this speech in their opposition memorandum. Indeed, Plaintiffs do not clearly allege retaliation on the basis of *this* speech, and their opposition reflects the understanding that Plaintiffs allege retaliation on the basis of their complaints and reports to

supervisors, not their discussions with fellow women employees.[191]   To the extent that Plaintiffs do allege retaliation in response to this speech, they have not carried their burden to show that Hollier and Skinner cannot invoke qualified immunity on the basis that this speech is not properly alleged to have been protected by the First Amendment.

- **Reporting instances regarding LSU's treatment of male employees**

In its April 14, 2020 Order & Reasons, the Court found that because Plaintiffs alleged that they reported instances of male employees being paid for work they were not performing "in fulfillment of the requirements of Permanent Memorandum-76," this speech was made pursuant to their official duties as employees of LSU, and thus was made in their role as employees, not private citizens.[192]   Plaintiffs now allege that "such complaints even in the presence of policies such as Permanent Memorandum-76 are protected by the First Amendment."[193]   They argue that "a blanket statement like the one in PM-76 that purportedly requires everyone associated with LSU to report misconduct does not divest an individual of his or her free-speech rights under the First Amendment," pointing to *Anderson II*, in which the Fifth Circuit recognized that "under *Lane*, a general job-imposed obligation to detect and prevent wrongdoing does not qualify as an employee's official duty because such broad obligations fail to describe with sufficient detail the day-to-day duties of a public employee's job."[194]   Defendants maintain that Permanent Memorandum-76 "applies to all employees during their association with LSU" and thus, this alleged speech was "made as part of [Plaintiffs'] duty as LSU employees,"[195] arguing that

---

[191] *See* R. Doc. 61 at 28-33.
[192] R. Doc. 45 at 46 (quoting R. Doc. 31 at 20) (emphasis omitted).
[193] R. Doc. 50 at 20.
[194] R. Doc. 61 at 29 (quoting *Anderson II*, 913 F.3d at 477) (emphasis and alterations omitted).
[195] R. Doc. 56-1 at 23

Plaintiffs' reliance on *Lane* and *Anderson II* is misplaced because "the speech in both cases was made outside the plaintiffs' workplace to public authorities."[196]

In *Anderson*, the plaintiff, a former briefing attorney with a Texas court of appeals, reported misuse of public funds by that court's chief justice to the state commission on judicial conduct, after being directed to do so upon initially reporting the alleged conduct to the state supreme court. *Anderson II*, 913 F.3d at 474-75.   The plaintiff claimed that the judge who he reported later retaliated against him. *Id.*   At the pleadings stage, the defendant-judge argued that the plaintiff, in reporting the misconduct, spoke pursuant to official duties, and thus as an employee, because he spoke in discharge of a lawyer's general obligation to report judicial misconduct.   The *Anderson I* court rejected this argument, holding that the plaintiff's speech was "'the kind of activity engaged in by citizens' – including licensed lawyers – 'who do not work for the government,'" as "[a]ll lawyers, not just lawyers who are public employees, have a duty to report malfeasance." *Anderson I*, 845 F.3d at 597 (quoting *Garcetti*, 547 U.S. at 422-23).   The distinction between "ordinary" and "non-ordinary" job duties, which would implicate *Lane*, was not in question as the plaintiff had alleged his speech was made outside the chain of command and outside his job duties. *Id.* at 602.   At the summary-judgment stage, the *Anderson* defendant argued that the plaintiff, through his oath of office as briefing attorney, was subjected to the state code of judicial conduct which requires reporting judicial misconduct to the state commission on judicial conduct: an obligation which the plaintiff had stated he was fulfilling in reporting the defendant. *Anderson II*, 913 F.3d at 477.   It was in this context that the Fifth Circuit explained that "*Lane* and our post-*Lane* caselaw make clear that a general obligation to report misconduct does not constitute an 'official duty' demarcating employee speech under *Garcetti*." *Id.*   Because the alleged retaliation occurred before

---

[196] R. Doc. 67 at 8.

*Lane* was decided, however, this law was not clearly established at the time, and the Fifth Circuit held that the defendant was entitled to qualified immunity.  *Id.* at 477-78.

Plaintiffs, like the plaintiff in *Anderson*, were under a general job-imposed reporting obligation,[197] and the existence of such a general job-imposed duty is not alone sufficient (nor necessary) to determine that a plaintiff-employee spoke pursuant to her official duties.  *See Anderson I*, 845 F.3d at 595 ("[A] public employee's speech is made pursuant to his official duties when that speech is 'made in the course of performing his employment,' ***whether or not*** that speech was specifically 'demanded of him.'") (quoting *Williams*, 480 F.3d at 694) (emphasis added); *see also Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016) (explaining, in the context of a plaintiff-police-officer's cooperation with outside law enforcement agencies, that "general, implicit assumptions," such as a law enforcement officer's general duty to "detect and prevent crime," are "***not dispositive*** regarding the scope of a public employee's 'ordinary' job duties") (citations omitted; emphasis added); *Paske v. Fitzgerald*, 785 F.3d 977, 984 (5th Cir. 2015) ("When speech-related 'activities are required by one's position ***or*** undertaken in the course of performing's one job,' they are within the scope of the employee's duties.") (quoting *Haverda v. Hays Cty.*, 723 F.3d 586, 598 (5th Cir. 2013)) (brackets omitted; emphasis added).[198]  But in *Anderson I*, without reference to the plaintiff's explicitly job-imposed obligation, the Fifth Circuit

---

[197] And previously, Plaintiffs explicitly alleged – like the *Anderson* plaintiff had stated – that in reporting the alleged irregularities, they were fulfilling this obligation.  In their reformulated allegations, Plaintiffs do not contradict that they acted under this obligation.

[198] Defendants repeatedly point to this language from *Paske*.  *See* R. Docs. 56-1 at 17 (quoting *Paske*, 785 F.3d at 984); 67 at 8 (citing the same). But this language is taken from a pre-*Lane* opinion, *see Paske*, 785 F.3d at 984 (quoting *Haverda*, 723 F.3d at 598), before it was established that a general employment requirement is not necessarily within the ordinary scope of the employee's duties (and thus not necessarily an official duty for purposes of the *Garcetti* analysis). Hence, the notion that speech "required by one's position … [is] within the scope of the employee's duties" does not illuminate the issue here, nor was it dispositive in *Paske*.  There, as "part of his job," the plaintiff, a police sergeant, attended a closed-door meeting of high-ranking officers to discuss his police department's policy, where he spoke *upon invitation*.  *Id.*  The plaintiff was therefore engaging in a type of speech – contributing to the formation of police operations though participation in a closed-door meeting of supervisors – that private citizens generally cannot engage in, and so the Fifth Circuit held that he spoke as an employee, not a citizen.  *See id.*

held that the plaintiff spoke as a citizen because reporting judicial misconduct to the state commission on judicial conduct is the type of speech a citizen may engage in pursuant to a general duty (in other words, there existed a "citizen analogue" per *Garcetti*). *See Garcetti*, 547 U.S. at 424 ("When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.").  That there existed a "citizen analogue" did not mean that this general citizen duty could not be an "official duty" of the employee.  *See Anderson II*, 913 F.3d at 477-78 (rejecting the plaintiff's argument that "a job-imposed duty with a 'citizen analogue' is never an official duty for the purposes of *Garcetti*" because "endorsing his position 'would raise the question that *Lane* expressly declined to answer, that is, whether there are obligations as a citizen that preempt obligations as an employee for First Amendment purposes'") (quoting *Gibson II*, 773 F.3d at 670).  Here, unlike in *Anderson* and *Lane*, there is no "citizen analogue."  *See Lane*, 573 U.S. at 239 (explaining that the independent obligation to testify truthfully in judicial proceedings "renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee").

Plaintiffs allege that they reported instances of male employees being paid for work they were not performing to Hollier, Skinner, Jones, and supervisors in the affected areas.[199]  Thus, this speech, directed internally to supervisors, and almost certainly which resulted from special knowledge gained as employees, is the "sort of up-the-command-chain communication that is routinely denied First Amendment protection."  *Mitchell v. Par. of Jefferson*, 2020 WL 1046352, at *4 (E.D. La. Mar. 4, 2020) (citing *Davis*, 518 F.3d at 313 n.3).  A non-employee citizen is under no obligation to report financial irregularities at LSU to LSU supervisors.  Nor is there any indication that Plaintiffs' reports were made publicly, or somehow publicized, or even that they

---

[199] *See* R. Doc. 50-4 at 19 (sealed unredacted allegations).

were viewed or heard by anyone but Plaintiffs and their supervisors.[200]  Closed-door meetings or internal reports[201] concerning an employer's financial irregularities between the employer's in-house counsel and supervisors do not involve the type of speech citizens can usually participate in.  *See, e.g., Paske*, 785 F.3d at 984 ("[P]rivate citizens do not generally have the right to participate in closed-door meetings of ranking police officers.").  Furthermore, Plaintiffs' reporting misuse of funds to their own supervisors and superiors within the affected units – exactly as Permanent Memorandum-76 instructs LSU employees to do[202] – is behavior subject to LSU's control and intended to benefit LSU.  *See Corn*, 954 F.3d at 277 ("We examine whether [the plaintiffs] were subject to the employer's control or whether the [plaintiffs'] course of conduct was intended to serve any purpose of the employer.") (citation, quotation marks, and alteration omitted).  Notably, there is no indication that Plaintiffs' reports were tied to any complaint of gender discrimination or brought solely to improve treatment of women employees.

In sum, while the *Anderson* plaintiff's speech had a citizen analogue, and the question in *Anderson II* was whether the plaintiff's speaking pursuant to a general job-imposed duty meant that this speech was ***nonetheless*** speech made pursuant to an official duty, here, there is no citizen analogue and Plaintiffs' reports were clearly made in the course of their employment, which the existence of a general job-imposed duty via Permanent Memorandum-76 only reinforces. Plaintiffs would have the Court flip the inquiry on its head, so as to ask whether a general job-imposed duty is a duty ordinarily within the scope of a plaintiff's employment, in order to determine whether or not speech made pursuant to that duty is speech made pursuant to an official duty, ***even though*** there is no citizen analogue.  The Court declines to so distort precedent.  There

---

[200] Indeed, the allegations detailing the instances Plaintiffs allegedly reported are under seal in this matter. *See id.*

[201] It is not apparent from the allegations how Plaintiffs reported these instances to their supervisors.

[202] *See Permanent Memorandum 76*, *supra* note 151, at 2 ("Reports of financial irregularities may be made in any of the following ways: (1) Report to immediate supervisor or superior within the affected activity or unit … .").

is no question that reporting financial irregularities about coworkers' compensation to supervisors lies within the scope of Plaintiffs' employment for purposes of *Garcetti*, irrespective of whether Permanent Memorandum-76's explicit language would render it "ordinarily" so.  *See Anderson I*, 845 F.3d at 601-02 (explaining that *Lane* and post-*Lane* Fifth Circuit caselaw did not alter the *Garcetti* analysis "when an employee's allegations do not concern the distinction between 'ordinary' and 'non-ordinary' job duties") (citations omitted).  Plaintiffs spoke as employees in reporting the alleged misuse of funds to LSU supervisors, and so this speech is not protected by the First Amendment.

*      *      *      *

In conclusion, Plaintiffs have not shown that Hollier and Skinner cannot invoke the defense of qualified immunity from their claim of First Amendment retaliation.  Accordingly, both Hollier and Skinner are protected by the defense, and Plaintiffs have failed to state a First Amendment retaliation claim against either of them.

### 4.  Punitive damages

Defendants argue that because punitive damages are limited to Plaintiffs' § 1983 individual-capacity claims, which they argue are subject to dismissal, the Court should determine that punitive damages are unavailable to Plaintiffs.[203]  Plaintiffs argue that because they have pleaded viable § 1983 individual-capacity claims, they are entitled to pursue punitive damages.[204]

Because the Court does not dismiss Plaintiffs' § 1983 equal-protection discrimination claims against Hollier and Harman, Plaintiffs may still seek punitive damages against these two defendants.  Plaintiffs' claims for punitive damages against Skinner, however, are dismissed with prejudice because there remains no § 1983 individual-capacity claim against him.

---

[203] R. Doc. 56-1 at 24-25.
[204] R. Doc. 61 at 33.

IV.    **CONCLUSION**

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' partial motion to dismiss (R. Doc. 56) is GRANTED IN PART and DENIED IN PART.

The Court dismisses with prejudice and strikes front pay in lieu of reinstatement as available relief for Plaintiffs' § 1983 official-capacity claims, as such relief was previously dismissed with prejudice.  To the extent that Plaintiffs re-urged requests for declaratory judgment and permanent injunction as retrospective relief, the Court dismisses with prejudice and strikes such claims.  The Court also dismisses with prejudice Plaintiffs' § 1983 official-capacity claims against Harman; § 1983 equal-protection discrimination claim against Skinner in his individual capacity; § 1983 First Amendment retaliation claims against Hollier and Skinner in their individual capacities; and punitive damages as an available remedy against Skinner in his individual capacity.

The Court does not dismiss Plaintiffs' § 1983 official-capacity claims against Skinner or Hollier, but substitutes DeCuir in place of Skinner in his official capacity for all such remaining claims.  Neither does the Court dismiss or strike Plaintiffs' request for declaratory judgment or permanent injunction as prospective relief accompanying reinstatement.  The Court also does not dismiss Plaintiffs' § 1983 equal-protection discrimination claims against Hollier or Harman in their individual capacities, nor punitive damages as an available remedy against them.

New Orleans, Louisiana, this 4th day of August, 2020.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE