UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KATHERINE MUSLOW, *et al.*                          CIVIL ACTION

VERSUS                                              NO. 19-11793

BOARD OF SUPERVISORS OF                             SECTION M (2)
LOUISIANA STATE UNIVERSITY
AND AGRICULTURAL AND
MECHANICAL COLLEGE, *et al.*

## ORDER & REASONS

Before the Court are six motions for summary judgment.  Individual co-defendants Thomas

Skinner, John Harman, Carlton "Trey" Jones, III, and Larry Hollier (collectively, the "individual

Defendants") each filed his own motion for summary judgment against both plaintiffs, Katherine

Muslow and Meredith Cunningham (together, "Plaintiffs").[1]  Board of Supervisors of Louisiana

State University and Agricultural and Mechanical College ("LSU," and together with the

individual Defendants, "Defendants") filed two motions for summary judgment, one against each

plaintiff.[2]  Plaintiffs respond to each motion in opposition.[3]  Defendants reply in further support

of their motions.[4]  Having considered the parties' memoranda, the record, and the applicable law,

the Court grants each motion for the reasons set forth below.[5]

---

[1] R. Docs. 345; 347; 353; 372.

[2] R. Docs. 363; 365.

[3] R. Docs. 387; 388; 391; 396; 400; 402.

[4] R. Docs. 408; 410; 425; 427; 429; 432.

[5] Given the Court's disposition of the motions for summary judgment, it need not consider the remaining pending motions, including LSU's and Hollier's motions *in limine* to exclude testimony of Leslie Schiff; LSU's and Hollier's motions *in limine* to exclude testimony of Elizabeth Martina; LSU's and Hollier's motions *in limine* to exclude testimony of Caren Goldberg; and Plaintiffs' motion to strike exhibit from Jones's reply in support of summary judgment.  R. Docs. 350; 351; 352; 373; 374; 375; 440.

## I.     BACKGROUND

This case arises out of an employment dispute.  The LSU Health Sciences Center New Orleans ("LSUHSC-NO") employed both Muslow, who served as full-time general counsel from 2002-2019,[6] and Cunningham, who served as a part-time staff attorney from 2014-2019.[7]  Each worked at LSU's New Orleans location pursuant to at-will employment contracts[8] until the summer of 2019, when LSU retired Plaintiffs' respective positions in an effort to consolidate the university-wide legal team.[9]  Plaintiffs were on notice of the consolidation plan as early as August of 2018.[10]

This consolidation process began with LSU's December 10, 2018 revision of Permanent Memorandum-72 ("PM-72"), which concerned "Obtaining Legal Services and the Office of General Counsel."[11]  "University employees with legal degrees, but working outside of the Office of General Counsel, are not authorized to provide legal advice to or on behalf of the University," the memorandum provided.[12]  Accordingly, the revision mandated that only attorneys employed in or through the Office of General Counsel ("OGC") could represent LSU on legal matters.[13]  To consolidate all legal services under the OGC,[14] LSU planned to (1) retire the two LSUHSC-NO pre-consolidation attorney positions, namely, Muslow's position as general counsel and Cunningham's position as staff attorney, on June 30, 2019; and (2) hire for two new OGC-attorney

---

[6] R. Doc. 365-1 at 2, 9.
[7] R. Doc. 363-1 at 2, 8.
[8] R. Docs. 363-1 at 2; 365-1 at 9.
[9] *See* R. Doc. 365-5 at 3 (email from Skinner to Muslow: "I understand that Chancellor Hollier met with you and let you know that in conjunction with the revision of PM 72, all LSU legal resources are being consolidated under one organization.").
[10] R. Doc. 372-4 at 101.
[11] R. Doc. 365-6 at 1.
[12] *Id.*
[13] *Id.*
[14] R. Docs. 372-1 at 7; 372-4 at 110.

positions, which would be stationed at LSUHSC-NO.[15]  LSU intended to transition Plaintiffs to the two new OGC positions.[16]

On December 19, 2018, Thomas Skinner, Vice President of Legal Affairs and General Counsel at the OGC, emailed Muslow stating that all LSU legal resources were being consolidated under one organization, the OGC, and that LSU would "transition [Muslow] to OGC administratively sometime after January 1, with a new title of Chief Counsel of [LSU]HSC-NO, at the same compensation level."[17]  Weeks later, on January 8, 2019, both Plaintiffs met with Skinner and Carlton "Trey" Jones, OGC Deputy General Counsel, to discuss consolidation and their transfer to the OGC.[18]  Before that meeting, Plaintiffs each received an email from the OGC's business manager, Donna Dewailly, advising them of steps to facilitate their transfer from LSUHSC-NO to the OGC, which included "completing the online application information and attaching [their] resume[s]" so that Plaintiffs would be "set up" in LSU's Human Resources system.[19]  Later, Muslow received (1) the online application link referenced in Dewailly's previous email; and (2) a proposed OGC employment contract for the rank of Chief Counsel in the OGC, with a starting salary of $227,520, and an effective date of February 1, 2019.[20]  The new chief counsel salary matched her then-current salary as LSUHSC-NO general counsel,[21] despite the Baton Rouge Human Resources Management ("HRM") recommending a salary range between $156,000 and $188,000 for the new position.[22]  Similarly, Cunningham received (1) the online application link referenced in Dewailly's previous email; and (2) a proposed OGC employment

---

[15] R. Doc. 365-5 at 24.
[16] R. Docs. 363-1 at 4; 365-1 at 4.
[17] R. Doc. 365-5 at 3.
[18] R. Docs. 363-1 at 4; 363-4 at 2, 37; 365-1 at 4.
[19] R. Docs. 363-1 at 4; 363-4 at 38-39; 365-1 at 30; 365-5 at 6.
[20] R. Docs. 365-1 at 30; 365-5 at 7-11.
[21] R. Doc. 365-10 at 31-32.
[22] R. Docs. 365-1 at 6; 365-6 at 8.

contract for the rank of Staff Attorney in the OGC, with a starting salary of $76,500 for part-time employment at 60% effort, and an effective date of February 1, 2019.[23]   The new OGC staff-attorney position matched Cunningham's then-current salary and effort as LSUHSC-NO staff attorney.[24]   Both proposed contracts included the following acceptance clause:

> **Employee Acceptance of Approved Offer**
> I hereby accept the offer and the conditions of employment as stated above.   I acknowledge that any representations or conditions not stated above or incorporated by reference are not binding on the University and do not form part of this employment contract.[25]

As evidenced by two January 30, 2019 emails, Plaintiffs completed the online application, but did not execute the employment contracts.[26]   Accordingly, Dewailly sent Plaintiffs a reminder email requesting execution of the proposed employment contracts.[27]   Still, Plaintiffs did not execute their respective contracts.   Days later, Dewailly emailed Cunningham requesting that she sign and return the proposed employment contract as soon as possible because LSU is "trying to time the termination and hire transactions so there is not a lapse in pay or benefits."[28]   Again, Cunningham did not execute the contract.   On February 15, 2019, Muslow emailed Skinner, with Cunningham carbon copied, requesting that Plaintiffs' salaries be revisited before they executed the proposed employment contracts.[29]   She suggested that, based on the findings of LSUHSC-NO's Unclassified Employee Market Study (the "2017 Market Study" or "the study"), their salaries should be increased.[30]

---

[23] R. Docs. 363-1 at 4; 363-4 at 40-42.
[24] R. Docs. 363-4 at 15; 363-7 at 106.
[25] R. Docs. 363-4 at 42; 365-5 at 10.
[26] R. Docs. 363-1 at 5; 363-4 at 44; 365-1 at 5; 365-5 at 12; 365-10 at 24.
[27] R. Docs. 363-1 at 5; 363-4 at 45; 365-1 at 30; 365-5 at 13.
[28] R. Docs. 363-1 at 5; 363-4 at 45.   Cunningham then forwarded Dewailly's email to Muslow, stating that "[t]his is her second request to me."   R. Doc. 363-4 at 48.
[29] R. Doc. 363-5 at 1-2.
[30] *Id.* at 1.

LSUHSC-NO conducted the 2017 Market Study to "update the current pay structure, calculate the cost of the pay structure, and implement and evaluate the new pay structure" for unclassified positions, including Muslow and Cunningham's then-existing positions.[31]  The study surveyed, analyzed, and compared salaries based on various databases that included nation-wide university and professional data.[32]  A "critical" component of the study was the creation of "a job worth hierarchy that identifie[d] and assign[ed] a relative position within the LSUHSC-NO pay grade structure."[33]  Accordingly, HRM created "job families" and a pay-grade system to organize the data.

"Job families" were "groupings of related jobs" created to help organize unclassified positions, like general counsel and staff attorney.[34]  Job families included, *inter alia*, "Leadership," "Clinical Professional," "Student Services," "Human Resources," and "Accounting/Financial."[35]  The 2017 Market Study noted that "[j]obs within a job family have many similarities," namely, they (1) "[r]equire similar knowledge, skills and abilities (competencies)"; (2) "[h]ave a continuum of knowledge, skills and abilities that represent a career path from the lowest to the highest level job"; (3) "[p]ossess associated and related key behaviors"; and (4) "[h]ave similar market competitive pay characteristics and conditions."[36]  LSUHSC-NO HRM's pay-grade system consisted of 30 steps, where a pay grade is "a step within a pay grid [that] defines the amount of pay an employee will receive" and corresponds with a specific salary range for each position.[37]

---

[31] R. Doc. 365-4 at 37.
[32] *Id.* at 38.
[33] *Id.*
[34] *Id.* at 39.
[35] *Id.*
[36] *Id.*
[37] *Id.* at 38-39.

The study slated Cunningham's position, staff attorney, in the "Administrative Professional Non-Clinical" job family and the N37 pay grade,[38] which correlated with a salary range of $119,736 (minimum), $162,242 (midpoint), and $204,748 (maximum).[39]  At the time of the study, Cunningham's annualized salary was $127,500,[40] which exceeded the N37 pay grade minimum.[41]

Muslow's position, general counsel, was slated in the "Leadership" job family and the N43 pay grade, which correlated with a salary range of $227,520 (minimum), $315,116 (midpoint), and $402,711 (maximum).[42]  At the time of the 2017 Market Study, Muslow earned $182,475, which fell below the minimum salary range for her pay grade.[43]  Accordingly, on or about July 31, 2017, upon the recommendation of defendant Hollier, Muslow's base pay increased to $212,475, effective July 1, 2017.[44]  This increase, however, was still below the N43 pay grade minimum.[45] Muslow then met with Hollier and argued that she should receive a greater increase to at least the pay grade's minimum salary amount.[46]  Thereafter, Muslow's base pay was increased to $227,520, the N43 pay grade minimum, effective July 1, 2017.[47]

So, in light of the 2017 Market Study and the new positions offered at OGC, Muslow, in her February 15, 2019 email to Skinner, requested a review of the salaries offered for the new

---

[38] R. Doc. 363-5 at 23, 28.

[39] R. Docs. 363-1 at 3; 363-5 at 28.

[40] R. Doc. 363-7 at 106.

[41] R. Docs. 363-1 at 3; 363-5 at 28.  Cunningham was hired as a part-time employee.  At the time of the study, Cunningham was working at 60% effort with an annual salary of $76,500.  Her annualized salary at 100% effort was $127,500.

[42] R. Docs. 365-1 at 4; 365-4 at 44, 49.  Only one other person was slotted in the N43 pay grade with Muslow – Wendy Simoneaux.  R. Docs. 365-10 at 71 (deposition of Muslow: Q: "I believe you testified you were graded N43, and the other person [in that category] was Wendy Simoneaux, who was making more than you; is that correct?" A: "Yes."); 429 at 4.

[43] R. Docs. 365-1 at 4; 365-4 at 35.

[44] R. Docs. 365-1 at 1, 4; 372-1 at 4; 372-4 at 99; 387 at 6.

[45] Hollier says that he did not recommend a raise to the N43 pay-grade minimum at first because such a raise would have resulted in more than a 20% increase of Muslow's salary, and LSU President F. King Alexander requested that LSU implement such a high salary increase in stages.  R. Doc. 372-1 at 5.  He further explained that he "did not attempt to initially recommend the entire increase to the minimum of Muslow's paygrade in July 2017 because of Muslow's unsatisfactory job performance."  Id.

[46] R. Doc. 365-1 at 4.

[47] R. Docs. 365-1 at 4; 365-5 at 2.

6

OGC positions.[48]  Muslow suggested that, for her position, a salary adjustment from the offered $227,520 to $375,000 was "equitable and necessary" because (1) the 2017 Market Study "call[ed] for a minimum salary of $227,520 (<5 yr. experience), a midpoint of $315,116 (10-15 yr. experience) and a maximum of $402,711 (>15 yr. experience) at the N43 grade"; (2) she had "more than thirty years of legal experience"; and (3) she had "more than twenty years highly relevant professional experience representing the [LSU]HSC[-NO] in private practice and as an employee with institutional knowledge."[49]  In addition, Muslow suggested that Cunningham's salary be adjusted from $76,500 at 60% effort to $204,748 at 80% effort because Cunningham's "litigation experience alone justifie[d] a salary at the maximum level determined by the [2017 Market S]tudy," and her N37 pay grade corresponded with "a minimum salary of $119,736 (<5 yr. experience), a midpoint of $162,242 (10-15 yr. experience), and a maximum of $204,748 (> 15 yr. experience)."[50]  Three days after Muslow sent her email, LSU rescinded both of Plaintiffs' offers "pending further review," for the stated reason that the employment contracts were not executed or returned before or by the effective appointment date of February 1, 2019.[51]

On March 1, 2019, over a week after Plaintiffs' offers were rescinded, Muslow emailed Skinner and Larry Hollier, the LSUHSC-NO Chancellor, and carbon copied Cunningham, requesting a status update regarding their transfer to the OGC.[52]  In an email to Hollier and other university administrators, Skinner (1) recapped the OGC's plan to hire two OGC attorney positions that would be stationed at LSUHSC-NO with established salary ranges; (2) stated that "[t]he plan is for the existing HSC counsel positions to be retired on June 30, 2019, and for new positions to

---

[48] R. Doc. 363-5 at 1.
[49] R. Doc. 363-5 at 1.  Notably, the $375,000 salary Muslow requested would be greater than the salaries of her supervisors at the OGC.  For example, Jones's salary was $255,000 and Skinner's salary was $339,000.  R. Doc. 372-1 at 10.
[50] R. Doc. 365-5 at 1-2.
[51] R. Docs. 363-1 at 5-6; 363-5 at 3-4; 365-1 at 6-7; 365-5 at 18-19.
[52] R. Docs. 365-1 at 7; 365-5 at 20.

be created in OGC"; (3) detailed the OGC's communications with Muslow and Cunningham regarding the proposed employment contract; (4) advised that (a) the OGC was ready to advertise and fill the two new OGC attorney positions, and (b) if Plaintiffs decided to apply, they would receive the same consideration as any other applicant; and (5) requested confirmation that LSUHSC-NO's pre-consolidation positions would be retired by June 30, 2019.[53]  Later that day, Hollier responded, copying Plaintiffs, and confirmed that, "[i]n accordance with revised PM-72, LSUHSC-NO will retire [its] existing legal positions by June 30, 2019."[54]

Muslow replied on March 6, 2019, explaining that "[a]fter taking the time to compile new CVs, complete online applications, and obtain law-school and undergrad transcripts, [she and Cunningham] asked only that the salaries for [their] positions be reviewed before signing employment agreements with LSU. ... That [she] requested that [their] salaries be reviewed does not render [their] response to the employment agreements nonresponsive or a rejection of the offers."[55]  Muslow continued: "The [salary-review] request was a reasonable one, and [they were] taken aback that the official response has been to eliminate the very positions [they] were assured would be unaffected by the consolidation."[56]

Weeks later, on March 25, 2019, Hollier notified Muslow and Cunningham that their respective positions as LSUHSC-NO general counsel and staff attorney would be retired and their LSUHSC-NO employment terminated on June 30, 2019.[57]  Hollier advised both that new positions located within the OGC in Baton Rouge (but on permanent assignment to LSUHSC-NO) would be advertised and filled through HRM, and that Plaintiffs were "invited to apply."[58]  The next day,

---

[53] R. Docs. 365-1 at 7; 365-5 at 21-22.
[54] R. Doc. 365-5 at 23-24.
[55] *Id.* at 23.
[56] *Id.*
[57] R. Docs. 363-1 at 6; 363-5 at 11; 365-1 at 7; 365-6 at 1.
[58] R. Docs. 363-5 at 11; 365-6 at 1.

on March 26, 2019, Muslow filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") against LSUHSC-NO, stating: "I believe I have been discriminat[ed] against based on my sex/female/wages, age/59 years and threatened with termination in retaliation for complaining about protected activity."[59]  In the complaint, Muslow recited the particulars of her charge as follows:

> In December 2018, I was advised that I was being transferred to LSU OGC's office. I agreed to the transfer and requested a salary review to bring my salary in compliance with the data in the salary market analysis.  I was then advised that the offer of transfer was being rescinded.  On March 1, 2019, management advised that my position was being eliminated effective June 30, 2019. ... No reason was given for the actions taken against me.[60]

Cunningham was neither a party to nor mentioned in the complaint itself,[61] but she indicated in a supplemental letter to the EEOC that Muslow's submission was a charge brought on her behalf as well.[62]   Enclosed with that supplemental letter were "relevant documents," including communications with Muslow's employer, and a jump drive containing the results of the 2017 Market Study.[63]  Plaintiffs removed, retained, and released these nonpublic, confidential, and privileged documents from LSU's files without its knowledge, informed consent, or conflict waiver.[64]

On April 4, 2019, Dewailly notified Muslow and Cunningham that the OGC chief counsel and staff attorney positions were posted online and that applications would be accepted through April 28, 2019.[65]  She provided them both with the link to the application form for their respective

---

[59] R. Doc. 365-8 at 11-12.
[60] *Id.* at 11.
[61] *Id.* at 11-15.
[62] *Id.* at 17.
[63] *Id.*
[64] R. Doc. 365-1 at 38-40.
[65] R. Docs. 363-1 at 7; 363-5 at 12; 365-1 at 7-8; 365-6 at 2.

positions.[66]  Neither plaintiff responded.[67]  On May 2, 2019, after the timeline to apply for the

OGC positions expired, Jones reached out to Muslow and Cunningham in separate emails, stating:

"I noticed that you are not in the online applicant pool.  Did you intend to apply?  Please let me

know by close of business May 3, 2019 if you would like to be considered."[68]  Cunningham did

not reply.[69]  Instead, on May 3, 2019, Muslow responded:

> [Cunningham] and I completed all the steps to get us set up in the HR system, which
> included an online application, resumes, and law-school/undergrad transcripts, last
> January.  As far as we knew, our positions had already "transferred" to OGC with
> our principal establishment remaining the [LSU]HSC[-NO].  It was only after we
> raised concerns about gendered wage disparities at the HSC and requested salary
> reviews that our unexecuted employment contracts were purportedly rescinded.
>
> We stand by our request for salary reviews and to be paid fairly as compared to our
> male peers and consistent with the HSC's 2017 market study.
>
> In asking if we intend to "apply" for our jobs, are you indicating that salary reviews
> will, indeed, take place and that we will be compensated equitably and in line with
> the HSC's market study?[70]

In response, Jones copied Cunningham and explained that he "was simply trying to determine if

[Muslow] was still interested once [he] discovered [Muslow's] name was not in the online

applicant pool."[71]  He noted that "the existing positions at [LSU]HSC[-]NO are scheduled to end

by June 30, 2019 in favor of the new positions under the LSU Office of General Counsel" and that

he would "forward [her] resume to the committee to be included in the applicant pool for the Chief

Counsel position."[72]  In response, Muslow stated that "[u]nless [her] position [were] going to be

compensated as dictated by the [2017] market study done at the HSC, which is the 'establishment'

---

[66] R. Docs. 363-1 at 7; 363-5 at 12; 365-1 at 7-8; 365-6 at 2.
[67] R. Docs. 363-1 at 7; 365-1 at 8.
[68] R. Docs. 363-5 at 13; 365-6 at 4-5.
[69] R. Doc. 363-1 at 7.
[70] R. Doc. 365-6 at 4.
[71] *Id.* at 3.
[72] *Id.*

for [her] position, [Jones] do[es] not have [her] permission to treat [her] as an 'applicant' for a position [she] ha[s] held going on eighteen years now.  [Cunningham] concurs."[73]

"The new Chief Counsel position is different with a different reporting structure, more focus on assisting administration and less focus on litigation," responded Jones.[74]  "[LSU] advertised the new Chief Counsel position and several applications were received," he continued, adding that (1) Muslow's "participation in the process [was] welcome but certainly not presumed"; (2) he had previously forwarded her resume to the committee reviewing applications; and (3) if he did not receive a response by May 15, 2019, at 5:00 p.m., confirming that her application should be considered, he would take her May 13, 2019 email as direction not to include her application in the process.[75]  Muslow did not respond.  And Jones removed her and Cunningham's applications from consideration.[76]

On June 18, 2019, Hollier distributed a memo to Muslow and Cunningham noting that their legal positions at LSUHSC-NO were ending on June 30, 2019, and describing steps to "begin the transition of legal efforts for LSUHSC-NO to the Office of General Counsel."[77]  Cunningham's at-will employment ended on June 30, 2019.[78]  Muslow's did not.  On June 25, 2019, Hollier emailed Muslow that he would extend her end date until July 15, 2019, to provide more time to complete the transitional assignments and to ensure that there would be no financial impact to her retirement resulting from an earlier end date.[79]  The next week, Muslow replied that she wanted to "make clear that [she] strongly disagree[d] with ... [Jones's] apparent suggestion that [she] ha[d]

---

[73] R. Docs. 363-5 at 14; 365-6 at 3.
[74] R. Doc. 365-6 at 7.
[75] Id.
[76] R. Docs. 363-1 at 7; 365-1 at 9; see also R. Doc. 365-6 at 11 (email from Donna Dewailly: "On May 8, 2019, we submitted the resume of Kathy Muslow to the candidate pool for the new Chief Counsel position.  Ms. Muslow has since indicated that she does not want to be part of the pool so her name will be removed.").
[77] R. Doc. 365-6 at 13.
[78] R. Docs. 363-1 at 8; 363-4 at 2.
[79] R. Docs. 365-1 at 9; 365-6 at 14.

ever had any intention of 'retiring' from [her] position."[80]  She advised that she would be available until July 15, 2019, and that all future communications be made through her legal counsel.[81]  On July 15, 2019, Muslow's at-will employment ended.[82]  Following Muslow's termination, the OGC hired Louis Colletta to fill the Chief Counsel position for LSUHSC at an annual salary of $182,500, approximately $45,000 less than the $227,520 salary offered to Muslow for that same position.[83]  OGC never filled the staff attorney position.[84]

After extensive motion practice, the following claims remain: (1) gender discrimination in violation of Title VII against LSU; (2) retaliation in violation of Title VII against LSU; (3) gender discrimination in violation of the Equal Pay Act ("EPA") against LSU, Hollier, Harman, and Skinner; (4) retaliation in violation of the EPA against LSU, Hollier, Skinner, and Jones; and (5) gender discrimination in violation of § 1983 against Harman and Hollier.[85]

## III.    LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates

---

[80] R. Doc. 365-6 at 15.
[81] R. Doc. 365-6 at 15.
[82] R. Docs. 365-1 at 9; 365-4 at 2.
[83] R. Doc. 372-1 at 12.
[84] R. Doc. 345-1 at 9.

[85] R. Doc. 99 at 12-16.  The Court notes that while Plaintiffs refer to their discrimination claims as "gender discrimination" rather than disparate treatment, disparate treatment is the form of unlawful employment discrimination at issue.  *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 995 n.1 (5th Cir. 2022) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) ("'Disparate treatment' ... is the most easily understood type of discrimination.  The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin ... Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.'  The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.")).

the entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Id*.  A party moving

for summary judgment bears the initial burden of demonstrating the basis for summary judgment

and identifying those portions of the record, discovery, and any affidavits supporting the

conclusion that there is no genuine issue of material fact.  *Id*. at 323.  If the moving party meets

that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate

the existence of a genuine issue of material fact.  *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the

nonmoving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The substantive

law identifies which facts are material.  *Id*.  Material facts are not genuinely disputed when a

rational trier of fact could not find for the nonmoving party upon a review of the record taken as a

whole.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC

v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014).  Unsubstantiated assertions, conclusory

allegations, and merely colorable factual bases are insufficient to defeat a motion for summary

judgment.  *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th

Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994).  In ruling on a summary-judgment

motion, a court may not resolve credibility issues or weigh evidence.  *See Delta & Pine Land Co.

v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008).  Furthermore, a court

must assess the evidence, review the facts, and draw any appropriate inferences based on the

evidence in the light most favorable to the party opposing summary judgment.  *See Tolan v. Cotton*,

572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).  Yet,

a court only draws reasonable inferences in favor of the nonmovant "when there is an actual

controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

**B. Title VII and Section 1983 Gender-discrimination Claims**

Plaintiffs assert a Title VII gender-discrimination (disparate treatment) claim against LSU, arguing that "LSU has intentionally discriminated against Plaintiffs on the basis of their gender in violation of Title VII by, among other things, (a) compensating them at rates lower than similarly situated male co-workers; and (b) terminating their employment."[86] Plaintiffs also allege a similar § 1983 gender-discrimination claim against Harman and Hollier, arguing that they "caused Plaintiffs to be deprived of their rights and privileges to be free of gender discrimination in violation of the Fourteenth Amendment to the U.S. Constitution" – in other words, an equal-

---

[86] R. Docs. 50 at 36; 99 at 12.

14

protection claim.[87]  LSU contends that Plaintiffs' claim fails because Plaintiffs cannot establish a *prima facie* case.[88]  Harman and Hollier agree.[89]  So, too, does the Court.  Despite giving an overly generous reading of Plaintiffs' papers and setting aside Plaintiffs' unsupported, conclusory assertions, the Court finds that Plaintiffs' Title VII and § 1983 gender-discrimination claims fail for two reasons: (1) Plaintiffs have no direct or circumstantial evidence of discrimination and cannot establish a *prima facie* case in the absence of a proper comparator; and (2) even if they could establish a *prima facie* case, Plaintiffs cannot establish pretext.

Title VII prohibits employers from intentionally discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment based on the individual's gender or other protected class.  42 U.S.C. § 2000e–2(a)(1); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).  "A plaintiff can prove intentional discrimination through either

---

[87] R. Doc. 99 at 15.  "Section 1983 and [T]itle VII are 'parallel causes of action.'"  *Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007) (quoting *Cervantez v. Bexar Cnty. Civil Serv. Comm'n*, 99 F.3d 730, 734 (5th Cir.1996)).  "When a § 1983 [equal-protection] claim is used as a parallel to a Title VII claim under a given set of facts, the elements required to be established for each claim are deemed the same under both statutes."  *Merwine v. Bd. of Trs. for State Insts. of Higher Learning*, 754 F.2d 631, 635 n.3 (5th Cir. 1985); *see also Lee v. Conecuh Cnty. Bd. of Educ.*, 634 F.2d 959, 961-62 (5th Cir. 1981); *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018) (observing that when a plaintiff brings an equal-protection wage-discrimination claim under § 1983, her "claim should be analyzed under the doctrinal framework applicable to wage-discrimination cases brought under Title VII").  Accordingly, where, as here, the same set of facts support both the Title VII and § 1983 claim, the claims will be analyzed under the Title VII evidentiary framework.  *See Lawrence v. Univ. of Tex. Med. Branch*, 163 F.3d 309, 311 (5th Cir. 1999).

[88] R. Doc. 365-1 at 25-29.

[89] In his motion for summary judgment, Harman contends that Plaintiffs' § 1983 claim against him fails because "the plaintiffs simply cannot establish that [he] intentionally conducted his duties as Vice Chancellor in a manner that intended to/and proximately caused the Constitutional injuries which they complained of."  R. Doc. 347-1 at 11.  Further, Harman argues that if Plaintiffs could support their § 1983 claim, he enjoys qualified immunity, as all of his actions were "squarely ministerial."  *Id.*

Similarly, in his motion for summary judgment, Hollier argues that Plaintiffs' § 1983 claim against him fails as a matter of law because Plaintiffs cannot establish that they were treated less favorably than other employees outside of their protected group under nearly identical circumstances – *i.e.*, comparators.  R. Docs. 372-1 at 41; 432 at 4-5.  Hollier argues that if a proper comparator exists, Plaintiffs' claim still fails because their "conclusory allegations" cannot establish that Hollier had discriminatory intent.  R. Doc. 372-1 at 41-42, 45.  Further, Hollier argues that even if Plaintiffs were able meet their *prima facie* burden, he is entitled to qualified immunity.  *Id.* at 45-46.

In their oppositions, Plaintiffs rely upon unsupported conclusions regarding genuine issues of material fact, intentional discrimination, and qualified immunity.  *See, e.g.,* R. Docs. 387 at 23; 391 at 3, 5.  Harman and Hollier respond to these conclusions, R. Docs. 410 at 1; 432 at 9, but there is no need to analyze these additional arguments because dismissal of the § 1983 claims is warranted for Plaintiffs' failure to identify comparators and pretext.

direct or circumstantial evidence." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Plaintiffs have not identified any direct evidence of discrimination.[90] When a plaintiff's Title VII discrimination claim relies entirely on circumstantial evidence, as here, it is subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the initial burden rests with the plaintiff to establish a *prima facie* case by showing that "she (1) belongs to a protected group, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) either (i) was replaced by someone outside of the protected group, or (ii) was treated less favorably than a similarly situated employee (disparate treatment)." *Walker v. Smith*, 801 F. App'x 265, 269 (5th Cir. 2020). If a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). Thereafter, the burden shifts back to the plaintiff to establish that the employer's asserted reason is pretextual. *Id.* The "ultimate burden" of persuasion remains with the plaintiff at "all times." *Id.*; *see also Turner v. Kan. City S. Ry.*, 675 F.3d 887, 900 (5th Cir. 2012) ("The plaintiff's 'ultimate burden' is to 'persuade the trier of fact that the defendant intentionally discriminated against the plaintiff.'") (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (alteration omitted).

---

[90] Of the thousands of pages of evidence in the record, Plaintiffs do not identify any direct evidence of discrimination. "'In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face.'" *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) (quoting *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994)). "A statement or document which shows 'on its face that an improper criterion served as a basis – not necessarily the sole basis, but a basis – for the adverse employment action is direct evidence of discrimination.'" *Id.* (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005)) (alteration omitted). Absent direct evidence, the Court relies on the *McDonnell Douglas* framework.

### 1.  Plaintiffs cannot establish a *prima facie* case.

Defendants do not contest the first three elements of a *prima facie* case: namely, that each of the Plaintiffs (1) belonged to a protected group; (2) was qualified for the position; and (3) suffered an adverse employment action.  *See Walker*, 801 F. App'x at 269.  The final element, however, remains in dispute – that is, whether Plaintiffs were treated less favorably than a similarly situated employee outside of their protected class.  *See id.*; *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001).  Based on the summary-judgment record before the Court, Plaintiffs have not shown that they were treated less favorably than a similarly situated male employee.

"The 'similarly situated' prong requires a Title VII claimant to identify at least one coworker outside of his protected class who was treated more favorably 'under nearly identical circumstances.'"  *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009)).  "This coworker, known as a comparator, must hold the 'same job' or hold the same job responsibilities as the Title VII claimant; must 'share the same supervisor or' have his 'employment status determined by the same person' as the Title VII claimant; and must have a history of 'violations' or 'infringements' similar to that of the Title VII claimant."[91]  *Id.* (alteration omitted).  "'By properly showing a significant difference in job responsibilities, [a defendant] can negate one of the crucial elements in [the plaintiff's] prima facie case' of discrimination."  *Herster*, 887 F.3d at 185 (quoting *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981)); *see also Fields v. Stephen F. Austin State Univ.*, 611 F. App'x 830, 832 n.2 (5th Cir. 2015) ("[A] plaintiff who intermittently performed the same

---

[91] No party provided information regarding the violation histories of Plaintiffs or their proffered comparators. Accordingly, the Court will only examine the first two parts of the comparator analysis, namely, that the comparator must (1) hold the same job or job responsibilities as Plaintiffs; and (2) share the same supervisor or have his employment status determined by the same person.  *See Alkhawaldeh*, 851 F.3d at 426.

duties as a comparator was not sufficient to rebut the differences in responsibility made clear from the summary judgment record.") (quotation and alteration in original omitted). "A failure to identify a potential comparator (*i.e.*, a similarly situated individual outside the protected class) 'alone justifies dismissal of a plaintiff's Title VII claim.'" *Saketkoo v. Tulane Univ. Sch. of Med.*, 510 F. Supp. 3d 376, 386 (E.D. La. 2020) (quoting *Alkhawaldeh*, 851 F.3d at 427 (alteration omitted)), *aff'd*, 31 F.4th at 995, 1004. Therefore, "[i]f no such comparator exists, the plaintiff cannot establish a *prima facie* case." *Id.* (citing *Alkhawaldeh*, 851 F.3d at 427).

### a. Muslow cannot identify a proper comparator as a matter of law.

Muslow proffers many comparators. But none is proper as a matter of law. Muslow argues that there are ten male employees who were allegedly "performing work requiring substantially less responsibility and/or equal skill than Muslow who were paid relatively equivalent or higher salaries than Muslow" – namely, Ben Lousteau, Executive Director of Fiscal Operations for the School of Medicine; Brent Herold, Executive Director of Supply Chain and Auxiliary Operations; John Ball, Associate Vice Chancellor of Property and Facilities; Matt Altier, Assistant Vice Chancellor of Business Development; Edwin Murray, Vice Chancellor of Government and Multicultural Affairs; Richard Buhler, Senior Contracts Administration Officer; Jimmy Cairo, Dean of the School of Allied Health; Demetrius Porche, Dean of the School of Nursing; Louis Colletta, former OGC Chief Counsel and LSUHSC-NO Chief of Staff; and Timothy Fair, Vice Chancellor for Diversity and Inclusion.[92] These are the only alleged comparators Muslow identifies by name.[93] In addition, Muslow argues that (1) the deans, vice chancellors, and assistant

---

[92] R. Docs. 365-1 at 13; 365-2 at 25-26.

[93] The Court notes that, in a supplemental response to LSU's interrogatory regarding the identities of Muslow's proffered comparators, Plaintiffs wrote: "*See also*, Expert Reports of Elizabeth Martina, produced April 12, 2021." R. Doc. 365-6 at 22. Plaintiffs' reference to Martina's expert report to identify Muslow's comparators is unavailing since the report does not include any individual names of possible comparators. R. Docs. 365-1 at 13; 365-6 at 24-28. As noted by LSU, R. Doc. 365-1 at 13 n.5, it is simply unclear who Martina assumes is a comparator because there are no names listed, just a general reference to the 2017 Market Study. R. Doc. 365-6 at 24-28.

vice chancellors are similarly situated comparators;[94] and (2) the 2017 Market Study created comparators on its face – *i.e.*, those in the same "N" classification.[95]

Of the ten male employees specifically identified, those who were paid less than Muslow are inappropriate comparators. *Wiley v. Am. Elec. Power Serv. Corp.*, 287 F. App'x 335, 341 (5th Cir. 2008) (observing that, to establish a *prima facie* case of pay discrimination, a plaintiff must show that she was "paid less than the employee of the opposite sex providing the basis of comparison"); *see also Spears v. Louisiana*, 767 F. Supp. 2d 629, 643 (M.D. La. 2011) (holding that plaintiff failed to establish *prima facie* case of pay discrimination where she received a higher salary than her comparator); *cf. Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993) (holding that plaintiff failed to establish *prima facie* case under the EPA where male comparators did not receive higher compensation than plaintiff). For example, where Muslow earned $227,520, proffered comparators Ben Lousteau, the executive director of fiscal operations for the school of medicine, earned $183,467.02; Brent Herold, the executive director of supply chain and auxiliary operations, earned $185,000.04; John Ball, the associate vice chancellor of property and facilities, earned $186,221.04; Matt Altier, the assistant vice chancellor of business development, earned $215,000.04; Richard Buhler, the senior contracts administration officer, earned $152,889.08; and Louis Colletta, the former OGC chief counsel at LSUHSC-NO,[96] earned $182,500.[97] Because

---

[94] R. Docs. 365-1 at 13; 365-10 at 69-71.

[95] R. Doc. 396 at 23.

[96] LSU also notes that Colletta's position changed from OGC chief counsel at LSUHSC-NO to LSUHSC-NO chief of staff, where he earned $249,000. R. Docs. 365-1 at 15; 365-7 at 31-35. Yet Plaintiffs claim that soon after Colletta was hired, his salary was raised to $264,000, citing no evidence in support. In opposition to LSU's argument that Colletta as chief of staff is not a proper comparator, Plaintiffs state that his salary "was two quadrants more than where he should have been with regards to experience within LSU's pay scale. By this logic if Mr. Colletta's $264,000 pay was warranted then Ms. Muslow should have been making approximately $402,000 during her employment." R. Doc. 396 at 21. This two-sentence "argument" is not adequate (1) to refute LSU's fully supported argument that Colletta is not a proper comparator; or (2) to establish that Muslow and Colletta's circumstances were nearly identical. *See Foster v. Ferrellgas, Inc.*, 834 F. App'x 88, 91 (5th Cir. 2020). Accordingly, Colletta, in his chief-of-staff position, is not a proper comparator.

[97] R. Doc. 365-1 at 13-22.

these proffered comparators make less than Muslow, they are insufficient to establish a *prima facie* case of pay discrimination.[98]  *See Durham v. AMIKids, Inc.*, 2019 WL 12290115, at *6 (M.D. La. Jan. 11, 2019) ("[Plaintiff] cannot rely on Jones or Atterbury as comparators because, by her own admission, neither earned more than she did.").

Of the ten male employees identified, only four were paid more than Muslow, specifically, Edwin Murray, Jimmy Cairo, Demetrius Porche,[99] and Timothy Fair.  These employees, however, are inappropriate comparators because they are not similarly situated in that their circumstances were not nearly identical with those of Muslow.  Muslow's position, general counsel, was slotted in the "Leadership" job family and the N43 pay grade, which correlated with a salary range of $227,520 (minimum), $315,118 (midpoint), and $402,711 (maximum).[100]  Muslow earned $227,520.[101]  She reported to Hollier.[102]  Her position mandated that she hold a juris doctorate ("J.D.") degree and a Louisiana bar license.[103]  Her "[d]uties and responsibilities included strategic support and legal guidance, including advis[ing] on legal matters, perform[ing] administrative filings, conduct[ing] legal research and analysis, and insur[ing] compliance with federal, state, and local laws and regulations."[104]  Muslow was also tasked with reviewing, analyzing, and compiling

---

[98] It is unclear whether Muslow, when analyzing alleged salary discrepancies, intends to utilize her $227,520 salary or the lower salaries she earned before her salary was raised to the 2017 Market Study minimum level.  As discussed, Muslow previously earned $182,457, then, after a pay raise, $212,475.  Regardless, these individuals are not proper comparators as a matter of law.  Buhler earned less than the lowest salary Muslow earned; therefore, he is not a proper comparator.  Further, while Lousteau, Herold, Ball, and Altier earned more than Muslow's lowest salary, Plaintiffs effectively concede that they are not comparators because they fail to rebut Defendants' arguments regarding their non-comparator status.  Finally, while Colletta as chief counsel at LSUHSC-NO earned three dollars more than Muslow's lowest salary, he, in that position, is not a proper comparator either because Plaintiffs present no evidence that Muslow's and Colletta's circumstances are nearly identical.

[99] Defendants contend that Porche is not a comparator, and Porche is not addressed in Plaintiffs' oppositions. *See* R. Docs. 396; 402.  Accordingly, because Plaintiffs fail to rebut Defendants' argument that Porche is not a proper comparator, they effectively concede the point.  *See Kellam v. Metrocare Servs.*, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013) (observing that a failure to respond to or adequately brief an argument results in waiver or concession of the argument) (collecting cases).

[100] R. Docs. 365-1 at 4; 365-4 at 44, 49.

[101] R. Docs. 365-1 at 4; 365-5 at 2.

[102] R. Doc. 365-4 at 44.

[103] R. Docs. 365-1 at 13; 365-6 at 30-31.

[104] R. Docs. 365-1 at 13; 365-6 at 29.

data to determine the legality, liability, and advisability of certain actions; preparing legal documents; advising, participating in, or directing the legal defense strategies; reviewing legislation and legal documents; and deposing faculty and staff to obtain information and provide legal analysis.[105]   As set forth below, Muslow's job duties, responsibilities, and required credentials are readily distinguishable from those of her proffered comparators.

**Edwin Murray:** Muslow argues that Edwin Murray, vice chancellor of government and multicultural affairs,[106] is a comparator.  Murray earned $243,750 a year.[107]  He was assigned to the N41 pay grade[108] and the Leadership job family.[109]  He, like Muslow, reported to Hollier.[110] Murray's position required (1) a master's degree in either business administration, public administration, health administration, law, public health, or a related field; (2) eight to ten years of experience in an academic or governmental affairs setting; and (3) three to five years of experience in a senior level administrator position.[111]   His duties and responsibilities included "(i) advocat[ing] and develop[ing] multicultural affairs programs and initiatives; (ii) serv[ing] as university Risk Management and Security Officer; (iii) interfac[ing] with internal and external relations to support community affairs and contacts; and (iv) sit[ting] on Faculty Oversight committee, and oversee[ing] and monitor[ing] all system contracts involving LSU personnel."[112] In addition, he (1) oversaw the (a) management of the LSU Health Police staff to ensure a safe and secure campus, and (b) support, tracking and management of malpractice insurance matters; and

---

[105] R. Doc. 365-6 at 29-30.
[106] R. Doc. 365-4 at 45.
[107] R. Docs. 365-1 at 18; 365-4 at 50.
[108] R. Doc. 365-4 at 50.
[109] *Id.* at 45.
[110] R. Doc. 365-1 at 18.
[111] R. Doc. 372-11 at 11.
[112] R. Docs. 365-1 at 18-19; 365-7 at 5-6; 372-11 at 10.

(2) interfaced directly with the Louisiana attorney general's office regarding malpractice coverage, legal representation, and case-management issues.[113]

Murray is not a proper comparator. None of Murray's duties, responsibilities, or required credentials as vice chancellor of government and multicultural affairs is nearly identical to those Muslow had as general counsel. Muslow was never tasked with, *inter alia*, developing multicultural affairs programs and initiatives or managing the LSU Health Police staff, which takes up approximately 60% of Murray's time.[114] And similarly, Murray – a non-lawyer – could never be tasked with conducting legal research, giving legal advice, or defending lawsuits, which takes up more than 65% of Muslow's time.[115] Moreover, Muslow had to have a J.D. degree to perform her job, whereas Murray does not. Instead, his job requires eight to ten years of experience in an academic or governmental affairs setting, which Muslow's job did not require and Muslow does not have. These significant differences, among others, demonstrate that Murray and Muslow did not operate under nearly identical circumstances, and, hence, are not similarly situated.

Plaintiffs essentially concede that Muslow and Murray are not comparators as they fail to argue that Muslow and Murray performed comparable work. In their two-sentence response to Defendants' argument that Murray is not a proper comparator, Plaintiffs simply say that "[Murray's] pay is 2 quadrants over from the experience he possessed. If this pay was appropriate, then Ms. Muslow should have been paid approximately $400,000."[116] This "argument" does not

---

[113] R. Doc. 372-1 at 25 (citing R. Doc. 372-11 at 10).

[114] R. Doc. 372-11 at 10.

[115] R. Doc. 365-6 at 29-30.

[116] R. Doc. 396 at 22. Plaintiffs proclaim that the lower salaries of Muslow's proffered comparators (as with Murray's here) show how much Muslow "should have been making," but they offer no explanation, reasoning, or formula in support. For example, Plaintiffs conclude that because "Buhler was paid $152,889.08, an amount for only those with 15 years or more experience within his pay grade," and he "was hired [on] 10/16/2007," Muslow "should have been making approximately $400,000." *Id.* at 21. The Court should not be expected to intuit how Plaintiffs came to this conclusion when no explanation is given. Regardless, this conclusory assertion – repeatedly made in support of comparator status – is insufficient to show that Buhler, Murray, or any other proffered comparator is appropriate as a matter of law.

begin to establish that Murray and Muslow functioned in "nearly identical" circumstances.  *See Foster*, 834 F. App'x at 91 (affirming grant of summary judgment where plaintiff "provided virtually no evidence concerning [the proffered comparators'] relevant qualifications, nor did she establish that they performed comparable work").  Obvious and significant differences in job responsibilities (*viz.*, legal representation as opposed to government and multicultural affairs) between the two exist and Plaintiffs fail to argue anything to the contrary.  Therefore, Murray is not a proper comparator.

**Jimmy Cairo:**  Similarly, Jimmy Cairo, the dean of the school of allied health, is not a suitable comparator.  Cairo earned $260,706.[117]  He was assigned to the N41 pay grade, the Leadership job family, and, like Muslow, reported to Hollier.[118]  His position required a Ph.D. degree in a health-related profession and five years' experience as an allied health practitioner.[119] His duties included: "(i) overall direction and management of School of Allied Health; (ii) fiscal planning and management for the school; (iii) improv[ing] interdisciplinary learning and research activities of school; (iv) recruit[ing] funding opportunities for school; and (v) establish[ing] partnerships with community leaders, alumni, etc."[120]

Importantly, none of these responsibilities mirrors Muslow's responsibilities as general counsel.  And, as Hollier argues, "[i]t is incredulous to purport that a legal position requires equal, skill, effort, and responsibility and such duties are under similar working conditions as a Dean of a graduate school."[121]  Muslow, tasked with providing legal support and strategic legal-related guidance, was never responsible for managing the School of Allied Health or recruiting funding

---

[117] R. Doc. 365-1 at 21.
[118] R. Docs. 365-1 at 21; 365-7 at 17.
[119] R. Docs. 365-1 at 21; 365-7 at 18.
[120] R. Docs. 365-1 at 21; 365-7 at 17.
[121] R. Doc. 372-1 at 25.

opportunities for the school, which took up approximately 80% of Cairo's time,[122] nor was she required to have a Ph.D. degree in a health-related profession or five years' experience as an allied health practitioner.  Further, Cairo was never tasked with giving legal advice, making legal and administrative filings, drafting legal documents, and deposing witnesses, which took up at least 75% of Muslow's time.[123]  Therefore, it cannot be said that Muslow and Cairo had the same job and job responsibilities as would make them similarly situated.

Again, Plaintiffs effectively concede this.  In their one-sentence argument in favor of Cairo as a comparator ("Jimmy Cairo: If pay is appropriate then Muslow should be making approximately $365,000."), Plaintiffs fail to show (1) that Muslow and Cairo are similarly situated and operated in "nearly identical" circumstances; and (2) the lack of a significant difference in their job responsibilities.  *See Foster*, 834 F. App'x at 91.  And so, Cairo is not a proper comparator.

**Timothy Fair:** Timothy Fair, vice chancellor for diversity and inclusion, is not a proper comparator, either.  He was assigned to the N39 pay grade.[124]  He earned a salary of $240,000.[125]  He, unlike Muslow, reported to Steve Nelson.[126]  Unlike Muslow's general counsel position, Fair's position required a doctorate, ten years' professional experience with at least five years in a senior leadership capacity in a university or academic medical center setting, and experience with diversity programs.[127]  Fair's responsibilities included "(i) oversee[ing] all LSUHSC-NO schools to build and support more inclusive and diverse campus, including development and management of Diversity Strategic Plan; (ii) leadership to campus police department; (iii) promot[ing] Office of Diversity and Inclusion; (iv) serv[ing] as chair or facilitator for committees that address

---

[122] R. Doc. 365-7 at 17.
[123] *See* R. Doc. 365-6 at 29-30.
[124] R. Doc. 365-7 at 42.
[125] R. Doc. 365-1 at 20.
[126] R. Doc. 365-7 at 43.
[127] *Id.* at 40.

inclusion, diversity and equity issues; (v) develop[ing] a framework and evaluation system for monitoring diversity for all LSUHSC-NO units; and (vi) actively support[ing the] LSU System Supplier Diversity Program."[128]  Fair's job description details that "[p]rior experience working in an academic medical center, health system or teaching hospital is highly preferred, with a high degree of cultural intelligence and technical mastery of diversity and inclusion strategies in academic medicine."[129]

Fair is not a proper comparator because he neither holds the same job or responsibilities as Muslow, nor has the same supervisor.  First, Fair's work does not require "substantially the same responsibility" as Muslow's work as general counsel.  *See Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008).  For example, Muslow's position required a different degree and had no connection to diversity initiatives or work history in an academic medical center setting. Further, Fair's position has no connection to defending lawsuits or offering legal advice, as Muslow's did.  Second, that Fair and Muslow reported to different supervisors necessarily rebuts his comparator status.  *See Alkhawaldeh*, 851 F.3d at 426 (describing that the comparator must (1) hold the same job or have the same responsibilities as the plaintiff; (2) share the same supervisor or have his employment status determined by the same person as the plaintiff; and (3) have a history of violations or infringements similar to that of the plaintiff).  Moreover, there is no evidence that Muslow and Fair had their employment statuses determined by the same person.

Plaintiffs effectively concede that Fair is not a comparator because they fail to show that there is not a significant difference between Muslow's and Fair's job responsibilities.  In opposition, Plaintiffs devote two sentences to show that Fair is a comparator: "Timothy Fair made above his pay grade.  If he was paid appropriately, then Muslow should have made approximately

---

[128] R. Docs. 365-1 at 20; 365-7 at 41-42; 372-11 at 25-29.
[129] R. Doc. 365-7 at 41.

$400,000."[130]   Again, this "argument" – Plaintiffs' familiar refrain – fails to establish that Muslow's responsibilities as general counsel and Fair's responsibilities as vice chancellor for diversity and inclusion were even remotely the same.  *See Foster*, 834 F. App'x at 91.  Thus, because Muslow and Fair had different supervisors as well as significant differences in their job responsibilities, Fair is not a proper comparator.

**Unidentified deans:** In addition to the proffered comparators Muslow identifies by name in her submissions, Muslow testified that the deans, vice chancellors, and assistant vice chancellors of LSU were her comparators, too.[131]  While she does not identify these additional deans, vice chancellors, or assistant vice chancellors by name, LSU and Hollier identify and brief each of these individuals.  But Plaintiffs fail to rebut Defendants' arguments.  For example, Plaintiffs fail to refute that Joe Moerschbaecher, Vice Chancellor of Academic Affairs; John Harman, Vice Chancellor of Administration and Finance; Jack Christian Winters, Vice Chancellor for Clinical Affairs; Patrick Gorman, Director of Financial Aid; and Robert Leaman, Director of Continuing Dental Education, are not appropriate comparators.  Because "'failure to brief an argument in the district court waives that argument in that court,'" *Slaughter v. Torres*, 2022 WL 861409, at *12 (M.D. La. Mar. 22, 2022) (quoting *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018)), the Court finds that Moerschbaecher, Harman, Winters, Gorman, and Leaman are not proper comparators.  *See also Kellam*, 2013 WL 12093753, at *3 (observing that a failure to respond to or adequately brief an argument results in waiver or concession of the argument).  Accordingly, the Court only addresses those proffered comparators that Plaintiffs attempt to rehabilitate in their opposition.

---

[130] R. Doc. 396 at 23.
[131] R. Doc. 365-1 at 13.

**Keith Schroth:**   Keith Schroth is the former Associate Vice Chancellor for Business Development and Associate Dean of Fiscal Affairs.[132]  He is not a proper comparator.  Schroth was assigned to the N44 pay grade and the Leadership job family.[133]  He earned $307,703.34, and, like Muslow, reported to Hollier.[134]  Schroth's position required (1) a bachelor's degree in business, finance, accounting, marketing, public administration, health administration, or a related field; and (2) eight years of progressive experience.[135]  His duties and responsibilities included "(i) oversee[ing] mission-based budgeting for LSUHSC-NO's six professional schools, including development and coordination of annual comprehensive department budgets; (ii) coordinat[ing] and enhanc[ing] contractual relations for each LSUHSC-NO school; (iii) creat[ing] and negotiat[ing] other business opportunities to support the LSUHSC-NO's mission; and (iv) devis[ing] effective methods to communicate with internal and external LSUHSC-NO constituencies."[136]

Muslow and Schroth are not similarly situated in their jobs such that they operate under nearly identical circumstances. Schroth's requirements and responsibilities as associate vice chancellor for business development and associate dean of fiscal affairs vary significantly from those of Muslow as general counsel.  For example, unlike Muslow's position, Schroth's does not require him to have a J.D. degree or give legal advice.  Conversely, unlike Schroth's position, Muslow's did not require her to (1) have a bachelor's degree in business, finance, accounting, marketing, public administration, health administration, or a related field and eight years of

---

[132] R. Docs. 365-1 at 18; 365-4 at 45; 365-7 at 50.
[133] R. Doc. 365-4 at 45, 50.
[134] R. Doc. 365-1 at 18.
[135] R. Docs. 365-1 at 18; 365-7 at 51.
[136] R. Docs. 365-1 at 18; 365-7 at 50-51.

progressive experience; or (2) budget or create business opportunities in support of LSU's mission. These differences cannot support a finding that Schroth and Muslow are true comparators.

Absent from Plaintiffs' papers is any attempt to marshal evidence to the contrary or establish that Schroth and Muslow's duties are "substantially the same."  Instead, in their one-sentence retort, they state: "If Mr. Schroth's pay was appropriate and within the structure, then Muslow should have been paid approximately $400,000."[137]  By itself and unexplained, this is insufficient to show that Muslow and Schroth were "nearly identical" in circumstances and, consequently, similarly situated.  Therefore, Schroth is not a proper comparator.  *See Foster*, 834 F. App'x at 91.

**Steve Nelson:**  Steve Nelson, the Dean of the School of Medicine, is not a proper comparator, either.  Nelson earned $311,739.96 and was assigned to the N47 pay grade and the Leadership job family.[138]  He, like Muslow, reported to Hollier.[139]  His position required a medical degree or Ph.D. degree, a minimum of ten years of teaching and research experience, previous administrative experience in a medical school environment, current Louisiana medical licensure, and privileges at all relevant clinical practice sites.[140]  His duties and responsibilities included "(i) [being] responsible for development and accreditation of undergraduate and graduate medical programs; (ii) foster[ing] basic, clinical, and translational research and enhancing research excellence; (iii) coordinat[ing] and evaluat[ing] clinical and public service programs; (iv) support[ing] and promot[ing] missions of School of Medicine, LSUHSC-NO and LSU system; (v) [being] responsible for School of Medicine budget; and (vi) coordinat[ing] clinical services."[141]

---

[137] R. Doc. 396 at 22.
[138] R. Doc. 365-4 at 44, 49.
[139] R. Doc. 365-1 at 20.
[140] R. Docs. 365-1 at 20; 365-7 at 69.
[141] R. Docs. 365-1 at 20-21; 365-7 at 68; 372-12 at 17-18.

Further, the position tasked Nelson with the responsibility "for all of the teaching, research, and clinical and public service programs" of the medical school.[142]

Nelson's work as the dean of the medical school is quite different from, much less requiring substantially the same responsibilities as, Muslow's work as general counsel. For example, Nelson's position does not require a J.D. degree, nor does it have any relation to providing legal services and advice concerning litigation strategy. Similarly, Muslow's position as general counsel did not involve, *inter alia*, the accreditation of undergraduate and graduate medical programs, the medical school's budget, or coordinating clinical and public service programs. Nor was Muslow responsible for all of the teaching and research programs at the medical school.

Plaintiffs do not attempt to argue anything to the contrary. Instead, Plaintiffs repeat the same two-sentence response to Muslow's other putative comparators: "Steve Nelson: Paid well beyond the parameters of his classification scale. If appropriate then Muslow should be making more than $400,000."[143] But, again, on its face, such a statement fails to show that Nelson and Muslow performed job responsibilities that were nearly identical. *See Foster*, 834 F. App'x at 91. Therefore, with virtually no evidence or argument to contradict that significant differences in job responsibilities exist, this Court finds that Nelson is not a proper comparator.

**Henry Gremillion:** Henry Gremillion, the Dean of the School of Dentistry, is not a proper comparator, either. Gremillion earned $280,000.[144] He was assigned to the N44 pay grade and the Leadership job family.[145] He, like Muslow, reported to Hollier.[146] His position required a D.D.S. or D.M.D. degree, ten years of administrative, teaching, and/or research experience, and

---

[142] R. Doc. 365-7 at 68.
[143] R. Doc. 396 at 23.
[144] R. Doc. 365-4 at 45.
[145] *Id.* at 45, 50.
[146] *Id.* at 45.

five or more years of managerial or administrative experience in a dental school environment.[147] His duties and responsibilities included "(i) [providing] leadership and oversight of all educational, research and service programs of Dentistry School; (ii) [being the] chief executive officer for research, service, and dental practice programs; (iii) [being] responsible for administration of Dentistry School; (iv) lead[ing] strategic planning and policy development activities; (v) approv[ing] all Dental School faculty promotions and appointments; (vi) assur[ing] compliance with La. Board of Regents, LSU System, HSCNO, State Board of Dentistry and all accreditation regulations, standards, policies and practices; and (vii) promot[ing] [the] Dental School mission."[148]   The dean of the dental school is "responsible for the vision, strategic planning, policy, development, academic, fiscal and other business activities of the School," and "serves as the official Dental School representative in the community and to external constituencies." [149]

None of Gremillion's duties, responsibilities, or required credentials as dean of the dental school is nearly identical to those Muslow had as general counsel.  Gremillion's job did not require a J.D. degree and Muslow's job did not require a D.D.S. or D.M.D. degree.  Muslow was never tasked with, *inter alia*, approving all dental school faculty promotions and appointments, promoting the dental school's mission, or being the chief executive officer for research, service, and dental practice programs.  Nor, conversely, was Gremillion charged with conducting depositions, legal research, or litigation defense strategy.  Muslow and Gremillion, therefore, are not similarly situated such that they operate under nearly identical circumstances.

Plaintiffs submit nothing to contradict this conclusion.  Instead, Plaintiffs' entire argument is their oft-repeated mantra: "Henry Gremillion: If pay is appropriate then it appears that Muslow

---

[147] R. Doc. 365-1 at 21.
[148] R. Docs. 365-1 at 21; 365-7 at 48; 372-12 at 20.
[149] R. Doc. 365-7 at 48.

should be making more than $400,000."[150]  This does not establish that Gremillion's and Muslow's positions require substantially the same duties, responsibilities, and credentials such that their job circumstances are "nearly identical."  *See Foster*, 834 F. App'x at 91.  Accordingly, absent evidence to the contrary, Gremillion is not a proper comparator.

**Dean Smith:** Dean Smith, the Dean of the School of Public Health,[151] is also not a proper comparator.  He was assigned to the N44 pay grade and the Leadership job family.[152]  He earned $324,999.96 and, like Muslow, reported to Hollier.[153]  Smith's position required a doctoral degree in public health or a related field, ten years of progressing administrative and professional experience, and experience in higher education in a leadership role.[154]  His duties and responsibilities included "(i) articulat[ing] strategic vision for [the] School [of Public Health], develop[ing] long and short term plans for all School activities, including educational programs, research activities, faculty matters, and staffing and space matters; (ii) develop[ing] partnership with national, state and local agencies that advance public health in [the] state of Louisiana; (iii) develop[ing] and advanc[ing] an innovative, high impact research program; (iv) recommend[ing] appointments, promotions and tenure of faculty members and program chairs; (v) direct[ing] efforts to recruit and retain exceptional academic and research faculty; and (vi) lead[ing] faculty and staff in development, expansion, advancement and delivery of innovative, high quality research and service programs."[155]  The dean of the school of public health is "the academic and administrative leader" of the school.[156]

---

[150] R. Doc. 396 at 23.
[151] R. Doc. 365-1 at 22.
[152] R. Doc. 365-4 at 45, 50.
[153] R. Docs. 365-1 at 22; 365-4 at 45.
[154] R. Docs. 365-1 at 22; 365-7 at 71.
[155] R. Docs. 365-1 at 22; 365-7 at 70-71; 372-12 at 22-23.
[156] R. Doc. 365-7 at 70.

Smith, too, is not a proper comparator because he does not have the same job or same job duties, responsibilities, and required credentials that Muslow had in her role as general counsel. First, Smith, who is not required to have a J.D. degree or bar license, cannot hold the same job as Muslow, who had to hold these criteria to perform her job.  Similarly, Muslow, who does not hold a doctoral degree in public health or a related field, cannot have the same job or responsibilities as Smith, who is required to have such a degree.  Second, Smith's duties and responsibilities have no relation to legal services and Muslow's duties and responsibilities did not include, *inter alia*, advancing the mission of the school of public health or developing partnerships with agencies that advance public health in Louisiana.

Plaintiffs do not establish Smith as a proper comparator.  Instead, they merely state that Smith "[a]ppears to be getting paid one quadrant more than he should be; using him Muslow should be making $400,000 plus."[157]  This isolated assertion does not speak to the question whether Smith and Muslow are so similarly situated in their employment circumstances to conclude that their positions were nearly identical.  *See Foster*, 834 F. App'x at 91.  Therefore, with virtually no evidence or argument to contradict the significant differences in job responsibilities shown to exist, this Court finds as a matter of law that Smith is not a proper comparator.

**The 2017 Market Study:** In addition to the proffered comparators Plaintiffs specifically name and their general reference to all deans, chancellors, and vice chancellors, Plaintiffs argue that "when Defendant LSU created the 2017 Market Study and established pay grades [at] LSUHSC-NO, it created comparators on its face," because "[t]he Market Study grouped employees with similar skill, experience, education, duties, etc. together by 'N['] numbers."[158] But the only other individual in Muslow's same "N" category, N43, was another woman who

---

[157] R. Doc. 396 at 23.
[158] *Id.* at 20.

received higher pay: Wendy Simoneaux.[159]   Simoneaux, given her gender, is not a proper comparator.  *See Herster*, 887 F.3d at 184 ("One of the requirements under the *McDonnell Douglas* framework for [a] gender discrimination in pay claim is that [the plaintiff] must show that she was paid less than a proffered comparator, *not in her protected class*, for work requiring substantially the same responsibility.") (emphasis added).  Even if Plaintiffs' argument that LSU's 2017 Market Study created comparators by categorizing certain employees in "N" groups had merit, Plaintiffs would still have the burden to show that Muslow's circumstances are nearly identical to those of a better-paid male employee whose work requires substantially the same responsibilities as Muslow's.  The assertion that an unidentified employee is a "comparator" simply because they are categorized together on a pay scale is insufficient.

In addition, Plaintiffs' bare-bones briefing seems to suggest that salaries are dependent upon ascending "N" pay-grade levels.  For example, Plaintiffs assert that they "have been able to show employees with lower 'N' number classifications with less experience making more money than Ms. Muslow."[160]   But Plaintiffs have not submitted any summary-judgment evidence establishing that the "N" groups represent an ascending pay scale.  In fact, the evidence shows that the "N" levels are not designed to be an ascending pay scale.  For example, if they were, Nelson, who earns $311,739.96 and is assigned to the N47 pay grade, should not be making less than Smith, who earns $324,999.96 and is assigned to a lower pay grade, N44.[161]   And, similarly, Fair, who earns $240,000 and is assigned to the N39 pay grade, should not be making more than Porche, who earns $237,915 and is assigned to a higher pay grade, N42.[162]   Thus, to suggest that Muslow

---

[159] R. Docs. 429; 365-10 at 72 (deposition of Muslow: "Q: I believe you testified you were graded N43, and the other person [in that category] was Wendy Simoneaux, who was making more than you; is that correct?  A: Yes."), 86.  Simoneaux was the Associate Vice Chancellor of Administration and Finance.  She earned $280,000.08.  R. Doc. 365-4 at 46.
[160] R. Doc. 396 at 20.
[161] R. Doc. 365-4 at 44-45, 49-50.
[162] R. Docs. 365-1 at 20; 365-4 at 45, 50; 365-7 at 42.

is the only employee making more or less than a proffered comparator based on only her "N" pay grade level is insufficient on the basis of the information Plaintiffs provide. Indeed, the evidence reflects that many male employees in higher N levels are paid less than other male employees in lower N levels.

Muslow has not identified a proper comparator that performs nearly identical work. Absent a comparator, Muslow cannot make out her *prima facie* case for pay discrimination. Accordingly, Muslow's Title VII disparate treatment claim against LSU and her § 1983 claims against Harman and Hollier must be dismissed.

### b. Cunningham cannot identify a proper comparator as a matter of law.

Like Muslow, Cunningham proffers many comparators. But none is proper as a matter of law. Cunningham argues that there are "several males who were performing work requiring substantially less responsibility and/or equal skill than [she] who were paid relatively higher salaries than [she]," including Richard Buhler, Senior Contracts Administration Officer; Frank Wasser, Compliance Officer; Roy Clay, Fiscal Compliance Officer; Matthew Gedge III, Project Manager; Wade Schomaker, Assistant Director of Information Technology Database Administration and Support Services; Robert Fahey, Executive Director of Environmental Health and Safety; Robert Parker Jr., Director of Purchasing; Michael Barrilleaux, Manager of Information Technology Security; William Jennings, Manager of Information Technology Financial; Steven T. Zimmerman, Director of Facility Services; and Gary Canzoneri, Director of Information Technology, Enterprise Infrastructure Support.[163]   In addition to these named comparators, Cunningham argues generally that the 2017 Market Study created comparators on its face and is "dispositive on this issue."[164]

---

[163] R. Doc. 363-5 at 151, 156, 158-162.
[164] R. Doc. 402 at 18-20.

Defendants brief each proffered comparator, arguing that none is "nearly identical."[165]  But Cunningham fails to refute each of Defendants' arguments.  Instead, she only addresses two of the eleven comparators in her opposition: Richard Buhler and Frank Wasser.[166]  Her failure to address the remaining nine comparators constitutes her concession that they are, as LSU and Hollier contend, not proper comparators.  *See Slaughter*, 2022 WL 861409, at *12 ("[F]ailure to brief an argument in the district court waives that argument in that court.").  The Court examines the evidence concerning Buhler, Wasser, and the 2017 Market Study and finds that Plaintiffs have not established that Cunningham has a proper comparator as a matter of law.

Cunningham worked as a staff attorney.  She earned an annualized salary of $127,500 and worked at 60% effort.[167]  She was assigned to the N37 pay grade and the Administrative Professional Non-Clinical job family.[168]  She reported to Muslow.[169]  Cunningham's position required a J.D. degree and Louisiana bar membership.[170]  Her "duties and responsibilities included responding to legal issues; review[ing] and approv[ing] contracts and other agreements; conducting legal research and analysis; assisting with review and drafting LSUHSC-NO policies and procedures; representing LSUHSC-NO in litigation; and assisting in staff, faculty and student training on legal matters."[171]  As set forth below, Cunningham's job responsibilities and required credentials are readily distinguishable from those of her proffered comparators.

**Richard Buhler:** Cunningham identifies Richard Buhler as her "closest" comparator.[172]  Buhler, senior contracts administration officer, was assigned to the N35 pay grade and the

---

[165] R. Docs. 363-1 at 12-16; 372-1 at 31-32.
[166] R. Doc. 402 at 20, 25.
[167] R. Docs. 363-7 at 105-06; 363-1 at 12; 363-5 at 23.
[168] R. Docs. 363-1 at 12; 363-5 at 23, 28.
[169] R. Docs. 363-1 at 12; 363-5 at 23; 363-6 at 2.
[170] R. Doc. 363-6 at 2.
[171] R. Docs. 363-1 at 12; 363-6 at 2.
[172] R. Docs. 363-1 at 12; 363-7 at 145.

External/Internal Relations job family.[173]   He earned $152,889.08 a year.[174]   He reported to the Associate Vice Chancellor of Business Development – not Muslow.[175]   His position required either a J.D. or a master's degree with eight years of experience.[176]   Buhler's "[d]uties and responsibilities include (i) manag[ing] internal information collection to support financial terms of contract, FMV analysis, funds distribution, budgetary items, and scope of services; (ii) develop[ing] and assist[ing] with renewal or amendment of professional services, subcontracts, and directorship contracts; (iii) work[ing] with Contract Management Team to develop new, renewal and amended resident supervision and affiliation contracts and to facilitate contracting process from start to finish; (iv) review[ing] final contracts for accuracy in financial terms and services; (v) resolv[ing] contracting and legal issues with contracting entities; (vi) develop[ing] physicians' professional service agreements; (vii) ensur[ing] LSUHSC-NO contracts capture fair market value and support School missions; (viii) maintain[ing] contract management database; (ix) prepar[ing] biannual contract summary; and (x) provid[ing] notary services."[177]   Importantly, the contracts administration officer is to "seek advice from LSUHSC legal counsel as appropriate and necessary so there will be no violation of state, or LSUHSC policy or procedure."[178]

While Buhler's position does have some connection to the law in that it deals with contracts, he is not a proper comparator.  First, as Hollier notes, Buhler's and Cunningham's "positions are not similar in skill, effort, or responsibility."[179]   For example, as LSU correctly argues, Cunningham's part-time position required a J.D. degree and a Louisiana bar license,[180]

---

[173] R. Docs. 363-1 at 12; 363-5 at 45, 67.
[174] R. Docs. 363-1 at 12; 363-5 at 133.
[175] R. Doc. 363-6 at 21.
[176] Id. at 23.
[177] R. Docs. 363-1 at 12; 363-6 at 21-23.
[178] R. Doc. 363-6 at 22.
[179] R. Doc. 372-1 at 32.
[180] R. Doc. 363-6 at 2.

whereas Buhler's full-time position required either a J.D. degree – with no bar license – or a master's degree with eight years of related, progressively responsible professional experience.[181] And, whereas 80% of the duties and responsibilities for Cunningham's position include responding to legal issues, conducting legal research, preparing and providing written and oral legal opinions, reviewing policies and procedures, participating in litigation, and developing training materials,[182] Buhler's position does not encompass any such duties or responsibilities.[183]   Instead, they are limited to preparing, monitoring, processing, and ensuring compliance with contracts.  There is no litigation component, which encompassed most of Cunningham's work.[184]   Buhler's job description mandates that he "seek" legal advice from LSU-HSC legal counsel;[185] it does not permit him to provide any such advice or to represent HSC and its officials in litigation, as Cunningham's position required.[186]  And, while there is some crossover with respect to contract review and preparation, Buhler's position charges him with "manag[ing] independently the preparation, monitoring, processing, and compliance with all Federal and State regulations of all contractual agreements for all Schools within LSU Health Sciences Center,"[187] whereas Cunningham's position charged her with "providing or assisting in the provision of legal counsel to specified organizational units of the [Health Sciences Center]" – a different scope of responsibility.[188]  Thus, Buhler and Cunningham did not hold the same job or job responsibilities. Second, Buhler cannot be a proper comparator because the two did not share the same supervisor: Cunningham reported to Muslow and Buhler reported to the Associate Vice Chancellor for

---

[181] *Id.* at 23.
[182] *Id.* at 2.
[183] *See id.* at 21-23.
[184] *Compare* R. Doc. 363-6 at 2, *with* R. Doc. 363-6 at 21-23.
[185] R. Doc. 363-6 at 22.
[186] R. Doc. 363-3 at 2.
[187] R. Doc. 363-6 at 21.
[188] *Id.* at 2.

Business Development.[189]   Moreover, there is no evidence that Cunningham and Buhler's employment statuses were determined by the same person.   Therefore, Cunningham and Buhler are not similarly situated.

And Plaintiffs fail to establish otherwise.   In their briefing, Plaintiffs allege that the 2017 Market Study placed Buhler's position in the N35 pay grade and that the study and its pay grade assignments "is the method by which LSU compares 'similarly situated employees.'"[190]   But even if this statement were enough to show that individuals were nearly identical, which it is not, Cunningham's position was assigned to a different pay grade than Buhler: N37.[191]   Then, presumably in an attempt to show similar job responsibilities and circumstances, Plaintiffs state that (1) Buhler's contract responsibilities included completing "boiler plate templates"; (2) Hollier "bore final responsibility on Buhler's pay"; and (3) Hollier testified that he did not know Buhler.[192]   Yet these statements, on their own, fail to contradict Buhler's non-comparator status when all the evidence is examined.   Therefore, Buhler is not a proper comparator.

**Frank Wasser:** Frank Wasser, the fiscal compliance officer, is not a proper comparator, either.   Wasser earned $150,000 a year.[193]   He was slotted in the N37 pay grade[194] and the Leadership job family.[195]   Unlike Cunningham, he reported to Hollier.[196]   His position required a J.D. degree, any state bar license, and a minimum of eight years of professional-level experience at a top law firm, in-house legal department, or university with a primary focus on compliance and privacy.[197]   His "[d]uties and responsibilities include (i) develop[ing] and implement[ing]

---

[189] *Id.* at 21.
[190] R. Doc. 402 at 25.
[191] R. Docs. 363-1 at 12; 402 at 21.
[192] R. Doc. 402 at 21-25.
[193] R. Doc. 363-6 at 19; *but see* R. Doc. 363-6 at 18 (stating that the incumbent's salary is $172,791).
[194] R. Doc. 363-6 at 18.
[195] R. Doc. 363-1 at 14.
[196] R. Docs. 363-2 at 26; 363-6 at 18.
[197] R. Doc. 363-6 at 14.

compliance plan; (ii) serv[ing] as employee resource on compliance matters; (iii) assist[ing] Privacy Officer to ensure policies and procedures are in accordance with state and federal privacy requirements; (iv) serv[ing] as university's liaison to LSU Internal Audit, Legislative Auditor and other oversight entities; (v) develop[ing] education and training programs on compliance; (vi) review[ing] and investigat[ing] allegations and complaints of non-compliant activity; (vii) develop[ing] policies to support compliance initiatives; and (viii) provid[ing] compliance reports."[198]   The "primary function" of Wasser's position is "to prevent, detect and resolve instances of conduct that do not conform to federal and state law, federal and state privacy payer health care program requirements, technical and professional billing and research requirements, as well as policies of the LSU Health Sciences Center."[199]

Cunningham and Wasser are not similarly situated in their employment circumstances. First, as Hollier observes,[200] Cunningham was not tasked with any of Wasser's duties or responsibilities as would justify finding they held the same job or had the same job responsibilities. For example, there was no requirement for Cunningham to handle compliance matters or serve as the university's liaison for auditing purposes, among other things.  And there is no requirement for Wasser to respond to legal issues, conduct legal research, prepare and provide written and oral legal opinions, review policies and procedures, participate in litigation, and develop training materials, as there was for Cunningham.[201]   Second, Wasser and Cunningham did not share the same supervisor, and there is no evidence that the two had their employment statuses determined by the same person.  Specifically, Wasser reported to Hollier, whereas Cunningham reported to Muslow.

---

[198] R. Docs. 363-1 at 14; 363-6 at 15-16.
[199] R. Doc. 363-6 at 14.
[200] R. Doc. 372-1 at 33.
[201] R. Doc. 363-6 at 2.

Plaintiffs effectively concede that Wasser is not a proper comparator.  Instead of rebutting Defendants' arguments, Plaintiffs offer irrelevant facts that fail to lend any support to Wasser's comparator status.  For example, Plaintiffs observe that (1) on his initial application, Wasser indicated that he did not have a Louisiana bar license and that he later resubmitted the application to state that he did have a bar license;[202] (2) Colletta requested that the fiscal compliance officer position requirements be revised to accept any bar licensure;[203] and (3) "[o]ne female applicant for this position was well-qualified" but "was not given the same consideration Wasser was."[204]  The relevance of Plaintiffs' observations and any related "argument" is lost on the Court.  In any event, these statements are insufficient to establish that Wasser is a proper comparator.  Plaintiffs make no attempt to establish that Cunningham and Wasser held the same job or responsibilities, that they reported to the same supervisor, or that the same person determined their employment statuses.  *See Foster*, 834 F. App'x at 91; *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 340 (5th Cir. 2021) (upholding summary judgment for defendant where plaintiff failed to establish that co-employee "was a similarly situated comparator" since their "positions entailed different responsibilities" and they did not share the same supervisor, among other things).  Accordingly, because Plaintiffs point to no evidence to controvert Defendants' amply supported position, the Court finds that Wasser is not a proper comparator as a matter of law.

**The 2017 Market Study:** Plaintiffs make the same argument about the 2017 Market Study with respect to Cunningham as they did with respect to Muslow, urging that "it created comparators on its face," because "[t]he Market Study grouped employees with similar skill, experience, education, duties, etc. together by 'N['] numbers."[205]  This argument fares no better

---

[202] R. Doc. 402 at 26.
[203] *Id.*
[204] *Id.*
[205] *Id.* at 18.

for Cunningham, however, and fails for the same reasons.[206]  Even assuming Plaintiffs' argument were colorable, they would still have the burden to show that Cunningham's circumstances were nearly identical to those of a better-paid male employee whose work requires substantially the same responsibilities as did Cunningham's.  A statement that an unidentified employee is a "comparator" is insufficient.

Plaintiffs have not presented summary-judgment evidence to refute Defendants' showing that there is a significant difference between Cunningham and her proffered comparators' job responsibilities, required credentials, and supervisors.  LSU maintains that "[t]he facts show the alleged male comparators are in <u>different</u> job families, perform <u>different</u> duties and responsibilities under <u>different</u> working conditions; report to <u>different</u> supervisors in <u>different</u> departments; several comparators oversee numerous direct and/or indirect reports (unlike [Cunningham]); and several comparators have a <u>different</u> seniority with LSU that is several years <u>greater</u> than [Cunningham]."[207]  The Court agrees.  Thus, Plaintiffs have not identified a comparator that performs nearly identical work as Cunningham.  Absent a comparator, Cunningham cannot make out a *prima facie* case of disparate treatment.  Therefore, Cunningham's Title VII and § 1983 claims for gender discrimination must be dismissed.[208]

### 2. Defendants offer nondiscriminatory reasons for their employment actions.

Because Plaintiffs have not identified appropriate comparators, they cannot carry their initial burden of establishing a *prima facie* case, and their Title VII and § 1983 gender-discrimination claims must be dismissed.  Even had they identified a proper comparator, however, dismissal is still warranted because Defendants offer nondiscriminatory reasons for their

---

[206] *See supra* at Section III(B)(1)(a).
[207] R. Doc. 363-1 at 17 (emphasis in original).
[208] Because the Court dismisses Plaintiffs' Title VII and § 1983 claims for failure to identify a proper comparator, it need not discuss LSU's alternative argument regarding statutes of limitations.

employment actions (*i.e.*, the alleged pay disparity and termination) and Plaintiffs cannot establish pretext.

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to proffer a legitimate, nondiscriminatory reason for his action." *Watkins v. Tregre*, 997 F.3d 275, 281-82 (5th Cir. 2021) (citing *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)). The defendant's burden is one of production, not persuasion. *Id.* at 282; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). To meet its burden of production, the defendant "'must articulate a nondiscriminatory reason with sufficient clarity to afford [the plaintiff] a realistic opportunity to show that the reason is pretextual.'" *Watkins*, 997 F.3d at 282 (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015)). "The defendant's burden during this second step is satisfied by producing evidence, which, '*taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)) (emphasis in original).

Here, Defendants satisfy this burden. They offer multiple nondiscriminatory reasons for both the pay disparities Plaintiffs claim and their termination. First, LSU argues that Plaintiffs were not eligible for a pay adjustment because (1) the pay raise provided to "certain key personnel" at LSUHSC-NO in October 2018 was for deans, vice chancellors, and associate vice chancellors only, and neither Muslow's position as general counsel nor Cunningham's position as staff attorney was equivalent to a dean, vice chancellor, or associate vice chancellor;[209] and (2) the LSUHSC-NO Unclassified Staff Pay Adjustments Policy only applied to those who were working at full-time capacity, which Cunningham was not.[210] Second, LSU contends that Muslow was not

---

[209] R. Doc. 365-1 at 26.
[210] R. Doc. 363-1 at 20-21.

eligible for a car allowance because only deans and vice chancellors received a car allowance and Muslow was neither a dean nor a vice chancellor.[211]   Third, LSU contends that Plaintiffs' positions were retired "in favor of new legal positions in the OGC to be assigned to LSUHSC-NO."[212] Fourth, LSU and Hollier argue that Plaintiffs failed to execute their proposed OGC employment contracts despite their knowledge that their LSUHSC-NO positions would be terminated as a result of the consolidation.[213]   Fifth, LSU argues that Muslow did not apply for the position of the OGC chief counsel, although invited to do so on March 1, March 25, April 4, May 2, and May 15, 2019;[214] and, similarly, Cunningham did not apply for the OGC staff attorney position, although invited to do so on March 1, March, 25, April 4, and May 2, 2019.[215]   Sixth, LSU argues that that Muslow advised in a May 13, 2019 email to Jones that he did not have permission to treat either plaintiff as an applicant for their respective OGC positions,[216] and Cunningham concurred.[217] Seventh, Hollier argues that pay ranges were based on many factors other than sex, including the gender-blind 2017 Market Study, different job and skill levels, previous training and experience, and business-related exigent circumstances.[218]   And finally, Hollier argues that Plaintiffs' decisions not to execute their contracts or apply for the new OGC positions were made of their own volition.[219]   These proffered reasons are sufficient to satisfy Defendants' burden of production at this second step.

---

[211] R. Doc. 365-1 at 27.
[212] R. Docs. 363-1 at 21-22; 365-1 at 28.
[213] R. Docs. 363-1 at 22; 365-1 at 28; 372-1 at 38.
[214] R. Doc. 365-1 at 28.
[215] R. Doc. 363-1 at 22.
[216] R. Doc. 365-1 at 28-29.
[217] R. Doc. 363-1 at 23.
[218] R. Doc. 372-1 at 33.
[219] *Id.* at 38.

### 3. Plaintiffs cannot establish pretext.

When the defendant meets its burden of production, as here, the burden shifts to the plaintiff to "substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Price*, 283 F.3d at 720.  Although a plaintiff need not *prove* pretext at the summary-judgment stage, a plaintiff must raise a genuine issue of fact regarding pretext. *Guthrie v. Tifco Indus.*, 941 F.2d 374, 378 (5th Cir. 1991).  A plaintiff "'may establish pretext either through evidence of disparate treatment or by showing that [the defendant's] proffered explanation is false or "unworthy of credence."'" *Watkins*, 997 F.3d at 283 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).  Even when such a showing is made, however, it is not always enough to prevent summary judgment if "'no rational factfinder could conclude that the action was discriminatory.'" *Lockhart v. Republic Servs., Inc.*, 2021 WL 4955241, at *3 (5th Cir. Oct. 25, 2021) (quoting *Price*, 283 F.3d at 720).

"[The Fifth Circuit] has held that a plaintiff's summary judgment proof must consist of more than 'a mere refutation of the employer's legitimate nondiscriminatory reason.'" *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (quoting *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 815 (5th Cir. 1993)).  A subjective disbelief of the employer's reason is not enough, as the ultimate fact issue is whether the defendant intentionally discriminated against the plaintiff. *St. Mary's Honor Ctr.*, 509 U.S. at 519; *see also Reeves*, 530 U.S. 133 at 153 ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.").  "Thus, the plaintiff is not relieved of her burden to present evidence that will permit a rational factfinder to infer intentional discrimination." *Douglas v. St. John Baptist Par. Libr. Bd. of Control*, 2022 WL 898746, at *12 (E.D. La. Mar. 28, 2022) (citing *Harville v. City of Hous.*, 945 F.3d 870, 877 (5th Cir. 2019)).

"Even in the face of sufficient evidence for a reasonable factfinder to find pretext and reject the nondiscriminatory reason, if no rational factfinder could conclude that the action was discriminatory, such as when the record conclusively reveals some other, nondiscriminatory reason for the decision, or if the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue and there is abundant and uncontroverted independent evidence that no discrimination occurred, summary judgment will be proper." *Id.* (citing *Harville*, 945 F.3d at 876-77).

"If the employer offers more than one [nondiscriminatory] reason, the plaintiff 'must put forward evidence rebutting *each* of the nondiscriminatory reasons the employer articulates.'" *Jones*, 8 F.4th at 368-69 (quoting *Wallace*, 271 F.3d at 220) (emphasis in original). "Because the plaintiff bears the ultimate burden of proving that intentional discrimination was a motivating factor by a preponderance of the evidence, she 'must produce *substantial evidence* that the defendant's nondiscriminatory reason is merely a pretext for impermissible discrimination.'" *Pippins v. Tangipahoa Par. Council*, 2004 WL 1575410, at *7 (E.D. La. July 13, 2004) (quoting *Read v. BT Alex Brown Inc.*, 72 F. App'x 112, 115 (5th Cir. 2003)) (emphasis in original). "'Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" *Riley v. Sch. Bd. Union Par.*, 379 F. App'x 335, 339 (5th Cir. 2010) (quoting *Laxton v. Gap Inc.,* 333 F.3d 572, 579 (5th Cir.2003)). "'Where the plaintiff fails to produce substantial evidence of pretext, or produces evidence permitting only an indisputably tenuous inference of pretext, summary judgment in favor of the defendant is appropriate.'" *Pippins*, 2004 WL 1575410, at *7 (quoting *Read*, 72 F. App'x at 115)). "'Whether summary judgment is appropriate depends on numerous factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's

explanation is false, and any other evidence that supports the employer's case and that properly may be considered.""" *Riley*, 379 F. App'x at 339-40 (quoting *Price*, 283 F.3d at 720).

Plaintiffs cannot carry their summary-judgment burden. First, Plaintiffs fail to address each of Defendants' nondiscriminatory reasons for the claimed pay disparities and their termination. *See Jones*, 8 F.4th at 368-69. In response to the various nondiscriminatory reasons, Muslow argues that there is a "general issue of material fact as to who was the employer of Ms. Muslow and who terminated her."[220] Similarly, Cunningham argues that there is "a general issue of material fact as to who was the employer of Ms. Cunningham and who terminated her."[221] It is unclear which nondiscriminatory reason this argument is meant to refute. In any event, this indisputably tenuous inference of pretext is insufficient to rebut each of the nondiscriminatory reasons Defendants articulate. *See Jones*, 8 F.4th at 368-69. "Where, as here, the employee fails to adduce evidence refuting a rational, non-discriminatory reason articulated by the employer, pretext cannot be established by the subjective belief that the illegitimate criterion gender motivated the employer's decision." *Pippins*, 2004 WL 1575410, at *9 (citing *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995)). Hence, summary judgment on this basis alone is appropriate.

Second, Plaintiffs have not established pretext because they fail to present evidence of (1) disparate treatment; or (2) facts that cast doubt on the credence of Defendants' stated justifications for the employment actions. "[T]o establish disparate treatment, a plaintiff must show that the employer gave preferential treatment to another employee under 'nearly identical' circumstances." *Moore v. Reeves Cnty.*, 360 F. App'x 546, 548 (5th Cir. 2010) (citing *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir.2005)). The Court has already found that

---

[220] R. Doc. 396 at 26.
[221] R. Doc. 402 at 32.

Plaintiffs did not produce sufficient evidence that similarly situated employees were treated more favorably in nearly identical circumstances.  *See supra* Section III(B)(1).  Nor have Plaintiffs identified any other employee who was hired despite refusal to sign an employment contract or to be included in the applicant pool.  Therefore, Plaintiffs have not established discrimination through disparate treatment.

Furthermore, Plaintiffs have not shown that Defendants' stated nondiscriminatory reasons are false or unworthy of credence.  "'[A]n explanation is false or unworthy of credence if it is not the real reason for the adverse employment action.'"  *Moore*, 360 F. App'x at 548-49 (quoting *Laxton,* 333 F.3d at 578).  Plaintiffs have not introduced material evidence as to whether Defendants' reasons were pretextual; instead, they simply make conclusory and unsupported assertions as to disputes concerning the identify of their employers and who fired them.[222]  This is insufficient to contradict Defendants' stated reasons for the pay disparities and termination.  "Absent countervailing evidence, the trier of fact must accept the defendant's explanation as the real reason for the discharge."  *Guthrie*, 941 F.2d at 378 (citing *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 566 (5th Cir. 1983)).  Because Plaintiffs point to no genuine fact issue concerning whether Defendants' stated reasons for their alleged pay disparities and termination were pretextual, they are entitled to judgment as a matter of law.  Accordingly, Plaintiffs' Title VII disparate treatment claim against LSU and their § 1983 gender-discrimination claims against Harman and Hollier must be dismissed for this reason as well.

### C.  Title VII Retaliation Claim

Plaintiffs assert a Title VII retaliation claim against LSU, arguing that they "have been retaliated against in response to their participation in proceedings under Title VII as well as to their

---

[222] R. Docs. 396 at 26; 402 at 32.

opposition of Defendants' practices, which violate Title VII or which Plaintiffs reasonably believed violated Title VII."[223]  LSU, however, contends that "the facts and substantive law do not support Plaintiff[s'] *prima facie* burden; the facts show non-discriminatory reasons for the termination of Plaintiff[s'] employment; the facts do not show substantial evidence of pretext; and the facts show breaches of ethical duties that are unprotected under Title VII."[224]  The Court finds that the retaliation claim fails because, even if Plaintiffs could establish a *prima facie* case, which is suspect given doubt as to whether they engaged in a protected activity, Plaintiffs cannot show that Defendants' stated nonretaliatory reasons are pretextual.

"Title VII protects an employee only from retaliation for complaining about the types of discrimination it prohibits."  *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 21 (5th Cir. 2020) (quotation and citation omitted).  When a Title VII retaliation claim is based on circumstantial evidence, as here, a court analyzes it under the *McDonnell Douglas* burden-shifting framework. *Saketkoo*, 31 F.4th at 1000.  Under the *McDonnell Douglas* framework, the plaintiff-employee has the initial burden of establishing a *prima facie* case of retaliation by showing (1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action.  *Id.*  "If the plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to introduce evidence of a legitimate, nonretaliatory reason for the adverse employment action."  *Id.* (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304-05) (5th Cir. 1996)).  If the defendant-employer meets its burden, the "'plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real retaliatory purpose.'"  *Id.* (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)) (alteration omitted).

---

[223] R. Doc. 50 at 37; *see also* R. Doc. 99 at 12.
[224] R. Docs. 363-1 at 24; 365-1 at 30 (emphasis omitted).

### 1. Plaintiffs' *prima facie* case is suspect.

For Plaintiffs to establish their *prima facie* case of retaliation, they must first show that they participated in an activity protected by Title VII. "'Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII.'" *Williams v. Recovery Sch. Dist.*, 859 F. Supp. 2d 824, 830-31 (E.D. La. 2012) (quoting *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir.2003)). Thus, Title VII's antiretaliation provision outlines two distinct types of protected activity: (1) opposition to any practice rendered unlawful by Title VII (the "opposition clause"); and (2) making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII (the "participation clause"). *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009).

In their briefing, Plaintiffs do not clearly identify the "protected activity" they claim is at issue. For example, Plaintiffs contend that LSU's alleged retaliation began when Plaintiffs "filed an EEOC complain[t] against LSU and the LSUHSC-NO after [Plaintiffs] attempted to discuss a salary review" with Skinner, Jones, and Hollier.[225]   Later, however, Plaintiffs contend that "but for" Plaintiffs' request for a salary review *and* the EEOC complaint, they would not have been fired, which seems to indicate that the request for a salary review is also protected activity Plaintiffs intend to rely upon to support their retaliation claim.[226]   The Court will address both as claimed protected activities: (1) the February 15, 2019 request for a salary review; and (2) the March 26, 2019 EEOC charge.

To the extent Plaintiffs intend to argue that their request for a salary review is protected activity, such a request likely falls under the opposition clause. "[T]he opposition clause does not

---

[225] R. Docs. 396 at 28; 402 at 33.
[226] R. Docs. 396 at 28; 402 at 34.

require opposition alone; it requires opposition of a practice made unlawful by Title VII." *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 240 (5th Cir. 2016) (emphasis omitted). Thus, an employee "cannot simply complain that she received unfair or undesirable treatment," *Carter v. Target Corp.*, 541 F. App'x 413, 417 (5th Cir. 2013), she must refer "to conduct that could plausibly be considered discriminatory in intent or effect, thereby alerting the employer of its alleged discriminatory practices." *Allen v. Envirogreen Landscape Pros., Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017). But this standard does not require a plaintiff to prove that the complained-of employment practice was unlawful; rather, the plaintiff need only reasonably believe that the complained-of employment practice was unlawful. *Rite Way*, 819 F.3d at 240 (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1137-40 (5th Cir. 1981)).[227] "[T]he reasonable belief standard recognizes there is some zone of conduct that falls short of an actual violation but could be reasonably perceived to violate Title VII." *Id.* at 242. A plaintiff's belief must be objectively reasonable. *Armstrong v. K & B La. Corp.*, 488 F. App'x 779, 782 (5th Cir. 2012) ("For [plaintiff's] actions to satisfy the opposition clause, [plaintiff] must have had an objectively reasonable belief that [defendant] was engaged in employment practices barred by Title VII."); *see also Ellis v. Compass Grp. USA, Inc.*, 426 F. App'x 292, 296 (5th Cir. 2011). A plaintiff's "subjective belief the incidents were retaliatory, without more, is not sufficient to survive summary judgment." *Peace v. Harvey*, 207 F. App'x 366, 369 (5th Cir. 2006) (citing *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000)).

---

[227] "The Fifth Circuit has repeatedly held that the opposition clause does not actually require the opposed conduct to, in fact, violate Title VII." *Saketkoo*, 510 F. Supp. 3d at 393. "Instead, it is 'enough that the plaintiff reasonably believed the employment practice to be unlawful.'" *Id.* (quoting *Rite Way*, 819 F.3d at 240) (alteration omitted). Ultimately, "[w]hile the reasonable belief standard is 'in tension with the plain text' of the statute, it 'remains good law.'" *Id.* (citing *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 n.2 (5th Cir. 2013), and *Rite Way*, 819 F.3d at 240). "The Supreme Court has not taken a position on the reasonable belief standard." *Rite Way*, 819 F.3d at 240.

The Court assumes, but does not decide, that Plaintiffs' belief about gender-pay disparity was objectively reasonable, although there is certainly evidence that may call that into question.[228] Plaintiffs contend that "Skinner fully appreciated Plaintiffs' email [requesting a salary review] to mean there was 'potentially a pay disparity between males and females at [LSU]HSC," and then purport to quote from Skinner's deposition, as follows: "'Did I read the letter as indicating that she had a problem with gender disparity in pay at Health Science Center New Orleans? Yes, that's what I took from that letter. But, I mean, that's all I took from the letter.'"[229] This testimony would seem to corroborate that Plaintiffs' belief was objectively reasonable. However, Plaintiffs fail to attach the quoted excerpt to their briefing or reference it in their statements of fact – and the Court, despite its best efforts, cannot find the quoted excerpt in the thousands of pages of evidence submitted for purposes of these motions. For this reason, then, Plaintiffs' position is unsupported and, thus, suspect. Nevertheless, the Court will assume that Plaintiffs' salary review request was objectively reasonable such that it constitutes protected activity. The Court need not definitively conclude as much, however, because Plaintiffs' claims fail at the pretext stage of the analysis.

---

[228] In *Byers v. Dallas Morning News, Inc.*, the Fifth Circuit considered whether it was "objectively reasonable" that the conduct plaintiff Byers opposed was discriminatory, such that he would have a viable claim under the opposition clause. *Byers*, 209 F.3d at 428. There, Byers, a white male, believed that his employer was discriminating on the basis of race in violation of Title VII and opposed the alleged acts of racial discrimination on several occasions. *Id.* Byers's complaints were not objectively reasonable, the Court held, because Byers failed to (1) present evidence that other non-white employees were treated differently; and (2) counter his employer's evidence that allegedly justified its actions. *Id.*; *see also Carpenter v. Haaland*, 2021 WL 1198261, at *5 (E.D. La. Mar. 30, 2021) (discussing the *Byers* holding).

Here, as in *Byers*, Plaintiffs' subjective belief that LSU violated Title VII could be viewed as not objectively reasonable because Plaintiffs cannot show that employees outside of their protected class were treated differently. In their February 15, 2019 email to Skinner requesting that their salaries be revisited, Plaintiffs voiced that they did not believe they were being compensated equitably compared to their male colleagues in violation of Title VII. R. Doc. 365-5 at 17. But, as reviewed above, Plaintiffs fail to identify a male comparator who received a higher salary. That Plaintiffs cannot present evidence that other similarly situated male employees were treated differently likely strips their "opposition" (by means of seeking pay increases) of objective reasonableness. And while it is true that Plaintiffs subjectively believed they were being discriminated against based on their gender, that belief on its own is insufficient. *See Byers*, 209 F.3d at 428. Therefore, it is possible to conclude that Plaintiffs' salary request was not a protected activity. *Id.* at 428-29; *see also Armstrong*, 488 F. App'x at 782 (affirming summary judgment when plaintiff offered no objective evidence of belief that defendant was engaged in employment practices barred by Title VII and instead offered "only conclusory allegations to support his *prima facie* case").

[229] R. Doc. 400 at 29.

Second, if Plaintiffs are attempting to argue that filing the EEOC complaint is "protected activity," such activity likely falls under Title VII's participation clause. Plaintiffs argue that the retaliation against them began after Muslow filed the EEOC complaint on March 26, 2019.[230] But weeks before Muslow filed the EEOC complaint, Plaintiffs were on notice that their positions would be terminated. On March 1, 2019, Hollier emailed Plaintiffs to confirm that, "[i]n accordance with revised PM-72, LSUHSC-NO will retire [its] existing legal positions by June 30, 2019,"[231] and, on March 25, 2019, Hollier sent Muslow and Cunningham letters detailing that their positions would be eliminated and employment terminated effective close of business on June 30, 2019.[232] Thus, when LSU gave notice that Plaintiffs would be fired, Plaintiffs had not yet made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. That participation did not begin until March 26, 2019 – after Plaintiffs had notice that their employment would terminate. Therefore, as LSU observes,[233] that this alleged "retaliation" occurred before Plaintiffs filed the EEOC charge makes the participation clause irrelevant. *See Ellis*, 426 F. App'x at 297 (finding that plaintiff did not satisfy the participation clause when the alleged retaliation occurred before her EEOC charge was filed); *see also Byers*, 209 F.3d at 428 ("In the instant case, the 'participation clause' is irrelevant because Byers's did not file a charge with the EEOC until *after* the alleged retaliatory discharge took place.") (emphasis in original).[234]

---

[230] R. Doc. 402 at 33.

[231] R. Doc. 365-5 at 23-24.

[232] R. Docs. 363-5 at 11; 365-6 at 1.

[233] R. Doc. 365-1 at 31 (citing *O'Daniel v. Indus. Serv. Sols.*, 2018 WL 265585, at *6 (M.D. La. Jan. 2, 2018) ("There is no dispute that there can be no causal connection between Plaintiff's filing of a formal EEOC charge after her termination, and any alleged retaliation by the Defendants.")).

[234] LSU also argues that Plaintiffs' conduct "while employed as legal counsel for LSU was not reasonable and, thus, [Plaintiffs are] not entitled to protection under Title VII." R. Docs. 363-1 at 27; 365-1 at 33. In particular, LSU observes that Plaintiffs *qua* LSU's lawyers took an adverse and conflicting position against their client, without its informed consent or a conflict waiver, when they (1) initiated an EEOC charge; and (2) removed, retained, and used LSU's confidential documents without permission. R. Docs. 363-1 at 27-31; 365-1 at 32-37. Because dismissal

Absent a protected activity, Plaintiffs' *prima facie* case and retaliation claim would fail. Therefore, if the Court were to decide that the lack of evidence in support of the Plaintiffs' salary review request destroyed the "objective reasonableness" component of the opposition clause, Plaintiffs' retaliation claim must be dismissed. But, as noted, the Court will assume that the Plaintiffs' salary review request constitutes protected activity. Even assuming Plaintiffs have established all three elements necessary to make a *prima facie* case of retaliation,[235] dismissal is still warranted because Plaintiffs fail to establish pretext.

---

is warranted on other grounds, the Court does not need to address whether this conduct resulted in Plaintiffs' forfeiture of Title VII protection.

[235] Although, here, the protected-activity prong of the *prima facie* case analysis is the one most suspect, the Court assumes it for purposes of these motions. With that, it is likely Plaintiffs can satisfy the other two elements necessary to establish a *prima facie* case of retaliation under Title VII.

Once a plaintiff establishes that she has engaged in a protected activity, she must then show that she suffered an adverse employment action. "[W]hen determining whether an allegedly retaliatory action is materially adverse, courts 'look to indicia such as whether the action affected job title, grade, hours, salary, or benefits or caused a diminution in prestige or change in standing among coworkers.'" *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019) (quoting *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir. 2016)) (alteration omitted). Plaintiffs contend that they suffered a material adverse employment action because their salary requests were ignored, their contracts were withdrawn, and they were fired. R. Docs. 396 at 27-28; 402 at 33. LSU does not deny that Plaintiffs suffered an adverse employment action. Thus, Plaintiffs satisfy this prong.

After a plaintiff establishes that she has engaged in a protected activity and suffered an adverse employment action, she must then show that a causal link existed between the protected activity and the adverse employment action. At the *prima facie* stage, the causation standard is much less stringent than it is at the final, pretext stage. *See Williams v. B R F H H Shreveport, L.L.C.*, 801 F. App'x 921, 925-26 (5th Cir. 2020). At the *prima facie* stage, a plaintiff need only show that "'the protected activity and the adverse employment action are not completely unrelated.'" *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 882 (5th Cir. 2020) (quoting *Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 583 (5th Cir. 2006)). The Fifth Circuit "look[s] to three factors when considering the causal link prong [at the *prima facie* stage]: '(1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination.'" *Valderaz v. Lubbock Cnty. Hosp. Dist.*, 611 F. App'x 816, 823 (5th Cir. 2015) (quoting *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007)). Although they did not expressly brief the causation element, Plaintiffs seem to imply that temporal proximity establishes the causal-link prong. *See* R. Docs. 396 at 28 ("It was after the filing of the request for a salary review based on LSUHSC-NO's own Market Study and termination letter that Ms. Muslow was fired by the Defendant."); 402 at 33 ("It was after the filing of the request for a salary review based on LSUHSC-NO's own Market Study and termination letter that [Cunningham] was fired by the Defendant."). "While suspicious timing alone is rarely sufficient to establish the requisite causal connection, this Court allows for a prima facie case to be made on temporal proximity alone if it is 'very close.'" *Valderaz*, 611 F. App'x at 823 (quoting *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir.2007)) (internal citation omitted). For example, "a period of two-and-a-half months, a period of two months, and a period of six-and-a-half weeks are close enough to show a causal connection." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) (internal citations omitted). Even "'a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes.'" *Hypolite v. City of Hous.*, 493 F. App'x 597, 606 (5th Cir. 2012) (citing *Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001)).

At this juncture, the Court assumes, but does not decide, that the temporal proximity between Plaintiffs' protected activity (the February 15, 2019 salary-review request) and notice of termination (March 1, 2019, and March

**2.  Defendants offer nonretaliatory reasons for its employment action.**

After a plaintiff establishes a *prima facie* case of retaliation, "the burden then shifts to the employer to articulate a legitimate, ... nonretaliatory reason for its employment action."  *McCoy*, 492 F.3d at 557 (citing *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)).  "The employer's burden is only one of production, not persuasion, and involves no credibility assessment."  *Id.* (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)).

Here, LSU satisfies its burden.  It provides four nonretaliatory reasons for Plaintiffs' termination.  First, LSU argues that the LSUHSC-NO general counsel and staff attorney positions were retired in favor of new legal positions under the OGC.[236]  Second, LSU contends that neither Muslow nor Cunningham executed the proposed OGC employment contracts before the effective appointment date of February 1, 2019.[237]  Third, LSU argues that Muslow did not apply to the OGC chief counsel online applicant pool, although invited to do so on March 1, March 25, April 4, and May 2, 10 and 15, 2019;[238] and, similarly, Cunningham did not apply to the staff attorney applicant pool, although invited to do so on March 1, March 25, April 4, and May 2, 2019.[239]  Finally, LSU argues that Muslow advised in a May 13, 2019 email that Jones did not have permission to treat her or Cunningham as applicants for the OGC positions,[240] and Cunningham concurred.[241]  These reasons are sufficient to satisfy LSU's burden of production.

---

25, 2019) leading to their ultimate termination (June 30, 2019, for Cunningham and July 15, 2019, for Muslow) falls within the time-periods sufficient to establish the causal-link prong of the *prima facie* case, at least for purposes of summary judgment.  Consequently, the Court assumes that Plaintiffs can establish a *prima facie* case of retaliation under Title VII.

[236] R. Docs. 363-1 at 25; 365-1 at 31.
[237] R. Docs. 363-1 at 25; 365-1 at 31.
[238] R. Doc. 365-1 at 31.
[239] R. Doc. 363-1 at 25.
[240] R. Doc. 365-1 at 32.
[241] *Id.* at 25.

### 3. **Plaintiffs cannot establish pretext.**

When the employer meets its burden of production, "the burden shifts back to the plaintiff to prove that the proffered reason is pretext for the discriminatory or retaliatory purpose." *Newbury v. City of Windcrest*, 991 F.3d 672, 678 (5th Cir. 2021) (citing *McCoy*, 492 F.3d at 557).  In other words, "[i]t is [the plaintiff's] burden 'to prove that a retaliatory motive was the but-for cause of, not merely a motivating factor behind, the decision to terminate him.'" *Valderaz*, 611 F. App'x at 823 (quoting *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F. App'x 484, 490 (5th Cir. 2013)) (alteration omitted); *see also Nassar*, 570 U.S. at 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation ....  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").  "'A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.'" *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378-79 (5th Cir. 2010)).

To survive summary judgment at the pretext stage, a plaintiff "must do more than just dispute the underlying facts and argue that [the employer] made the wrong decision." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).  Instead, "a plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Brown*, 969 F.3d at 577 (quoting *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019)).  "'Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" *Id.* (quoting *Musser*, 944 F.3d at 561-62).  "Even if a plaintiff's protected conduct is a substantial element in a defendant's adverse employment

action, no liability for unlawful retaliation arises if the employee would have faced that discipline even without the protected conduct." *Wantou v. Wal-Mart Stores Tex.*, L.L.C., 23 F.4th 422, 437 (5th Cir. 2022). Importantly, to carry her summary-judgment burden, "the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." *McCoy*, 492 F.3d at 557.

Plaintiffs do not meet their summary-judgment burden. First, Plaintiffs fail to address any of LSU's nonretaliatory reasons for their termination.[242] Not one. Yet to survive summary judgment, a plaintiff must present facts to rebut each and every legitimate, nonretaliatory reason advanced by defendant. Accordingly, summary judgment on this basis alone is appropriate. *Cf. Paulin v. U.S. Dep't of Homeland Sec.*, 2022 WL 952262, at *16 (E.D. La. Mar. 30, 2022) (granting summary judgment when plaintiff failed to address each of defendant's nondiscriminatory reasons), *appeal docketed*, No. 22-30285 (5th Cir. May 11, 2022).

Second, Plaintiffs have not established pretext because they fail to present evidence of (1) disparate treatment; or (2) facts that cast doubt on the credence of LSU's proffered justifications for their termination. "Typically, 'a plaintiff who proffers the [disparate] treatment of a fellow employee must show that the plaintiff's termination was taken "under nearly identical circumstances" as those faced by the comparator.'" *Brown*, 969 F.3d at 580 (quoting *Garcia*, 938 F.3d at 244). But, for the reasons explained in Section III(B)(1), Plaintiffs have not identified a comparator and, therefore, cannot show evidence of disparate treatment. *See Paulin*, 2022 WL 952262, at *14-15 (finding plaintiff failed to establish pretext though disparate treatment where plaintiff's alleged comparator was not a "nearly identical, similarly situated individual"). Furthermore, Plaintiffs have not shown – or even tried to show – that LSU's proffered

---

[242] *See* R. Docs. 396 at 28; 402 at 34.

nonretaliatory explanations are false or unworthy of credence.   Plaintiffs seem to imply that temporal proximity alone establishes pretext.[243]   While temporal proximity may suffice to establish causation in the *prima facie* analysis, it is insufficient alone to demonstrate that a proffered reason is pretextual.   *Brown*, 969 F.3d at 579 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)).   Absent any other evidence, which Plaintiffs do not cite and the Court has not identified, Plaintiffs cannot show pretext.

Third, Plaintiffs have not established that "but for" their salary request, their termination would not have occurred.   *See Garcia*, 938 F.3d at 243.   In December of 2018, months before Plaintiffs' salary request, LSU had in place a plan to terminate their LSUHSC-NO positions in favor of new positions under the OGC.[244]   Defendants then met with Plaintiffs in January of 2019 – again, weeks before the salary request – to discuss the transfer of their positions to OGC in light of PM-72, which provided that only attorneys employed in or through the OGC could represent LSU on legal matters.[245]   Termination of the LSUHSC-NO positions was inevitable under PM-72.   Plaintiffs' failure to execute the tendered employment contracts with OGC or to apply for the new OGC positions – despite being prompted and invited to do so multiple times – cemented their termination.   Thus, while there may be several "but for" reasons for Plaintiffs' termination, none of those reasons is their alleged protected activity.

Put differently, even if Plaintiffs' subsequent request for a salary review played a part in their termination (which cannot be said on this summary-judgment record), "no liability for unlawful retaliation arises if the employee would have faced that discipline even without the

---

[243] *See* R. Docs. 396 at 28 ("It was after the filing of the request for a salary review based on LSUHSC-NO's own Market Study and termination letter that Ms. Muslow was fired by the Defendant."); 402 at 33 ("It was after the filing of the request for a salary review based on LSUHSC-NO's own Market Study and termination letter that [Cunningham] was fired by the Defendant.").
[244] *See* R. Doc. 365-5 at 3.
[245] *See* R. Docs. 363-1 at 4; 363-4 at 2, 37; 365-1 at 4.

protected conduct." *Wantou*, 23 F.4th at 437.  LSU had floated its plan to retire Plaintiffs' positions as early as August 2018, and started the process in December 2018, so that all legal resources could be consolidated under the OGC.[246]   Thus, Plaintiffs' termination from their LSUHSC-NO positions was inevitable even without the protected conduct.  And Plaintiffs removed themselves from consideration as applicants for the new positions.  Therefore, because Plaintiffs cannot establish pretext as to LSU's nonretaliatory reasons for their termination, their Title VII retaliation claims must be dismissed.

### D.  EPA Gender-discrimination Claims

Plaintiffs assert an EPA gender-discrimination claim against LSU, Hollier, Harman, and Skinner, arguing that (1) they "paid Plaintiffs, or directed that Plaintiffs be paid, less than similarly-situated male employees performing equal work on jobs the performance of which require equal skill, effort and responsibility and which are performed under similar working conditions"; and (2) "[t]he differential in pay between Plaintiffs and similarly-situated male employees was and is not due to any bona fide seniority, merit or incentive system or any other factor other than gender."[247]  Plaintiffs' claims fail, say Defendants, because (1) none of the individual Defendants is an "employer" as a matter of law; and (2) Plaintiffs cannot identify a comparator – a male employee working in a position requiring equal skill, effort, and responsibility under similar working conditions.  The Court agrees.  Plaintiffs fail to establish a *prima facie* case because no individual Defendant is subject to the EPA and there are no proper comparators.  The claims also fail because Plaintiffs have not shown pretext as to LSU's stated nondiscriminatory reasons for the differential in pay.

---

[246] R. Docs. 365-6 at 1; 377-4 at 101.
[247] R. Docs. 50 at 37; 99 at 13.

Employment discrimination on the basis of sex is prohibited by the EPA, which provides in pertinent part:

> No employer having [covered] employees ... shall discriminate ... between employees on the basis of sex by paying wages to employees in [a covered establishment] at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex ....

29 U.S.C. § 206(d)(1).  The *McDonnell Douglas* burden-shifting framework governs claims under the EPA.  *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 466 (5th Cir. 2021).  To establish a *prima facie* case under the EPA, a plaintiff must show that (1) her employer is subject to the EPA; (2) she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) she was paid less than the employee of the opposite sex providing the basis of comparison.  *Badgerow v. REJ Props., Inc.,* 974 F.3d 610, 617 (5th Cir. 2020).

"'Once a plaintiff has made her prima facie case by showing that an employer compensates employees differently for equal work, the burden shifts to the defendant to' show by a preponderance of the evidence that the differential in pay was made pursuant to one of the four enumerated exceptions." *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 723 (5th Cir. 2011) (quoting *Siler-Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio,* 261 F.3d 542, 546 (5th Cir.2001)).  "Disparities in salary are allowed where payment is made pursuant to '(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex.'" *Reznick v. Associated Orthopedics & Sports Med., P.A.*, 104 F. App'x 387, 390 n.4 (5th Cir. 2004) (quoting *Plemer v. Parsons-Gilbane,* 713 F.2d 1127, 1136 (5th Cir.1983)).  "The exceptions are affirmative defenses

on which the employer has the burden both of production and of persuasion." *Jones v. Flagship Int'l*, 793 F.2d 714, 722 (5th Cir. 1986). "If an employer responds with legitimate, non-discriminatory reasons for an alleged pay disparity, the plaintiff must then show that the purported reason is a pretext for discrimination." *Browning v. Sw. Rsch. Inst.*, 288 F. App'x 170, 174 (5th Cir. 2008).

### 1. The individual Defendants are not Plaintiffs' "employers."

Plaintiffs assert an EPA gender-discrimination claim against each of the individual Defendants, except Jones. But their claims against the individual Defendants fail because none is subject to the Act. "To establish a prima facie case under the Equal Pay Act, [a plaintiff] must show [among other things] that 'her employer is subject to the Act.'" *Badgerow*, 974 F.3d at 617 (quoting *Chance*, 984 F.2d at 153). The Equal Pay Act, 29 U.S.C. § 206(d), was added as an amendment to the Fair Labor Standards Act (the "FLSA") to uphold "the principle of equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974). Under the FLSA, an employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). The ultimate determination of whether an individual is an employer is a question of law. *Castillo v. Givens*, 704 F.2d 181, 187 n.12 (5th Cir. 1983), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); *Slabisak v. Univ. of Tex. Health Sci. Ctr.*, 2018 WL 4762121, at *2 n.1 (E.D. Tex. Oct. 2, 2018). "However, this legal question is dependent upon factual determinations as to each factor of the 'economic realities/common law control test.'" *Slabisak*, 2018 WL 4762121, at *2 n.1.

To identify an employer, the Fifth Circuit uses an "economic realities" test to consider "who has operating control over the employees, and … 'whether the alleged employer:

(1) possessed the power to hire and fire employees; (2) supervised or controlled employee work schedules or conditions of employment; (3) determined the rate or method of payment; and (4) maintained employee records.'" *Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x 182, 185 (5th Cir. 2014) (quoting *Gray v. Powers*, 673 F.3d 352, 354-55 (5th Cir. 2012)). Plaintiffs need not establish each element to hold an individual liable as an employer under the EPA. *See Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). "While 'the absence of one factor is not necessarily dispositive, the absence of all factors is fatal.'" *Oncale v. CASA of Terrebonne Par., Inc.*, 2020 WL 3469838, at *13 (E.D. La. June 25, 2020) (quoting *Joaquin v. Coliseum Inc.*, 2016 WL 3906820, at *2 (W.D. Tex. July 13, 2016)) (alterations omitted). Establishing just one factor might not be enough, though. *See Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 253 (5th Cir. 2012) (affirming summary judgment for defendant when plaintiff only established one economic-realities factor); *Gunaldo v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 2020 WL 4584186, at *13 (E.D. La. Aug. 10, 2020) (holding that individual defendant is not an employer where only one economic-realities factor was satisfied). "'The dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies.'" *Orozco*, 757 F.3d at 448 (quoting *Martin*, 688 F.3d at 251). "In cases where there may be more than one employer, [a] court must apply the economic realities test to each individual or entity alleged to be an employer and each must satisfy the four part test." *Gray*, 673 F.3d at 355 (quotation omitted). The Court applies the economic-realities test to each individual Defendant in turn and finds that none is an employer as a matter of law.

### a. **Skinner is not an employer.**

In his motion for summary judgment, Skinner argues that Plaintiffs' EPA claim against him must fail as a matter of law because he is, by definition, not an employer.[248]  Skinner argues that Plaintiffs "cannot satisfy the Fifth Circuit's 'economic realities' test to prove that [he] was their employer."[249]  "Skinner did not become the plaintiffs' 'employer' merely by virtue of offering them employment contracts to transfer into the Office of General Counsel," he says, "especially when the proposed transfer never came to fruition."[250]  Skinner concludes that "[i]f plaintiffs have any viable EPA claims against an employer for the alleged gender pay disparities at LSUHSC-NO, [he] is not the proper party against whom plaintiffs should pursue those claims."[251]

The first factor of the economic-realities test is that the putative employer possessed the power to hire and fire employees. *Chapman*, 562 F. App'x at 185.  Skinner argues that "Plaintiffs can offer no evidence to demonstrate that [he] individually possessed the power to hire or fire employees at LSUHSC-NO."[252]  He did not have the power to hire and fire either Muslow or Cunningham because (1) both were employees of LSUHSC-NO prior to his own employment with LSU;[253] and (2) while Skinner did withdraw Plaintiffs' employment contracts to join the OGC, "the documents clearly show that plaintiffs' positions at LSUHSC-NO were terminated by Dr. Hollier."[254]  Skinner contends that "[t]he only 'employer' with the power to hire and fire the plaintiffs was LSUHSC-NO."[255]

---

[248] R. Doc. 345-1 at 1.
[249] *Id.* at 18.
[250] *Id.*  Whether the transfer occurred is disputed but it is not material to the Court's decision.
[251] *Id.*
[252] *Id.* at 15.
[253] R. Docs. 345-1 at 15; 345-12 at 2; 408 at 1 (citing R. Doc. 345-12 at 2).
[254] R. Doc. 345-1 at 15.
[255] *Id.*

Plaintiffs respond that "[t]here is evidence in the record that Defendant[s] Skinner and Jones, along with Hollier, fired the Plaintiffs," although no such evidence is cited.[256]  Plaintiffs then point to termination letters dated the day before Plaintiffs filed their EEOC charge, highlighting that "[n]o one from LSU has accepted knowledge or responsibility for drafting or sending the letters."[257]  Even if true, however, this does not establish that Skinner had the ability to hire and fire Plaintiffs.  Plaintiffs conclude that because Skinner sent Muslow an email that read "welcome formally to OGC," it "sounds like [Skinner] is welcoming [Muslow] as her employer, and thus would also have the ability to fire her."[258]  This leap of logic is unsubstantiated, speculative, and dubious.  Regardless, Plaintiffs present no evidence that Skinner also had the authority to hire them – an essential element to the first economic-realities factor.  *See Chapman*, 562 F. App'x at 185 (observing that the first factor of the economic-realities test is whether the alleged employer "possessed the power to hire ***and*** fire employees") (emphasis added); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012) (discussing the conjunctive/disjunctive canon wherein "and" combines items in a list, such that all items are required).  Ultimately, Plaintiffs fail to present competent evidence that refutes Skinner's position that he did not have authority to hire and fire either of them. Accordingly, Plaintiffs fail to establish this first factor of the economic-realities test.

The second factor of the test is that the alleged employer supervised or controlled employee work schedules or conditions of employment.  *Chapman*, 562 F. App'x at 185.  Skinner rightly maintains that this factor is "undisputed per the plaintiffs' own allegations and deposition

---

[256] R. Doc. 400 at 11.
[257] *Id.* at 12.
[258] *Id.* at 23.

testimony,"[259] noting that he "did not ever review or comment on work product prepared by the plaintiffs,"[260] conduct performance evaluations, or have control over their work hours.[261]   Still, Plaintiffs argue that, as of January 1, 2019, they were under Skinner's authority[262] – yet cite Skinner's own testimony stating that Plaintiffs were not reporting to him.[263]   Even if Plaintiffs were employed by OGC, as they claim,[264] they offer no direct evidence that Skinner supervised them or controlled their work schedules or conditions of employment.   In fact, as both his testimony and that of Plaintiffs confirm, Skinner did not supervise them or control their work schedules or conditions of employment.[265]   Thus, Plaintiffs fail to establish the second element of the test.

The third factor of the economic-realities test is that the alleged employer determined the rate or method of payment.   *Chapman*, 562 F. App'x at 185.   Skinner argues that he "had nothing to do with the methods LSUHSC-NO used to determine employee pay," and that "[t]he amount of pay that OGC chose to offer in plaintiffs' employment contracts was simply an extension of their existing salaries at LSUHSC-NO."[266]   Therefore, says Skinner, he "did not choose the amounts to offer based on comparison of any salaries paid to men at LSUHSC-NO."[267]   Plaintiffs conclude

---

[259] R. Doc. 345-1 at 16; *see also* R. Docs. 345-2 at 8 (deposition of Muslow: "Q: Did Tom Skinner ever review or offer suggestions about any of your work product? A: No.  Q: So did Tom Skinner have any control over your work hours? ... A: Did he have control?  Not that I know of."); 353-8 at 73 (deposition of Cunningham: "Q:  Did Tom Skinner ever direct your daily duties in your position as staff attorney at LSU Health Sciences Center? A: No.").

[260] R. Doc. 408 at 2 n.15.

[261] R. Docs. 345-2 at 8; 345-12 at 7; 408 at 3.

[262] R. Doc. 400 at 19 (citing Hollier's deposition testimony that "as of January 1st, [plaintiff] no longer worked for me [Hollier].  She was under the authority of Skinner.").

[263] R. Docs. 365-10 at 79 (deposition of Skinner: when asked who Plaintiffs were working for, Skinner answered: "That's an excellent question.  I don't have the answer to that.  They were not reporting to me during that time period, I can tell you that.  Or if they were, there was an absence of communication."); 400 at 21.

[264] R. Doc. 400 at 19-23.

[265] R. Doc. 365-10 at 79.

[266] R. Doc. 345-1 at 16; *see also* R. Doc. 345-11 at 4 (deposition of Cunningham: "Q: Do you have any reason to believe that Trey Jones or Tom Skinner played any role in establishing your salary at any time while you were employed as staff attorney at the LSU Health Sciences Center?  A: I don't know what they talked about once the consolidation occurred, but predating January 1, 2019, no, I don't think they had any role in my salary.").

[267] R. Doc. 345-1 at 16

that Skinner determined their rate of pay for he "portrayed himself as the Plaintiffs['] employer."[268]

Plaintiffs neither explain this logic nor present evidence that Skinner did, in fact, determine their rate of pay. Such improbable inferences and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden on a motion for summary judgment. *See, e.g., Saunders v. McDonough*, 2021 WL 1401762, at *6 (E.D. La. Apr. 14, 2021) (citing *Henry v. Cont'l Airlines*, 415 F. App'x 537, 540 (5th Cir. 2011)). Therefore, Plaintiffs fail to establish the third factor of the test.

The final factor of the economic-realities test is whether the alleged employer maintained employee records. *Chapman*, 562 F. App'x at 185. Skinner argues that "[a]t all times plaintiffs' personnel records were maintained by LSUHSC-NO's HR function," which, he says, Plaintiffs appear to concede.[269] Plaintiffs do not refute Skinner's assertion and instead discuss various "welcome to the OGC" email exchanges that make no mention of employee records at all.[270] With no facts in dispute, Plaintiffs fail to establish this factor of the test.

Because failure to meet all factors of the economic-realities test is "fatal," Skinner is not an employer as a matter of law for purposes of the EPA and the claim against him fails. *See Oncale*, 2020 WL 3469838, at *13 (observing that the absence of all of the economic-realities test factors is fatal). Accordingly, Plaintiffs' EPA claim against Skinner for gender discrimination must be dismissed.[271]

---

[268] R. Doc. 400 at 23.

[269] R. Doc. 345-1 at 16; *see also* R. Doc. 345-11 at 4 (deposition of Cunningham: stating that she believes HR would keep employment records).

[270] R. Doc. 400 at 24-25.

[271] Skinner states two additional bases for dismissal of the EPA claim: (1) that any EPA claim asserted against him is a remedial redundancy to the same claim asserted against LSU and should be dismissed; and (2) even if he were an employer for purposes of the EPA, "[a] claim under the EPA necessarily requires a plaintiff to prove that the 'employer' paid different wages to her than to employees of the opposite sex who perform substantially similar work" and "[t]here is no evidence that Skinner paid anyone, much less any alleged male comparator." R. Doc. 345-1 at 18. The Court need not address these arguments, but it does appear that the remedial redundancy argument has support in the jurisprudence. *See Suter v. Univ. of Tx. at San Antonio*, 495 F. App'x 506, 511 n.4 (5th Cir. 2012); *Hilliard v. Jefferson Par.*, 991 F. Supp. 2d 769, 775 (E.D. La. 2014); *Traylor v. S. Components, Inc.*, 2019 WL 3526358, at *3 (W.D. La. Aug. 1, 2019) (granting summary judgment in favor of individual supervisor where plaintiff asserted

### b. Harman is not an employer.

In his motion for summary judgment, Harman, vice chancellor of administration and finance, argues that Plaintiffs' EPA claims must fail as a matter of law because he is not an "employer" for purposes of the Act.[272]  In opposition, Plaintiffs broadly contend that Harman did not establish the absence of disputed facts because there is a "manifest divergence in the statements and interpretation of the record evidence and testimony," yet they provide no examples of such divergence.[273]  They do not refute any of Harman's arguments as to why he is not an employer under the EPA,[274] but merely state, without explanation, that Harman "has not produced competent, affirmative evidence demonstrating that Plaintiffs will be unable to establish their burden of proof at trial."[275]  In reply, Harman observes that there is no evidence contradicting that Harman is not an employer, "much less any argument which suggests as much."[276]  And the Court agrees.  Although Plaintiffs adopt and incorporate all facts, arguments, and exhibits pleaded in their various oppositions,[277] none refutes Harman's non-employer status.  Accordingly, Plaintiffs have failed to "'articulate the precise manner in which the submitted or identified evidence supports [their] claim,'" a requisite to avoid summary judgment.  *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir.2004)).  Even supposing such evidence exists in the summary-judgment

---

"redundant" EPA claims against the supervisor and the entity, reasoning that plaintiff "cannot recover twice for the same alleged act of discrimination").

[272] R. Doc. 347-1 at 10.

[273] R. Doc. 391 at 3.

[274] *Id.* at 2-5.

[275] *Id.* at 4.  This misstates the burden.  When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden.  *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B).

[276] R. Doc. 410 at 2.

[277] R. Doc. 391 at 1 ("As argued ... in Plaintiffs' other memoranda opposing Defendants' summary judgment motions and motions *in limine*, which are incorporated by reference as if set forth *in extenso* herein, the instant Motion should be denied in its entirety ....").

record, when "'the nonmovant *fails even to refer to it* in the response to the motion for summary

judgment, that evidence is not properly before the district court.'"  *Id.* (quoting *Smith*, 391 F.3d at

625) (emphasis in original). Because it is thus uncontroverted that Harman is not an employer,[278]

Plaintiffs cannot establish a viable discrimination claim under the EPA.  *See Oncale*, 2020 WL

3469838, at *13 (observing that absence of all factors of the economic-realities test is fatal).

Therefore, Plaintiffs' EPA claim against Harman for gender discrimination must be dismissed.

### c.  Hollier is not an employer.

In his motion for summary judgment, Hollier, chancellor of LSUHSC-NO, similarly argues

that Plaintiffs' EPA claim against him fails as a matter of law because he is not subject to the

EPA.[279]  Plaintiffs' claim fails, argues Hollier, because there is no evidence establishing that he is

their employer pursuant to the economic-realities test.[280]  Plaintiffs respond that Hollier is their

employer because he satisfies each factor of the economic-realities test, despite failing to cite any

evidence in their opposition or statements of fact.[281]  Applying the economic-realities test, the

---

[278] After all, Harman's argument that he is not an employer is well supported.  First, Harman establishes that he did not have the power to hire and fire Muslow or Cunningham through uncontroverted evidence.  R. Docs. 347-1 at 10; 347-11 at 317 (deposition of Muslow: "[Harman] didn't have the power to [hire or fire Muslow] on his own, no, but he could certainly suggest it."); 410 at 4.  Second, he establishes, by way of Plaintiffs' own testimony, that he did not supervise or control their work schedules or conditions of employment.  R. Docs. 347-1 at 10; 347-11 at 24-25; 347-12 at 9 (deposition of Cunningham: stating that Cunningham had no working relationship with Harman).  Third, Harman establishes that he did not determine the rate and method of Plaintiffs' payment, asserting instead that such rates and methods were dictated by Hollier.  R. Docs. 347-1 at 10; 347-12 at 9-10 (deposition of Cunningham: "I did not negotiate with Mr. Harman my rate of pay.  He got there after I got there, so I don't think he had any say in the rate of my salary.").  And finally, Harman establishes that he did not maintain Plaintiffs' employee records, which, according to the Director of Human Resource Management Rosalynn Martin's deposition testimony, were maintained within the Human Resources Department.  R. Doc. 347-1 at 10; *see also* R. Docs. 347-4 at 3-4; 347-12 at 8 (deposition of Cunningham: stating that Human Resources Management maintained her employment records).

[279] R. Doc. 372-1 at 19.

[280] *Id.* at 15-17.  In addition, Hollier argues that even if he were an "employer," Plaintiffs cannot establish a *prima facie* case for lack of a proper comparator.  Moreover, says Hollier, if Plaintiffs could sustain their initial burden to bring an EPA claim for gender discrimination, (1) "any alleged differential pay was justified under a seniority system, a merit system, a system which measures earning by quantity or quality of production, or a differential based on any other factor other than sex"; and (2) their claim is subject to a two- or three-year statute of limitations.  *Id.* at 14-33.  The Court need not address these additional arguments.

[281] *See* R. Docs. 387; 387-1.  The only evidence referenced anywhere in Plaintiffs' argument concerning Hollier's employer status are general citations to "Exhibit 7 – Roy Clay Affidavit" or "Exhibit 6, Nicole Honoree Affidavit."  R. Doc. 387 at 19-20.  However, these affidavits cannot carry the weight Plaintiffs attempt to place on

Court finds that Hollier is not either Muslow's or Cunningham's employer.  Hollier divides his argument into two parts: (1) his status with respect to Cunningham only;[282] and (2) his status with respect to both Muslow and Cunningham during the "OGC Application Process and Consolidation."[283]  The Court will address each part in turn.

The first factor of the economic-realities test is that the alleged employer possessed the power to hire and fire employees.  *Chapman*, 562 F. App'x at 185.  First, as to Cunningham only, Hollier asserts that Muslow, not he, possessed the power to hire Cunningham.[284]  In support, Hollier cites a letter to Cunningham from Muslow, dated May 9, 2014, in which she writes: "We are pleased to offer you an appointment to join the staff of the Office of The General Counsel, LSU Health Sciences Center (LSUHSC) in New Orleans, LA as Staff Attorney."[285]  Hollier does not dispute, however, that he eliminated Cunningham's position.[286]  This, according to Hollier, is "[t]he only prong that Cunningham can arguably establish[: namely,] that he had the authority to terminate [Cunningham's] employment."[287]  Second, as to both Muslow and Cunningham for the alleged OGC-consolidation period, Hollier argues that, because he was head of LSUHSC-NO, not OGC, he did not have the authority to hire and fire Muslow and Cunningham "for the OGC consolidation."[288]  It was Skinner and the OGC that had such authority, says Hollier, because (1) Skinner "informed Hollier on July 20, 2018 that they 'are ready to launch the integration of [LSUHSC-NO's] legal functions into the Office of General Counsel'";[289] and (2) it was Skinner

---

them when (1) Plaintiffs do not identify specific portions of the affidavits for the Court to review; and (2) the only seemingly relevant statement regarding Hollier's employer status in (a) Honoree's affidavit is that Hollier gave Honoree a raise, and (b) Clay's affidavit is that Clay reported to Hollier.  R. Docs. 396-4 at 5; 396-5 at 2-3.

[282] R. Doc. 372-1 at 15-17.
[283] *Id.* at 17-18.
[284] *Id.* at 16.
[285] R. Doc. 372-6 at 16.
[286] R. Doc. 372-1 at 16.
[287] *Id.*
[288] *Id.* at 17.
[289] *Id.* (quoting R. Doc. 372-4 at 103 (email from Skinner to Hollier, among others)).

who directed Hollier to terminate Plaintiffs' positions, and the OGC that rescinded their employment contracts.[290]

Plaintiffs, on the other hand, argue that Hollier "had the power to hire and fire the Plaintiffs because he did in fact fire them in this instance."[291]  After all, they say, "there is no doubt that Hollier signed the [termination] letters."[292]  By itself, this point is insufficient to establish this first element.  The first element of the economic-realities test is conjunctive: a plaintiff must show that the alleged employer had the ability to hire **and** fire employees.  *See Chapman*, 562 F. App'x at 185 (noting that the first factor of the economic-realities test is whether the alleged employer "possessed the power to hire **and** fire employees") (emphasis added); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012) (discussing the conjunctive/disjunctive canon wherein "and" combines items in a list, such that all items are required).  Thus, while Plaintiffs address Hollier's ability to fire them, they offer no proof as to his ability to hire them.  That he could fire Plaintiffs does not establish that he had the ability to hire Plaintiffs.  This Court cannot, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  *Little*, 37 F.3d at 1075.  Therefore, Plaintiffs have not satisfied the first prong of the economic-realities test as applied to Hollier.

The second factor of the test is that the alleged employer supervised or controlled employee work schedules or conditions of employment.  *Chapman*, 562 F. App'x at 185.  First, as to Cunningham, Hollier argues that "the evidence establishes that Muslow supervised or controlled Cunningham's work schedule and conditions of employment – if Cunningham required a day off,

---

[290] *Id.* at 17-18.
[291] R. Doc. 387 at 20.
[292] *Id.* at 19.  Plaintiffs cite generally to the affidavit of Nicole Honoree in support of their assertion, yet provide no particular paragraph or page reference to confirm their statement.  The Court does not have a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.  *Cardoso-Gonzalez v. Anadarko Petroleum Corp.*, 326 F. Supp. 3d 273, 280 (E.D. La. 2018) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

she testified that she would inform Muslow and Cunningham testified that Muslow directed her daily legal duties in her position as Staff Attorney at LSUHSC (not Hollier)."[293]   Second, as to both Muslow and Cunningham for the alleged OGC-consolidation period, Hollier argues that he would not be in control of their work schedules or conditions of employment with the OGC because "the entire reason for the consolidation was to provide a centralized general counsel's office."[294]   Plaintiffs respond in one sentence, without citation to supporting evidence, that "Hollier supervised Ms. Muslow directly and Ms. Cunningham indirectly as Cunningham reported to Muslow who reported to Hollier."[295]   Plaintiffs cannot satisfy their summary-judgment burden with "some metaphysical doubt as to the material facts" tied to unsubstantiated assertions, conclusory allegations, or a scintilla of evidence. *See Little*, 37 F.3d at 1075.   Therefore, Plaintiffs have not shown that Hollier satisfies the second prong of the economic-realities test.

The third factor of the test is that the alleged employer determined the rate or method of payment. *Chapman*, 562 F. App'x at 185.   First, as to Cunningham, Hollier contends that Muslow determined Cunningham's rate of pay, again citing Muslow's offer letter to Cunningham, which sets out the staff-attorney salary.[296]   Second, as to the OGC-consolidation period, Hollier contends that he "did not establish or have control over Muslow and Cunningham's rate of pay with respect to the offer extended by the OGC"[297] because "the OGC provided Muslow and Cunningham with employment contracts with stated salary amounts."[298]   Further, Hollier explains that "[w]hen Muslow and Cunningham had an issue with the salary offered in the contracts, they contacted Skinner [so] Plaintiffs were clearly aware that Hollier was not able to set their salary with the

---

[293] R. Doc. 372-1 at 16.
[294] *Id.* at 18.
[295] R. Doc. 387 at 20.
[296] R. Doc. 372-1 at 16 (citing R. Doc. 372-6 at 16).
[297] *Id.* at 18.
[298] *Id.*

OGC."  Plaintiffs respond that Hollier "determined the rate of pay because he had the 2017 Market Study done and clearly recommend[ed] raises to John Harman (Vice Chancellor of Administration and Finance)."[299]  In addition, they argue that "Ms. Muslow did not determine Ms. Cunningham's rate of pay because she clearly could not."[300]  But, again, Plaintiffs fail to cite any record evidence in support of their conclusory assertions.  While factual controversies are to be resolved in favor of the nonmovant, this is so "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075.  Because Plaintiffs have not submitted evidence of contradictory facts, their "mere conclusory allegations," advanced here, "are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment."  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Even so, the fact that Plaintiffs recognize that Hollier could only recommend raises shows that Hollier did not have the authority to determine the rate of pay or method of payment.  As such, Plaintiffs have not shown that Hollier meets the third element of the economic-realities test.

The final factor of the test is whether the alleged employer maintained employee records.  *Chapman*, 562 F. App'x at 185.  First, as to Cunningham, Hollier argues that by Cunningham's own admission, her employment records were maintained by HRM – not Hollier.[301]  Second, as to both Muslow and Cunningham for the alleged OGC-consolidation period, Hollier asserts that he "did not maintain any employment records in relation to the OGC application process and consolidation."[302]  Plaintiffs argue that Hollier satisfies this prong because "[LSU]HSC-NO as an institution maintained all employees['] HR records which Hollier had access to at any point in his

---

[299] R. Doc. 387 at 20.  No record evidence is cited in support of their argument in either the opposition or statements of fact.

[300] *Id.*

[301] R. Doc. 372-1 at 16; *see also* R. Doc. 353-8 at 78 (deposition of Cunningham: "Q:  While you were employed at LSUHSC, do you know who maintained your employment records?  A:  HRM.  Q:  For the record, is that human resources management?  A:  Yes.").

[302] R. Doc. 372-1 at 18.

role as Chancellor."[303]  Plaintiffs' logic is breathtaking: under this argument, every person who has access to the LSU system would satisfy this prong.  Plaintiffs provide no evidence for such a sweeping proposition.  It is hard to imagine that they could.  "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."  *Ragas*, 136 F.3d at 458.  Plaintiffs have not met this burden.[304]  As a result, the fourth prong of the economic-realities test is not met.

With no prong of the economic-realities test satisfied, the Court must conclude that Hollier is not an "employer" and the EPA-discrimination claim against him fails as a matter of law.  *See Oncale*, 2020 WL 3469838, at *13 (observing that the absence of all of the economic-realities test factors is fatal).  Thus, Plaintiffs' EPA claim against Hollier for gender discrimination is must be dismissed.

### 2.  Plaintiffs' fail to identify a proper comparator.

Even if Plaintiffs were able to show that any of the defendants were "employers" subject to the EPA,[305] Plaintiffs' *prima facie* case still fails because they cannot identify a proper comparator.  Once a plaintiff shows that her alleged employer is subject to the EPA, she must then show that (1) she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (2) she was paid less than the employee of the opposite sex providing the basis of comparison.  *Badgerow,* 974 F.3d at 617.  This comparison "relates to job content rather than to job title or description."  *EEOC v. Hernando Bank, Inc.*, 724 F.2d 1188,

---

[303] R. Doc. 387 at 20.

[304] Even if there were some indication that the unsupported claims existed, on summary judgment "'the court is under no obligation to comb or scour the record to find support for the plaintiffs' response or evidence that creates a genuine dispute as to a material fact.'"  *Green v. Specialized Loan Servicing, LLC*, 2022 WL 704203, at *3 (N.D. Miss. Mar. 8, 2022) (quoting *Holmes v. N. Tex. Health Care Laundry Coop. Ass'n*, 304 F. Supp. 3d 525, 540 (N.D. Tex. Jan. 18, 2018)) (alteration omitted); *see also Amedee v. Shell Chem. LP-Geismer Plant*, 384 F. Supp. 3d 613, 637 (M.D. La. 2019) ("On summary judgment, the Court is not required to assume a party's argument or survey the record for evidence and argument suggesting Plaintiff's position and support for same.").

[305] LSU does not dispute its employer status.

1196 (5th Cir. 1984).  Because Congress amended the EPA to substitute the word "equal" for

"comparable," the statute has been narrowly construed to apply "only to jobs that are substantially

identical or equal."  *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973); *see also*

*Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256, 1258 (5th Cir. 1972) ("It is

not merely comparable skill and responsibility that Congress sought to address, but a substantial

identity of job functions.").  A female plaintiff "must show that her job requirements and

performance were substantially equal, though not necessarily identical, to those of a male

employee." *Reznick*, 104 F. App'x at 390 (citing 29 C.F.R. § 1620.13(e)).  "To make this showing,

[a female plaintiff] must offer evidence that her circumstances were 'nearly identical to those of a

better-paid employee who is not a member of the protected class.'" *Badgerow*, 974 F.3d at 617

(quoting *Taylor*, 554 F.3d at 523).  In determining whether the positions required substantially

equal work, a court conducts a case-by-case analysis in the context of the employer's particular

practices. *Hodgson*, 468 F.2d at 1258; *see, e.g.*, *Parr v. Nicholls State Univ.*, 2011 WL 838903, at

*4-5 (E.D. La. Mar. 3, 2011) (considering distinct roles, experience, and terms of employment of

positions proposed for comparison); *Gunaldo*, 2020 WL 4584186, at *10 ("To establish 'equal

work,' the plaintiff need only prove that the 'skill, effort and responsibility' required in the

performance of the jobs is 'substantially equal.'") (quoting *Jones*, 793 F.2d at 723).

Because "[g]enerally, a Title VII wage discrimination claim parallels that of an EPA

violation," *Montgomery v. Clayton Homes, Inc.*, 65 F. App'x 508, 2003 WL 1922917, at *1 (5th

Cir. Mar. 25, 2003); *see also Lindsley*, 984 F.3d at 466 ("The standards under each statute [*i.e.*,

the EPA and Title VII] for establishing a prima facie case are similar."), Plaintiffs' gender-

discrimination claims in violation of the EPA fail for the same reasons that their Title VII disparate-

treatment claim fails.[306]   Absent a proper comparator, Plaintiffs cannot establish a *prima facie* case, and their EPA claim for discrimination must be dismissed.  Even if Plaintiffs had established a *prima facie* case, dismissal is still warranted because Plaintiffs fail to establish pretext.

### 3.   Defendants offer persuasive nondiscriminatory reasons for the alleged pay disparity.

If a plaintiff shows a *prima facie* case, the burden then shifts to the defendant to prove by a preponderance of the evidence that the wage differential between the plaintiff and her comparators is justified under one of the four affirmative defenses set forth in the EPA: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex.  *See King*, 645 F.3d at 723.  "An employer is not liable under the EPA if it shows that the pay differential is 'made pursuant to ... a differential based on any other factor other than sex.'"  *Thibodeaux-Woody v. Hous. Cmty. Coll.*, 593 F. App'x 280, 283 (5th Cir. 2014) (citing § 206(d)(1)).  "Factors other than sex include, among other things, employees' 'different job levels, different skill levels, previous training, and experience.'"  *Browning*, 288 F. App'x at 174 (quoting *Pouncy v. Prudential Ins. Co.,* 668 F.2d 795, 803 (5th Cir. 1982)) (alteration omitted).  "The 'factor other than sex' defense applies only where 'pay differentials are based on a *bona fide* use of "other factors other than sex."'"  *Thibodeaux-Woody*, 593 F. App'x at 284 (quoting *Wash. Cnty. v. Gunther,* 452 U.S. 161, 170 (1981)) (emphasis in original).  "A practice is not a bona fide 'factor other than sex' if it is discriminatorily applied."  *Id.*  "'[A] bona fide job classification program that does not discriminate on the basis of sex will serve as a valid defense to a charge of discrimination.'"  *Corning Glass Works*, 417 U.S. at 201 (quoting H.R. Rep. No. 88-309, 8 (1963)); *see also* 109 Cong. Rec. 9209 (1963) ("Differences in

---

[306] *See supra* Section III(B)(1).

pay that are based upon a bona fide job classification system will not violate this act, if not based on sex.").

Here, Defendants satisfy this burden.  They argue that "the Market Study Methodology used a gender-neutral process used to assign a position to a job family and pay grade; and HRM was 'strictly looking at the role' for pay grade assignments, not individuals in a position."[307] Hollier adds that because "[t]he positions that were reviewed in connection with the market study were assigned to pay grades by solely considering the position, not the individual[,] there was no opportunity for gender-based considerations (whether for positive or nefarious reasons) for established pay ranges."[308]  "[T]he assignment of pay grades and salary ranges was not arbitrary," LSU explains, and was based on a "'collection of relevant information'" including: (1) current position descriptions; (2) historical compensation practices; (3) salary surveys; (4) employee census; (5) reporting structures; (6) third-party salaries; and (7) salary survey databases.[309]  And further, says LSU, "market (equity) adjustments were directed to be based on gender-neutral factors, including available budgetary resources, current positioning with respect to market range, performance and accomplishments, and equity and salary relationships to substantially equivalent incumbents in the same work unit or school/division."[310]  Upon reviewing the language of the 2017 Market Study and the depositions cited by the Defendants, the Court finds that Defendants have stated multiple valid defenses, including a bona fide non-gender-based job classification program that does not discriminate on the basis of sex.  *See Corning Glass Works*, 417 U.S. at 201. The Court finds this defense persuasive, satisfying the EPA standard.  *See Jones*, 793 F.2d at 722.

---

[307] R. Doc. 363-1 at 18 (quoting R. Doc. 363-7 at 86 (deposition of Rosalynn Martin)).
[308] R. Doc. 372-1 at 33 (citing R. Doc. 372-4 at 61, 65-66).
[309] R. Doc. 363-1 at 18 (quoting R. Doc. 363-4 at 23 (the 2017 Market Study)).
[310] *Id.* (citing R. Docs. 363-4 at 25-26; 363-7 at 19-22).

### 4. **Plaintiffs cannot establish pretext.**

Once the defendant establishes a legitimate, nondiscriminatory reason for the alleged pay disparity, the plaintiff must raise a genuine issue of material fact as to whether the purported reason was pretextual. *Browning*, 288 F. App'x at 174. Here, Plaintiffs do not dispute that the pay grades were established by a gender-neutral process.[311] Nevertheless, read generously, Plaintiffs seem to contend that it was "the implementation of those pay grades and special consideration given to men that was not given to female employees" that was allegedly pretextual.[312] But they offer no evidence in support of their statement. Instead, Plaintiffs (1) assert that "[n]o one at LSUHSC-NO considered whether the compensation paid any individual was in compliance with LSU's policies and the law";[313] (2) address Muslow's job performance;[314] and (3) fail to respond to the argument in support of a nondiscriminatory reason for the pay disparity.[315] In doing so, Plaintiffs offer no evidence to show that Defendants' proffered reason for any pay differential – a gender-blind market study – was based on sex. Because Plaintiffs have not shown that Defendants' nondiscriminatory reasons are pretextual, Plaintiffs' EPA gender-discrimination claims against LSU, Hollier, Harman, and Skinner must be dismissed on this ground as well.

### E. **EPA Retaliation Claims**

Plaintiffs assert retaliation claims in violation of the EPA against LSU, Hollier, Skinner, and Jones, arguing that they were "retaliated against in response to their participation in proceedings under the EPA as well as to their opposition of Defendants' practices ...."[316] The claims fail, say Defendants, because: (1) Hollier, Skinner, and Jones are not "employers" and

---

[311] R. Doc. 402 at 27.
[312] *Id.* at 27-28.
[313] *Id.* at 28.
[314] R. Doc. 396 at 28-39.
[315] *See* R. Doc. 387.
[316] R. Docs. 50 at 38; 99 at 14.

therefore are not subject to the EPA;[317] and (2) Plaintiffs cannot establish either a *prima facie* case or pretext.[318]   The Court agrees.

The analysis of an EPA retaliation claim mirrors that of a Title VII retaliation claim. *Lindsley*, 984 F.3d at 469 ("We analyze retaliation claims under Title VII ... and the FMLA pursuant to the *McDonnell Douglas* burden-shifting framework, and we are offered no reason why we should not do the same under the Equal Pay Act."); *see also Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) ("Retaliation claims under both Title VII and the FMLA ... are analyzed under the *McDonnell Douglas* burden-shifting framework.").   Under both Title VII and the EPA, an employer may not retaliate against an employee who opposes a discriminatory practice prohibited by the statute.   *See* 42 U.S.C. § 2000e-3(a) (Title VII) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); 29 U.S.C. § 215(a)(3) (EPA) ("[I]t shall be unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter.").   To establish a retaliation claim under either Title VII or the EPA, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.   *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017); *see also Thibodeaux-Woody*, 593 F. App'x at 285 (observing that an analysis of a Title VII or an EPA retaliation claim concerns the same elements).   "Assuming the plaintiff

---

[317] R. Docs. 345-1 at 12; 353-2 at 13; 372-1 at 15-19.
[318] R. Docs. 363-1 at 24-25; 365-1 at 30-31; 372-1 at 35.

is able to establish her prima facie case, the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action. If the defendant satisfies this burden, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Gee*, 289 F.3d at 345 (quotations, citations, and alterations omitted).

### 1. The individual Defendants are not subject to the Act.

As discussed above,[319] Hollier and Skinner are not "employers" as a matter of law.  Neither is Jones, against whom the Plaintiffs assert an EPA retaliation claim, but not an EPA gender-discrimination claim.  In his motion for summary judgment, Jones argues that Plaintiffs' EPA claim for retaliation against him must fail.[320]  Plaintiffs cannot establish a single economic-realities test factor, says Jones, and therefore he is not an "employer" subject to the EPA.[321]  In opposition, Plaintiffs rely on speculation and conclusory leaps to "establish" that Jones is an employer.[322]  Then, Plaintiffs argue that an unidentified defendant retaliated against them when (1) their employment contracts with the OGC were withdrawn "after Plaintiffs put Jones and Skinner on notice that there was a gender pay and discrimination issue"; and (2) they received backdated termination letters postmarked after the filing of their EEOC complaint.[323]  Plaintiffs do not allege that Jones specifically committed either alleged retaliatory act.[324]  In reply, Jones notes that Plaintiffs have failed to establish that Jones was their "employer" under the EPA, as they do not controvert Jones's uncontested material facts.[325]  For the reasons outlined below, the Court agrees.

---

[319] *See supra* Sections III(D)(1)(a) and (c).
[320] R. Doc. 353-2 at 13-25.
[321] *Id.*
[322] R. Doc. 388 at 8-9.
[323] *Id.* at 6, 10.
[324] *See id.* at 10.
[325] R. Doc. 425 at 1-2.

Plaintiffs have not proven that Jones satisfies the first factor of the economic-realities test, namely, that the alleged employer possessed the power to hire and fire employees. *See Chapman*, 562 F. App'x at 185. Jones contends that he did not have the power to hire and fire Plaintiffs from their LSUHSC-NO employment positions, as neither worked for nor reported to him.[326] Jones cites to deposition testimony indicating that (1) he never had authority to hire or fire Plaintiffs because they never worked for the OGC (where he worked); and (2) Hollier had the power to terminate plaintiffs.[327] Plaintiffs, however, state that because Jones could recommend to Hollier that Plaintiffs be fired, "[i]t stands to reason that if Mr. Jones believes that he could recommend someone be fired, that he also believed he had the power to do so."[328] They cite no evidence to support this unreasonable inference, which, without more, is not enough to controvert Jones's evidence that he did not have the power to hire and fire Plaintiffs. *See Gray*, 673 F.3d at 355 (observing that "mere conclusory allegations and inferences are not sufficient" for purposes of establishing the economic-realities test).

Likewise, there is no proof that Jones satisfies the second factor of the economic-realities test, namely, that he supervised or controlled employee work schedules or conditions of employment. *Chapman*, 562 F. App'x at 185. Jones argues that he never (1) reviewed the Plaintiffs' work;[329] (2) directed their daily job duties; (3) controlled their work hours; or (4) had a reporting relationship with them, as indicated by the LSUHSC-NO organizational charts and position descriptions.[330] Further, Jones points to Muslow's deposition testimony for the

---

[326] R. Doc. 353-2 at 14.
[327] R. Docs. 353-2 at 14-15; 353-7 at 38, 82.
[328] R. Doc. 388 at 8.
[329] R. Docs. 353-2 at 18; 353-7 at 31 (deposition of Jones: "I never had an opportunity to review their work.").
[330] R. Docs. 353-2 at 17, 19; 353-8 at 71, 73 (deposition of Cunningham: confirming that Jones never directed her daily duties, Muslow did).

proposition that Plaintiffs operated independently from Jones's workplace, the OGC.[331]  Plaintiffs, in opposition, merely state that Jones "sent emails and assigned work to the Plaintiffs after January 1, 2019," but that they "have been unable to obtain any of these documents in discovery."[332]  Plaintiffs' naked assertions are not sufficient.  Thus, Plaintiffs fail to controvert Jones's competent summary-judgment evidence and therefore cannot establish this second factor.

Plaintiffs also fail to establish the remaining two economic-realities test factors – that Jones determined the rate or method of payment and that he maintained employee records – because neither factor is addressed in Plaintiffs' opposition.[333]  Jones argues that there is no record evidence that he either determined Plaintiffs' rate or method of payment or that he maintained their employment records.[334]  Plaintiffs do not directly controvert Jones's argument.  Instead, Plaintiffs assert that (1) the OGC was "provided a salary range" by Baton Rouge HRM for the OGC chief counsel and staff attorney positions; and (2) Jones directed Dewailly that Plaintiffs "needed to complete the onboarding process to the HR system WorkDay."[335]  But neither of these propositions supports either of the final two factors.  To be sure, they seem to confirm that the Plaintiffs were not under Jones's supervision in any way as would allow him to determine their pay or maintain their records.

Accordingly, with no prong of the economic-realities test satisfied, Jones is not an "employer" and the EPA retaliation claim against him fails as a matter of law.  *See Oncale*, 2020

---

[331] R. Doc. 353-8 at 101-02 (deposition of Muslow: "We operated independently, my establishment was the Health Sciences Center, which is entirely different than the OGC, and the work was entirely different ....").

[332] R. Doc. 388 at 8-9.  Plaintiffs contend that Muslow testified in support of this fact and cite materials not attached to their opposition or Jones's motion.  Where Plaintiffs do not provide record citations, the Court is not required to sift through thousands of pages of exhibits to locate such materials.  Regardless, even assuming that such testimony could be found, the existence of one economic-realities factor is not enough for Jones to be an "employer" as a matter of law.

[333] *See* R. Doc. 388.

[334] R. Doc. 353-2 at 19-22.

[335] R. Doc. 388 at 9.

WL 3469838, at *13 (observing that the absence of all factors of the economic-realities test is fatal).[336]

### 2. Plaintiffs cannot establish their *prima facie* case.

If a plaintiff can identify an employer that is subject to the EPA, she must then establish her *prima facie* case. The analysis under the EPA and Title VII is the same. *See Lindsley*, 984 F.3d at 469 (analyzing Title VII and EPA retaliation claims under the same standard and framework). "To establish a prima facie case of retaliation, a plaintiff must 'demonstrate that: (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action.'" *Id.* (quoting *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014)). For the reasons set forth in Section III(C), even if Plaintiffs could establish a *prima facie* case, which, as with their Title VII retaliation claim, is suspect, dismissal is still warranted because Plaintiffs do not establish pretext.

### 3. Defendants offer persuasive nonretaliatory reasons for the alleged pay disparity.

"If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to demonstrate a legitimate, non-retaliatory reason for the employment action." *Lindsley*, 984 F.3d at 470. For the reasons stated in Section III(C), Defendants have carried their burden of establishing a legitimate, nonretaliatory reason for Plaintiffs' termination. The Court finds Defendants' reasons persuasive, satisfying the EPA standard. *See Jones*, 793 F.2d at 522.

### 4. Plaintiffs cannot establish pretext.

If the defendant satisfies its burden of production and persuasion and demonstrates a legitimate, nonretaliatory reason for the employment action, "'the plaintiff must prove that the

---

[336] Curiously, Plaintiffs brief § 1983 claims in their opposition to Jones's motion, *id.* at 6, but no § 1983 claims are asserted against Jones. R. Doc. 425 at 9.

employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose.'" *Wilder v. Stephen F. Austin State Univ.*, 552 F. Supp. 3d 639, 661 (E.D. Tex. 2021) (quoting *Gee*, 289 F.3d at 345). For the reasons stated in Section III(C), Plaintiffs have not established pretext. On multiple grounds, then, Plaintiffs' EPA retaliation claims against LSU, Skinner, Hollier, and Jones must be dismissed.[337]

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that:

- Skinner's motion for summary judgment (R. Doc 345) is GRANTED and all claims against him are DISMISSED WITH PREJUDICE.

- Harman's motion for summary judgment (R. Doc. 347) is GRANTED and all claims against him are DISMISSED WITH PREJUDICE.

---

[337] LSU also argues that the after-acquired-evidence doctrine limits Plaintiffs' remedies as neither was authorized to remove, retain, and use LSU's documents while employed as its legal counsel. R. Docs. 363-1 at 31-34; 365-1 at 37-40. The after-acquired-evidence doctrine "considers a scenario in which a defendant employer uncovers evidence of the employee's misconduct after she is fired." *Garza v. AAA Cooper Transp.*, 2021 WL 3777739, at *4 (S.D. Tex. May 18, 2021). Even if an employer unlawfully discriminates against an employee, courts "must consider how the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995). "In determining appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee, or out of concern for the relative moral worth of the parties, but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." *Id.* at 361 (quotation omitted). "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362-63. "Where ... the alleged discriminatory action occurs before the alleged misconduct, the plain language of *McKennon* precludes the use of the after-acquired evidence defense." *Teague v. Omni Hotels Mgmt. Corp.*, 2020 WL 7680547, at *6 (W.D. Tex. Nov. 24, 2020). LSU argues that it discovered evidence that would have resulted in Plaintiffs' earlier termination if known earlier. R. Doc. 365-1 at 38. For example, LSU says it learned that Plaintiffs attached exhibits to their complaint that "contained a non-public document obtained by Plaintiffs in their former roles as LSU attorneys *and* an email with privileged information of LSU." *Id.* at 39 (citing R. Doc. 24-7 at 1-8) (emphasis in original). LSU argues that Plaintiffs' use of these documents violated their ethical and professional obligations governing the attorney-client relationship and breached their fiduciary duty to their client LSU. *Id.* at 40. So, argues LSU, the after-acquired-evidence doctrine precludes Plaintiffs' recovery for damages. *Id.* The Court need not decide whether LSU's after-acquired-evidence argument has merit, though, because Plaintiffs' claims are dismissed on other grounds.

- Jones's motion for summary judgment (R. Doc. 353) is GRANTED and all claims against him are DISMISSED WITH PREJUDICE.

- Hollier's motion for summary judgment (R. Doc. 372) is GRANTED and all claims against him are DISMISSED WITH PREJUDICE.

- LSU's motions for summary judgment regarding Cunningham's claims (R. Doc. 363) and Muslow's claims (R. Doc. 365) are GRANTED and all claims against it are DISMISSED WITH PREJUDICE.

- LSU's motion *in limine* to exclude testimony of Leslie Schiff (R. Doc. 350) is DENIED AS MOOT.

- LSU's motion *in limine* to exclude testimony of Elizabeth Martina (R. Doc. 351) is DENIED AS MOOT.

- LSU's motion *in limine* to exclude testimony of Caren Goldberg (R. Doc. 352) is DENIED AS MOOT.

- Hollier's motion *in limine* to exclude testimony of Leslie Schiff (R. Doc. 373) is DENIED AS MOOT.

- Hollier's motion *in limine* to exclude testimony of Elizabeth Martina (R. Doc. 374) is DENIED AS MOOT.

- Hollier's motion *in limine* to exclude testimony of Caren Goldberg (R. Doc. 375) is DENIED AS MOOT.

- Plaintiffs' motion to strike exhibit from Jones's reply in support of summary judgment (R. Doc. 440) is DENIED AS MOOT.[338]

---

[338] The motion to strike is moot because the Court did not consider, rely on, or analyze the complained-of exhibit when deciding the outcome of the motions for summary judgment.

New Orleans, Louisiana, this 24th day of May, 2022.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE