UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KATHERINE MUSLOW, *et al.*

VERSUS

BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY,
AND AGRICULTURAL AND
MECHANICAL COLLEGE, *et al.*

CIVIL ACTION

NO. 19-11793

SECTION M (2)

## ORDER & REASONS

Before the Court is a motion for summary judgment regarding available damages filed by defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU").[1]  Plaintiffs Katherine Muslow and Meredith Cunningham (together, "Plaintiffs") respond in opposition.[2]  LSU replies in further support of its motion,[3] and Plaintiffs file a surreply.[4] Having considered the parties' memoranda, the record, and the applicable law, the Court grants the motion in most all respects.

## I.    BACKGROUND

This case arises out of an employment dispute.  Muslow and Cunningham were employed by LSU's Health Sciences Center in New Orleans ("LSUHSC-NO") as full-time general counsel and part-time staff attorney, respectively, until the summer of 2019, when their positions were retired as part of LSU's plan to consolidate its university-wide legal team.[5]

---

[1] R. Doc. 551.
[2] R. Doc. 553.
[3] R. Doc. 559.
[4] R. Doc. 560.
[5] R. Docs. 551-1 at 2-4; 553 at 3-4.

The consolidation plan involved retiring the two LSUHSC-NO legal positions, then occupied by Plaintiffs, and adding two new attorney positions to LSU's office of general counsel ("OGC"), intended to be filled by Plaintiffs.[6]  LSU informed Muslow of this plan in December 2018.[7]  In January 2019, Muslow and Cunningham were each provided an unexecuted, proposed employment contract for the positions of OGC chief counsel and OGC staff attorney, respectively, with salaries matching each Plaintiff's then-current LSUHSC-NO salary and an effective date of February 1, 2019.[8]  By February, Plaintiffs had completed applications for the new positions, as requested by OGC to facilitate their transfer, but neither had executed her OGC contract, despite prompting by OGC staff.[9]  On February 15, 2019, Muslow emailed OGC vice president of legal affairs Thomas Skinner, with Cunningham copied on the email, requesting that Plaintiffs' salaries be reviewed before they executed the contracts.[10]  Based on the results of a 2017 market study conducted by LSUHSC-NO, Muslow suggested that her salary be increased from $227,520 to $375,000, and Cunningham's part-time salary from $76,500 at 60% full time equivalent ("FTE") to $204,748 at 80% FTE, adjustments she deemed "overdue and necessary to ameliorate an environment at [LSUHSC-NO] that has not seemed historically to view equity as potentially a gendered issue."[11]

On February 18, Skinner notified Plaintiffs that their OGC offers were rescinded "pending further review" for the stated reason that the contracts had not been executed or returned by the effective date.[12]  On March 1, Muslow emailed Skinner and LSUHSC-NO chancellor Larry Hollier, inquiring whether "the review referenced in Mr. Skinner's [recission] letter [was] still

---

[6] R. Docs. 551-1 at 3-4; 553 at 3-4.
[7] R. Doc. 553-3 at 7.
[8] R. Docs. 551-1 at 3; 551-5 at 8-13; 553 at 6.
[9] R. Docs. 551-5 at 9-10, 12-13.
[10] *Id.* at 14-15.
[11] *Id.* (quote at 15).
[12] *Id.* at 16-17; R. Doc. 551-6 at 1-2.

pending or if further guidance [was] forthcoming."[13]  On March 6, Muslow again emailed Skinner and Hollier, stating that Plaintiffs "complied with everything asked of [them] and … were responsive to the employment agreements" and "[t]hat [they] requested that [their] salaries be reviewed [did] not render [their] response to the employment agreements nonresponsive or a rejection of the offers."[14]  Muslow also requested confirmation that Plaintiffs were "active candidates" for the OGC positions.[15]  Neither Skinner nor Hollier responded.[16]

On March 28, 2019, the OGC positions were publicly posted with an application deadline of April 28, 2019.[17]  Plaintiffs were each personally invited to apply by OGC business manager Dana Dewailly on April 4.[18]  Upon learning that Plaintiffs had not submitted applications, LSU deputy general counsel Carlton Jones emailed Plaintiffs on May 2, after the April 28 deadline had passed, to confirm whether they intended to apply for the OGC positions.[19]  On May 3, Muslow responded, with Cunningham copied on the email:

> … We stand by our request for salary reviews and to be paid fairly as compared to our male peers and consistent with the [LSUHSC-NO]'s 2017 market study.  In asking if we intend to "apply" for our jobs, are you indicating that salary reviews will, indeed, take place and that we will be compensated equitably and in line with the [LSUHSC-NO]'s market study?[20]

Jones clarified on May 10 that he "was simply trying to determine if [Muslow was] still interested" in the OGC chief counsel position and informed her that he would forward her resume to the hiring committee.[21]  On May 13, Muslow replied, again copying Cunningham, stating:  "... Unless my position is going to be compensated as dictated by the market study done at [LSUHSC-NO], …

---

[13] R. Doc. 553-4 at 11.
[14] *Id.* at 12.
[15] *Id.*
[16] *Id.* at 15.
[17] R. Doc. 551-6 at 20, 23.
[18] *Id.* at 22, 25.
[19] *Id.* at 26; R. Doc. 551-7 at 3.
[20] R. Doc. 551-7 at 2.
[21] *Id.* at 1.

you do not have my permission to treat me as an 'applicant' for a position I have held going on eighteen years now. [Cunningham] concurs."[22]

On May 15, Jones again asked Muslow to confirm whether she was interested in being considered for the OGC chief counsel position, adding that if she did not respond by 5:00 p.m. the following day, he would "take [her] May 13, 2019 email as direction to <u>not</u> include [her] in the application process and … move forward with the current pool of online applicants."[23] Muslow did not respond, and Jones removed Plaintiffs from consideration for the OGC positions.[24] Pursuant to the consolidation plan, the LSUHSC-NO staff attorney position was retired, ending Cunningham's employment at LSU, on June 30, 2019,[25] and the LSUHSC-NO general counsel position was retired, ending Muslow's employment at LSU, on July 15, 2019.[26] LSU subsequently hired Louis Colletta for the OGC chief counsel position, at a starting annual salary of $182,500.[27] The OGC staff attorney position was not filled.[28]

On July 22, 2019, Plaintiffs filed this action against LSU and several individual defendants, alleging violations of Title VII, Title IX, the Equal Pay Act ("EPA"), 42 U.S.C. § 1983, and the Louisiana Employment Discrimination Law.[29] After extensive preliminary motion practice and with the filing of a third amended complaint, the Plaintiffs' claims included gender discrimination in violation of Title VII against LSU, retaliation in violation of Title VII against LSU, gender discrimination in violation of the EPA against LSU and three individual defendants, retaliation in violation of the EPA against LSU and three individual defendants, and gender discrimination in

---

[22] *Id.*
[23] *Id.* at 4 (emphasis in original).
[24] *Id.* at 5.
[25] *Id.* at 7-8.
[26] *Id.* at 9-10.
[27] R. Doc. 365-10 at 100.
[28] R. Doc. 551-1 at 13.
[29] R. Doc. 1.

violation of § 1983 against two individual defendants.[30]  Thereafter, the Court granted the defendants' motions for summary judgment, dismissing all of Plaintiffs' claims,[31] and upon Plaintiffs' appeal,[32] the Fifth Circuit affirmed the dismissal in all respects but one.

The Fifth Circuit determined that, as of the summary-judgment stage, Plaintiffs had established a *prima facie* case only as to one of their retaliation allegations against LSU – namely, "that their employment contracts with OGC were rescinded, and they were eventually terminated, after they raised gender-pay equity concerns to Skinner via email."[33]  Thus, the Fifth Circuit held that Plaintiffs "identified two adverse employment actions related to this allegation – the rescission of their employment contracts, and their eventual termination."[34]  Applying the *McDonnell Douglas* burden-shifting framework,[35] the Fifth Circuit then observed that the "[d]efendants offer[ed] several non-retaliatory reasons for the employment actions."[36]  The Fifth Circuit went on to analyze whether Plaintiffs had shown that the defendants' stated reasons for each employment action were "pretext for the real, retaliatory purpose," *i.e.*, whether Plaintiffs "provide[d] substantial evidence that, but for [their] protected activity, [they] would not have been subject to the adverse employment action."[37]  The Fifth Circuit concluded:

---

[30] R. Doc. 99.

[31] R. Docs. 451; 452.

[32] R. Docs. 502; 503.

[33] *Muslow v. La. State Univ. & Agric. & Mech. Coll., Bd. of Supervisors*, 2023 WL 5498952, at *7 (5th Cir. Aug. 24, 2023) [hereinafter *Muslow v. LSU*] (R. Doc. 511-1 at 16), *cert. denied*, 144 S. Ct. 573 (2024).  To establish a retaliation claim under either Title VII or the EPA, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017); *see also Thibodeaux-Woody v. Hous. Cmty. Coll.*, 593 F. App'x 280, 285 (5th Cir. 2014) (observing that an analysis of a Title VII or an EPA retaliation claim concerns the same elements).

[34] *Muslow v. LSU* at *8 (R. Doc. 511-1 at 18).

[35] Under this framework, set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), once a plaintiff has established a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a nonretaliatory reason for the alleged employment action.  *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008).  The plaintiff must then show that the defendant's stated reason is a pretext for retaliation.  *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008).

[36] *Muslow v. LSU* at *8 (R. Doc. 511-1 at 18).

[37] *Id.* at *9 (R. Doc. 511-1 at 18).

Muslow and Cunningham have not met this burden with respect to their termination from LSUHSC[-NO]. The evidence establishes that Plaintiffs were aware of the plan to consolidate all legal services within OGC by December 2018. While they were told at that time that the transition would be administrative, Muslow and Cunningham do not dispute that they were required to go through the entire recruiting process, which included the submission of a "completed employment contract" before OGC could effectuate their hiring. As the district court recognized, Plaintiffs' "failure to execute the tendered employment contracts with OGC or to apply for the new OGC positions – despite being prompted and invited to do so multiple times – cemented their termination." Thus, it was inevitable that their positions would be terminated, and the salary-review request was not the but-for cause of their termination.

However, Muslow and Cunningham have provided substantial evidence regarding that their employment contracts at OGC would not have been rescinded but for the request for their salaries to be reviewed because of gender-pay equity concerns. Upon review, it appears that the district court – and [d]efendants on appeal – treated the rescission of Plaintiffs' employment contracts and their later termination as a single adverse employment action and thus did not separately consider whether the salary-review request was the but-for cause of the contract rescission. But these are their own adverse employment actions and must be considered separately.[38]

As a result, said the court, "the recission of [Plaintiffs'] employment contracts … is the only alleged retaliatory action that … survives summary judgment."[39] The Fifth Circuit thus affirmed the Court's dismissal of all of Plaintiffs' claims except those "alleging that LSU retaliated against Muslow and Cunningham by revoking their employment contracts following their salary-review request" and remanded the action for further proceedings on these remaining claims.[40]

On remand, this Court ordered the parties to file briefs addressing the issues remaining for trial and how they should be tried.[41] The parties identified three dispositive issues remaining on remand, including the damages available for Plaintiffs' remaining claims.[42] The Court then ordered that the parties address all dispositive issues via motions for summary judgment, beginning

[38] *Id.* (R. Doc. 511-1 at 19-20).
[39] *Id.* at *10 (R. Doc. 511-1 at 21).
[40] R. Doc. 510; *Muslow v. LSU* at *11 (R. Doc. 511-1 at 23).
[41] R. Doc. 535.
[42] R. Docs. 537; 538; 539; 540.

6

with damages.[43]  Accordingly, LSU now moves for summary judgment dismissing or limiting the damages sought by Plaintiffs on their remaining claims.[44]

## II.     PENDING MOTION

In its motion for summary judgment on available damages, LSU first argues that punitive damages are not available to Plaintiffs because they failed to provide fair notice of any claim for punitive damages against LSU in their series of amended complaints (including the operative complaint).[45]  LSU next argues that punitive damages under Title VII are barred in this case as a matter of law because LSU, as a state university, is exempt from Title VII punitive damages.[46] LSU also contends that punitive damages are not available for Plaintiffs' EPA claim as a matter of law because Fifth Circuit case law suggests that the Fair Labor Standards Act ("FLSA") does not authorize punitive damages.[47]

LSU then argues that back pay is unavailable for the period between LSU's recission of the contracts on February 18, 2019, and the retirement of Plaintiffs' LSUHSC-NO positions in the summer of 2019 because Plaintiffs remained employed at their same salaries throughout that period.[48]  LSU further argues that because there are no wrongful termination claims remaining in this case, and Plaintiffs made no constructive discharge claims, Plaintiffs cannot recover back pay for the period following the retirement of their LSUHSC-NO positions.[49]

LSU next urges that reinstatement is not feasible, given that Plaintiffs' LSUHSC-NO positions have been retired, the OGC chief counsel position was filled, and LSU decided not to fill the OGC staff attorney position, and because "the record of this suit is replete with … LSU's

---

[43] R. Doc. 541.
[44] R. Doc. 551.
[45] R. Doc. 551-2 at 5-10.
[46] *Id.* at 10.
[47] *Id.* at 11-14.
[48] *Id.* at 15.
[49] *Id.* at 16-18.

objections to conduct by Plaintiffs during their former employment as legal counsel for LSUHSC-NO."[50] LSU also argues that front pay is not available in lieu of reinstatement for the same reasons that backpay is unavailable.[51] LSU likewise contends that, because back pay is not available, neither are EPA liquidated damages which "are an 'additional equal amount' to the payment of lost wages."[52]

Finally, LSU argues that any compensatory damages should be "limited to a single allegedly retaliatory act for a limited period."[53] LSU notes that 29 C.F.R. § 1620.27(b) prohibits an individual from "receiv[ing] duplicative relief for the same wrong" under both Title VII and the EPA.[54] LSU then contends that Plaintiffs' recoverable compensatory damages should be confined to the period between the alleged retaliatory act (*i.e.*, the recission of the OGC contracts on February 18, 2019) and the retirement of the Plaintiffs' LSUHSC-NO positions (on June 20, 2019, for Cunningham and July 15, 2019, for Muslow) because recovery for losses suffered after those dates would compensate Plaintiffs for more than the "single allegedly retaliatory act" underlying the only remaining claim in the case.[55]

In opposition, Plaintiffs first argue that they "are entitled to present the full range of back-pay and front-pay damages to the jury at trial,"[56] because LSU "took away Plaintiffs' opportunity to sign the OGC contracts and remain employed at LSU," an opportunity which Plaintiffs claim they would have taken but for LSU's rescission of the contracts, resulting in their termination.[57]

---

[50] *Id.* at 18-20 (quote at 20).
[51] *Id.* at 20-22.
[52] *Id.* at 22.
[53] *Id.* at 23.
[54] *Id.*
[55] *Id.* at 23-24 (quote at 23).
[56] R. Doc. 553 at 9.
[57] *Id.*; *see also* R. Docs. 553-1 at 4 ("Plaintiffs could have (and would have) signed the OGC contracts and remained employed at LSU"); 560 at 9 ("But for LSU's rescission of those contracts, Plaintiffs would have signed them and remained employed at LSU.").

Plaintiffs reason that LSU is really asserting a "disguised mitigation affirmative defense" for which LSU would bear the burden of proof, were it procedurally proper.[58]  And Plaintiffs then argue that this mitigation defense must fail because LSU never gave Plaintiffs unconditional employment offers after "Plaintiffs were left in positions slated for termination and then *involuntarily terminated* (i.e., actually discharged) by LSU."[59]  Because, in Plaintiffs' view, front and back pay are available, EPA liquidated damages are also available.[60]  Plaintiffs also contend that the availability of reinstatement as a remedy should be evaluated after trial.[61]

Plaintiffs then posit that LSU offers no support for its argument that compensatory damages "should be artificially limited to the few months [Plaintiffs] remained employed at LSU" after the contracts were rescinded and that Plaintiffs therefore "have every right to present evidence to the jury" that the rescission of the contracts "caused them harm supporting compensatory damages," up until and after their LSUHSC-NO positions were retired.[62]  Finally, Plaintiffs contend that the Court should let the jury decide the issue of punitive damages at trial because their pleadings sufficiently put LSU on notice that they sought punitive damages[63] and some district courts in this circuit have allowed the question of punitive damages to go to the jury following the Fifth Circuit's decision in *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062, 1066 (5th Cir. 2016).[64]

In reply, LSU first argues that Plaintiffs' objections to LSU's statement of material facts and Plaintiffs' own statements of undisputed and disputed facts "fail[] to raise a genuine dispute as to any material fact [given their] reliance on conclusory arguments and failure to cite contrary,

---

[58] R. Doc. 553 at 10.
[59] *Id.* at 14-16 (quote at 14-15) (emphasis in original).
[60] *Id.* at 19.
[61] *Id.* at 18.
[62] *Id.* at 19-20.
[63] *Id.* at 21-22.
[64] *Id.* at 23-24.

material facts."[65]  LSU next reurges that punitive damages are not available because Plaintiffs failed to provide notice of such a claim in their pleadings and punitive damages are not authorized by the EPA, disputing Plaintiffs' interpretation of the *Pineda* decision.[66]  LSU then reiterates that front and back pay are not available because no termination claims remain.  LSU maintains that Plaintiffs' argument that the rescission of the contracts caused Plaintiffs' termination "overlook[s] the proper 'causal link' analysis of Title VII and EPA retaliation claims, misread[s] the Fifth Circuit opinion, and improperly conflate[s] and attempt[s] to re-cast the sole retaliatory rescission claim as the separate and dismissed retaliatory termination claim."[67]  LSU also contends that Plaintiffs' argument that LSU asserts an affirmative mitigation defense does not address "the stated premise of LSU's damages motion: Plaintiffs are not entitled to seek post-employment lost wages in the absence of a wrongful termination or constructive discharge claim."[68]  Lastly, LSU argues that Plaintiffs do not refute the facts and law cited in support of LSU's arguments that reinstatement, EPA liquidated damages, and duplicative compensatory damages are unavailable.[69]

Plaintiffs' surreply again urges that front and back pay are available because LSU's rescission of the contracts resulted in Plaintiffs' termination[70] and that LSU "avoid[s] that simple logic" by "adopt[ing] a red-herring 'no-wrongful-termination' mantra"[71] based on a misreading of the Fifth Circuit's opinion.  According to Plaintiffs, "the key point" of that opinion is the identification of "Plaintiffs' 'execut[ion of] the tendered employment contracts' as a way to remain

---

[65] R. Doc. 559 at 2.
[66] *Id.* at 3-4.
[67] *Id.* at 5-6 (quote at 6) (emphasis omitted).
[68] *Id.* at 7 (emphasis omitted).
[69] *Id.* at 9-10.
[70] R. Doc. 560 at 2-3.
[71] *Id.* at 3.

employed."[72]  Plaintiffs conclude by reiterating their positions regarding the availability of EPA

liquidated damages, compensatory damages, and punitive damages.[73]

## III.    LAW & ANALYSIS

### A.  LEGAL STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  "One of the principal purposes of

the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."

*Id.* at 324-25.  "Rule 56(c) mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  *Id*. at 322.  A party moving for summary judgment bears the initial burden of

demonstrating the basis for summary judgment and identifying those portions of the record,

discovery, and any affidavits supporting the conclusion that there is no genuine issue of material

fact.  *Id*. at 323.  If the moving party meets that burden, then the nonmoving party must use

evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material

fact.  *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the

nonmoving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The substantive

law identifies which facts are material.  *Id*.  Material facts are not genuinely disputed when a

rational trier of fact could not find for the nonmoving party upon a review of the record taken as a

---

[72] *Id.* at 4 (quoting *Muslow v. LSU* at *9 (R. Doc. 511-1 at 19)).
[73] *Id.* at 6-9.

whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). "In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the

manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial." *Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).  Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### B. ANALYSIS

#### 1. Punitive Damages

##### a. Plaintiffs did not provide adequate notice of any punitive damage claims against LSU.

A complaint must contain "a short and plain statement of the claim" and "a demand for the relief sought, which may include relief in the alternative or different types of relief."  Fed. R. Civ. P. 8(a)(2)-(3).  To provide sufficient notice of a claim for punitive damages, "'the complaint need not contain the words "punitive" or "exemplary," or refer to the statute under which such damages are sought, but need only allege facts sufficient to put the other party on notice of a claim for punitive damages.'"  *Blewster v. Garvey*, 2020 WL 12740544, at *4 (E.D. La. Sept. 23, 2020) (quoting *S. Pac. Transp. Co. v. Builders Transp., Inc.*, 1993 WL 232058, at *4 (E.D. La. June 22, 1993)).

LSU argues that, even if punitive damages were available as a matter of law in this case, which LSU denies,[74] Plaintiffs failed to provide sufficient notice of any punitive damage claims against LSU.[75]  As LSU observes, the operative complaint (the third supplemental and amended complaint), and the three prior versions, all contain "specific notice by Plaintiffs as to which claims

---

[74] R. Docs. 551-2 at 10-14; 559 at 3-4.
[75] R. Docs. 551-2 at 5-10; 559 at 2-3.

and which [d]efendants against whom they sought punitive damages," with no version of the complaint specifying that Plaintiffs were seeking punitive damages against LSU for their EPA claims.[76]  The original complaint sought punitive damages for Plaintiffs' claims against LSU under the Louisiana Employment Discrimination Law and Title IX (which claims have since been withdrawn or dismissed) and Title VII (under which LSU is exempt from punitive damages), but not under the EPA.[77]  The first amended complaint only sought punitive damages from LSU for Plaintiffs' Title IX claim.[78]  The second and third amended complaints did not seek punitive damages for any of Plaintiffs' claims against LSU, and only sought punitive damages against individual defendants under § 1983.[79]

Plaintiffs contend that their allegation that "[d]efendants acted with malice or with reckless or deliberate indifference to Plaintiffs' legal rights"[80] put LSU on notice of Plaintiffs' punitive damage claims.  This allegation reflects the standard for punitive damages under Title VII.  *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages … if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices *with malice or with reckless indifference to the federally protected rights of an aggrieved individual*." (emphasis added)).  Plaintiffs' punitive damage claim against LSU under Title VII was omitted from the first, second, and third amended complaints,[81] most likely because LSU is exempt from punitive damages under Title VII.[82]  Thus, the allegation that all defendants acted with malice or reckless indifference could not have put LSU on notice of a punitive damages claim

[76] R. Doc. 551-2 at 7.
[77] R. Doc. 1 at 19-23.
[78] R. Doc 31 at 24-25.
[79] R. Docs. 50 at 38-42; 99 at 15-16.
[80] R. Doc 553 at 21 (citing R. Docs. 50 at 30; 99 at 7).
[81] R. Docs. 31 at 24-25; 50 at 38-42; 99 at 7.
[82] *See infra* Section III(B)(1)(b).  The issue of LSU's exemption from Title VII punitive damages was raised in its 12(b)(6) motion to dismiss (R. Doc. 13), which was denied as moot (R. Doc. 32) after Plaintiffs sought leave to file the first amended complaint (R. Doc. 24).

against it because LSU was never subject to punitive damages under that standard.  And because the two circuits to address whether punitive damages are available under the FLSA are split on this issue,[83] there is no generally accepted test for a claim for punitive damages under the FLSA (though the few district courts addressing the issue have applied the § 1981a(b)(1) standard).  *See, e.g., Azkour v. Little Rest Twelve*, 2015 WL 631377, at *9 (S.D.N.Y. Feb. 12, 2015) ("[T]he Court agrees with what appears to be the only other federal court opinion to consider the standard for punitive damages under the FLSA and concludes that the § 1981a(b)(1) standard also applies here." (citing *Randolph v. ADT Sec. Servs., Inc.*, 2012 WL 2234362, at *4 (D. Md. June 14, 2012)). Given that the availability of punitive damages under the FLSA is unsettled, and the consequent lack of an accepted standard for such damages, the allegation that all "defendants acted with malice or reckless or deliberate indifference" is insufficient to have put LSU on notice that Plaintiffs were seeking punitive damages against LSU for their EPA retaliation claim.[84]  Finally, Plaintiffs contend that their broad requests in the third amended complaint for "all available relief" and "all other and further relief as to this Court appears necessary and proper"[85] are not limited by their having "list[ed] punitive damages as to two individual defendants."[86]  However, these general requests for relief fail to "allege facts sufficient to put [LSU] on notice of a claim for punitive damages." *S. Pac. Transp. Co.*, 1993 WL 232058, at *4.

Therefore, the lack of notice means punitive damages are not available to Plaintiffs against LSU on any claim.

---

[83] *See infra* Section III(B)(1)(c).
[84] To be sure, at one point in the litigation, Plaintiffs expressly agreed with LSU that "the EPA does not provide for the imposition of punitive damages," R. Doc. 69 at 5 – which would certainly explain why they did not include such a claim in their pleadings.
[85] R. Doc. 553 at 22 (quoting R. Doc. 99 at 12-13).
[86] *Id*.

**b.  Punitive damages are not available for Plaintiffs' Title VII claim.**

Title VII permits a plaintiff to recover punitive damages from a "respondent (*other than a government, governmental agency or political subdivision*) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference."  42 U.S.C. § 1981a(b)(1) (emphasis added).  The exception of government entities from Title VII punitive damages applies to state universities, like LSU.  *See, e.g., Tureaud v. Grambling State Univ.*, 2005 WL 8167346, at *5 (W.D. La. Aug. 26, 2005).  LSU therefore correctly argues,[87] and Plaintiffs do not deny,[88] that punitive damages are unavailable for Plaintiffs' Title VII retaliation claim against LSU.  Accordingly, the only claim for which Plaintiffs now pursue punitive damages is their EPA retaliation claim.[89]

**c.  Punitive damages are not available for Plaintiffs' EPA claim.**

The Equal Pay Act, 29 U.S.C. § 206(d), is part of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219.  Plaintiffs' EPA retaliation claim thus arises out of the FLSA's antiretaliation provision, which prohibits employers from:

> discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).  The FLSA's remedial provision states in relevant part:

> Any employer who violates the provisions of section 215(a)(3) … of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) … of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

---

[87] R. Docs. 551-2 at 10-14; 559 at 3-4.
[88] *See* R. Docs. 553 at 20-24; 560 at 6-8.
[89] *See* R. Doc. 553 at 23 (arguing that LSU provides no "persuasive reason to decide pre-trial that Plaintiffs cannot recover punitive damages *under the EPA*" (emphasis added)).

*Id.* § 216(b). Neither the Supreme Court nor the Fifth Circuit has determined whether "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3)" includes punitive damages. *See, e.g., Litton v. Preferred Eng'g LP*, 2022 WL 22860989, at *1 (S.D. Tex. Apr. 19, 2022) ("The Fifth Circuit hasn't ruled on the precise issue whether punitive damages are available for retaliation under the FLSA."). And other circuits are split on this issue. *Compare Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108 (7th Cir. 1990) (holding that punitive damages are authorized by § 216(b)), *with Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928 (11th Cir. 2000) (holding that punitive damages are not authorized by § 216(b)).

LSU contends that "punitive damages are not recoverable under the FLSA's antiretaliation provisions, as a matter of law"[90] because § 216(b) should be read consistently with the remedial provision of the Age Discrimination and Employment Act ("ADEA"), which incorporates § 216(b),[91] and the Fifth Circuit has ruled that punitive damages are not authorized by the ADEA.[92] LSU further argues that this Court, as well as "[n]umerous other district courts in this federal circuit" have accordingly held that punitive damages are not available under the FLSA.[93] Plaintiffs respond, however, that the Fifth Circuit "charted a different course" in *Pineda v. JTCH Apartments, L.L.C.* when it concluded that its "'case law interpreting the ADEA [was] no obstacle to joining other circuits in deciding that the FLSA's broad authorization of "legal and equitable relief" encompasses compensation for emotional injuries suffered by an employee on account of

---

[90] R. Doc. 551-2 at 11.

[91] "The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section." 29 U.S.C. § 626(b).

[92] R. Doc. 551-2 at 11-12 (citing *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 491 (5th Cir. 2007); *Hansard v. Pepsi-Cola Metro. Bottling Co.,* 865 F.2d 1461, 1469 (5th Cir. 1989); *Dean v. Am. Sec. Ins. Co.*, 559 F.2d 1036, 1038-39 (5th Cir. 1977)).

[93] R. Doc. 551-2 at 12 (citing, *inter alia*, *Aucoin v. Kennedy*, 355 F. Supp. 2d 830, 841 (E.D. La. 2004); *Biggio v. H2O Hair Inc.*, 2016 WL 1031344, at *2-3 (E.D. La. Mar. 14, 2016)).

employer retaliation.'"[94]  In *Pineda*, the Fifth Circuit found that "the final 'as may be appropriate to effectuate the purposes' phrase [in the ADEA] ... warrant[s] a different result when it comes to the FLSA retaliation provision" because, unlike the ADEA which requires an employee to exhaust her administrative remedies before bringing suit, "the FLSA follows the path of tort law, authorizing immediate suits by employees to provide compensation and deterrence."  843 F.3d at 1066.  Thus, while the Fifth Circuit in *Pineda* held only that emotional distress damages are recoverable under the EPA, Plaintiffs rely heavily on the *Pineda* court's quotation from a Seventh Circuit case – reciting that "[c]ompensation for emotional distress, and punitive damages, are appropriate for intentional torts such as retaliatory discharge," *Travis*, 921 F.2d at 112, *quoted in Pineda*, 843 F.3d at 1064 – to urge that punitive damages, too, should be recoverable under the EPA here.  LSU counters that Plaintiffs place undue emphasis on the Fifth Circuit's citation to *Travis* and misread the *Pineda* opinion which, says LSU, "does not stand for, did not reach findings on, and did not include dicta on the availability of punitive damages under an FLSA retaliation claim."[95]  Nevertheless, *Pineda* does seem to indicate that the Fifth Circuit case law holding that certain remedies are not authorized by the ADEA (*e.g.,* compensation for emotional distress) does not necessarily preclude the same remedies under the FLSA.  *See Pineda*, 843 F.3d at 1066.  Therefore, the line of Fifth Circuit cases denying punitive damages for ADEA claims[96] does not in and of itself restrain this Court from finding that punitive damages are available for FLSA antiretaliation claims.  But this does not resolve the question either.

So, to resolve the question, the Court must start with the basic proposition that the EPA does not expressly provide for the recovery of punitive damages.  In determining whether a federal

---

[94] R. Doc. 553 at 23 (citing *Pineda*, 843 F.3d at 1066) (emphasis omitted).

[95] R. Doc. 559 at 3 (emphasis omitted).

[96] *See, e.g., Vaughan v. Anderson Reg'l Med. Ctr.,* 849 F.3d 588, 591 (5th Cir. 2017); *Palasota*, 499 F.3d at 491; *Hansard*, 865 F.2d at 1469; *Dean*, 559 F.2d at 1038-39.

statute like the EPA implicitly authorizes a private remedy not expressly provided for by the statute, the Supreme Court identified the "ultimate question" as "whether Congress intended to create the private remedy … that the plaintiff seeks to invoke." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 93-94 (1981) (holding that employers have no implied right of action for contribution from unions under the EPA); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) ("[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted.").    Only two circuits have addressed this question with respect to punitive damages under the FLSA: the Seventh Circuit in *Travis*, 921 F.2d at 108, and the Eleventh Circuit in *Snapp*, 208 F.3d at 928.

On the one hand, the Seventh Circuit in *Travis* held that punitive damages are available under § 216(b), beginning its analysis of the issue by examining the 1977 amendment to § 216(b).[97] Having found no "case interpreting this amendment" and having ascertained that "[t]he legislative history is unhelpful," the *Travis* court determined that the question of what additional forms of relief are authorized by the amendment "has been left to the courts." 921 F.2d at 111-12. Looking to the text of § 216(b) before and after the amendment, the Seventh Circuit held that because post-amendment "relief" was provided "without limitation" and "authoriz[es] 'legal' relief, a term commonly understood to include compensatory and punitive damages," punitive damages are recoverable under the FLSA for intentional torts such as retaliatory discharge. *Id.* at 111.

---

[97] The 1977 amendment added the relevant language to § 216(b) allowing suits against employers for violations of § 215(a)(3)'s antiretaliation provision.  Following the amendment, § 216(b) read: "Any employer who violates the provisions of section 15(a)(3) of this Act shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 15(a)(3), including without limitation employment, reinstatement or promotion and the payment of wages lost and an additional equal amount as liquidated damages."  Pub. L. No. 95-151, 91 Stat. 1245, 1252 (1977).

On the other hand, the Eleventh Circuit in *Snapp* explicitly "disagree[d] with the Seventh Circuit's conclusion that punitive damages are available under section 216(b)," likewise commencing its analysis with the plain language of the statute. 208 F.3d at 933. Thus, while noting that the term "'[l]egal relief' is certainly a broad formulation," the *Snapp* court went on to observe that "Congress has not abandoned all specificity." *Id.* at 934. Though the Eleventh Circuit later indicated that it "fe[lt] some constraint to exclude punitive damages from the 'legal relief' provided in section 216(b) by the former Fifth Circuit's decision in *Dean* [an ADEA case]," *id.* at 938, it primarily based its holding on a close analysis of the language of § 216(b) and the statutory design of the FLSA. *Id.* at 933-37. In this way, then, considering that the remedies expressly authorized by § 216(b) – "employment, reinstatement, promotion and the payment of wages lost and … liquidated damages" – "all attempt to put the plaintiff in the place she would have been absent the employer's misconduct," the Eleventh Circuit determined that the "evident purpose of section 216(b) is compensation."[98] *Id.* at 934. As such, the *Snapp* court concluded that punitive damages, which "have nothing to do with compensation," are not authorized by § 216(b). *Id.* The

---

[98] The Eleventh Circuit applied the *ejusdem generis* interpretive cannon to reach this conclusion. *Snapp*, 208 F.3d at 934 ("When so broad a term as 'legal relief' is included in a statutory provision that delineates more specific forms of redress, the judicial mind naturally turns to the principle of *ejusdem generis*. We must interpret 'a general statutory term ... in light of the specific terms that surround it.'" (quoting *Hughey v. United States*, 495 U.S. 411, 419 (1990)). However, the Fifth Circuit subsequently rejected application of this canon to § 216(b):

> [The defendant employer] argues that *Pineda* did not address its argument that the general "legal or equitable relief" language of the remedy provision is limited by the examples that follow: "reinstatement, promotion, and the payment of wages lost." Because the listed remedies target economic harm, [the defendant] contends this *ejusdem generis* canon – meaning words should be interpreted to be "of the same kind" – precludes allowing emotional damages under the general language. Even if we could use this argument to reconsider *Pineda*, [the defendant] misapplies this canon. It applies when "general words follow an enumeration of two or more things," not to a statute like this one that starts with the general and follows that with specifics.

*Starnes v. Wallace*, 849 F.3d 627, 636 n.9 (5th Cir. 2017) (alteration and internal citations omitted) (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 132-33, 199, 203-205 (2012)). However, the Eleventh Circuit's analysis in *Snapp* follows the more general principle of *noscitur a sociis, see* SCALIA & GARNER, *supra*, at 195-98; *Snapp*, 208 F.3d at 934 ("[T]here is something that all of the relief provided in section 216(b) has in common."), which is the proper canon to apply to § 216(b)'s general-to-specific listing. SCALIA & GARNER, *supra*, at 205 ("In all contexts other than the pattern of specific-to-general, the proper rule to invoke is the broad associated-words canon, not the narrow *ejusdem generis* canon.").

court also reasoned that the remedial scheme of § 216, examined as a whole, evinces the compensatory nature of § 216(b), as "Congress has already covered punitive sanctions in section 216(a)," which imposes criminal penalties for willful violations. *Id.* at 935. The *Snapp* court posited that Congress used such broad language in the 1977 amendment not "to abandon all restraints and throw open the doors to every conceivable variety of damages in retaliation cases," but to account for the "differences in the nature of minimum wage and overtime wage cases on the one hand, and retaliation cases on the other," as "'employment, reinstatement, promotion, and the payment of wages lost' may not fully compensate the plaintiff" in a retaliation case. *Id.* at 937 (noting that "[f]ront pay is just one example" of a form of relief not listed in § 216(b) that may be warranted in a retaliation case).

After considering the competing rationales of the two cases, this Court finds that the Eleventh Circuit's holding is more "faithful to the congressional design" of the FLSA. *Id.* at 939. The Supreme Court has indicated that "the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies" are all relevant factors in determining whether Congress intended to implicitly authorize a remedy. *Nw. Airlines*, 451 U.S. at 91-95 (quote at 91). Both "the language of the statute itself" and "the underlying purpose and structure of the statutory scheme" weigh against the availability of punitive damages under the EPA. While the phrase "legal and equitable relief" might generally encompass punitive damages, *Miller v. Tex. State Bd. of Barber Exam'rs*, 615 F.2d 650, 654 (5th Cir. 1980) ("Punitive damages are a legal remedy …."), it should not be read in isolation from the rest of § 216(b). It is a "basic principle that words are given meaning by their context." SCALIA & GARNER, *supra*, at 195. The "legal or equitable relief" authorized by § 216(b) is qualified as that which "may be appropriate to

effectuate the purposes of section 215(a)(3)" with examples of such relief "including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages."[99]  29 U.S.C. § 216(b).  Each of these examples, as the Eleventh Circuit observed in *Snapp*, "has [one thing] in common: it is meant to *compensate* the plaintiff … [e]ven the liquidated damages provision."[100]  208 F.3d at 934 (emphasis in original). Thus, applying the interpretive canon for associated words, *noscitur a sociis*, which instructs that words "associated in a context suggesting that the words have something in common … should be assigned a permissible meaning that makes them similar,"[101] SCALIA & GARNER, *supra*, at 195, this Court reads the phrase "legal or equitable relief" as meaning *compensatory* legal or equitable relief. This is consistent with the Fifth Circuit's conclusion in *Pineda* that "'legal and equitable relief' encompasses *compensation* for emotional injuries suffered by an employee on account of employer retaliation."  843 F.3d at 1066 (emphasis added); *cf. Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1199 (11th Cir. 2007) (observing in a Rehabilitation Act case that "emotional damages, like other forms of compensatory damages, are designed to make the plaintiff whole"). Because the purpose of punitive damages is to punish a defendant, and not to compensate the plaintiff, they do not fall within the scope of relief authorized by § 216(b).  *See Exxon Shipping*

---

[99] In *Starnes*, the Fifth Circuit observed that "[a]nother canon is actually implicated because the section 216(b)'s specific examples are preceded by the phrase 'including without limitation': 'the verb to include introduces examples, not an exhaustive list.'"  849 F.3d at 636 n. 9 (citing SCALIA & GARNER, *supra*, at 132-33).  The referenced canon simply presumes that "the word *include* does not ordinarily introduce an exhaustive list."  SCALIA & GARNER, *supra*, at 132 (emphasis in original).  The additional phrase "without limitation" does not alter the application of this canon but only reinforces it.  *Id.* at 132-33.  ("These cautious phrases are intended to defeat the negative-implication canon.").  Unlike the *ejusdem generis* argument rejected in *Starnes*, this Court's application of *noscitur a sociis* here does not attempt to exclude any remedy not listed in § 216(b), but simply defines the scope of implied remedies in accordance with the listed remedies.

[100] *See, e.g., Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945) ("[T]he liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages.").

[101] The remedies enumerated in § 216(b) are associated with the phrase "legal or equitable relief … appropriate to effectuate the purposes of section 215(a)(3)" and thus are included within and illustrative of those "appropriate" forms of relief.  "[A] listing is not prerequisite.  An 'association' is all that is required."  SCALIA & GARNER, *supra*, at 197.

*Co. v. Baker*, 554 U.S. 471, 492 (2008) (observing generally that "the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct").

Interpreting § 216(b) as authorizing compensatory relief also accords with "the underlying purpose and structure of the statutory scheme." *Nw. Airlines*, 451 U.S. at 91. Congress did not explicitly define the purpose of the FLSA antiretaliation provision, which the "legal or equitable relief" it authorizes must "effectuate," 29 U.S.C. § 216(b), but the Supreme Court has explained the function of the antiretaliation provision as follows:

> The central aim of the [FLSA] was to achieve, in those industries within its scope, certain minimum labor standards. … Congress did not seek to secure compliance with prescribed standards through continuing detailed federal supervision or inspection of payrolls. Rather it chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied. Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances. This ends the prohibition of § 15(a)(3) against discharges and other discriminatory practices was designed to serve.

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960); *see also Donovan v. Square D Co.*, 709 F.2d 335, 338 (5th Cir. 1983) ("[I]n the case of OSHA, like that of the FLSA and NLRA, the long-term effect and primary purpose of anti-retaliation suits is to promote effective enforcement of the statute by protecting employee communication with federal authorities."). The purpose, then, of § 215(a)(3) is not to punish employers, but to protect employees by mitigating the "calculated risk" of retaliation they must take to report a violation by their employer. *Mitchell*, 361 U.S. at 293. And while adding punitive damages may help to reduce that risk by discouraging employers from retaliating, employers' potential liability for the compensatory remedies authorized by § 216(b) already achieves this deterrent effect. *See Pineda*, 843 F.3d at 1066 (noting that the FLSA's "authoriz[ation of] immediate suits by employees … provide[s] compensation *and deterrence*" (emphasis added)); *Brooklyn Sav. Bank*, 324 U.S. at 709-10 (noting that "[a]lthough

this right to sue is compensatory, [§ 216(b)] is nevertheless an enforcement provision" which Congress "plainly intended" to have a "deterrent effect").  Punitive damages are unnecessary to effectuate the purposes of the antiretaliation provision, as well as the underlying remedial purposes of the EPA and the FLSA as a whole.  *See Irizarry v. Catsimatidis*, 722 F.3d 99, 116 (2d Cir. 2013) ("[T]he purpose of the FLSA is not to punish an employer but to remunerate aggrieved employees.").

Moreover, even if the liquidated damages are viewed as punitive, such that not all the remedies listed in § 216(b) are compensatory, general punitive damages would still be unwarranted.  A bit of background is instructive.  Within a few short years after the adoption of the FLSA, the Supreme Court held that "the liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages."  *Brooklyn Sav. Bank*, 324 U.S. at 707 (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942)). However, *Brooklyn Savings Bank* was decided before the FLSA was amended to allow courts discretion to "award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216" where an employer has shown that it acted in good faith.  29 U.S.C. § 260. Some courts have since found that the liquidated damages provision functions as a penalty for bad-faith violations.  *See, e.g., Snelling v. O. K. Serv. Garage, Inc.*, 311 F. Supp. 842, 846 (E.D. Ky. 1970) ("Theoretically liquidated damages are compensatory, but whatever label is attached to such an award it cannot be gainsaid that it is a severe sanction. … Liquidated damages should only be granted where an oppressive employer, well knowing it has no defense … stubbornly refuses to comply with [the FLSA]."); *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1013 (11th Cir. 1989) ("*Doubling* the amount of wages lost already pushes damages beyond the sphere of compensation,

however, and suffices as a punishment for appellant's conduct." (emphasis in original)).  If the Fifth Circuit were to agree that discretionary liquidated damages serve a punitive function, general punitive damages would then be unnecessary.  *See Lee v. U.S. Sec. Assocs., Inc.*, 2008 WL 958219, at *8 (W.D. Tex. Apr. 8, 2008) ("[T]he most appropriate way to give meaning to all of the language of the statute is to conclude that the only punitive damages permitted are liquidated damages equal to the plaintiff's lost wages."); *Little v. Tech. Specialty Prods., LLC*, 940 F. Supp. 2d 460, 479-80 (E.D. Tex. 2013) (agreeing with and adopting the reasoning of *Lee*).  Recovery of both a liquidated damages "penalty" and general punitive damages for the same violation would unduly burden employers and result in a windfall to plaintiffs, in contravention of the remedial purpose of the FLSA.  *See Dacar v. Saybolt, L.P.*, 914 F.3d 917, 933 (5th Cir. 2019) (Jones, J. concurring and dissenting) ("This court and others have repeatedly emphasized that FLSA damages should reflect the plaintiffs' actual losses and must not represent a windfall." (citing, *inter alia*, *Roman v. Maietta Const., Inc.*, 147 F.3d 71, 77 (1st Cir. 1998))).

Finally, the Court disagrees with Plaintiffs' suggestion that "the better course is simply to follow those post-*Pineda* district courts that have submitted punitive damages to the jury" without deciding the issue.[102]  Plaintiffs do not explain why "the better course," in their view, is to permit the jury to hear evidence and arguments on the issue of punitive damages without first determining whether such damages are available, but the post-*Pineda* district court decisions cited by Plaintiffs found that judicial economy favored allowing the jury to decide the issue "to maximize the options which are available to the Fifth Circuit on appeal."  *West*, 2019 WL 2454066, at *3; *see also Ward*, 2024 WL 1336475, at *1 (quoting *West*, 2019 WL 2454066, at *3).  While permitting punitive damages to go to the jury in this case might "maximize" the Fifth Circuit's options on appeal, the

---

[102] R. Doc. 560 at 8 (citing *West v. City of Holly Springs*, 2019 WL 2454066, at *3 (N.D. Miss. June 12, 2019); *Ward v. Tex. Farm Bureau*, 2024 WL 1336475, at *1 (W.D. Tex. Mar. 28, 2024)).

Court cannot ignore the potential for distortion doing so may have on the trial. As a result, the Court will not evade its responsibility to decide a fully-briefed legal issue squarely placed before it. Because the Court has determined that punitive damages are not available under § 216(b) as a matter of law, a decision on the merits is the better use of judicial resources in this case in any event, as it prevents the unnecessary expansion of the scope of trial to include punitive damages. Therefore, the Court will not put punitive damages to the jury.

### 2. Front and Back Pay

A successful plaintiff may recover front and back pay as compensation for wages and other benefits lost due to an employers' violation of Title VII or the EPA. 29 U.S.C. § 216(b); 42 U.S.C. § 2000e-5(g)(1). Front and back pay are equitable remedies meant to restore plaintiffs to the position they would have been in but for the violation. *See Badgerow v. REJ Props., Inc.*, 2021 WL 1582219, at *3 (E.D. La. Feb. 24, 2021) (citing *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th Cir. 1988)). Back pay compensates a plaintiff for losses suffered between the time of the wrongdoing and the date of final judgment, while front pay prospectively compensates a plaintiff for losses incurred between final judgment and reinstatement or in lieu of reinstatement. *See id.* at *4. "[I]n order to be eligible for back pay compensation for lost wages beyond the end of the employment period, the employee must have been actually or constructively discharged by the employer." *Jurgens v. EEOC*, 903 F.2d 386, 390 n.5 (5th Cir. 1990).

### a. Post-employment lost wages are not available absent a wrongful termination claim.

The parties do not dispute that Plaintiffs remained employed with no reduction in their wages during the period between LSU's rescission of the contracts and the retirement of Plaintiffs' LSUHSC-NO positions in summer 2019.[103] Therefore, the only period for which the parties

---

[103] *See* R. Docs. 551-1 at 7; 553-1.

dispute whether front and back pay are available is the period following the retirement of the LSUHSC-NO positions in June and July of 2019 (the "post-employment period"). Despite the absence of any wrongful termination claims, Plaintiffs contend that they "are entitled to present the full range of back-pay and front-pay damages to the jury at trial."[104] Plaintiffs do not specify what lost wages the "full range" of damages encompasses, but because Plaintiffs do not dispute that they suffered no lost wages prior to the post-employment period, their front- and back-pay claims must be for the salaries they would have earned had they assumed the OGC positions upon the retirement of their LSUHSC-NO positions. Plaintiffs, then, not only seek post-employment lost wages absent a wrongful termination claim but seek to "recover" the salaries of positions they never occupied – and, as shown below, likely never would have accepted – and therefore could not have been terminated from.[105] LSU argues that "such damages would give Plaintiffs an impermissible windfall."[106]

LSU argues that back and front pay are not available for the post-employment period as a matter of law because there are no wrongful termination claims remaining in this case and Plaintiffs never made a constructive discharge claim.[107] Plaintiffs never directly refute LSU's argument that, absent an actual or constructive termination claim, back and front pay are not available for the post-employment period, but contend that "a retaliation plaintiff is entitled to back-pay and front-pay remedies in situations where … the defendant's conduct *resulted in* the

---

[104] R. Doc. 553 at 9.
[105] While Plaintiffs suggest that they had already assumed the OGC positions as early as January 2019 (R. Doc. 553-1 at 2), their back- and front-pay arguments are based on their recognition that they needed to sign the OGC contracts, *i.e.*, accept the employment offers, to be guaranteed continued employment at LSU. *See* R. Docs. 553 at 9-14; 560 at 2-4. And despite the Plaintiffs' "object[ion] to LSU's characterization of Plaintiffs' employer as LSUHSC-NO" and not LSU (R. Doc. 553-1 at 2), the Fifth Circuit stated that "Plaintiffs were still employed by LSUHSC[-NO] when they were eventually terminated, and it was LSUHSC[-NO] that ultimately fired them." *Muslow v. LSU* at *10 (R. Doc. 511-1 at 21).
[106] R. Doc. 551-2 at 21.
[107] *Id.* at 16-18.

plaintiff's actual termination (as is the case here)."[108]  The contention that LSU's rescission of the contracts "resulted in plaintiffs' actual termination" directly contradicts the Fifth Circuit opinion, which bifurcated Plaintiffs' "salary-review-request allegation" into "two adverse employment actions[,] … the rescission of their employment contracts, and their eventual termination,"[109] and then found that "[Plaintiffs] have not met [their summary-judgment] burden with respect to their termination from LSUHSC[-NO]," because "it was inevitable that their positions would be terminated [due to the known plan to consolidate all legal services within OGC], and the salary-review request was not the but-for cause of their termination."[110]  Plaintiffs contend that the relevant portion of the Fifth Circuit's opinion "goes no further" than finding that the "the *LSUHSC-NO positions* would have been terminated regardless of [the salary-review-request] email," and "tellingly does not address the causal link between LSU's rescission of the OGC employment contracts and Plaintiffs' termination."[111]  The insinuation that the Fifth Circuit intended to reserve the issue of whether such a "causal link" exists is also in contravention of the Fifth Circuit's opinion, which determined that "the rescission of Plaintiffs' employment contracts and their later termination … *are their own adverse employment actions and must be considered separately.*"[112]  When the Fifth Circuit accordingly considered the retaliatory rescission and retaliatory termination claims separately, it determined that "Plaintiffs' 'failure to execute the tendered employment contracts with OGC or to apply for the new OGC positions – despite being prompted and invited to do so multiple times – cemented their termination,'"[113] eliminating the retaliatory termination

---

[108] R. Doc. 560 at 5 (emphasis added; original emphasis and footnote omitted).
[109] *Muslow v. LSU* at *8 (R. Doc. 511-1 at 18).
[110] *Id.* at *9 (R. Doc. 511-1 at 19).
[111] R. Doc. 553 at 12 (emphasis in original; other emphasis omitted).
[112] *Muslow v. LSU* at *9 (R. Doc. 511-1 at 20) (emphasis added).
[113] *Id.* (R. Doc. 511-1 at 19).

claim.[114]  As LSU correctly points out, Plaintiffs' argument attempts to circumvent the dismissal of their retaliatory termination claim by "convert[ing] the remaining retaliatory rescission claim into a revived *de facto* retaliatory termination claim."[115]  There are no wrongful termination claims remaining in this case, and Plaintiffs cannot revive any claims to post-employment back and front pay by collapsing their surviving retaliatory rescission claim and their termination into one "*de facto* retaliatory termination claim.*"

### b.  There is no causal link between the rescission and Plaintiffs' termination.

As shown above, Plaintiffs' claims for post-employment front and back pay absent a wrongful termination claim fail as a matter of law.  But even assuming *arguendo* that front and back pay are available where the sole adverse act underlying a plaintiffs' retaliation claim is not an actual or constructive discharge, but a separate act which "results in" the plaintiff's eventual termination, Plaintiffs have not established the requisite causal link between the recission of the contracts and their eventual termination from their LSUHSC-NO positions.  Plaintiffs insist that they "would have 'gone through the entire recruiting process' and remained employed at LSU" but for LSU's recission of the contracts, which "eliminated Plaintiffs' only guaranteed pathway to continued employment."[116]  But, had LSU not rescinded the contracts, the onus still would have been on Plaintiffs, not LSU, to complete the recruiting process by executing the contracts.  And unless and until Plaintiffs did so, their continued employment at LSU would not have been guaranteed.  Therefore, to support a finding that LSU's conduct, and not Plaintiffs' omissions, ultimately precluded Plaintiffs' continued employment with LSU, it is not enough that Plaintiffs

---

[114] *Id.* at *10 (R. Doc. 511-1 at 21) ("[T]he recission of [Plaintiffs'] employment contracts … is the only alleged retaliatory action that we hold survives summary judgment.").

[115] R. Doc. 559 at 5.

[116] R Doc. 553 at 13 (alteration omitted).

*could* have signed the contracts had they not been rescinded – it must also be true that Plaintiffs *would* have signed the contracts but for their rescission.

Plaintiffs recognize that their willingness to sign the contracts is necessary to establish causation, arguing that "LSU does not try to prove, nor could it as a matter of law, that Plaintiffs would not have signed the OGC contracts had they been given the opportunity post-rescission."[117] But it is Plaintiff's burden, not LSU's, to establish the causal link between the protected activity and the adverse employment action. *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 469 (5th Cir. 2021) ("To establish a prima facie case of retaliation, a plaintiff must 'demonstrate [*inter alia*] that … a causal link exists between the protected activity and the adverse employment action.'" (quoting *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014)); *Cox*, 667 F. Supp. 3d at 213 ("'[T]he non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial.'" (quoting *Johnson*, 379 F.3d at 301)). Plaintiffs contend that LSU, by pointing to Plaintiffs' failure to apply for the posted OGC positions, asserts a procedurally improper "failure-to-mitigate affirmative defense," for which LSU would bear the burden of proof.[118] But LSU does not argue that Plaintiffs' refusal to apply for the OGC positions was a failure to mitigate losses caused by LSU's own retaliatory conduct. LSU instead cites the Plaintiffs' failure to apply for the positions as the reason this Court and the Fifth Circuit found that it was Plaintiffs' conduct, not LSU's, that "cemented their termination," thereby negating an element of Plaintiffs' claim for back pay – namely, the causal link between the alleged retaliation

---

[117] *Id.* at 9 (emphasis omitted).
[118] *Id.* at 11.

and the claimed losses – for which Plaintiffs bear the burden of proof.[119]  Thus, even if Plaintiffs could assert a "*de facto* retaliatory termination claim," it would be their burden to establish a causal link between their salary-review email, the recission of the contracts, and their eventual termination.

Plaintiffs cannot meet this burden.  Plaintiffs contend that "[p]lenty of evidence at least raises a fact issue" as to whether Plaintiffs would have signed the contracts had they not been rescinded, citing two emails sent by Muslow on March 1 and March 6, 2019, "seeking assurances that [Plaintiffs] would remain employed" after the contracts were rescinded and denying that the salary-review email was "nonresponsive or a rejection of the offers," and a deposition transcript in which Skinner indicates that he thought the salary-review email was a "negotiation."[120]  At best, the emails support an inference that, at the time they were sent in early March 2019, Plaintiffs were still interested in being considered for the OGC positions and did not intend to reject LSU's offer of the OGC positions by sending the salary-review request.[121]  Plaintiffs cite no other evidence in direct support of their assertion that but for LSU's recission of those contracts, Plaintiffs would have signed them and remained employed at LSU.[122]  However, the March emails are not the end of the story as to whether Plaintiffs would have signed the OGC contracts but for their rescission. Other record evidence shows beyond cavil that Plaintiffs would not have signed the OGC contracts without the significant salary increases sought in the salary-review email, which increases were

---

[119] R. Doc. 551-2 at 17-18.

[120] R. Doc. 553 at 9-10 (citing R. Doc. 553-4 at 11-15, 27).

[121] *See* R. Doc. 553-4 at 11-15, 27.  Skinner's subjective interpretation of the email as a negotiating tactic has no bearing on whether Plaintiffs would have been willing to sign the contracts.  *Id.* at 27 ("I thought that this was a salary – an attempted salary revision or negotiation.").

[122] R. Doc. 553-1 at 4. Plaintiffs' only citation in support of this purported "undisputed material fact[]" is to record documents which Plaintiffs claim show that "Plaintiffs' transfer to the OGC was automatic and had already occurred." *Id.* at n.1.  Whether or not Plaintiffs had already begun transitioning to the OGC is immaterial, as Plaintiffs admit that they were required to sign the contracts in order to complete their transfer to the OGC and be "guaranteed" continued employment at LSU.  *See, e.g.,* R. Doc. 553 at 7 ("[H]ad Plaintiffs signed the OGC contracts, they would have continued their employment with LSU.").

never on the table for any candidate for the OGC positions, regardless of gender.[123]  Thus, on May 2, 2019, after failing to sign the contracts prior to their recission on February 18 and subsequently failing to apply for the posted OGC positions by the April 28 deadline, Plaintiffs were given yet another opportunity to be considered for the OGC positions.[124]  Muslow responded on May 3, telling LSU that Plaintiffs "st[oo]d by [their] request for salary reviews and to be paid fairly as compared to [their] male peers and consistent with the [LSUHSC-NO]'s 2017 market study."[125] And then on May 13, in the same email string, after receiving one more chance to be considered, Muslow told LSU, on behalf of herself and Cunningham, that "[u]nless [each] position [was] going to be compensated as dictated by the market study … [LSU did] not have [their] permission to treat [either of them] as an 'applicant'" for the OGC positions.[126]  So, while Plaintiffs may have presented evidence that they hoped to be "active candidates" for the OGC positions in March, Plaintiffs unequivocally revoked their candidacy for those positions in May.  Plaintiffs do not address the May emails, except to "object to the extent that LSU seeks to create an uncontested 'fact' about the veracity or meaning" of the statements in these emails.[127]  The unsupported objection falls flat.  Nor do Plaintiffs cite to any evidence showing that they ever would have accepted the OGC positions at the salaries offered.[128]  Therefore, even if Plaintiffs could assert a

---

[123]  *See* R. Docs. 355-6 at 24 (May 1, 2019 email from Skinner describing the increases requested in the salary-review email as "far in excess of the amounts authorized for the positions"); 365-10 at 84-85 (Skinner's deposition testimony: "[I]f [$370,000] is what we have to pay for a chief counsel in New Orleans … it completely skews and destroys our compensation structure in Baton Rouge.  Paying the chief counsel in New Orleans $370,000, when that individual is a Baton Rouge employee, would have made that individual maybe the second-highest paid employee on the Baton Rouge campus next to President Alexander.").

[124]  R. Doc. 551-7 at 3.

[125]  *Id.* at 2.

[126]  *Id.* at 1.

[127]  R. Doc. 553-1 at 3.

[128]  While the March emails indicate that Plaintiffs were still interested in being considered for the OGC positions at that time, they do not indicate that Plaintiffs would have accepted the positions at the salaries offered, or any salaries below the salaries requested by Plaintiffs.  *See* R. Doc. 553-4 at 12 ("[T]hat [2017 market] study reflects the salaries for our positions are and have been historically underpaid ….  The [salary-review] request was a reasonable one ….  If there is a separate market study that LSU's [human resources] prepared, it would be helpful and informative if we could review a copy of that, though we cannot understand how the [LSUHSC-NO]'s study can be discounted.").

valid "*de facto* retaliatory termination claim," they fail to raise an issue of material fact as to whether they would have signed the OGC contracts had they not been rescinded.  In the end, then, because there are no wrongful termination claims remaining in this case and Plaintiffs cannot support their argument that the rescission of the contracts led to their termination, front and back pay are not available.

### 3. Reinstatement

Like front pay, reinstatement is a prospective equitable remedy which seeks to place the employee in the position she would have been had she not been discharged.  *See Bogan v. MTD Consumer Grp., Inc.*, 919 F.3d 332, 336-37 (5th Cir. 2019).   Thus, for reinstatement to be warranted, there generally must have been an actual or constructive discharge.  *See Jurgens*, 903 F.2d at 389 & n.2 ("'As a general rule, employees are entitled to awards such as back pay and reinstatement only if they were actually or constructively discharged from their employment.'" (quoting *Maney v. Brinkley Mun. Waterworks & Sewer Dep't*, 802 F.2d 1073, 1075 (8th Cir. 1986))).  "Courts generally award front pay if reinstatement is not appropriate or possible, but denying one does not necessarily result in awarding the other."  *Bogan v. MTD Consumer Grp., Inc.*, 839 F. App'x 832, 835 (5th Cir. 2020) (citing *Palasota*, 499 F.3d at 489).  In determining whether reinstatement is appropriate, courts consider "a number of factors, including whether positions now exist comparable to the plaintiff's former position[,] whether reinstatement would require an employer to displace an existing employee[,] … whether the plaintiff has changed careers and whether animosity exists between the plaintiff and his former employer."  *Palasota*, 499 F.3d at 489 (internal citations omitted) (citing *Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254-55 (5th Cir. 1995); *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1346 (9th Cir. 1987); *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir. 1990)).

Plaintiffs contend that "whether reinstatement is a feasible remedy should be determined *after* trial, not before and as a matter of law."[129]  But because there are no wrongful termination claims remaining in this case, and because Plaintiffs have not shown that LSU's rescission of the OGC contracts caused Plaintiffs' termination, the Court can and does decide as a matter of law that reinstatement is not appropriate in this case for the same reasons that front pay is not available.[130]  And even if reinstatement were available, LSU is correct that reinstatement is not feasible considering the relevant factors in this case.[131]  The LSUHSC-NO positions previously held by Plaintiffs no longer exist.[132]  And the OGC chief counsel position was filled.[133]  Thus, because "innocent incumbents may not be displaced" absent "extraordinary circumstances," Muslow cannot be reinstated.  *Palasota*, 499 F.3d at 489 (citing *Gamble v. Birmingham S. R.R. Co.*, 514 F.2d 678, 685 (5th Cir. 1975)).  LSU also points to evidence of animosity between LSU and Plaintiffs – consisting of "LSU's objections to conduct by Plaintiffs during their former employment as legal counsel for LSUHSC-NO, including LSU's objections to the removal, retention, and use of LSU documents that were obtained by Plaintiffs during their former representation of LSU"[134] – which weighs against reinstatement.  *See Palasota*, 499 F.3d at 490 (finding that "lingering animosity between the parties" militated against reinstatement where the defendant employer alleged that the plaintiff falsified expense reports while employed by defendant).  Moreover, evidence of Plaintiffs' insistence on unrealistic pay increases[135] (at least

---

[129] R. Doc. 553 at 18 (emphasis in original).   Plaintiffs also contend in their objections to LSU's statement of uncontested material facts that "LSU's position on the unavailability of reinstatement also fails due to multiple fact disputes," but provide no evidence establishing a fact dispute.  R. Doc. 553-1 at 6.

[130] *See supra* section III(B)(2)(b).

[131] R. Docs. 551-2 at 19-20; 559 at 9.

[132] R. Docs. 551-1 at 2-4; 553 at 3-4.

[133] R. Doc. 551-1 at 13.  LSU opted not to fill the staff attorney position at OGC.  *Id.*

[134] R. Doc. 551-2 at 20 (citing R. Docs. 33-1; 45 at 17, 52; 83 at 8-11; 109 at 4; 147-1; 175; 363-1 at 26-31; 365-1 at 32-37; 427 at 8; 429 at 8; 451 at 52-53 n.234; 473 at 22 n.12).

[135] *See* R. Docs. 355-6 at 24; 365-10 at 84-85; 551-5 at 14-15; 553-4 at 12.

from LSU's point of view) further suggests that reinstatement is not feasible here. *See id.* (finding that reinstatement was not feasible where, among other factors, plaintiff admitted "that he would not be interested in returning to [his former employer] for a yearly income of $75,000 – and would be ambivalent about returning even if he earned $100,000 a year").  Therefore, because there are no wrongful termination claims remaining and reinstatement would not be feasible in this case in any event, Plaintiffs' request for reinstatement also fails as a matter of law.

### 4.  EPA Liquidated Damages

The remedies provided for violations of the FLSA's antiretaliation provision include "the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "Only 'wages lost' can give rise to liquidated damages." *Fontenot v. Safety Council of Sw. La.*, 782 F. App'x 356, 358 (5th Cir. 2019) (citing 29 U.S.C. § 216(b)).  And because "'[w]ages lost' refers to past earnings an employer withholds," *id.* (citing *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, 1479 (5th Cir. 1992); *Cassino*, 817 F.2d at 1348), front pay, which represents "lost future wages[,] … cannot support a liquidated damages award." *Id.*; *see also Miller v. Raytheon Co.*, 2011 WL 13234303, at *11 (N.D. Tex. May 13, 2011) ("Liquidated damages are determined by doubling the amount of back pay owed to the plaintiff." (citing *Olitsky*, 964 F.2d at 1479)).  Thus, LSU correctly argues that "to the extent Plaintiffs seek EPA liquidated damages based on front pay, such damages are not available, as a matter of law."[136]  Plaintiffs contend that because, in their view, "Plaintiffs can recover back pay … [they] are therefore entitled to liquidated damages too."[137]  But since the Court finds that Plaintiffs suffered no lost wages as a result of the rescission

---

[136] R. Doc. 551-2 at 22 (emphasis omitted).
[137] R. Doc. 553 at 19.

of the OGC contracts,[138] there is no basis for liquidated damages.  Liquidated damages are thus not available for Plaintiffs' EPA retaliation claim as a matter of law.

### 5.  Compensatory Damages

Compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" are recoverable under both Title VII and the EPA.  42 U.S.C. § 1981a(b)(3); *see Pineda*, 843 F.3d at 1064, 1066.  Title VII compensatory damages are limited by statute, 42 U.S.C. § 1981a(b)(3), but EPA compensatory damages are not.  *See* 29 U.S.C. § 216(b).  A plaintiff may recover compensatory damages under either or both statutes as follows:

> Recovery for the same period of time may be had under both the EPA and title VII so long as the same individual does not receive duplicative relief for the same wrong.  Relief is computed to give each individual the highest benefit which entitlement under either statute would provide. (e.g., liquidated damages may be available under the EPA but not under title VII.)  Relief for the same individual may be computed under one statute for one or more periods of the violation and under the other statute for other periods of the violation.

29 C.F.R. § 1620.27(b).  Plaintiffs do not deny LSU's contention that 29 C.F.R. § 1620.27(b) precludes Plaintiffs from recovering compensatory damages for the same period of time for both their Title VII and EPA claims, as they arise out of the same "wrong" (the recission of the OGC contracts).[139]  Because "there is no retaliatory termination claim at issue on remand," LSU seeks to further restrict Plaintiffs' claims for compensatory damages to the "limited period between the OGC's rescission of proposed OGC employment contracts through the retirement of Plaintiffs' LSUHSC-NO positions."[140]  However, LSU's argument improperly conflates losses allegedly suffered *after* Plaintiffs' termination with losses allegedly suffered *because of* their termination.

---

[138] *See supra* section III(B)(2).
[139] *See* R. Docs. 553 at 19-20; 560 at 6.
[140] R. Doc. 551-2 at 24.

The restriction of recovery "to a single allegedly retaliatory act"[141] is not a temporal limitation, but a causal one – and the relevant cause is the actionable retaliatory act, not termination.

Losses attributable to the rescission of the contracts could have been suffered as early as February 18, 2019, and could continue to be suffered indefinitely. A district court in this circuit illustrated the continuous nature of emotional distress damages in an employment context (a race discrimination case) in rejecting an argument that compensatory damages "should be time limited" by the discovery of after-acquired evidence of a nondiscriminatory basis for termination. *Gale v. Town of Como*, 2012 WL 12885081, at \*1-5 (N.D. Miss. May 24, 2012), *aff'd*, 523 F. App'x 267 (5th Cir. 2013). The defendant employer in *Gale* argued that the Supreme Court's holding in *McKennon* "that, in cases where after-acquired evidence of an employee's wrongdoing would have resulted in his termination, his recovery of backpay is limited to a period 'from the date of the unlawful discharge to the date the new information was discovered'" should extend to any demand of compensatory damages for emotional harm. *Id.* at \*1 (quoting *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995)). Although the argument was procedurally barred, the court "deem[ed] it important to note that there are very strong practical and policy considerations which militate against the merits of defendant's argument," the Court having just explained that "[t]he mental distress which an employee experiences from the knowledge that he has been fired because of his race does not cease upon the discovery of some other reason for firing him." *Id.* at \*4. The same reasoning applies here: "The mental distress which an employee experiences from" – in this case, her employer's retaliatory conduct – "does not cease upon" employment's end for "some other reason" – here, because Plaintiffs failed to sign the OGC contracts or apply for the OGC positions.

---

[141] *Id.* at 23.

Of course, Plaintiffs must prove at trial that the harms underlying their claimed compensatory damages, whether during or post-employment, are sufficiently attributable to the alleged retaliatory act (the rescission of the contracts) and not some other cause. *See Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938 (5th Cir. 1996) ("Although we generally defer to the fact finder in determining intangible harms, an award is warranted only when a sufficient causal connection exists between the statutory violation and the alleged injury."); *Miller v. Raytheon Co.*, 716 F.3d 138, 147 (5th Cir. 2013) ("The award of damages must be supported by specific evidence of the nature and extent of the harm.") (citing *Patterson*, 90 F.3d at 938). There is no reason at this stage for the Court to preclude Plaintiffs from attempting to do so. Therefore, LSU's argument seeking to limit compensatory damages fails and Plaintiffs may present evidence at trial of compensatory damages beyond the end of their employment at LSU.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that LSU's motion for summary judgment regarding available damages (R. Doc. 551) is GRANTED in most all respects. It is DENIED only to the extent that compensatory damages are not restricted to the period between the retaliatory act and the end of Plaintiffs' employment at LSU.

New Orleans, Louisiana, this 30th day of December, 2024.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE