UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KATHERINE MUSLOW, *et al.* — CIVIL ACTION

VERSUS — NO. 19-11793

BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, *et al.* — SECTION M (2)

**ORDER & REASONS**

Before the Court is a renewed motion for judgment as a matter of law, or in the alternative, a motion for new trial, or in the further alternative, a motion for remittitur filed by defendant the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU").[1] Plaintiffs Katherine Muslow and Meredith Cunningham (together, "Plaintiffs") respond in opposition,[2] and LSU replies in further support of its motion.[3] Also before the Court is Plaintiffs' motion to amend the judgment to include an award of prejudgment interest.[4] LSU responds in opposition,[5] and Plaintiffs reply in further support of their motion.[6] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons denying LSU's motions for judgment as a matter of law and for new trial; granting LSU's motion for remittitur; and granting in part Plaintiffs' motion to amend the judgment.

---

[1] R. Doc. 656.
[2] R. Doc. 665.
[3] R. Doc. 667.
[4] R. Doc. 653.
[5] R. Doc. 664.
[6] R. Doc. 666.

## I. BACKGROUND

This is an action for retaliation under Title VII and the Equal Pay Act ("EPA") arising from the rescission of two job offers. Katherine Muslow served as general counsel for the LSU Health Sciences Center in New Orleans ("LSUHSC-NO"), and Meredith Cunningham was a part-time staff attorney there.[7] While at LSUHSC-NO, Muslow worked under Dr. Larry Hollier, the chancellor of LSUHSC-NO, and Cunningham worked under Muslow.[8] In 2018, however, LSU implemented Permanent Memorandum 72, which consolidated legal services system-wide across all LSU campuses under the Office of General Counsel ("OGC") in Baton Rouge, and Plaintiffs were advised in August and again in December of that year that their positions would transfer to the OGC.[9] In January 2019, the OGC extended written offers to both Plaintiffs for positions at the OGC, with salaries identical to those they made at LSUHSC-NO: $227,520 for Muslow and $76,500 for Cunningham at 60% full-time equivalent, annualized to $127,500.[10] The OGC offered Plaintiffs salaries identical to their LSUHSC-NO salaries despite the OGC's determination that an appropriate salary range for Muslow's position was between $130,377 and $188,014.[11] Neither plaintiff signed the offer letters (in the form of proposed contracts). On February 12, 2019, the OGC sent a reminder regarding their execution.[12]

On Friday, February 15, 2019, Muslow sent an email on behalf of both Plaintiffs raising concerns about gender pay equity at LSUHSC-NO, attaching materials from a 2017 LSUHSC-NO Market Salary Study (the "2017 Market Study"), asking that their salaries be reviewed, and proposing salaries of $375,000 for herself and an annualized $204,748 at an increased workload

---

[7] R. Docs. 658 at 138-39; 659 at 148-50.
[8] R. Doc. 657 at 72-73.
[9] Trial Exs. 103, 125, 134.
[10] Trial Exs. 110, 113; R. Doc. 660 at 31.
[11] Trial Ex. 312.
[12] Trial Ex. 106.

for Cunningham.[13] The following Monday, February 18, 2019, Thomas Skinner – then general counsel at LSU – rescinded both offers.[14] LSU maintains it did so because the contracts remained unsigned as the transition date approached and because the salaries that Plaintiffs proposed were too high and would have created salary compression within the OGC.[15] Plaintiffs contend that both explanations were pretextual and that the rescission was retaliation for the pay-equity concerns raised in the February 15 email.[16] Plaintiffs remained in their LSUHSC-NO positions for several months before those positions were retired; LSU later posted the OGC positions competitively and invited Plaintiffs to apply, but neither did.[17]

Plaintiffs filed this action on July 22, 2019, against LSU and several individual defendants, alleging violations of Title VII, Title IX, the EPA, 42 U.S.C. § 1983, and the Louisiana Employment Discrimination Law.[18] After extensive preliminary motion practice and the filing of a third amended complaint, which together narrowed the claims to gender discrimination under Title VII, the EPA, and § 1983, and retaliation under Title VII and the EPA, this Court granted the defendants' motions for summary judgment, dismissing all of Plaintiffs' claims.[19] On appeal, the Fifth Circuit affirmed the dismissal of all of Plaintiffs' gender-discrimination and retaliation claims except their "Title VII and Equal Pay Act claims alleging that LSU retaliated against [them] by revoking their employment contracts following their salary-review request."[20] On remand, in a series of rulings, this Court determined that back- and front-pay was not available as damages[21]

---

[13] Trial Exs. 100, 201.
[14] Trial Ex. 102.
[15] R. Doc. 656-1 at 7-13.
[16] R. Doc. 665 at 1-2, 4-18.
[17] Trial Ex. 318.
[18] R. Docs. 1; 581 at 3.
[19] R. Docs. 451; 452. At the time, there were several individual defendants along with LSU.
[20] *Muslow v. La. State Univ. & Agric. & Mech. Coll., Bd. of Supervisors*, 2023 WL 5498952, at *11 (5th Cir. Aug. 24, 2023).
[21] R. Doc. 561 at 26-33. The Court also determined that punitive damages and EPA liquidated damages were not available.

and that the Fifth Circuit had held in its decision that Plaintiffs had established a *prima facie* case with respect to their retaliatory rescission claim as a matter of law – including that their belief of gender-based wage discrimination was reasonable and that the gender-based pay-equity statements in the February 15, 2019 email constituted protected activity.[22] This Court further determined that LSU could not assert at trial any non-retaliatory reason for the rescission beyond the two it had identified: namely, that Plaintiffs had not signed the contracts, and that Plaintiffs' salary demands were too high.[23] Accordingly, the sole liability issue remaining for trial was whether those two stated reasons were pretext for unlawful retaliation.[24]

Given the limited issue to be resolved at trial, the Court excluded all evidence going only to Plaintiffs' belief of wage discrimination, including their EEOC charges, their dismissed discrimination claims, non-party pay-equity complaints, internal audit exhibits, a Title IX review, and a 2019 LSUHSC-NO equity review.[25] It declined, however, to exclude compensation evidence bearing on LSU's stated too-high-salary rationale, including the 2017 Market Study, LSUHSC-NO and OGC salary exhibits, and the LSUHSC-NO pay adjustments policy, emphasizing that "the only remaining jury issue to which compensation evidence may be relevant is whether LSU rescinded the OGC contracts based on its subjective belief that the salaries requested by Plaintiffs for the OGC positions were 'too high,'" and expressly reserving the right to exclude such evidence at trial if it proved unfairly prejudicial, cumulative, or confusing.[26] The Court issued additional, more specific evidentiary rulings just before trial which aligned with its earlier ruling.[27]

[22] R. Doc. 581 at 17-20.
[23] *Id.* at 20.
[24] *Id.* at 20-21.
[25] *Id.* at 19-20.
[26] *Id.* at 21-22.
[27] R. Docs. 626; 629; 630; 631; 632; 633.

The case was tried before an eight-person jury over five days, from April 27, 2026, to May 1, 2026. From time to time throughout trial, the Court found it advisable to give limiting instructions contemporaneously with the admission of certain compensation evidence, and then again in the final charge, instructing the jury that the sole liability issue was whether LSU had retaliated against Plaintiffs by rescinding the OGC contracts; that the evidence presented at trial could be considered only for the purpose of resolving this issue and not other issues that may have been suggested by the evidence; that but-for causation was required; and that damages could be awarded only for injuries proximately caused by the rescission of the contracts and not for the retirement of Plaintiffs' LSUHSC-NO positions.[28] The jury returned a unanimous verdict finding that LSU retaliated against Plaintiffs and awarding $750,000 to each of them for pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.[29] The Court entered judgment in accordance with the verdict, but it did not address prejudgment or post-judgment interest.[30] The parties then filed the pending posttrial motions. Specifically, LSU moves for judgment as a matter of law, new trial, or remittitur, while Plaintiffs move to alter the judgment to include awards of prejudgment and post-judgment interest.[31]

## II. LAW & ANALYSIS

### A. LSU's Renewed Motion for Judgment as a Matter of Law

LSU moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure at the close of Plaintiffs' evidence at trial and orally renewed its motion at the close of all evidence.[32] Both times, the Court denied the motion.[33] LSU now renews its motion

[28] *See, e.g.*, R. Docs. 658 at 145-46; 659 at 51-52, 88-90; 640-2 at 5-8.
[29] R. Doc. 641.
[30] R. Doc. 645.
[31] R. Docs. 653 (Plaintiffs' motion to alter judgment); 656 (LSU's omnibus posttrial motion).
[32] R. Docs. 659 at 263-274; 660 at 261-69.
[33] R. Docs. 659 at 278; 660 at 271.

under Rule 50(b).[34] LSU contends that judgment as a matter of law in its favor is warranted because Plaintiffs failed to prove that their protected statements were the "but for" cause of LSU's rescission of their employment contracts and because they failed to establish that they are entitled to compensatory damages.[35] The Court will address and analyze each argument in turn.

In ruling on a Rule 50(b) motion, a "court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b). Judgment as a matter of law on an issue is appropriate when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). When evaluating a Rule 50(b) motion, courts "consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 431 (5th Cir. 2022) (quotation omitted). "Thus, a Rule 50 motion must be denied unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* (quotation omitted).

**1. LSU's argument that Plaintiffs failed to prove but-for causation**

LSU first argues that Plaintiffs failed to prove that their protected statements were the "but for" cause of LSU's rescission of their employment contracts, such that the rescission amounted to retaliation under Title VII and the Equal Pay Act, making six points in connection with this argument.[36] First, LSU notes that it is undisputed that Plaintiffs did not sign the employment contracts.[37] Second, LSU observes that Plaintiffs requested substantially higher salaries than those offered by LSU, and Muslow's offer was already above the salary recommended by LSU's Baton

---

[34] R. Doc. 656-1 at 6-19.
[35] *See id.*
[36] *Id.* at 7-8.
[37] *Id.* at 8-9.

Rouge Office of Human Resources Management ("HRM").[38] Third, argues LSU, Plaintiffs' trial presentation that the 2017 Market Study justified their salary requests was insufficient to show pretext where multiple witnesses confirmed that the OGC, rather than LSUHSC-NO, was the Plaintiffs' employing agency.[39] Fourth, LSU submits that there was insufficient evidence for a reasonable jury to conclude that LSU's intent to implement salary compression was pretextual based on (1) Plaintiffs' reference to Dr. Hollier's total compensation as both LSUHSC-NO chancellor and a vascular surgeon and (2) Plaintiffs' speculation that LSU head coaches earn more than its athletics director.[40] Fifth, LSU urges that "Plaintiffs did not provide sufficient evidence for a reasonable jury to conclude that the OGC [contract] rescissions were retaliatory, as opposed to a disagreement over OGC's compensation structure and Plaintiffs' higher salary requests," and that it is entitled to judgment as a matter of law since Plaintiffs' burden was to show that LSU acted with retaliatory intent, not merely poor business judgment.[41] Sixth and finally, LSU maintains that the evidence Plaintiffs adduced at trial, which it says relied upon "speculative inferences," was insufficient for a reasonable jury to conclude that both of LSU's stated reasons for the contract rescission were pretextual *and* that retaliation was the real reason.[42]

In their opposition, Plaintiffs make five points in support of their contention that the trial record contains substantial evidence that the gender-based pay-equity statements in Muslow's February 15, 2019 email were the but-for cause of LSU's rescission of the OGC contracts.[43] They emphasize that the jury needed to find only that the rescission would not have occurred absent the protected activity, not that it was the sole reason.[44]

---

[38] *Id.* at 9-11.
[39] *Id.* at 11-12.
[40] *Id.* at 12-13.
[41] *Id.* at 13-14 (quote at 14).
[42] *Id.* at 14-16.
[43] R. Doc. 665 at 4-18.
[44] *Id.* at 5.

First, Plaintiffs posit that trial evidence showed that LSU's rescission of the OGC employment offers was not based on the length of time that passed before the contracts were signed. This was demonstrated by the testimony of Trey Jones, LSU's current general counsel and its deputy counsel at the time of the subject events, that the contracts' effective date was not a deadline and that "Plaintiffs' lack of signature on the employment contracts was not LSU's reason for rescinding the contracts"; Skinner's testimony that Plaintiffs' failure to sign the contracts "was not 'an explanation for why' the contracts were rescinded"; the testimony of Donna Dewailly, OGC's business manager, that the timing of the agency transfer of Plaintiffs' positions was for the benefit of Plaintiffs, not any needs of LSU; and evidence that Muslow's replacement did not begin his role until September 16, 2019, months after the rescission.[45]

Second, according to Plaintiffs, the evidence showed that they did not demand significantly higher salaries, but instead merely requested a review of their offered salaries.[46] In connection with this point, Plaintiffs further argue that LSU misrepresented Cunningham's requested salary in its opening statement, that LSU's salary-compression argument could not have applied to Cunningham's actual request, and that LSU presented no evidence of a market study it may have done for Cunningham's position.[47] With respect to Muslow's salary request, Plaintiffs contend that, although Muslow requested a salary higher than Jones's or Skinner's salary at the time, there was no evidence that she was aware of their salaries.[48] Further, say Plaintiffs, a finding of pretext is supported by the insufficient evidence of the accuracy and completeness of the OGC market study done for Muslow's OGC position; the evidence that the OGC salary initially offered to Muslow exceeded the recommended range; and LSU's failure to respond to Plaintiffs' inquiries

[45] *Id.* at 5-7.
[46] *Id.* at 7.
[47] *Id.* at 7-9.
[48] *Id.* at 10.

following the rescission.[49] Plaintiffs also assert that there was a basis for the jury to conclude that Muslow's salary request was reasonable in light of her own experience and background because the jury heard evidence that Muslow's replacement, Louis Colletta, who was hired at a salary within the OGC range, lacked commensurate qualifications and experience for the role.[50]

As their third point in opposition, Plaintiffs submit that their use of the 2017 Market Study at trial was an appropriate rebuttal of LSU's stated rationale that Plaintiffs' salary demands were too high.[51] Plaintiffs make four arguments in support of this point: first, that the 2017 Market Study directly undermined LSU's contention that Plaintiffs' salary requests were too high;[52] second, that although Plaintiffs' positions were being transitioned from LSUHSC-NO to the OGC, there was evidence that Plaintiffs' positions would remain inextricably linked to LSUHSC-NO, even after implementation of the transition;[53] third, that when Muslow previously submitted a salary adjustment request that did not mention pay equity, LSU's response (*viz.*, a salary adjustment) stands in contrast to its response to her February 15, 2019 email requesting a salary adjustment on the basis of gender pay equity;[54] and fourth, that Plaintiffs' introduction of the 2017 Market Study did not invite the jury to second-guess LSU's business judgment when presented in conjunction with other evidence.[55]

Plaintiffs' fourth of five points in opposition to LSU's argument that Plaintiffs failed to submit evidence sufficient to support a finding of pretext is that they appropriately rebutted LSU's salary compression theory. Specifically, Plaintiffs urge that, although LSU's HR witness Joyce Whitfield testified that inversion – a subordinate's salary approaching, equaling, or exceeding their

[49] *Id.* at 10-12.
[50] *Id.* at 12.
[51] *Id.* at 12-18.
[52] *Id.* at 12-13.
[53] *Id.* at 13-14.
[54] *Id.* at 14-15.
[55] *Id.* at 15.

supervisor's salary – is discouraged, she did not testify that it never occurs.[56] Plaintiffs highlight that salary compression was not a concern with respect to Cunningham's salary request and that, although Muslow's requested salary would have exceeded that of OGC administrators, it was less than Hollier's salary, for whom Muslow would continue to work at LSUHSC-NO.[57] Finally, Plaintiffs say that LSU's own witness examination invited Plaintiffs' comparison of the salaries of LSU's coaches to that of its athletic director.[58]

Fifth, Plaintiffs submit that they did not ask the jury to assess the fairness of LSU's salary decisions, only whether the salary dispute was pretext for the rescission of the employment offers.[59] Plaintiffs finally remark that the evidence at trial – specifically, Skinner's admissions and LSU's shifting proffered reasons for rescinding Plaintiffs' employment contracts – was sufficient for a reasonable jury to conclude that LSU's stated reasons were pretextual.[60]

In reply, LSU says that none of Plaintiffs' purported causation evidence withstands scrutiny.[61] LSU first contends that, although Skinner testified that he was aware that the email contained statements of gender pay disparity, a reasonable jury could only conclude that the rescission was actually motivated by the too-high salary request because there was no evidence of LSU's retaliatory motive.[62] Next, LSU asserts that Jones's testimony confirms not that the contracts had no signing deadline or that the February 15 email was the only thing that could have resulted in the rescission, but that LSU had the ability to revoke the unaccepted offers at any time and indeed did so as a result of Muslow's salary demand.[63] LSU then argues that whether the

---

[56] *Id.*
[57] *Id.* at 15-17.
[58] *Id.* at 17.
[59] *Id.*
[60] *Id.* at 18.
[61] R. Doc. 667 at 1-2.
[62] *Id.* at 3-4.
[63] *Id.* at 4.

February 15 email could be classified as a suggestion or demand does not change the fact that Muslow's proposed salary created salary compression concerns and that Cunningham's proposed salary exceeded the OGC's annualized salary offer by more than 60%.[64] LSU next posits that the proximity in time of the February 15 email to the February 18 rescission does not show causation "because the same period included intervening, non-retaliatory reasons [for rescission]: Plaintiffs had not signed the OGC contracts, the appointment date had passed, and Plaintiffs had proposed structurally unworkable salaries."[65] And as to Plaintiff's assertion of shifting explanations, LSU says that Plaintiffs "confuse[] elaboration with contradiction" and "mistakenly treat[] context as changed rationale."[66] Finally, LSU argues that comparing Muslow's 2017 pay-raise request to her 2019 pay-raise request is not probative of retaliatory motive as the requests involved different decision-makers, positions, budgets, and chains of command.[67]

To prevail on its Rule 50(b) motion, LSU must show that "the jury's factual findings are unsupported by substantial evidence or 'the legal conclusions implied from the jury's verdict cannot in law be supported by those findings.'" *Wantou*, 23 F.4th at 431 (quoting *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614 (5th Cir. 2018)). LSU's arguments largely ask the Court to reweigh the evidence presented at trial and to draw inferences in its favor, rather than in favor of the jury's verdict. The Court concludes that the record contains sufficient evidence from which a reasonable jury could find that the gender-based pay statements in Muslow's February 15, 2019 email was the but-for cause of LSU's decision to rescind the employment contracts.

First, LSU's reliance on the undisputed fact that Plaintiffs never signed the OGC employment contracts does not entitle it to judgment as a matter of law because there was sufficient

---

[64] *Id.* at 4-5.
[65] *Id.* at 5.
[66] *Id.*
[67] *Id.* at 5-6.

evidence presented at trial upon which the jury could reasonably rely to reject LSU's suggestion that the unsigned contracts independently explained the rescission. To be sure, Plaintiffs point to testimony from multiple witnesses that the absence of signed contracts was not the reason the offers were rescinded: Jones testified that the contracts' effective date did not operate as a signing deadline and acknowledged that Plaintiffs' failure to sign the contracts was not LSU's actual reason for rescission;[68] Skinner testified that Plaintiffs' failure to execute the contracts was not "an explanation for why" the contracts were rescinded;[69] and Donna Dewailly further testified that the timing of the transfer was designed to benefit Plaintiffs rather than to meet some necessary internal deadline.[70]

Although LSU did present evidence that it was Plaintiffs' too-high salary requests alone which motivated its decision to rescind the OGC employment offers, the jury was also presented with sufficient evidence upon which they could reasonably conclude that the protected activity in the February 15, 2019 email also motivated LSU's decision to rescind the contracts. No party to this litigation need be reminded that the February 15 email did not simply request higher compensation; it expressly raised Plaintiffs' concerns regarding gender-based pay disparities and requested that their salaries be reviewed in this light. And Thomas Skinner testified that he "took [Muslow's email] to mean … that there was potentially a pay disparity between males and females at [LSUHSC-NO]" and that he "read the letter as indicating that she had a problem with gender disparity in pay at [LSUHSC-NO]," confirming that he understood the email to entail protected activity in addition to making the salary requests.[71] The jury also heard evidence sufficient for it to reasonably disbelieve LSU's explanation that Plaintiffs' requested salaries were the reason it

---

[68] R. Doc. 658 at 7.
[69] R. Doc. 660 at 174.
[70] *Id.* at 74-75.
[71] R. Doc. 661 at 4-5.

decided to rescind the offers. First, Plaintiffs introduced evidence challenging the thoroughness of the market analyses underlying the salaries proposed for the OGC positions.[72] Second, even though LSU emphasized that the OGC, rather than LSUHSC-NO, would become Plaintiffs' employing agency, Plaintiffs introduced evidence that their positions would remain closely connected to LSUHSC-NO after the transition[73] and that LSUHSC-NO would reimburse the OGC for Muslow's and Cunningham's salaries.[74] Third, Plaintiffs presented the 2017 Market Study as evidence that their requested compensation was not facially unreasonable. Although the parties spill much ink over whether the 2017 Market Study remained relevant to assessing Plaintiffs' proposed salaries, the Court had resolved that legal question before trial, leaving to the jury the question of what weight to assign the 2017 Market Study in evaluating the reasonableness of the requested salaries. The Court will not disturb the jury's findings merely because LSU offers an alternative interpretation of the evidence.

Sufficient evidence likewise supports the jury's apparent rejection of LSU's salary-compression rationale. Jones ultimately acknowledged that Cunningham's proposed salary fell below both his and Skinner's, indicating that salary compression was not a concern with respect to her.[75] A rationale that cannot possibly explain the rescission as to one of the two Plaintiffs is one the jury could reasonably infer was not the real rationale for either.

LSU's argument that Plaintiffs merely challenged the reasonableness of its business decisions mischaracterizes the theory presented at trial. This is not to say that the reasonableness of the salary figures was not an issue at trial; it was, as LSU urged that it rescinded Plaintiffs' contracts based on unreasonable salary requests, and Plaintiffs responded that they were entitled

[72] R. Doc. 660 at 107-143.
[73] Trial Ex. 103; R. Docs. 658 at 20-22, 24; 660 at 194-95.
[74] R. Doc. 660 at 85-86.
[75] *Id.* at 240-41.

to develop evidence to establish the reasonableness of their salary requests in an effort to show pretext. However, in doing so, Plaintiffs did not ask the jury to determine whether LSU made sound compensation decisions or to second-guess its salary structure, as LSU contends. Rather, Plaintiffs sought to establish that LSU's stated business reasons were pretextual – not bad business judgments – and that the true reason for rescinding the contracts was retaliation for Plaintiffs' protected complaints about gender-based pay disparities. Indeed, Plaintiffs' counsel made this very distinction in her closing argument.[76]

Finally, the temporal relationship between Plaintiffs' protected activity and LSU's decision to rescind the contracts further supports the verdict. Although temporal proximity alone may not always establish but-for causation, it is probative evidence that may be considered together with other evidence of pretext. *Harris v. FedEx Corp. Servs. Inc*, 92 F.4th 286, 297 (5th Cir. 2024). Plaintiffs' February 15 email raising gender pay-equity concerns was followed by the rescission of both employment contracts only three calendar days (and just one business day) later. Here, the jury heard additional evidence that LSU failed to contemporaneously communicate to Plaintiffs that their too-high salary requests were the reason for rescission, that LSU's explanations for the rescission evolved over time, and that prior salary-adjustment requests unaccompanied by allegations of pay inequity had elicited a materially different response. Viewed as a whole, this evidence permitted the jury to conclude that LSU's proffered explanations were not its actual reasons for rescission.

In sum, the trial record contains substantial evidence from which a reasonable jury could conclude that LSU's stated reasons for rescinding Plaintiffs' employment contracts were pretextual and that Plaintiffs' protected activity was the but-for cause of the rescission. The Court

[76] R. Doc. 661 at 25.

acknowledges that the trial record also contains substantial evidence to support a verdict in favor of LSU, had the jury come out that way. But that's what trials are for. Because LSU's arguments principally invite the Court to reweigh conflicting evidence and reassess witness credibility, relief under Rule 50 is unwarranted. Therefore, LSU is not entitled to judgment as a matter of law on Plaintiffs' retaliation claims.

**2. LSU's argument that Plaintiffs failed to establish entitlement to compensatory damages as a result of rescission**

LSU also argues that Plaintiffs did not provide sufficient evidence at trial to support an award of compensatory damages for LSU's retaliatory rescission.[77] LSU first highlights that, after the Fifth Circuit's ruling that Plaintiffs' "salary-review request was not the but-for cause of their termination," this Court rightly rejected Plaintiffs' argument that LSU's rescission of their employment contracts resulted in their actual termination.[78] LSU then urges that both Muslow's and Cunningham's testimony related to emotional damages they suffered as a result of LSUHSC-NO administrators' and employees' responses to their position retirements – that is, termination – rather than the OGC's decision to rescind the proposed employment contracts.[79] LSU also submits that, although three of Plaintiffs' former LSUHSC-NO coworkers testified about Plaintiffs' emotional damages, those witnesses testified to comments that LSUHSC-NO (not OGC) administrators made to the coworkers and that Plaintiffs never heard firsthand, which comments LSU says do not support any award of emotional damages, or at least do not support damages in the amount of $750,000 per plaintiff.[80] Finally, LSU argues that, because Plaintiffs could recover only emotional distress damages, and Plaintiffs introduced no medical evidence, expert testimony,

[77] R. Doc. 656-1 at 16-19.
[78] *Id.* (citing *Muslow*, 2023 WL 5498952, at *9).
[79] *Id.* at 17-18.
[80] *Id.* at 18.

spouse and family member testimony, or proof of psychiatric injury, the jury awarded them $750,000 each only at the suggestion of Plaintiffs' counsel, which LSU claims "doubles Muslow's prior $375,000 salary request to the OGC and effectively functions as an award of lost wages plus liquidated damages."[81] Consequently, concludes LSU, no reasonable jury could have found that the Plaintiffs suffered damages based on the evidence presented at trial.[82]

In their opposition, Plaintiffs contend that the evidence at trial established that their emotional distress damages were a result of the OGC contract rescission, not the retirement of their LSUHSC-NO positions.[83] Specifically, Plaintiffs point to Muslow's testimony "that she was 'stunned' when she received Mr. Skinner's rescission letter"; that the response she received to her email raising pay-equity concerns was not what she expected; that colleagues avoided her or stopped communicating with her after the rescission; and that her departure from LSU affected her identity and self-confidence.[84] Muslow broke down and wept on the stand when explaining this last reaction. Plaintiffs also highlight Cunningham's testimony in which she compared her LSU contract rescission to the loss of her father, explaining that she was shocked by the rescission, that it caused her to grieve her career, and that it also affected her family relationships and identity.[85]

Considering the evidence in the light most favorable to Plaintiffs, the Court does not agree with LSU that Plaintiffs failed to present legally sufficient evidence that they suffered compensable emotional distress damages as a result of the retaliatory rescission of the OGC employment contracts, as opposed to the subsequent elimination of their LSUHSC-NO positions. Plaintiffs did indeed testify to the emotional distress they suffered as a direct result of the rescission of the offers.

---

[81] *Id.* at 18-19 (quote at 19).
[82] *Id.* at 19.
[83] R. Doc. 665 at 18-19.
[84] *Id.*
[85] *Id.* at 19.

For example, the jury heard testimony that, following the rescission, coworkers stopped communicating with Muslow or avoided her altogether, circumstances that she described as profoundly affecting her sense of professional identity and self-worth.[86] Likewise, Cunningham testified that the rescission of the OGC employment contract came as a shock, caused her to grieve the loss of her career, and negatively affected both her personal identity and her family relationships.[87] A reasonable jury could conclude from this testimony that Plaintiffs suffered emotional distress attributable to the retaliatory rescission itself.

LSU cannot prevail on its position that the evidence is insufficient to support damages resulting from the rescission simply because certain testimony referenced Plaintiffs' ultimate departure from LSU. It is true that the Fifth Circuit held that Plaintiffs' protected activity was not the but-for cause of the termination of their LSUHSC-NO employment, *Muslow*, 2023 WL 5498952 at *9, and that this Court likewise recognized that the elimination of Plaintiffs' existing positions was distinct from the rescission of the contracts and thus could not be the basis for any damages.[88] Those rulings, however, do not constrain this Court to rule now that the evidence of Plaintiffs' emotional distress presented at trial was insufficient; instead, it was reasonable, from the evidence, for the jury to award damages for distress that it found resulted from the rescission of the OGC contracts, even though some manifestations of that distress may have lingered until when Plaintiffs' LSUHSC-NO positions terminated.

Although LSU emphasizes the absence of medical records, expert testimony, and testimony from family members, such evidence is not a prerequisite to recovering compensatory damages for emotional distress under Title VII. A plaintiff's own testimony, if credited by the jury, may be

---

[86] R. Doc. 658 at 185-86.
[87] R. Doc. 659 at 183-84, 200-03, 191-92.
[88] *See generally* R. Doc. 561 at 13-38.

sufficient to support such an award generally. *See, e.g.*, *Vadie v. Miss. State Univ.*, 218 F.3d 365, 377-78 (5th Cir. 2000). Here, both Plaintiffs testified extensively regarding the emotional impact of the rescission and their treatment by others in the wake of rescission. And the jury had the opportunity to assess the Plaintiffs' credibility firsthand, including observing Muslow become visibly emotional while describing the effect the events had on her identity and self-confidence. Former coworkers of Plaintiffs corroborated the altered attitudes of other coworkers and further testified to their observations of Plaintiffs' emotional distress in the LSUHSC-NO workplace following the rescission.

Finally, LSU's challenge to the amount of the jury's award does not warrant judgment as a matter of law.[89] The relevant inquiry under Rule 50 is not whether the jury could have reached a different amount, but whether there was a legally sufficient evidentiary basis from which the jury could conclude that Plaintiffs suffered compensable emotional harm as a result of the retaliatory rescission. *Wantou*, 23 F.4th at 431. Viewing the evidence in the light most favorable to the verdict, the Court concludes that there was.

**B. LSU's Motion for a New Trial**

"After a jury trial, Rule 59 of the Federal Rules of Civil Procedure authorizes courts to grant motions for new trial for any reason for which a new trial has heretofore been granted in an action at law in federal court." *Wantou*, 23 F.4th at 431. Those reasons include "if the trial court finds that the verdict is against the weight of evidence; the damages awarded are excessive; the trial was unfair; or prejudicial error was committed." *Adams v. Ethyl Corp.*, 838 F. App'x 822, 827 (5th Cir. 2020). "Notwithstanding the broad sweep of Rule 59, courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice

[89] The Court will consider LSU's arguments with respect to the amount of damages in conjunction with its analysis of LSU's alternative motion for remittitur. *See infra* Section II.C.

has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Gen. Access Sols., Ltd. v. T-Mobile USA, Inc.*, 2026 WL 823162, at *1 (E.D. Tex. Mar. 25, 2026) (quotation omitted). In other words, "a new trial is warranted only if the opposing party shows that it was sufficiently prejudiced considering all the facts and circumstances of the case." *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 180 (5th Cir. 2005). Counsels' "improper remarks become the basis for granting a new trial when the trial judge, with the benefit of his or her first hand knowledge of the entire proceedings, believes that the remarks infected the deliberations and conclusions of the jury." *Guar. Serv. Corp. v. Am. Emps.' Ins. Co.,* 893 F.2d 725, 729 (5th Cir.), *modified on reh'g on other grounds*, 898 F.2d 453 (5th Cir. 1990).

As LSU makes eight arguments in support of its motion for a new trial, for clarity and ease of discussion, the Court will address each argument in turn.

**1. Admission of the 2017 Market Study and related compensation evidence**

LSU contends that the 2017 Market Study and associated compensation exhibits were irrelevant and should have been excluded under Federal Rules of Evidence 401 and 402 because the OGC was the employing agency and set salaries by reference to its own budget and recommendations from LSU's Baton Rouge HRM, and that neither Skinner nor Jones knew of the study when the OGC established the salaries for the new positions.[90] It argues in the alternative that the evidence should have been excluded under Rule 403 because, according to LSU, it allowed Plaintiffs to place their dismissed wage-discrimination claims before the jury indirectly.[91] Plaintiffs respond that the study bore directly on LSU's stated rationale (*i.e.*, whether the salaries Plaintiffs requested were unreasonably high) and that the Court's rulings confined it to that use.[92]

[90] R. Doc. 656-1 at 21-23.
[91] *Id.* at 23-24.
[92] R. Doc. 665 at 20-22.

Specifically, say Plaintiffs, because some evidence established that Skinner received relevant portions of the 2017 Market Study before rescinding Plaintiff's employment offers, there is support for an inference that Skinner understood the basis for Plaintiffs' pay-disparity complaints, but did not inquire into the reasonableness of their requested salaries.[93] LSU replies that the evidence was used in a way "[t]hat invited the jury to decide whether the OGC made a fair compensation decision, *not* whether LSU retaliated" and thus amounted to prejudicial error.[94]

The Court addressed these arguments in its pretrial evidentiary rulings, and it now adheres to those rulings. In its August 20, 2025 order, the Court held that "the only remaining jury issue to which compensation evidence may be relevant is whether LSU rescinded the OGC contracts based on its subjective belief that the salaries requested by Plaintiffs for the OGC positions were 'too high.'"[95] Having advanced that rationale as one of its two reasons for rescinding the contracts, LSU cannot fairly insist that the jury evaluate this rationale without reference to the document from which Plaintiffs derived the figures they proposed. Pretext is measured against the employer's stated reason, and a jury cannot fairly assess whether that reason is worthy of credence without necessary context.

The Court also previously considered and rejected the premise on which LSU's relevance argument rests. In declining to exclude LSUHSC-NO compensation evidence, the Court observed that the salaries in the proposed OGC contracts matched Plaintiffs' existing LSUHSC-NO salaries, and so the distinction between the two entities did not justify categorical exclusion.[96] LSU does not point to anything at trial that requires the Court to reconsider that observation. Simply put, LSU was able to, and indeed did, put forth evidence that the OGC positions were entirely separate

[93] *Id.* at 22.
[94] R. Doc. 667 at 6 (emphasis in original).
[95] R. Doc. 581 at 21-22.
[96] *Id.* at 21 n.130.

from those at LSUHSC-NO and, thus, were not governed by the 2017 Market Study.[97] But Plaintiffs put forth countervailing evidence that LSUHSC-NO would reimburse the OGC for the Plaintiffs' salaries, suggesting that the study was an appropriate consideration.[98] Accordingly, whether the OGC should have taken into account the 2017 Market Study in determining Plaintiffs' salaries was a question properly decided by the jury on competing evidence.

Finally, LSU's Rule 403 objection has already been addressed by the mechanism the rule contemplates. The Court excluded nearly all compensation evidence concerning LSUHSC-NO employees other than Plaintiffs, limited testimony on the methodology of the study, excluded evidence regarding the asserted culture of discrimination at LSUHSC-NO, and reserved authority to revisit admissibility of such evidence as the trial developed. That the Court did not exercise that reserved authority reflects its contemporaneous judgment that the evidence presented remained within permissible bounds.

**2. The adequacy of the limiting instructions**

Second, LSU argues that the Court's limiting instructions were insufficient to cure the prejudice resulting from the admission of evidence concerning the 2017 Market Study and Plaintiffs' allegations of gender-based pay inequity (*i.e.*, the dismissed claim of discrimination).[99] According to LSU, Plaintiffs consistently presented evidence and argument suggesting that LSUHSC-NO underpaid them based on gender and that the OGC improperly failed to use the 2017 Market Study salary data when evaluating their compensation requests such that the volume and repetition of that testimony and evidence rendered the limiting instructions ineffective.[100] Plaintiffs respond that the limiting instructions were not rendered ineffective because the Court

---

[97] *See, e.g.*, R. Docs. 658 at 28-29; 660 at 206.
[98] R. Docs. 657 at 88; 658 at 50-51; 660 at 85-86, 242.
[99] R. Doc. 656-1 at 24-25.
[100] *Id.*

reissued targeted limiting instructions each time a witness's testimony touched upon the subject of pay inequity, and that the instructions explicitly told the jury to consider the evidence only in connection with the sole liability issue being tried (*viz.*, whether LSU's stated reasons for rescinding the contracts were pretext for unlawful retaliation).[101] Plaintiffs also note that LSU never objected to the sufficiency of the limiting instructions, proposed additional limiting language, or otherwise raised the concern it now presses.[102] Finally, Plaintiffs submit that LSU's argument, if accepted, would essentially mean that no case in which pretext evidence overlaps with dismissed claims could be fairly tried.[103] In reply, LSU says that it preserved its objections through motions *in limine* and reiterates its point that the repetition and volume of the testimony rendered limiting instructions ineffective.

LSU has not shown that it is entitled to a new trial due to inadequate limiting instructions. First, despite LSU's contention, the instructions given were neither generic nor infrequent. The Court instructed the jury contemporaneously multiple times when the notion of pay inequity was broached[104] and, again, in the final charge.[105] The charge stated that "it has been established, through prior proceedings in this case, that LSU did not discriminate against Plaintiffs on the basis of gender," and directed the jury "not to give any weight to testimony or argument presented by either party that LSU discriminated against Plaintiffs on the basis of their gender."[106] It further confined the jury to the sole liability issue to be tried and instructed that the evidence be considered "only for the purpose of resolving this issue and not other issues that may have been suggested by the evidence."[107] These instructions were clear, repeatedly given, and narrowly tailored to address

[101] R. Doc. 665 at 23-24.
[102] *Id.* at 24.
[103] *Id.*
[104] *See, e.g.*, R. Docs. 658 at 145-46; 659 at 51-52, 88-90.
[105] R. Doc. 640-2 at 6.
[106] *Id.*
[107] *Id.* at 5-6.

the concerns raised by LSU. Second, LSU contends that the Court's limiting instructions failed to "limit Plaintiffs' theme at trial that LSUHSC-NO market studies set the proper salary ranges."[108] This Court has already explained that whether the 2017 Market Study was or should have been considered by the OGC in setting Plaintiffs' salaries was a factual question for the jury and, thus, a proper theme for Plaintiffs' case at trial necessitating no limiting instruction.

"A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). LSU has offered nothing to overcome that presumption – especially where, as here, the particular instructions were given several times contemporaneously to cabin the purportedly prejudicial testimony.

**3. Second-guessing of salary decisions**

Third, LSU argues that Plaintiffs improperly invited the jury to second-guess the OGC's salary decisions by relying on the 2017 Market Study to compare the OGC's salary offers against Plaintiffs' qualifications.[109] According to LSU, this evidence shifted the jury's focus from whether the rescission was retaliatory to whether the OGC made a fair or correct compensation decision, contravening jurisprudence in the Fifth Circuit which precludes courts from reviewing an employer's business judgments.[110] Plaintiffs respond that the jury was asked not whether LSU made the right salary decision, but simply whether it made the rescission decision on the basis LSU claimed.[111] Plaintiffs also note that the jury charge instructed that employers may act for good, bad, or no reasons, so long as the decision is not retaliatory and that their counsel expressly acknowledged that standard in her closing argument.[112] Finally, Plaintiffs emphasize that LSU

---

[108] R. Doc. 656-1 at 24.
[109] *Id.* at 25-26.
[110] *Id.* at 26 (citing *Lemaire v. La. Dep't of Transp. & Dev.,* 480 F.3d 383, 391 (5th Cir. 2007); *Abbood v. Tex. Health & Human Servs. Comm'n,* 783 F. App'x 459, 463-64 (5th Cir. 2019)).
[111] R. Doc. 665 at 24-26.
[112] *Id.* at 25.

ignores substantial evidence that supports pretext, including the temporal proximity between the email and rescission and LSU's failure to engage with Plaintiffs about their salary requests.[113]

LSU has not shown that it is entitled to a new trial on the grounds that the jury was invited to evaluate the fairness of the OGC salary offers. The jury instructions explicitly distinguished between perceived poor business decisions and retaliatory motives.[114] Specifically, this Court instructed the jury that "employers are entitled to make decisions in the workplace for good reasons, bad reasons, or for no reasons at all, so long as the decisions are not based on unlawful retaliation" and that "the fact that a decision was a mistake, unwise, or was even harsh or unfair, does not constitute retaliation."[115] The jury was not asked whether LSU's salary determinations were correct or wise. It was asked only whether the rescission occurred as a result of the protected activity in Muslow's February 15 email.[116]

LSU says that "[m]erely disputing the facts does not establish pretext" and that "Plaintiffs must 'submit evidence to support an inference that [LSU] had a retaliatory motive, not just an incorrect belief.'"[117] This is true, but the Court finds that Plaintiffs did submit sufficient evidence to support an inference of LSU's retaliatory motive. By way of example, Dewailly testified that the timing of Plaintiffs' transition to the OGC had already been adjusted once and could have been extended again;[118] Jones testified that the February 1 effective date was not a deadline;[119] and Skinner testified that the lack of signature was not an explanation for the rescission.[120] All of this is evidence of pretext which, although circumstantial, when weighed together with all the

[113] *Id.* at 25-26.
[114] R. Doc. 640-2 at 7.
[115] *Id.*
[116] *See* R. Doc. 641.
[117] R. Doc. 656-1 at 26 (quoting *Coleman v. Jason Pharms.*, 540 F. App'x 302, 305 (5th Cir. 2013)).
[118] R. Doc. 660 at 80-84.
[119] R. Doc. 658 at 7.
[120] R. Doc. 660 at 174.

evidence, is sufficient to support an inference of LSU's retaliatory motive. *See Harmon v. Collier*, 158 F.4th 595, 615-16 (5th Cir. 2025).

**4. The "CYA" characterization**

Fourth, LSU contends that Plaintiffs' counsel's repeated characterization of LSU's post-rescission application invitations for the OGC positions as "CYA" was materially prejudicial to LSU's defense because it was a pejorative label that suggested LSU's dishonesty rather than an impartial view of disputed evidence and encouraged the jury to form opinions based on rhetoric rather than the evidence.[121] LSU says that "[t]he prejudice was heightened in light of pre-trial rulings that determined Plaintiffs' failure to apply for OGC positions after rescission – despite multiple invitations – 'cemented their termination,' eliminating a retaliatory termination claim."[122] Plaintiffs respond that the "CYA" characterization was record-based argument rather than inflammatory rhetoric, noting that both Muslow and Cunningham used the term in their own sworn testimony to describe, in their opinion, the post-rescission invitations.[123] Plaintiffs distinguish *Clapper v. American Realty Investors, Inc.*, 95 F.4th 309, 313 (5th Cir. 2024) (to which LSU cites), where a new trial was granted following a barrage of personal attacks on opposing counsel and an expert, as bearing no resemblance to their use of "a common and understandable refrain."[124] Plaintiffs further note that here the Court addressed the "CYA" complaint in real time from the bench, expressing its confidence that the jury could place the evidence and argument in proper perspective and instructing the jury that statements of counsel are not evidence.[125] In reply, LSU

[121] R. Doc. 656-1 at 26-27.
[122] *Id.* at 27-28 (quote at 27).
[123] R. Doc. 665 at 26.
[124] *Id.* at 27.
[125] *Id.*

says that the frequency of the term "CYA" is not the issue; instead, the critical issue is the meaning and usage of the term.[126]

LSU states that "the constant use of 'CYA' encouraged the jury to infer bad faith from rhetoric rather than objective evidence."[127] But even assuming that the "CYA" references could be considered to "suggest[] dishonesty and wrongdoing by LSU,"[128] the Court finds that the use of the term does not entitle LSU to a new trial. The term "CYA" was not pervasive: it was used at trial roughly twelve times across five trial days by Plaintiffs, their counsel, and by LSU's counsel during cross-examination.[129] Further, it was not either counsel's invention or argument of facts that were "false or without basis in the record." *Clapper*, 95 F.4th at 313 (quotation omitted). To be sure, Muslow testified that she understood the invitations to reapply for their positions as "a CYA,"[130] and Cunningham testified that she similarly viewed the certified-mail letter inviting her to reapply as "CYA."[131]

Additionally, the Court addressed LSU's objection to Plaintiffs' use of the term "CYA" during trial and sees no basis to revisit that assessment now. As the Court stated during trial, the jury heard sufficient evidence and argument to place the Plaintiffs' "CYA" characterization in proper perspective and was instructed that statements of counsel were not evidence. In sum, the Court finds that LSU is not entitled to a new trial as a result of Plaintiffs' counsel's use of the term "CYA" during trial.

---

[126] R. Doc. 667 at 7-8.
[127] R. Doc. 656-1 at 27.
[128] *Id.*
[129] R. Docs. 657 at 25; 658 at 70, 90, 178, 181; 659 at 39, 194, 208; 661 at 25, 28, 31.
[130] R. Doc. 658 at 178.
[131] R. Doc. 659 at 194.

**5. The testimony of Christine Manalla and Nicole Honoree**

Fifth, LSU submits that a new trial is warranted because a portion of Plaintiffs' emotional distress claim relied upon testimony from former LSUHSC-NO coworkers regarding statements made by LSUHSC-NO administrators (Larry Hollier and John Harman) outside of Plaintiffs' presence.[132] LSU emphasizes that the referenced comments were purportedly made by LSUHSC-NO administrators (specifically, Hollier) who were not involved in the decision to rescind Plaintiffs' OGC contracts.[133] Because the statements were not made by decision-makers, contends LSU, they are not relevant to retaliatory motive, and even if they were, their relevance was outweighed by the risk of prejudice – particularly, that the jury would confuse Hollier's statement as evidence of retaliatory motive on the part of Skinner.[134] Plaintiffs respond that the testimony of Honoree and Manalla was admitted for a proper limited purpose and cabined by contemporaneous instruction.[135] Plaintiffs identify two independent grounds for its relevance: to describe the workplace atmosphere Plaintiffs experienced after the rescission, which bore on emotional distress damages; and to frame for the jury LSU's perspective on the post-rescission invitations to reapply for the OGC positions.[136] Finally, Plaintiffs contend that LSU invited the testimony by introducing evidence of the offers to reapply, that LSU's objections go to weight rather than admissibility, that LSU cites no authority holding a limiting instruction of this kind insufficient, and that LSU never requested a more robust instruction.[137]

LSU is not entitled to a new trial on the basis of Manalla's and Honoree's testimony about certain comments made to them outside of Plaintiffs' presence. Honoree testified that senior

---

[132] R. Doc. 656-1 at 28.
[133] *Id.*
[134] *Id.* at 28-29.
[135] R. Doc. 665 at 27-28.
[136] *Id.*
[137] *Id.* at 29.

administrators "sort of made joking disparagements about [Muslow]" after the February 15, 2019 email.[138] The Court instructed the jury, as the testimony came in, that statements made outside Plaintiffs' presence could not be considered "for the truth of the matters that were asserted in these remarks or references," but only "in terms of general impressions."[139] The Court further clarified that the testimony about Honoree's own assessment of the remarks was not relevant to whether Plaintiffs were damaged.[140] And after Manalla testified that Hollier made certain disparaging remarks more generally in the office, the Court issued the same instruction.[141] LSU cites no authority holding that an instruction of this kind is inadequate to the task, and, as Plaintiffs point out, it never asked for a stronger one. Because the jury was told, each time this testimony arose, precisely how it could and could not be used, LSU's assertion that the jury nonetheless treated these remarks as proof of retaliatory motive on the part of Skinner, the ultimate decision-maker, rests on speculation rather than anything in the record.

**6. The damages award as evidence of passion or prejudice**

Sixth, LSU contends that the jury award of compensatory damages is so large that it can only be the result of bias, passion, or prejudice, and thus a new trial – rather than remittitur – is the appropriate remedy.[142] LSU submits that the jury's damages award of $750,000 to each of the Plaintiffs, which is the figure that Plaintiffs' counsel suggested was appropriate during closing, is exactly twice the amount of the salary Muslow requested from the OGC, $375,000, and thus "indicates the jury was swayed by emotional appeals."[143] Plaintiffs respond that the damages award does not reflect passion or prejudice.[144] Plaintiffs point to the jury charge directing the jury

[138] R. Doc. 659 at 61.
[139] *Id.* at 62.
[140] *Id.* at 63.
[141] R. Doc. 659 at 92-94.
[142] R. Doc. 656-1 at 29.
[143] *Id.* at 29-30 (quote at 30).
[144] R. Doc. 665 at 29-30.

to make its decision without passion, prejudice, or sympathy and to not award damages as punishment, and they argue that LSU offered no evidence the jury disregarded either of these instructions.[145] Plaintiffs maintain that an award explained by the evidence is not a passion verdict, and they go on to describe the evidentiary record of emotional distress as detailed, specific, and independently corroborated.[146] Plaintiffs also dispute LSU's theory that the verdict is twice Muslow's requested salary, noting that counsel did not reference the salary figure in her closing argument and that nothing in the record would tie Cunningham's damages award to Muslow's suggested salary.[147]

The Court agrees with Plaintiffs. LSU's theory that the jury "anchored" its award to Muslow's requested salary on the suggestion of Plaintiffs' counsel does not compel the conclusion that the verdict reflects passion or prejudice. LSU observes that $750,000 is twice the salary Muslow proposed, but Plaintiffs' counsel suggested that the jury consider a range of $500,000 to $1 million for damages and told the jury the figure for any award was theirs to determine.[148] The amount awarded is the midpoint of that range, and the same sum was awarded to Cunningham, who proposed no such salary figure to LSU.

Because an award of damages in some amount is supported by credible evidence of emotional distress, this Court cannot say that it is the product of passion or prejudice such that a new trial is warranted. As this Court has already explained in connection with LSU's motion for judgment as a matter of law, record evidence supports an award of compensatory damages. Both Plaintiffs testified at length and with specificity to the consequences of the rescission, and three

---

[145] *Id.*
[146] *Id.* at 30.
[147] *Id.*
[148] R. Doc. 661 at 34-35.

witnesses described observable changes in them during the relevant period.[149] Whatever the correct measure of those damages, the award of some amount is not unmoored from evidence the jury heard and was entitled to credit. The jury was instructed to decide the case in a fair, impartial, and unbiased manner, to avoid influence by passion, prejudice, or sympathy, and that damages could not be imposed or increased to penalize LSU.[150] LSU offers no evidence that these instructions were disregarded.

**7. Plaintiffs' closing argument**

In LSU's seventh argument for new trial, it identifies eight statements in Plaintiffs' closing argument that it says are misleading or prejudicial and warrant a new trial.[151] Plaintiffs respond to each of the eight challenged closing argument statements.[152] Examined collectively and in context, none of the statements necessitates a new trial. The Court will address the parties' briefing on each statement separately.

*First*, LSU contends that Plaintiff's counsel's comparison of the credentials of the author of the 2017 Market Study to those of Joyce Whitfield (who gathered compensation data for the OGC), and counsel's description of the Baton Rouge HRM analysis as a screenshot from an app, was an *ad hominem* attack inviting the jury to discount the HRM salary recommendations on which the OGC's salary scale rested.[153] Plaintiffs respond that counsel's remarks concerning Whitfield's methodology and credentials tracked her testimony that she drew her data from a third-party salary platform and that she obtained her compensation certificate in 2020, after the January 2019 recommendation.[154] LSU takes issue with Plaintiffs' counsel's statement that characterized the

---

[149] *See* discussion *infra* accompanying notes 213-243.
[150] R. Doc. 640-2 at 2, 8.
[151] R. Doc. 656-1 at 30-39.
[152] R. Doc. 665 at 30-35.
[153] R. Doc. 656-1 at 30-31 (citing trial testimony at R. Doc. 661 at 23-24).
[154] R. Doc. 665 at 31 (citing trial testimony at R. Doc. 660 at 93, 100-101, 131).

OGC's market study as "a screenshot from an app without any information of the job duties, searched by a woman who didn't even have a certificate in compensation administration until three years after the screenshot."[155] The Court finds, however, that this portion of counsel's argument is a fair comment on a witness's methodology and qualifications, where such comment was grounded in her own testimony.

*Second*, LSU submits that counsel improperly invited the jury to compare Plaintiffs' qualifications to those of Skinner, Jones, and Colletta (who was hired as chief counsel after Muslow), on an issue unrelated to the reason for rescission.[156] Plaintiffs respond that the comparison was responsive to LSU's salary compression defense and that LSU itself placed the comparison before the jury by eliciting on the direct examination of Jones that Colletta was hired within the HRM salary range and below the salary offered to Muslow, opening the door to rebuttal that Plaintiffs had flagged in pretrial motions and that the Court permitted.[157] The Court has already explained that the reasonableness of the salaries Plaintiffs requested was an issue fairly before the jury. And the statements made in Plaintiffs' closing argument do not exceed the limits set by this Court regarding the evidence of Colletta's qualifications that could be developed at trial.[158] Again, the Court finds that the statements with which LSU takes issue here are fair comment on the facts in evidence.

*Third*, LSU contends that Plaintiffs' counsel misleadingly discounted LSU's salary compression concerns by analogizing Plaintiffs to LSU coaches who earn more than their supervisor (the athletic director), which shifted focus from LSU's genuine belief about the

[155] R. Doc. 661 at 24.
[156] R. Doc. 656-1 at 31-32.
[157] R. Doc. 665 at 31-32.
[158] *See* R. Doc. 658 at 100-01.

reasonableness of Plaintiffs' salary requests to Plaintiffs' asserted market value.[159] Plaintiffs respond that the comparison illustrated that LSU tolerates subordinates earning more than supervisors where market factors support it, rebutting LSU's suggestion of a categorical constraint, and that a reasonable inference from the record is not a material misstatement.[160] The reference to coaching salaries followed LSU's own cross-examination question to Cunningham whether she knew of any instance in government of a subordinate earning substantially more than a supervisor.[161] Accordingly, because the jury had heard testimony analogizing Plaintiffs' situation to that of LSU coaches, the Court does not find that such reference in the closing argument was so prejudicial to LSU as to warrant a new trial.

*Fourth*, LSU posits that Plaintiffs' counsel misstated the evidence by suggesting that LSU invented new positions and hired a less-experienced candidate at $182,000, even though the HRM recommended salary range of $131,000 to $188,000 predated the rescission and the same positions were later publicly posted through a competitive process.[162] In response, Plaintiffs say that the statement illustrated their pretext theory and tracked the documentary record, given testimony that the transition was contemplated to be an agency transfer, not a competitive process, until after Plaintiffs pressed their pay-equity concerns.[163] Again, the assertions of Plaintiffs' counsel in closing were based on facts in evidence or fair inferences to be drawn from such facts.[164]

*Fifth*, LSU contends that Plaintiffs' counsel inaccurately told the jury that the OGC was not paying the salaries at issue, which LSU says conflated interagency chargebacks with the OGC's status as the employing agency and undermined LSU's salary-compression rationale.[165]

---

[159] R. Doc. 656-1 at 32.
[160] R. Doc. 665 at 32-33.
[161] R. Doc. 659 at 249-52.
[162] R. Doc. 656-1 at 33.
[163] R. Doc. 665 at 33.
[164] R. Doc. 660 at 32, 64, 187.
[165] R. Doc. 656-1 at 33-34.

Plaintiffs respond that their statement was supported by documentary evidence and LSU's own witnesses' testimony that LSUHSC-NO would fund Plaintiffs' salaries by reimbursing the OGC.[166] Counsel's statement that Plaintiffs' salaries would ultimately be borne by LSUHSC-NO was supported by documentary evidence and by LSU's witnesses.[167]

*Sixth*, LSU says that Plaintiffs' counsel misstated the but-for liability question by framing the issue as whether LSU retaliated because Plaintiffs sent the February 15, 2019 email, which LSU argues improperly treated the entire email as protected activity even though it also contained unprotected (and, to LSU, unreasonable) salary requests exceeding the OGC's offers.[168] Plaintiffs respond that their closing argument, considered as a whole, repeatedly isolated the protected activity (*i.e.*, the pay-equity concerns) from the balance of the email, and that any imprecision in an initial shorthand reference was cured by counsel's narrowing of the issue and the Court's but-for instruction.[169] It is true that Plaintiffs' counsel initially framed the issue as whether LSU retaliated because Plaintiffs sent the February 15 email,[170] which contained both protected statements and unprotected salary requests. But it is also true that this framing did not stand alone. The theme of Plaintiffs' closing argument was the gender-based pay statements, such that it is highly unlikely that the jury could have understood the protected activity to be any other portion of the February 15 email. In addition, later in the closing argument, Plaintiffs' counsel articulated the protected activity with specificity and addressed the causation standard directly.[171] The Court then charged the jury in precise terms on but-for causation.[172] In sum, considering the entire argument made by Plaintiffs' counsel, the jury could not have been confused about what

[166] R. Doc. 665 at 33-34.
[167] R. Doc. 660 at 85-86.
[168] R. Doc. 656-1 at 34-36.
[169] R. Doc. 665 at 34.
[170] R. Doc. 661 at 16.
[171] *Id.* at 29.
[172] R. Doc. 640-2 at 7-8.

constituted the protected activity, but even if they were at the start of Plaintiffs' closing, any imprecision was corrected by counsel's later statements and the jury charge itself.

*Seventh*, LSU submits that Plaintiffs' counsel improperly equated Muslow's 2017 pay raise request while in her LSUHSC-NO role with her 2019 salary request for her anticipated role with the OGC, which LSU says disregarded differences in position, employing agency, decision-maker, budget, and compensation structure.[173] Plaintiffs respond that the statement was offered to show a departure from prior practice requiring explanation, that the factual distinctions LSU identifies were all before the jury, and that arguing an available pretext inference is not misrepresentation.[174] The distinctions LSU identifies were before the jury, and LSU argued them. That the jury may have been persuaded to draw Plaintiffs' suggested inference is not a ground for relief to LSU.

*Eighth*, LSU argues that Plaintiffs' counsel invited an excessive emotional distress award through anchoring (that is, suggesting a damages figure), noting that the only supporting evidence was the testimony of Plaintiffs and three former coworkers, without medical documentation, expert testimony, or corroboration from family members, and that no front pay, back pay, liquidated, or punitive damages were available.[175] Plaintiffs respond that suggesting a damages figure is accepted practice, that counsel offered a range of $500,000 to $1 million and expressly left the decision of the amount of any award to the jury, and that a jury's acceptance of a figure within the range supported by the evidence reflects the reasonableness of the suggestion rather than "the power of the anchor."[176] Plaintiffs also observe that LSU declined to offer the jury an alternative

[173] R. Doc. 656-1 at 37.
[174] R. Doc. 665 at 34.
[175] R. Doc. 656-1 at 38-39.
[176] R. Doc. 665 at 35.

figure, which they characterize as a strategic choice.[177] The Court tends to agree that suggesting a range of damages is a fairly common practice. Further, counsel explained that she was suggesting a proposed range of $500,000 to $1,000,000, but said to the jury that "[t]he number you decide is entirely up to you."[178] That the jury chose the midpoint of that range does not mean that counsel's suggestion of a range was improper or prejudicial, and LSU cites no authority to that effect as would support a new trial.[179]

* * * *

Although it has considered each of the eight closing-argument statements with which LSU takes issue individually, the Court is aware that such "statements must be examined collectively and in the specific context of the trial at issue." *Clapper*, 95 F.4th at 314. Given that the eight statements of Plaintiffs' counsel were largely fair characterizations of record evidence and otherwise not prohibited practices for closing arguments, the Court concludes that a new trial is not warranted when the eight statements are considered collectively against the backdrop of the trial as a whole.

**8. The great weight of the evidence**

Eighth and finally, LSU argues that a new trial is warranted because the verdict is against the great weight of the evidence.[180] LSU contends that the cumulative effect of the references to dismissed claims and market studies, the repeated "CYA" characterization, the secondhand remarks by non-OGC personnel, and the suggested damages figure overshadowed the sole liability question tried to the jury.[181] LSU asserts that the resulting $1.5 million combined award, which

---

[177] *Id.*

[178] R. Doc. 661 at 35.

[179] Whether the suggested range and awards were excessive, even if not so prejudicial as to warrant a new trial, is a different question that will be taken up in conjunction with the Court's consideration of LSU's motion for remittitur.

[180] R. Doc. 656-1 at 39-40.

[181] *Id.*

exactly matched the amount suggested by Plaintiffs' counsel, confirms substantial prejudice that was cumulative rather than isolated and that could not be cured by limiting instructions.[182] In response, Plaintiffs say the verdict is not against the great weight of the evidence.[183] They contend that each component of LSU's cumulative argument fails on its own terms and that the volume of unsuccessful arguments does not change the result.[184] Plaintiffs identify eight categories of evidence supporting liability: the near-immediate rescission; Muslow's earlier successful salary-review request based on the 2017 Market Study without any mention of gender equity; Skinner's own admissions regarding the reasons for the rescission; LSU's shifting explanations both after the rescission and during the litigation; the implausibility of the deadline for signing the OGC contracts and lack-of-signature rationale; the mischaracterization of the February 15 email as a salary demand; LSU's refusal to engage on Plaintiffs' request for a salary review in the months that followed; and the existence of LSU's own market study, which Plaintiffs relied on and which they contend was ignored.[185] As to damages, Plaintiffs point to their testimony regarding lasting physical harm, permanent personal loss, and professional ostracism.[186] Plaintiffs conclude that every concern LSU raises – spillover from dismissed claims, inflammatory rhetoric, secondhand testimony, and improper anchoring – was addressed by the jury instructions or by the limiting instructions given throughout the trial, that the jury is presumed to have followed them, and that LSU has offered nothing sufficient to overcome that presumption.[187]

As an initial matter, LSU's weight-of-the-evidence argument is really a cumulative-error argument; that is to say, LSU does not contend that the great weight of the evidence is in *its* favor,

---

[182] *Id.*
[183] R. Doc. 665 at 35.
[184] *Id.*
[185] *Id.* at 35-36.
[186] *Id.* at 36.
[187] *Id.*

but that the cumulative effect of its complained-of trial testimony and rulings warrant a new trial. To that end, the Court has addressed each of LSU's arguments individually and found that none of them warrants a new trial. That result does not change just because the arguments are presented in the aggregate.

Then, to the extent that LSU makes the argument that the evidence is contrary to the great weight of the evidence, it does not satisfy the standard for a new trial. The Court, in its discussion of LSU's motion for judgment as a matter of law, has chronicled the Plaintiffs' evidence that was sufficient to support the verdict,[188] and LSU does not make a specific argument that the great weight of the evidence is in its favor. Accordingly, the Court finds that LSU has not shown that the verdict is against the great weight of the evidence.

**C. LSU's Motion for Remittitur**

LSU, in its alternative motion for remittitur, first seeks to establish that, although Plaintiffs' claims arose under both Title VII and the Equal Pay Act – and that compensatory damages are available under both statutes – Plaintiffs cannot recover separate compensatory damages under both statutes because plaintiffs generally "may not receive duplicative compensatory damages for the same wrong."[189] Then, LSU argues that the jury's compensatory damages award for each Plaintiff is excessive when compared to awards in other cases in the Fifth Circuit, providing 13 cases it says are evidence of "the typical compensatory damages' [*sic*] awards in this circuit."[190]

---

[188] *See* discussion *supra* Section II.A.

[189] R. Doc. 656-1 at 41-42 (quote at 41).

[190] *Id.* at 42-43 (quote at 42) (citing *Liner v. Terminix Pest Control, Inc.*, 2025 WL 2054584, at *3 (E.D. La. July 18, 2025); *Harris v. FedEx Corp. Servs.*, 92 F.4th 286, 300-01 (5th Cir. 2024); *Pickett v. Miss. Bd. of Animal Health,* 2021 WL 3373806, at *7 (S.D. Miss. Aug. 3, 2021); *Wallace v. Bd. of Supervisors for Univ. of La. Sys.,* 2017 WL 1428459 (M.D. La. Mar. 31, 2017); *Tureaud v. Grambling State Univ.,* 294 F. App'x 909, 916 (5th Cir. 2008); *Salinas v. O'Neill,* 286 F.3d 827, 830-33 (5th Cir. 2002); *Picou v. City of Jackson,* 2002 WL 31016468, at *5-6 (5th Cir. Aug. 13, 2002); *Thomas v. Tex. Dep't of Crim. Just.,* 297 F.3d 361, 371-72 (5th Cir. 2002); *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 487-89 (5th Cir. 2001); *Vadie v. Miss. State Univ.,* 218 F.3d 365, 377-78 (5th Cir. 2000); *Williams v. Trader Publ'g Co.,* 218 F.3d 481, 487 (5th Cir. 2000); *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1046-47 (5th Cir. 1998); and *Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 941 (5th Cir. 1996)).

LSU specifically submits that Plaintiffs' awards are excessive because much of the trial testimony related to damages, such as the "career grief shock" Cunningham reported experiencing and emotional damages resulting from the extension of Muslow's LSUHSC-NO position retirement date, was attributable to Plaintiffs' dismissed claims of wage discrimination and wrongful termination.[191] LSU next asserts that the jury's award is "anchored to double Muslow's prior OGC $375,000 salary request" and "indicates the compensatory damages award may have effectively served as disguised lost wages and unauthorized liquidated damages."[192] Finally, says LSU, because the jury understood Plaintiffs' emotional distress testimony to primarily address Plaintiffs' concerns of gender-based pay inequity, how the retirement of their positions affected them, remarks from certain LSUHSC-NO administrators which Plaintiffs did not hear firsthand, and their perceived isolation from others during the final days of their employment at LSUHSC-NO, the jury's award was based on sympathy for Plaintiffs and an intent to punish LSU and, thus, must be remitted.[193]

In response, Plaintiffs submit that remittitur is not warranted because of the strong presumption in favor of affirming jury awards.[194] And further, say Plaintiffs, remittitur is unwarranted because, on the basis of the verdict form, LSU has no ground to argue that the recovery is duplicative and because it is proper to presume, on the basis of the Court's jury instructions, that the jury found sufficient causal connection between the Plaintiffs' contract rescission and the emotional damages to which they testified.[195] Plaintiffs then argue that the evidence presented at trial satisfies the requisite standard for the award of emotional distress

[191] *Id.* at 44.
[192] *Id.* at 45.
[193] *Id.* at 45-46. LSU also requests that, if this Court orders remittitur, and Plaintiffs do not accept such remittitur, the Court order a new trial on damages only.
[194] R. Doc. 665 at 36-37.
[195] *Id.* at 37-38.

damages on several grounds, including Muslow's testimony regarding the specific and lasting physical consequences she suffers as a result of the emotional distress she endured following her contract recession (*i.e.*, elevated blood pressure, an inability to return to LSU facilities unaccompanied, a lack of desire to leave her home, being avoided by coworkers, mocking by colleagues, and a "destruction of [her] professional identity");[196] Cunningham's testimony of "distressing symptoms" (*i.e.*, a feeling a being in limbo, "career grief shock," negative impacts to "her dynamic with her children," fear of permanent professional consequences, and the guilt she felt when seeing the way Muslow had been treated);[197] and corroborating witness testimony of three coworkers (*i.e.*, Nicole Honoree's testimony that the atmosphere at the university became more hostile, that she witnessed "observable physical deterioration," and that Muslow had not been eating and did not look well; Christine Manalla's testimony that "avoidance atmosphere [existed] around Plaintiffs' office," that Hollier made remarks in the general office area that amounted to counting down the days Plaintiffs would remain employed at LSUHSC-NO, and that the Plaintiffs were anxious and felt disrespected; and the testimony of Terrilyn Cunningham that she withdrew from her friendship with Muslow out of fear of retaliation, that Muslow had gotten thinner and was not herself, and that she observed the same changes in Meredith Cunningham).[198]

Plaintiffs further argue that the cases to which LSU cites for its proposition that the jury's damages award is too high are insufficient to establish excessiveness of the awards. First, Plaintiffs note that six of the cases are insufficient to use as benchmark verdicts for the maximum recovery rule, as five are unpublished and one is a bench trial damages award to which the maximum recovery rule never applied.[199] Second, Plaintiffs also submit that the three cases to which LSU

---

[196] *Id.* at 39-40.
[197] *Id.* at 40.
[198] *Id.* at 40-41.
[199] *Id.* at 42.

cites with the lowest verdict awards[200] were remitted "because the emotional distress evidence was legally insufficient," not necessarily because the amount of damages was too high.[201] Then, say Plaintiffs, the evidence they elicited at trial with respect to their emotional distress was specific and extensive, and contains none of the same deficiencies as did the evidence in those cases.[202] Third, Plaintiffs posit that remittitur is not appropriate based on "'the mere fact that an award is greater or less than awards in comparable cases,'"[203] and they provide several cases in which verdicts, although lower than the jury award in this case, were upheld based on evidence of emotional distress damages that Plaintiffs maintain either is less credible or reflects less severe distress.[204] Accordingly, say Plaintiffs, those cases support upholding the jury award in this case, as the record here has more credible evidence of more severe emotional distress.[205] Fourth, Plaintiffs submit that the jury's adoption of their counsel's suggested award of damages does not necessarily indicate that the jury was motivated by passion or prejudice, as the jury is presumed to have followed the Court's instructions, and that even if such adoption did suggest passion or prejudice on the part of the jury, the remedy would be a new trial, not remittitur.[206] And finally, Plaintiffs urge that LSU has failed to meet its burden to justify remittitur, and the command for deference to the jury requires that the jury award be left undisturbed.[207]

In reply, LSU reiterates its position that the identical awards of $750,000 for each of the Plaintiffs are excessive because *Harris*, the 2024 case in which the Fifth Circuit applied the

[200] *Vadie,* 218 F.3d 365; *Patterson,* 90 F.3d 927; and *Picou*, 2002 WL 31016468.
[201] *Id.* at 42-43.
[202] *Id*.
[203] *Id.* at 43 (quoting *Thomas*, 297 F.3d at 376 (Dennis, J., concurring)).
[204] *Id.* at 43-44 (citing *Williams*, 218 F.3d at 486-87; *Forsyth v. City of Dall.*, 91 F.3d 769, 774 (5th Cir. 1996); *Salinas*, 286 F.3d at 829-32; *Giles*, 245 F.3d at 487-89; *Thomas*, 297 F.3d at 370-72; and *Harris*, 92 F.4th at 300-01).
[205] *Id.*
[206] *Id.* at 44-45.
[207] *Id.* at 45.

maximum recovery rule to sustain damages of only $248,619.57, included stronger evidence of emotional distress.[208] And LSU argues that certain of Plaintiffs' cited authority is distinguishable.[209] It notes that Plaintiffs do not bother to identify a single case in which a comparable verdict was awarded for emotional distress damages resulting from employment retaliation.[210] LSU then says that Plaintiffs' arguments that the verdict form and jury instructions prevented duplicative recovery or any award of non-actionable damages do not speak to a challenge to the excessiveness of the award.[211] Finally, LSU repeats that the matching $750,000 awards represent an adoption of "a rhetorical number" and, when considering that "the narrow rescission claim affected Plaintiffs under different salaries, FTE status, and offer terms," further indicate the excessiveness of the awards.[212]

Under Rule 59(a)(1)(A), a court may "grant a new trial when the jury's award is excessive and against the great weight of the evidence in a manner that suggests bias or prejudice." *Gaddy v. Taylor Seidenbach, Inc.*, 446 F. Supp. 3d 140, 159 (E.D. La. 2020) (citing *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992)), *aff'd sub nom., Adams v. Ethyl Corp.*, 838 F. App'x 822 (5th Cir. 2020). If, however, the damages award is "merely excessive or so large as to appear contrary to right reason … remitter, not a new trial," is the appropriate remedy. *Brunnemann*, 975 F.2d at 178. "An award is excessive only if it is greater than the maximum amount the trier of fact could properly have awarded." *Moore v. M/V Angela*, 353 F.3d 376, 384 (5th Cir. 2003).

Courts in the Fifth Circuit utilize a "maximum recovery rule" to determine whether a jury's general damages award is excessive. *Harris*, 92 F.4th at 299 & n.10; *Puga v. RCX Sols., Inc.*, 922

[208] R. Doc. 667 at 8-9.
[209] *Id.* at 9.
[210] *Id.* at 9 n.38.
[211] *Id.* at 9.
[212] *Id.* at 9-10 (quote at 10).

F.3d 285, 297 (5th Cir. 2019). "The inquiry looks to other published decisions from the relevant jurisdiction … involving comparable facts." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019). "'The relevant jurisdiction for federal discrimination law can only mean cases decided by this court [*i.e.*, the Fifth Circuit].'" *Harris*, 92 F.4th at 299 (quoting *Salinas*, 286 F.3d at 832). Although "[p]ast verdicts can provide an objective frame of reference," they do not control, because "[w]hen determining the excessiveness of a jury verdict, courts must review each case on its own facts." *Puga*, 922 F.3d at 297 (quotations omitted). The maximum recovery rule allows a verdict that is less than or equal to 150% of the highest inflation-adjusted awards in analogous, published cases from the relevant jurisdiction. *Longoria*, 932 F.3d at 365, 367.

The Court's remittitur inquiry at step one, then, is the question of excessiveness. It is not lost on the Court that "[t]here is a strong presumption in favor of affirming a jury award of damages." *Harris*, 92 F.4th at 298. But, having examined the facts and circumstances of this case, coupled with a careful review of the prior awards in comparable cases in this Circuit, the Court is persuaded that the jury's damages award "'exceeds the bounds of any reasonable recovery.'" *Brunnemann*, 975 F.2d at 178 (alteration omitted) (quoting *Hansen v. Johns-Manville Prods. Corp.*, 734 F.2d 1036 (5th Cir. 1984)).

As for the facts and circumstances of this case, the extent of the emotional damages evidence came from Muslow's and Cunningham's own testimony, as well as that of three corroborating witnesses – Nicole Honoree, Christine Manalla, and Terrilyn Cunningham. First, Muslow explained that she was "shocked" and "stunned" when she received notification from Skinner that her employment offer had been rescinded.[213] Muslow testified that coworkers, including some with whom she had had relationships for years, began to avoid her out of concern

[213] R. Doc. 658 at 159-60.

that they, too, would be retaliated against.[214] She described such avoidance as "hurtful."[215] She explained that, as a result of her emotional distress, she does not sleep well, feels nervous and uncomfortable, and struggles with self-esteem issues.[216] She explained that, because she felt that LSUHSC-NO "was [her] identity," after she realized she would no longer work there, she became antisocial and would rarely leave her home.[217] She was too distressed to return to the LSUHSC-NO campus, where the majority of her doctors were, so she either stopped visiting her healthcare providers or changed them.[218] She experienced high blood pressure when she visited the campus.[219] And she told the jury that she was absent "mentally" from her children's lives and "fe[lt] like a failure" because she was not there for her family in the way she felt she should have been.[220] Further, Muslow explained that, in order for her to receive certain retirement benefits, LSUHSC-NO extended the end date for her position to July 15, 2019, rather than the originally anticipated end date of June 30, 2019, but the interim prospect of losing the benefits was worrisome.[221] And according to Muslow, although LSUHSC-NO would normally not require an employee whose employment would soon end to come into the office, they required her to go into work, which meant Muslow could not celebrate her sixtieth birthday with her parents in Shreveport.[222] Muslow further testified that, as it turned out, that planned trip would have been the last time she or her family could "s[ee her father] healthy … where he was himself" because the next time she was able to see him, several months later in October, he had become ill, and he

[214] *Id.* at 185-86.
[215] *Id.* at 187.
[216] *Id.*
[217] *Id.* at 188.
[218] *Id.* at 188-89.
[219] *Id.* at 189.
[220] *Id.* at 189-90.
[221] *Id.* at 175.
[222] *Id.* at 175-77.

died shortly afterwards.[223] Muslow wept during the testimony about her inability to travel to Shreveport in the summer of 2019 to see her parents.[224]

Plaintiff Cunningham testified that, after her OGC employment offer had been rescinded, she "fe[lt] physically sick," "unhuman," and of little worth to LSUHSC-NO.[225] When asked by counsel about her "stress levels," Cunningham explained that she was "very familiar with cortisol," evidence that she had endured stress for at least some time as a result of the rescission and that she had been "grieving a career," although she explained that she loves her current job.[226] She attested that her stress caused her to be "short" and "not present" with her children, which she is still trying to make up to them.[227] Cunningham also testified that the LSU system generally had been part of her identity, as she received her undergraduate degree from LSU in Baton Rouge, and following the rescission, "that little part of [her] is dead and gone" and she will "never get it back."[228] Cunningham likened the shock she felt when receiving Skinner's email recounting the events leading to the rescission to a lesser version of the shock she felt when her father passed away unexpectedly – like "electricity flowing through your veins, and your brain kind of turns off."[229] She stated that people at work treated her like a "toxic waste dump[]" and would avoid her, which made her feel "humiliated."[230] She explained that, as of the date of her trial testimony, she was still not "over" the rescission.[231]

---

[223] *Id.* at 177.
[224] *See id.* at 178 (indicating that Plaintiffs' counsel asked Muslow if she needed to take a break shortly after testifying about her father's death).
[225] R. Doc. 659 at 200.
[226] *Id.* at 183-84, 201 (quotes at 201).
[227] *Id.* at 201-02 (quotes at 201).
[228] *Id.* at 202-03.
[229] *Id.* at 183.
[230] *Id.* at 191.
[231] *Id.* at 192.

Nicole Honoree testified that Muslow seemed significantly affected, that she "appeared to stop eating," and she "didn't look well."[232] Honoree corroborated Muslow's testimony that Muslow was worried about her family and her retirement eligibility, and she also testified that Muslow became more isolated at work.[233] Honoree did not testify to Cunningham's emotional distress damages. Christine Manalla testified that the rescission was "incredibly stressful for [Muslow]," "took a toll on [Muslow] physically," and made Muslow "fe[el] very disrespected" and isolated.[234] She explained that people avoided both Plaintiffs at work.[235] And she said that Cunningham was similarly affected by the rescission: Cunningham was "stressed, anxious, worried, disrespected" and "fe[lt] … tossed off."[236] Finally, Manalla testified that Hollier would make comments about Plaintiffs – that they were "'not really [his] problem anymore'" – out loud in the general office area.[237] Terrilyn Cunningham testified that, following the rescission, the Plaintiffs were left off emails and not involved in the same work they would normally be involved in;[238] that people around the office, including herself, did not want or were afraid to engage with Muslow;[239] that Muslow became thinner and stopped eating certain foods she loved, like French fries;[240] that Muslow's self-confidence began waning;[241] that her friendship with Muslow deteriorated;[242] and that Meredith Cunningham became more isolated at work and stopped smiling as much as she used to.[243]

---

[232] *Id.* at 64.
[233] *Id.* at 64-65.
[234] *Id.* at 91.
[235] *Id.* at 92.
[236] *Id.* at 92-93 (quotes at 93).
[237] *Id.* at 94.
[238] *Id.* at 117.
[239] *Id.* at 118-19.
[240] *Id.* at 119.
[241] *Id.* at 120.
[242] *Id.* at 121.
[243] *Id.* at 120-21.

The Court, after considering comparable, published cases in this district, is persuaded that the jury's award is clearly excessive.[244] In *Harris*, the plaintiff Harris had been employed by FedEx, but was terminated after she made a series of race-discrimination complaints to HR. *Harris*, 92 F.4th at 291-92. After a trial, the jury found that FedEx had retaliated against Harris in violation of Title VII and awarded her $1,160,000 for past and future pain and suffering, inconvenience, and mental anguish, *id.* at 293, which the Fifth Circuit reduced to $300,000, the compensatory damages cap for Title VII claims. *Id.* at 296. At trial, the jury heard testimony from Harris "about the emotional distress she suffered from [her supervisor's] conduct and her termination. Specifically, Harris stated she suffered from stress and anxiety, which resulted in dry heaving; she took medication and sought professional help; she had trouble sleeping; she gained weight; and she generally lost her enjoyment of life." *Id.* at 300. Further, Harris's emotional distress testimony was corroborated by her pastor, cousin, and a long-time friend, who provided testimony that "it was like the bottom fell out [Harris] was so emotionally destroyed"; "was having to go to the doctor for more stomach issues"; "was gaining weight"; "had a sadness about herself"; and "wasn't the optimistic hopeful friend" she had once been. *Id.* at 300-01 (quotes at 301) (alterations omitted). The Fifth Circuit explained that Harris had provided sufficient evidence of emotional distress such that more than nominal damages were appropriate, but that "[her] symptoms do not warrant a $300,000 compensatory damage award." *Id.* at 301 (citing *Giles*, 245 F.3d at 489). Finding *Salinas* (a 2002 case) and *Giles* (a 2001 case) to be the most comparable cases, the court found that the evidence supported a compensatory damages award equal to the

[244] The parties spend a substantial amount of time in their briefing on remittitur discussing whether the evidence was sufficient to support any award of damages for the specific claim at issue – the rescission of Plaintiffs' contracts. Because the Court addressed the merits of this argument in Section II.A.2 above, it does not now retread this ground.

awards in those cases – $100,000 – and, after adjusting for inflation and applying the maximum recovery rule, remitted Harris's compensatory damages award to $248,619.57. *Id.*

In *Salinas*, Romeo Salinas was a Customs Service agent who, after filing three EEOC complaints, was passed over for a promotion. 286 F.3d at 829. The jury found that the government had retaliated against him and awarded $1,000,000 in compensatory damages, which the district court reduced to $300,000 in accordance with Title VII's damages cap. *Id.* Salinas testified to substantial paranoia about further retaliation – specifically, "that it caused him to buy an alarm for his house and reduced him to a constant state of fear, always looking over his shoulder and not even allowing his wife to get the mail by herself"; to use "lots" of sick leave; to make more than 70 visits to physicians as a result of health problems brought about by his emotional harm, confirmed by an award of $16,000 in medical damages; and to experience strain on his family relationships. *Id.* at 832-33. His wife corroborated his testimony. *Id.* at 833. The Fifth Circuit found that such evidence was not "enough … to support an award of $300,000" in emotional damages. *Id.* The *Salinas* court found $100,000 to be "the proper award" supported by the evidence and remitted the jury's award to $150,000 in compensatory damages upon application of the maximum recovery rule.[245] *Id.*

The Court finds that the evidence of Plaintiffs' emotional distress in this case cannot sustain a damages award of $750,000 to each plaintiff. The evidence Plaintiffs presented is strikingly similar to the evidence in *Salinas* and *Harris* – including evidence of physical manifestations of emotional distress, deteriorating family relationships, and social withdrawal, a large part of which was corroborated by other witnesses – which the Fifth Circuit held in those cases could not sustain damages awards of $300,000. And although Plaintiffs suggest that remittitur is not appropriate

[245] On a similar record of emotional distress testimony, the Fifth Circuit in *Giles* remitted a $400,000 jury award of compensatory damages to $100,000. 245 F.3d at 489.

based on "'the mere fact that an award is greater or less than awards in comparable cases,'"[246] this Court is convinced, based on its review of the most comparable cases, that the jury's compensatory damages award to Plaintiffs "exceeds th[e] bounds of reason under the facts of the case."[247] *Thomas*, 297 F.3d at 374 (Dennis, J., concurring).

"Having found that the jury's award was excessive, the Court [at step two of the remittitur inquiry] must now determine the highest amount the jury could have awarded based on the evidence without abusing its discretion." *Gaddy*, 446 F. Supp. 3d at 161. Again, *Harris*, along with the principal cases upon which it relies (*Salinas* and *Giles*), serves as the best guide – if not controlling precedent. As these cases all resulted in determinations that the appropriate award was $100,000, this Court follows suit, finding that a more appropriate award in this case, given the analogous facts and circumstances, is $100,000. Because the award in *Harris* was based off the analogous award in *Salinas*, published in April 2002, the Fifth Circuit there adjusted the award to $165,746.38 to account for inflation from 2002 through the date the jury returned its verdict and then multiplied that number by 150%, yielding a compensatory award of $248,619.57. Likewise, this Court will adjust the *Salinas* award of $100,000 for inflation through May 2026, the date the jury returned its verdict, using the CPI Inflation Calculator from the Bureau of Labor Statistics. *See Harris*, 92 F.4th at 301 & n.14. That amount is $186,386.54, and when multiplied by 150% pursuant to the maximum recovery rule "[t]o avoid substituting our judgment for that of the jury,"

[246] R. Doc. 665 at 43 (quoting *Thomas*, 297 F.3d at 376 (Dennis, J., concurring)).

[247] Further, the Fifth Circuit has since explained that the distinction of whether to apply the maximum recovery rule at the first step – determination of whether the award is excessive – or the second step – remitting the damages – has no practical effect on cases decided under federal law. To be sure, the *Harris* court explained that, although the Fifth Circuit "[s]ometimes … appl[ies] maximum recovery at the outset to determine whether the damages are excessive" and "[o]ther times … use[s] the rule only to determine how much of a reduction is warranted after deciding the award is excessive," such inconsistency has no effect on the analysis of cases decided under federal law. 92 F.4th at 299 n.10 (quotations omitted).

*Giles*, 245 F.3d at 489, each Plaintiff's award is remitted to $279,579.83, as the highest reasonable award for this case.

**D. Plaintiffs' Rule 59(e) Motion to Alter or Amend Final Judgment**

The remitted jury award is below Title VII's compensatory damages cap of $300,000. *See* 42 U.S.C. § 1981a(b)(3); *Black v. Pan Am. Lab'ys, L.L.C.*, 646 F.3d 254, 264 (5th Cir. 2011) (holding that the Title VII damages cap applies per litigant). Accordingly, as prejudgment interest is available under Title VII when appropriate, *see Thomas*, 297 F.3d at 372, the Court must first determine whether prejudgment interest is appropriately applied to the jury's award in this case to reflect "the time value of money and … to make the plaintiff whole." *Id.* If so, the Court then sets an appropriate interest rate. Finally, because the remitted award plus prejudgment interest may exceed Title VII's compensatory damages cap, the Court addresses LSU's argument that prejudgment interest is unavailable for damages in claims under the Equal Pay Act because Plaintiffs also prevailed on their EPA claims and there is no damages cap in such cases.

**1. The parties' arguments**

Plaintiffs request prejudgment interest because "to disallow prejudgment interest would work an injustice, particularly considering the extensive emotional distress that Plaintiffs suffered" in connection with the facts underlying the litigation "[a]nd the nearly seven years that this matter has remained pending."[248] Plaintiffs suggest that either Louisiana's judicial interest rate of 6% or the average of the federal post-judgment interest rate and the Louisiana judicial interest rate would be appropriate in this case.[249]

In its opposition, LSU takes two alternative positions. In support of its primary position – that prejudgment interest is unavailable or inappropriate in this case – LSU argues first that, for

[248] R. Doc. 653-1 at 2.
[249] *Id.* at 2-3.

two reasons, Plaintiffs have not shown they are entitled to prejudgment interest.[250] LSU first reasons that, because prejudgment interest is not available for future emotional harms, and the jury award does not distinguish between damages awarded for past or future emotional injury, Plaintiffs have not carried their burden on prejudgment interest.[251] LSU then reasons that, based on the language in the jury verdict form, the jury's damages award already includes the amount the jury deemed "necessary to fairly compensate Plaintiffs in present dollars."[252] According to LSU, then, awarding prejudgment interest would result in a windfall to Plaintiffs.[253] LSU's second argument in opposition is that prejudgment interest, insofar as it is intended to compensate a plaintiff for the time value of money, does not serve its intended purpose when applied to a jury verdict for emotional distress damages only, which is meant to compensate for emotional injury rather than provide a plaintiff money that had effectively been wrongly retained by the defendant.[254] Reiterating its contention that the jury awarded Plaintiffs an amount that it found fully compensated them for their injuries, LSU says that "awarding prejudgment interest would stretch the 'make-whole' rationale [of prejudgment interest] beyond its intended bounds."[255] Third, LSU argues in its opposition that, because the verdict did not establish when Plaintiffs' injuries accrued, the date from which interest should begin accruing is unclear and an award of interest would thus be speculative.[256] Fourth, LSU says that, because the jury's verdict did not make clear the statute under which it awarded damages, and because prejudgment interest is not available under 29 U.S.C. § 216(b) (a portion of the Fair Labor Standards Act, or "FLSA," incorporated into the EPA, one of the statutes under which their claims arise), the Court would have to speculate about this

---

[250] R. Doc. 664 at 4-6.
[251] *Id.* at 4-5.
[252] *Id.* at 6.
[253] *Id.*
[254] *Id.* at 6-7.
[255] *Id.* at 7.
[256] *Id.* at 9-10.

question to establish that Plaintiffs are entitled to prejudgment interest.[257] LSU concludes that, to the extent Plaintiffs are theoretically permitted to recover more than Title VII's statutory damages cap of $300,000 by nature of having an identical uncapped claim under the EPA, they should be subject to the EPA's bar on prejudgment interest.[258] Finally, LSU's alternative position is that, if prejudgment interest is awarded, the Court should award prejudgment interest at the federal post-judgment interest rate, as, maintains LSU, the Louisiana state prejudgment interest rate or an average of the federal post-judgment interest rate and the Louisiana state prejudgment interest rate would create a windfall to Plaintiffs.[259]

Plaintiffs argue in their reply that LSU's opposition rests on a "near categorical premise" already rejected by the Fifth Circuit – namely, that emotional distress damages are too intangible to support prejudgment interest – and contend that under *Thomas v. Texas Department of Criminal Justice*, 297 F.3d 361 (5th Cir. 2002), prejudgment interest is available for past emotional injuries under both Title VII and the FLSA (and, thus, the EPA).[260] Plaintiffs assert that LSU's reliance on certain decisions that turned on "an explicit present-cash-value formulation 'if paid now in cash'" (that does not appear in the jury verdict form or jury charge in this case) is misplaced.[261] They argue that LSU's "speculative accrual" theory is simply a generic critique of all emotional distress awards which the holding in *Thomas* forecloses, and that requiring a precise accrual date would impose an unworkable standard on juries.[262] Plaintiffs defend July 22, 2019 – the filing date – as a conservative accrual date, citing trial testimony that placed the most acute emotional distress in the months immediately following the February 2019 rescission of Plaintiffs' contracts,

[257] *Id.* at 10-12.
[258] *Id.* at 12-13.
[259] *Id.* at 13-15.
[260] R. Doc. 666 at 1-2 (quote at 1).
[261] *Id.* at 3-4.
[262] *Id.* at 4-5.

before the complaint was even filed.[263] They further contend that once the jury fixed a dollar amount, the damages ceased to be "intangible," since the judgment itself supplies the sum certain on which interest can run.[264] On the verdict form's structure, Plaintiffs note that both the form and jury charge were phrased in past tense and contained only a single passing reference to future harm, with no present-value or discounting instruction anywhere in the record.[265] Plaintiffs argue that LSU waived any objection to the verdict form's structure by failing to raise it at the charge conference and by proposing a substantially similar form itself.[266] They also argue that the decision in *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062 (5th Cir. 2016), undermines LSU's § 216 case law, since *Pineda* extended FLSA retaliation remedies to include emotional distress damages and most of LSU's cited authority predates that decision.[267] Plaintiffs maintain that because lost wages and liquidated damages were unavailable at trial, there is no double-recovery concern as addressed by the Title VII/EPA overlap regulation, 29 C.F.R. § 1620.27(b).[268] Finally, Plaintiffs reiterate that the interest rate is discretionary, and they ask the Court to grant the motion and award interest from July 22, 2019, through entry of judgment at whatever rate the Court finds equitable.[269]

**2. Whether prejudgment interest is required to make plaintiffs whole**

In Title VII retaliation cases, "[p]rejudgment interest should apply to all past injuries, including past emotional injuries." *Thomas*, 297 F.3d at 372. Prejudgment interest is meant to compensate the plaintiff for "the time value of money" and is intended "to make the plaintiff whole." *Id.* Where damages in a "certain sum" are awarded, courts should award prejudgment

[263] *Id.* at 5-6.
[264] *Id.*
[265] *Id.* at 6-7.
[266] *Id.* at 7-8.
[267] *Id.* at 8-9.
[268] *Id.* at 9-10.
[269] *Id.*

interest to the plaintiff. *Id.* However, prejudgment interest is unavailable for future harms. *Id.* In this case, the Court finds that the entire jury award relates to the Plaintiffs' past emotional harms and that, consequently, they are entitled to prejudgment interest on the entire award.

There was virtually no testimony by either Muslow or Cunningham of future emotional damage. Muslow's testimony did not focus at all on emotional (as opposed to physical) harms she may experience in the future or an expectation that any of her distress will persist. Cunningham – although she arguably testified to the permanence of some of her injuries, including that she may never get over the rescission and that she cannot take back the harm she did to her children – similarly did not testify to any particular ongoing or future distress. Thus, although the jury was instructed that it could award compensatory damages for injuries "that Plaintiffs are reasonably likely to suffer in the future,"[270] the Court sees no material evidence of future emotional harm for which the jury could have compensated the Plaintiffs. And LSU does not specifically point to any. A common-sense understanding of Muslow's and Cunningham's testimony, when viewed as a whole, reveals that the verdict was for past damages (to which prejudgment interest is applicable).

Although LSU argues that prejudgment interest should be denied because there is no ascertainable accrual date of such damages, the Fifth Circuit's decision in *Thomas* forecloses this argument. The Court there noted that "[p]rejudgment interest should apply to all past injuries, including past emotional injuries," and that "[c]ourts should award prejudgment interest whenever a certain sum is involved." 297 F.3d at 372. The court in *Thomas* never concluded that Thomas's $30,000 award for past emotional harms corresponded to some precise injury-onset date. It simply found that once the jury determined that the plaintiff suffered past harm and fixed the amount, prejudgment interest had to be awarded on those past injuries. *Id.*

[270] R. Doc. 640-2 at 8-9 (quote at 9).

LSU's argument that the jury's verdict reflects the present value of the Plaintiffs' injuries also fails. As Plaintiffs point out, the two cases to which LSU cites for the proposition that a verdict already reflected the present value of a plaintiff's injuries turned on the specific language in the verdict form. *See Grandstaff v. City of Borger*, 846 F.2d 1016, 1018-19 (5th Cir. 1988); *Aetna Ins. Co. v. Paddock*, 301 F.2d 807, 813 (5th Cir. 1962). In those cases, the court asked the respective juries to identify a sum of money, "if paid now in cash," that would fairly compensate the plaintiffs. Here, the jury was asked only "the total amount of money that fairly compensates" each plaintiff for her respective injuries.[271] Importantly, unlike the two cases which LSU cites, there was no language that expressly directed the jury to consider the present worth of past harm. *See Grandstaff*, 846 F.2d at 1019 (noting that the phrase "if paid now in cash" is used in Texas practice "to direct the jury's attention to the element of present value in a claim for future damages"). The Court declines to read such language into the jury verdict form's direction that the jury award an amount of damages, if any, that "fairly compensates" the Plaintiffs. Again, prejudgment interest should apply to all past injuries, including past emotional injuries. Because neither the jury charge nor the verdict form encouraged the jury to consider present-value, and because the Court will not assume that ordinary compensatory-damages language does so as would preclude the addition of prejudgment interest for past damages, the Court determines that Plaintiffs are entitled to prejudgment interest on their damages award.

**3. The applicable prejudgment interest rate**

Having determined that prejudgment interest is available for at least a portion of Plaintiffs' claims, and that Plaintiffs are entitled to prejudgment interest to make them whole, the Court now turns to setting an applicable prejudgment interest rate. At first, Plaintiffs request the Louisiana

[271] R. Doc. 641 at 1-2.

judicial interest rate from 2019, or alternatively, an average of the Louisiana judicial interest rate and the federal post-judgment interest rate.[272] Plaintiffs request prejudgment interest from the date of judicial demand.[273] LSU responds that the federal post-judgment interest rate is more appropriate, as there are only federal claims in play here.[274] Plaintiffs reply that they would be satisfied with any prejudgment interest rate this Court deems appropriate.[275]

In light of the discussion below, the Court need not select a particular prejudgment interest rate because any such selection is unnecessary to the final result.

**4. Whether prejudgment interest is available for EPA claims**

Compensatory damages under Title VII are statutorily capped at $300,000 per plaintiff, inclusive of prejudgment interest. *See, e.g.*, *Johnson v. Sw. Rsch. Inst.*, 384 F. Supp. 3d 722, 727 (W.D. Tex. 2019); *Marquez v. TE Connectivity Corp.*, 2022 WL 17494655, at *11 (W.D. Tex. Dec. 7, 2022). Given that the remitted award nears $280,000, the addition of prejudgment interest – by any of the requested measures applied from a start date of July 2019 – is certain to take the award over Title VII's statutory damages cap. Accordingly, to determine whether Plaintiffs can recover the portion of their award, inclusive of prejudgment interest, that exceeds $300,000, it is necessary to resolve whether prejudgment interest is available in claims brought pursuant to the EPA – a point which the parties dispute.

In *Reich v. Tiller Helicopter Services, Inc.*, 8 F.3d 1018, 1031 (5th Cir. 1993), the Fifth Circuit explained that its practice, for years, has been to prohibit the recovery of prejudgment interest in actions brought under § 216 – the statutory predicate for EPA damage awards. It explained that such precedent was based on the rationale of a Supreme Court decision, *Brooklyn*

---

[272] R. Doc. 653-1 at 2-3.
[273] *Id.*
[274] R. Doc. 664 at 13-14.
[275] R. Doc. 653 at 10.

*Savings Bank v. O'Neil*, 324 U.S. 697, 715-16 (1945), which reasoned that where liquidated damages were awarded in actions under § 216, permitting recovery of prejudgment interest would result in a windfall to plaintiffs. *Reich*, 8 F.3d at 1031. The *Reich* court noted that it "has consistently refused to allow prejudgment interest in actions brought under § 216 regardless of whether liquidated damages were actually awarded." *Id.* This Court is not aware of any decisions in this Circuit since *Reich* – nor do Plaintiffs point to any – in which a court has awarded prejudgment interest in an action under § 216(b).

Plaintiffs represent that the Fifth Circuit's 2016 decision in *Pineda* undermines LSU's proposition that "FLSA retaliation remedies do not include prejudgment interest for emotional distress damages awards."[276] Plaintiffs' reading of *Pineda*, while not unreasonable, is overly broad. Despite its rationale – "the FLSA's broad authorization of 'legal and equitable relief'" – *Pineda*'s holding can more fairly be limited to allowing recovery for emotional injuries that an employee suffers as a result of employer retaliation, rather than opening the door to all other kinds of remedies. 843 F.3d at 1066. The Court declines Plaintiffs' particular invitation here to read the narrow holding of *Pineda* to have overturned the Fifth Circuit's consistent practice predating *Reich* of disallowing prejudgment interest for damages recovered under § 216 simply because the *Pineda* court recognized that the FLSA broadly authorizes relief.

As a result, because Title VII's compensatory damages are capped at $300,000, and prejudgment interest is not available in actions under § 216, thus leaving the EPA award at $279,579.83, each Plaintiffs' Title VII award is the greater of the two, inclusive of prejudgment interest, and will be capped at $300,000.

---

[276] R. Doc. 666 at 7-8.

## III. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that LSU's motion for judgment as a matter of law (R. Doc. 656) is DENIED.

IT IS FURTHER ORDERED that LSU's motion for a new trial (R. Doc. 656) is DENIED.

IT IS FURTHER ORDERED that LSU's motion for remittitur (R. Doc. 656) is GRANTED, and Plaintiffs' damages are remitted to $279,579.81 as to Katherine Muslow and $279,579.81 as to Meredith Cunningham. Plaintiffs must file either an acceptance of the remittitur or notice of intent to retry the case within 21 days of the issuance of this Order & Reasons.

IT IS FURTHER ORDERED that Plaintiffs' Rule 59(e) motion to alter or amend the final judgment to include prejudgment interest (R. Doc. 653) is GRANTED. Plaintiffs are awarded prejudgment interest (whether at the federal or state interest rate) from the date of judicial demand (July 22, 2019), through the date of the final judgment (May 7, 2026), up to the Title VII compensatory damages cap of $300,000 (that is, prejudgment interest is awarded in an amount that will bring the total damages figure to an amount that will exceed the statutory cap and thus is capped at $300,000).

IT IS FURTHER ORDERED that, if Plaintiffs elect to accept the remitted award, the parties must jointly submit to the Court a proposed final judgment within five days of the date of Plaintiffs' notification of their choice to the Court.

New Orleans, Louisiana, this 19th day of August, 2026.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE